IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. Jennifer L. GRIFFITH and Sarah CARVER, | | |
| Plaintiffs | | |
| v. | Civil No. _____ | |
| Eric C. CONN, ERIC CONN, P.S.C., and David B. DAUGHERTY, | **FILED UNDER SEAL** | |
| Defendants. | | |

**COMPLAINT**

The United States of America, by and through its qui tam Relators, Jennifer L. Griffith (Griffith) and Sarah Carver (Carver) (collectively, the Relators) brings this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, et seq., against Eric Conn, Eric Conn, P.S.C., and David B. Daugherty, to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the United States and the Relators, and for their Complaint allege:

**Introduction**

This is an action to recover fraudulently obtained disability benefits and

attorneys' fees paid by the United States of America to Eric C. Conn and Eric Conn, P.S.C.

(collectively "Conn").  The disability benefits and attorneys' fees obtained by Conn

which are the subject of this qui tam all originate from a fraudulent scheme coordinated

between Conn and a social security administrative law judge named David B. Daugherty

("Daugherty").  The fraudulent scheme involved Daugherty wrongfully taking control of

a high number of Conn's clients' Social Security disability claims from randomly assigned

administrative law judges and conducting sham proceedings, resulting in the Conn

clients overwhelmingly and fraudulently obtaining successful results. For example,

during the fiscal year 2010 Daugherty approved 99.7% of all Social Security claims while

the national average of successful claims was approximately 62%. The fraudulent

scheme resulted in millions of dollars in fraudulently obtained attorneys fees to Conn.

**Parties**

1.  Relator Jennifer L. Griffith was, from September 2001, until her resignation

    effective November 2, 2007, an employee of the Social Security Administration at

    the agency's Huntington, West Virginia, Hearing Office in the Office of Disability

    Adjudication and Review (ODAR). Until her resignation, Ms. Griffith was a Master

Docket Clerk with responsibility for managing the Huntington office's docket of Social Security disability cases, as described in more detail below.

2. Relator Sarah Carver has been an employee of the Social Security Administration at the Huntington Hearing Office since September 2001. She is a Senior Case Technician and is the Union Steward of the American Federation of Government Employees at the Huntington Hearing Office.

3. Plaintiff United States of America, acting through the Department of Health and Human Services (HHS), and its Social Security Administration administers the Social Security disability programs (described, below, in Paragraphs 11 to 13).

4. Defendant Eric C. Conn is an attorney licensed to practice law in the Commonwealth of Kentucky, and practices law in his firm, Eric Conn, P.S.C., a professional service corporation incorporated under the laws of the Commonwealth of Kentucky, with offices in Stanville and Ashland, Kentucky. Conn's and Eric Conn, P.S.C.'s practice consists primarily of representing claimants for Social Security disability payments under Title II and Title XVI (as described below, in Paragraphs 11 to 13).

5. David B. Daugherty was, until on or about July 13, 2011, an Administrative Law Judge employed by the Social Security Administration at the Huntington Hearing Office, with responsibilities to review and issue decisions on appeals from denials

of reconsideration, as described in Paragraphs 17 to 20, below. In May 2011, Daugherty was placed on administrative leave as a result of an investigation by the Office of Inspector General of the Social Security Administration, and chose to retire effective June 13, 2011.

## Jurisdiction and Venue

6. Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

7. The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 et seq., and complained of herein took place in part in this District and the Defendants transacted business in this District:

   a. At all times relevant to this Complaint, Conn and Eric Conn, P.S.C., have operated law firms in this District, in Stanville and Ashland, Kentucky. In the course of representing Social Security disability claimants, Conn and Eric Conn, P.S.C., filed applications, requests for reconsideration, and requests for a hearing with Social Security Administration Field Offices in this District.

    b. On numerous occasions from at least 2002 to mid-2011, Daugherty

       conducted hearings in this District involving claimants represented by

       Conn and Eric Conn, P.S.C.

    c. The United States made payments for disability benefits under Titles II and

       XVI of the Social Security Act (as described, below, in Paragraphs 11 to 13)

       to persons and at financial institutions within this District.

8. Pursuant to 31 U.S.C. § 3730(b)(2), the Relators prepared and will serve with the

original Complaint on the Attorney General of the United States, and the United

States Attorney for the Eastern District of Kentucky, a statement of all material

evidence and information currently in their possession and of which they are the

original source. This disclosure statement is supported by material evidence

known to the Relators at the time of filing establishing the existence of

Defendants' false and fraudulent claims. Because the disclosure statement

includes attorney-client communications and work product of Relators'

attorneys, and was submitted to those Federal officials in their capacity as

potential co-counsel in the litigation, the Relators understand this disclosure to

be confidential and exempt from disclosure under the Freedom of Information

Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## Background

### *The False Claims Act*

9.  The False Claims Act provides, in pertinent part:

(a) Liability for certain acts.—

(1) In general.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410),

plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions.—For purposes of this section—

  (1) the terms "knowing" and "knowingly" —

    (A) mean that a person, with respect to information—

      (i) has actual knowledge of the information;

      (ii) acts in deliberate ignorance of the truth or falsity of the information; or

      (iii) acts in reckless disregard of the truth or falsity of the information; and

    (B) require no proof of specific intent to defraud;

  (2) the term "claim"—

    (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

      (i) is presented to an officer, employee, or agent of the United States; or

      (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

        (I) provides or has provided any portion of the money or property requested or demanded; or

        (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729(a), (b).

10.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### *Social Security Disability Programs*

11.  Social Security is a set of programs funded by the federal government and managed by the Social Security Administration (SSA), an agency of the Department of Health and Human Services (HHS). Two of Social Security's programs provide disability insurance, and individuals may apply for benefits under one or both programs.

12. The Social Security Disability Insurance Program pays benefits to persons unable to work due to a medical condition expected to last at least one year or result in

death. *See* Social Security Act, Title II (codified at 42 U.S.C. § 401, et seq.)
(hereafter, "Title II"). These benefits are available to persons who paid
contributions to the Social Security trust fund through a tax on their earnings,
and to certain disabled children of such individuals.

13. The Supplemental Security Income Program also makes payments to people with
disabilities whose income and assets fall below threshold amounts. *See* Social
Security Act, Title XVI (codified at 42 U.S.C. § 1381, et seq.) (hereafter, "Title
XVI").

### *Applying for Social Security Disability*

14. For all individuals applying for disability benefits under Title II, and for adults
applying under Title XVI, the definition of disability is the same. The law defines
disability as the inability to engage in any *substantial gainful activity* (SGA) by
reason of any medically determinable physical or mental impairment(s) which
can be expected to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months. 42 U.S.C. §§ 416(i)(1),
423(d)(1), 1382c(3).

15. Persons seeking to claim benefits under Title II or Title XVI begin the process by
completing an application and submitting it to the SSA online through a web
page, in person at certain state agencies or an SSA Field Office, or over the

telephone. Based on the information in the application, the Field Office in the

claimant's geographical area makes an initial determination of eligibility.

16. The following description of the initial process is quoted from the SSA's website

(available at http://www.ssa.gov/disability/professionals/bluebook/general-

info.htm; last accessed on Sep. 15, 2011):

a. "The SSA Field Office is responsible for verifying nonmedical eligibility

requirements, which may include age, employment, marital status,

citizenship/residency and Social Security coverage information, and

additionally, for Social Security Income eligibility, income, resources, and

living arrangement information. The field office sends the case to a

Disability Determination Services (DDS) for evaluation of disability.

b. "The DDSs, which are fully funded by the Federal Government, are State

agencies responsible for developing medical evidence and rendering the

initial determination on whether the claimant is or is not disabled or blind

under the law.

c. "Usually, the DDS tries to obtain evidence from the claimant's own

medical sources first. If that evidence is unavailable or insufficient to make

a determination, the DDS will arrange for a consultative examination (CE)

in order to obtain the additional information needed. The claimant's

treating source is the preferred source for the CE; however, the DDS may

also obtain the CE from an independent source. (See Part II, Evidentiary

Requirements, for more information about CEs.)

d.  "After completing its initial development, the DDS makes the disability

determination. The determination is made by a two-person adjudicative

team consisting of a medical or psychological consultant and a disability

examiner. If the adjudicative team finds that additional evidence is still

needed, the consultant or examiner may recontact a medical source(s) and

ask for supplemental information.

e.  "The DDS also makes a determination whether the claimant is a candidate

for vocational rehabilitation (VR). If so, the DDS makes a referral to the

State VR agency.

f.  "After the DDS makes the disability determination, it returns the case to

the field office for appropriate action depending on whether the claim is

allowed or denied. If the DDS finds the claimant disabled, SSA will

complete any outstanding non-disability development, compute the

benefit amount, and begin paying benefits. If the claimant is found not

disabled, the file is retained in the field office in case the claimant decides

to appeal the determination.

g.  "If the claimant files an appeal of an initial unfavorable determination, the

appeal is usually handled much the same as the initial claim, except that

the disability determination is made by a different adjudicative team in the
DDS than the one that handled the original case."

### Appealing Adverse Decisions

17. If the Field Office denies the application on reconsideration, too, the claimant may request a hearing, which is conducted by an Administrative Law Judge (ALJ) based in a Hearing Office in the geographical area of the Field Office to which the Claimant applied.

18. If the ALJ affirms the denial, the claimant has additional options for review, including an appeal to HHS's Departmental Appeals Board (DAB), and, if unsuccessful there, to a United States District Court.

19.  Claimants may, at any point in the process of applying for disability insurance and appealing adverse decisions, choose to be represented by a qualified person (not necessarily an attorney). A representative must comply with the SSA's standards of conduct. *See* 20 C.F.R. §§ 404.1740 and 416.1540.

20. Representatives are compensated either by entering into a fee agreement with the claimant (that must be approved by the SSA) or by petitioning the SSA for fees upon achieving a successful result. In Title II and Title XVI cases, representatives' fees are generally limited to the lesser of 25% of the back-pay awarded or a specified amount ($6,000 for fee agreements approved on or after June 22, 2009).

### *SSA's Disability Appeals Operations*

21. SSA's hearing process for Title II and Title XVI cases is managed by the Office of Disability Adjudication and Review (ODAR), comprised of 10 regional offices, 165 hearing offices, 5 national hearing centers, and 2 national case assistance centers. ODAR employs 1,300 ALJs and 7,000 support staff in the field.

22. One of ODAR's hearing offices is located in Huntington, West Virginia, at 301 9th Street. The Huntington hearing office services SSA Field Offices in Huntington, West Virginia, as well as Ashland, Pikeville, and Prestonsburg, Kentucky.

23. Each claim for disability insurance under Title II and Title XVI is housed in a file consisting of the application, medical and other supporting documentation (if any), the initial decision and the decision upon reconsideration. The file is created and maintained by the Field Office that handled the initial determination and reconsideration.

24. When a Field Office denies benefits after reconsideration, the claimant or his or her representative files a request for a hearing with the Field Office, which prepares and transmits the claimant's files to the Hearing Office (such as the Huntington Hearing Office).

25. SSA ODAR Hearing Office operations are governed by ODAR's Hearings, Appeals and Litigation Law Manual, known by the acronym HALLEX (available at

http://www.ssa.gov/OP_Home/hallex/hallex.html; last accessed on September

15, 2011). The purpose of HALLEX is as follows:

> Through HALLEX, the Deputy Commissioner for Disability Adjudication and Review conveys guiding principles, procedural guidance, and information to Office of Disability Adjudication and Review staff. HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council, and civil action levels. It also includes policy statements resulting from Appeals Council *en banc* meetings under the authority of the Appeals Council Chair.

*Id.*, § I-1-0-1.

26.  Because some claimant representatives have developed large disability

practices, the SSA implemented a requirement through HALLEX that cases for

such representatives be assigned to ALJs within a Hearing Office on a rotating

schedule, to prevent the representative from developing too cooperative a

relationship with any given ALJ. The HALLEX manual provides:

> [Hearing Offices] maintain a "master docket" which lists all [Requests for Hearing] and remands received. The HOCALJ [Hearing Office Chief ALJ] generally assigns cases to ALJs from the master docket on a rotational basis, with the earliest (i.e., oldest) [Requests for Hearing] receiving priority, unless there is a special situation which requires a change in the order in which a case is assigned.

HALLEX § I-2-1-55 ("Rotational Requirement"). At all times relevant to this

Complaint, Chief ALJ Charlie Paul Andrus of the Huntington Hearing Office

directed that the assignment of the claims of Conn and Eric Conn, P.S.C., were to

be rotated among ALJs.

### *ODAR Changes Its Docket Systems*

27. Prior to 2004, ODAR employed a mainframe computer-based docketing system called the Hearing Office Tracking System (and referred to as "HOTS"). HOTS provided limited docketing functions, but was accessible by few Hearing Office employees.

28. Beginning in 2004, ODAR began to deploy a new docketing system, the Case Process Management System (referred to as "CPMS"). CPMS had a graphical user interface and greater functionality (including ALJ assignment) than HOTS.

29. In 2005, as part of the CPMS deployment, the Huntington Hearing Office selected five employees – an ALJ (Daugherty), a Master Docket Clerk (Ms. Griffith), a Supervisor, a Paralegal, and an Attorney – to be trained as a team (called the "E-file Cadre") in the use of CPMS.  Each of the team members received training and access to CPMS, with the intention that at a future date, these individuals would assist in training their peer employees.

### The Defendants' Fraudulent Scheme

30. Since no later than 2002, and continuing at least until Daugherty's retirement on July 13, 2011, Defendants engaged in a scheme to defraud the United States' Social Security disability programs through Daugherty's corrupt and unjustified awarding of disability benefits to claimants represented by Conn and Eric Conn, P.S.C. (hereafter, the "Conn Claims").

15

31. The manner and means of the Defendants' scheme to defraud the United States includes the following:

### Daugherty Takes Control of the Conn Claims

32. In the initial step of the fraudulent scheme, Conn communicated to Daugherty identifying information of the Conn Claims.  Daugherty routinely received faxes and other communications containing this identifying information from either Conn or others acting on Conn's behalf.  Because of the HALLEX Rotational Requirement described in Paragraph 26 and Chief ALJ Andrus's directive that the Conn Claims specifically were to be rotated, only a portion of the Conn Claims were assigned to Daugherty's docket.  One component of the Defendants' fraudulent scheme, therefore, was Daugherty's takeover of the Conn Claims not legitimately assigned him in rotation.

33. Daugherty sought out and obtained control of the Conn Claims both before and after the CPMS came into effect.  Prior to the implementation of CPMS (described in Paragraphs 28-29), Daugherty took control of the Conn Claims not routinely assigned to him by locating and taking physical possession of the claims' paper files from the desks, files, and workspaces of Hearing Office docket clerks, other ALJs, and Master Docket cabinets. Both docket clerks and ALJs notified Huntington Hearing Office management that Daugherty was taking the Conn Claims.

34. Subsequent to the implementation of CPMS (described in Paragraphs 28-29), Daugherty took control of the Conn Claims by manipulating the access and training granted to him through his participation with the CPMS implementation cadre. As a member of this cadre, Daugherty received special access and training that gave him the ability to electronically reassign cases to himself. Daugherty took this opportunity to reassign high numbers of Conn Claims to his docket in violation of the Rotational Requirement.

35. Daugherty's reassignments, however, were completed in a manner that was hurried and rushed leaving requisite factual and procedural information blank. Daugherty's reassignments caused CPMS to report these incomplete fields as errors to Ms. Griffith's supervisors and Regional SSA officials. Ms. Griffith's supervisor, in turn, accused Ms. Griffith of creating the error and failing to correctly and timely docket and rotate incoming Conn Claims.

36. Initially the cause of the errors remained unknown. Ms. Griffith soon discovered that Daugherty's reassignment of the Conn Claims created the error reports for which she was being blamed. She reported Daugherty's actions to her supervisors, and personally asked him to stop. He did not and her supervisor failed to adequately respond to Daugherty's actions.

### *Daugherty Conducts Sham Proceedings*

37. Once Daugherty seized control of a Conn Claim, he conducted a sham proceeding to make it appear that he was performing a bona fide review of the claim. Assigned Contract Hearing Reporters created audio recordings of the hearings.

38. Unlike other ALJs, Daugherty scheduled his own on-the-record hearings. He routinely scheduled up to twenty Conn Claims for on-the-record hearings on the same day at ten-minute intervals.

39. Other ALJs, conducting genuine hearings, were able to schedule only six to eight claims per day, each lasting 30 to 60 minutes.

40. Although the claimants would be scheduled at intervals throughout the day, Conn and Eric Conn, P.S.C., instructed them all to arrive at 9:00 a.m.

41. For Conn Claims, Daugherty held perfunctory proceedings: merely opening the record, identifying those in attendance (typically himself, the Assigned Contract Hearing Reporter, the Vocational Expert), reading the Social Security number and naming the claimant and their attorney, then granting the case and closing the record, before moving on to the next Conn Claim. Daugherty typically concluded his full day of up to twenty hearings by 11:00 a.m.

42. Eventually, other claim representatives complained that Daugherty's hearing procedures were favoring the Conn Claims. Daugherty responded by issuing

decisions on Conn Claims without holding a hearing, using a procedure known as an "on-the-record" decision – i.e., deciding a claim on the basis of the existing record. On-the-record decisions are to be used in exceptional circumstances, but Daugherty used them for virtually all Conn Claims from 2006 to 2010.

### *Daugherty Awards Benefits to the Conn Claimants Without Justification*

43. Although ALJs differ in their rate of claim approval (i.e., reversal of denials), the average is approximately 60-65%. ALJ caseloads vary, too, but the majority of ALJs average 200-250 cases per year.

44. During his tenure as ALJ, Daugherty approved the vast majority of the Conn Claims, with a caseload two to two and one-half times greater than the average. For Fiscal Year 2010, for example, Daugherty reviewed 1,284 cases, and granted benefits in all but 4 (an approval rate of 99.7%).

45. As a result of the fraudulent diversion and reassignment of cases to Daugherty, and his sham consideration of their merits, the SSA awarded disability benefits to Conn Claim claimants who would otherwise have not received them.

### Relators Reported the Fraud

46. On numerous occasions between 2006 and 2011, the Relators reported Daugherty's fraudulent misconduct.

47. As described in Paragraph 36, Ms. Griffith first reported Daugherty's misconduct on or about January, 2006, after her supervisor complained to her of errors in the

CPMS system that were caused by Daugherty's reassignment of cases. On numerous occasions, both Ms. Griffith and Ms. Carver brought their concerns about Defendants to their supervisors at the Huntington Hearing Office. In fact, Ms. Griffith's resignation from the SSA, effective November 2, 2007, resulted from stress-induced and –aggravated medical conditions.

48. On May 19, 2011, the Wall Street Journal published an article, "Disability-Claim Judge Has Trouble Saying 'No'", written by reporter Damian Paletta, describing Daugherty's high claim approval rate, and linking him to the Conn Claims. As described in that article, Ms. Griffith was an original source of information to Mr. Paletta.

49. On several occasions in 2011, the Relators reported their concerns to the Office of Inspector General of the SSA (SSA-OIG). Ms. Griffith and Ms. Carver were contacted by and met with SSA-OIG fraud investigators several times in the three weeks preceding the article's publication. Following the Wall Street Journal's publication of the Paletta article, a large number of SSA-OIG agents arrived unannounced at the Huntington Hearing Office and interviewed current and former employees. Both Ms. Griffith and Ms. Carver cooperated fully in the SSA-OIG's investigation, and have complied fully with all requests for information and documents.

50. Following the Wall Street Journal's publication of the Paletta article, the offices of Senators Orrin Hatch (UT) and Tom Coburn (OK) commenced an investigation into the conduct of Daugherty and the operations of the Huntington Hearing Office. Both Ms. Griffith and Ms. Carver cooperated fully in the Senate investigation.

**COUNT I – SUBMISSION OF FALSE CLAIMS**

**FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.**

51. Relators repeats each and every allegation of Paragraphs 1 through 50 of this Complaint with the same force and effect as if set forth herein.

52. As a result of the foregoing conduct, Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

53. The claims relevant to this Count include all Conn Claims under Title II or Title XVI that were not initially assigned to Daugherty but which he took over or reassigned and subsequently granted.

54. Defendants' claims were false or fraudulent because Daugherty's acquisition of the cases not assigned to him was in contravention to Social Security Administration policy, and his failure to objectively consider the merits of each case was in contravention of his responsibilities as an ALJ.

55. Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because each knew that the claims were initially assigned to other ALJs, and that Daugherty's consideration of them was a sham intended to award benefits without satisfying the requirement of factfinding by a neutral decisionmaker.

### COUNT II – USE OF A FALSE RECORD

### FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.

56. Plaintiff and Relators repeat each and every allegation of Paragraphs 1 through 55 of this Complaint with the same force and effect as if set forth herein.

57. As a result of the foregoing conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

58. The false or fraudulent records or statements relevant to this Count include all records of assignment, disposition listings, hearing audiotapes, contents of the Conn Claims files, and all records of decision, made by Daugherty with respect to the Conn Claims.

59. Daugherty's records of assignment and reassignment were false because HALLEX 1-2-1-55, and Chief ALJ Andrus's directives required the Conn Claims to be assigned to ALJs in the Huntington Hearing Office on a rotating basis, and Daugherty assigned or reassigned them to himself without justification.

60. Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the records' or statements' falsity because Daugherty was aware of HALLEX's Rotational Requirement and Chief ALJ Andrus's directives, and that he lacked justification for assigning or reassigning the Conn Claims to himself.

61. The claims relevant to this Count include all Conn Claims under Title II or Title XVI that were not initially assigned to Daugherty but which he took over or reassigned and subsequently granted.

62. The falsity of the records or statements was material to the SSA's decision to approve the claims for payment because had the agency known that Daugherty had been corruptly influenced to take control over the Conn Claims and award benefits without a bona fide review, it would not have paid benefits to the claimants.

**COUNT III – FALSE CLAIMS CONSPIRACY**

**FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(C), et seq.**

63. Plaintiff and Relators repeat each and every allegation of Paragraphs 1 through 62 of this Complaint with the same force and effect as if set forth herein.

64. As a result of the foregoing conduct, Defendants conspired to commit a violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (B), in violation of the False Claims Act, *id.*, § 3729(a)(1)(C).

65. The claims, their falsity, and Defendants' knowledge relevant to this Count is described in Paragraphs 54 to 55, and 59 to 60 of this Complaint, which are repeated with the same force and effect as if set forth herein.

66. The Defendants committed overt acts in furtherance of the conspiracy, including the submission of false and fraudulent claims for disability, reconsideration, and requests for hearing, the communication by Conn and Eric Conn, P.S.C., to Daugherty of lists of claims to enable him to take them over, the holding of sham hearings and other proceedings to provide the appearance of legitimate process, and the rendering of corrupt decisions granting disability benefits to clients of Conn and Eric Conn, P.S.C.

**JURY TRIAL DEMAND**

67. Relators demand a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(a) that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., provides;

(b) that civil penalties of $11,000 be imposed for each and every false claim that

Defendants caused to be presented to the United States and/or its grantees, and

for each false record or statement that Defendants made, used, or caused to be

made or used that was material to a false or fraudulent claim;

(c) that attorneys' fees, costs, and expenses that the Relators necessarily incurred in

bringing and pressing this case be awarded;

(d) that the Relators be awarded the maximum amount allowed to it pursuant to the

False Claims Act; and

(e) that this Court award such other and further relief as it deems proper

Respectfully submitted,


/s/ Mark A. Wohlander
Mark A. Wohlander
Wohlander Law Office, PSC
wohlanderlaw@insightbb.com
P.O. Box 910483
Lexington, Kentucky 40591
Telephone: (859) 361-5604


Brian A. Ritchie
brian@wallingfordlaw.com
William Nicholas Wallingford
nick@wallingfordlaw.com
Wallingford Law, PSC
3141 Beaumont Centre Circle, Suite 302
Lexington, Kentucky 40513
Telephone: (859) 219-0066


Benjamin J. Vernia
bvernia@vernialaw.com
The Vernia Law Firm

1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C.  20004
Telephone: (202) 349-4053
***[Moving Pro Hac Vice]***

CO-COUNSEL FOR RELATORS
JENNIFER GRIFFITH AND
SARAH CARVER

Date: October 11, 2011

**Certificate of Service**

I hereby certify that a copy of the foregoing Complaint filed under seal, pursuant

to 31 U.S.C. § 3730, was sent to the following:

Hon. Eric Holder                          Hon. Kerry B. Harvey
Attorney General                          United States Attorney
  of the United States                      for the Eastern District
U.S. Department of Justice                   of Kentucky
950 Pennsylvania Avenue, NW                260 West Vine Street, Suite 300
Washington, D.C. 20530-0001                Lexington, Kentucky, 40507-1671
***[Via Federal Express]***                ***[Via Hand Delivery]***


  /s/ Mark A. Wohlander_____
  Mark A. Wohlander
  wohlanderlaw@insightbb.com
  CO-COUNSEL FOR RELATORS
  JENNIFER GRIFFITH AND
  SARAH CARVER