IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. Jennifer L. GRIFFITH and Sarah CARVER, | ⎤<br>\|<br>\| | |
| Plaintiffs | \|<br>\| | |
| v. | ⎬ | Civil No. 11-157 ART |
| Eric C. CONN, ERIC CONN, P.S.C., David B. DAUGHERTY, Dr. David P. HERR, Dr. Bradley ADKINS, and Dr. Srinivas AMMISETTY, | \|<br>\|<br>\|<br>\|<br>\|<br>\| | |
| Defendants. | ⎦ | |

## SECOND AMENDED COMPLAINT

The United States of America, by and through its qui tam Relators, Jennifer L. Griffith (Griffith) and Sarah Carver (Carver) (collectively, the Relators) brings this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, et seq., against Defendants Eric Conn, Eric Conn, P.S.C., David B. Daugherty, and Drs. David P. Herr, Bradley Adkins, and Srinivas Ammisetty, to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the United States and the Relators, and for their Second Amended Complaint allege:

1

**Introduction**

This is an action to recover fraudulently obtained representative's fees and disability benefits, which the United States of America paid to Eric C. Conn and Eric Conn, P.S.C. (collectively "Conn"), and to Conn's clients.  The fees and benefits obtained by Conn and his clients that are the subject of this qui tam all originate from a fraudulent scheme coordinated between Conn and a Social Security Administrative Law Judge, David B. Daugherty ("Daugherty").

This is also an action by Plaintiff Sarah Carver personally, to recover from Conn special damages resulting from Conn's violation of the antiretaliation provision of the False Claims Act, False Claims Act, 31 U.S.C. § 3730(h).

In the fraudulent scheme: Conn notified Daugherty of Conn's clients' Social Security disability claim appeals; Daugherty wrongfully took control of a high number of Conn's clients' appeals from randomly-assigned Administrative Law Judges; Conn, with the cooperation of Defendants Herr, Adkins, and Ammisetty, created and presented false medical documentation; and, Daugherty, after conducting sham proceedings, granted representative fees to Conn and disability benefits to Conn's clients.

The fraudulent scheme resulted in the Social Security Administration paying millions of dollars in fraudulent representatives' fees to Conn, and many times that amount in fraudulent benefits to those of Conn's clients who were not entitled to them.

**Parties**

1.  Relator Jennifer L. Griffith was, from September 2001, until her resignation

    effective November 2, 2007, an employee of the Social Security Administration at

    the agency's Huntington, West Virginia, Hearing Office in the Office of Disability

    Adjudication and Review (Huntington ODAR). Until her resignation, Ms. Griffith

    was a Master Docket Clerk with responsibility for managing the Huntington

    office's docket of Social Security disability cases, as described in more detail

    below. The Social Security Administration does not employ or train Master

    Docket Clerks in detecting and investigating fraud.

2.  Relator and Plaintiff Sarah Carver has been an employee of the Social Security

    Administration at the Huntington ODAR since September 2001. She is a Senior

    Case Technician and is the Union Steward of the American Federation of

    Government Employees at the Huntington ODAR. The Social Security

    Administration does not employ or train Senior Case Technicians in detecting and

    investigating fraud.

3.  Plaintiff United States of America, acting through the Social Security

    Administration, administers the Social Security disability programs (described,

    below, in Paragraphs 17 to 19).

3

4. At all times relevant to this Second Amended Complaint, Defendant Eric C. Conn was an attorney licensed to practice law in the Commonwealth of Kentucky, and practiced law in his firm, Eric Conn, P.S.C., a professional service corporation incorporated under the laws of the Commonwealth of Kentucky, with offices in Stanville and Ashland, Kentucky.

5. Conn and Eric Conn, P.S.C.'s practice consisted primarily of representing claimants for Social Security disability payments under Title II and Title XVI (as described below, in Paragraphs 20 to 30). In 2012, Conn opened an office in Beverly Hills, California, and closed the Ashland, Kentucky office.

6. In 2001, the Committee on Admissions and Practice of the United States Court of Appeals for Veterans Claims launched an investigation of Conn for professional misconduct; in 2002, while Conn was still under investigation, he submitted his resignation "in lieu of further investigatory proceedings on allegations of professional misconduct in cases before" that Court, and relinquished "any right to apply for reinstatement of readmission at any time in the future." *See* In re *Eric C. Conn*, No. 01-8001 (Vet. App. Sep. 30, 2002).

7. David B. Daugherty was, until on or about July 13, 2011, an Administrative Law Judge (ALJ) employed by the Social Security Administration at the Huntington ODAR, with responsibilities to review and issue decisions on appeals from denials

4

of reconsideration, as described in Paragraphs 23 to 24, below. In May 2011, Daugherty was placed on administrative leave as a result of an investigation by the Office of Inspector General of the Social Security Administration, and chose to retire effective June 13, 2011.

8. Dr. David P. Herr, D.O., is a physician practicing in West Union, Ohio, whom Conn has employed as a medical consultant.

9. Dr. Bradley Adkins, Ph.D., is a psychologist practicing in Pikeville, Kentucky, whom Conn has employed as a psychological consultant.

10. Dr. Srinivas Ammisetty, M.D., is a physician practicing in Stanville, Kentucky, whom Conn has employed as a medical consultant.

## Jurisdiction and Venue

11. Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

12. The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 et seq., and complained of herein took place in part in this District and the Defendants transacted business in this District:

a.  At all times relevant to this Second Amended Complaint, Conn and Eric
    Conn, P.S.C., have operated law firms in this District, in Stanville and
    Ashland, Kentucky. In the course of representing Social Security disability
    claimants, Conn and Eric Conn, P.S.C., filed applications, requests for
    reconsideration, and requests for a hearing with Social Security
    Administration Field Offices in this District (hereafter, the "Conn Claims").

b.  From their offices in this District, Conn and Eric Conn, P.S.C., have filed
    appointments as representative, fee agreements, and registered for
    appointed representative services with the Social Security Administration.

c.  Defendants Herr, Adkins, and Ammisetty have purportedly examined (or
    participated in the examination) of Conn's clients in this District, and have
    otherwise transacted business relating to their participation in the fraudulent
    scheme described in this Second Amended Complaint in this District.

d.  On numerous occasions from at least 2002 to 2007, Daugherty conducted
    hearings in this District involving claimants represented by Conn and Eric
    Conn, P.S.C.

e.  Many of Conn's clients reside in this District, where he ubiquitously
    advertised his Social Security disability practice.

f.  The United States made payments to Conn in this District for fees for
    representing disability claimants.

g.  The United States made payments for disability benefits under Titles II and XVI of the Social Security Act (as described, below, in Paragraphs 17 to 19) to persons and at financial institutions within this District.

13. Pursuant to 31 U.S.C. § 3730(b)(2), the Relators prepared and served with the original Complaint on the Attorney General of the United States, and the United States Attorney for the Eastern District of Kentucky, a statement of all material evidence and information in their possession and of which they are the original source. This disclosure statement was supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false and fraudulent claims. Because the disclosure statement included attorney-client communications and work product of Relators' attorneys, and was submitted to those Federal officials in their capacity as counsel for the United States – a potential and real party in interest in this action – the Relators understand this disclosure to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

14. Prior to filing this Second Amended Complaint, the Relators provided the United States with it, and obtained the concurrence of counsel for the United States that it need not be filed under seal.

7

## Background

### *The False Claims Act*

15. The False Claims Act provides, in pertinent part:

    (a) Liability for certain acts.—

        (1) In general.—Subject to paragraph (2), any person who—

            (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

            (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

            (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

            (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

            (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

            (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

            (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3

8

times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions.—For purposes of this section—

    (1) the terms "knowing" and "knowingly" —

        (A) mean that a person, with respect to information—

            (i) has actual knowledge of the information;

            (ii) acts in deliberate ignorance of the truth or falsity of the information; or

            (iii) acts in reckless disregard of the truth or falsity of the information; and

        (B) require no proof of specific intent to defraud;

    (2) the term "claim"—

        (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

            (i) is presented to an officer, employee, or agent of the United States; or

            (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

                (I) provides or has provided any portion of the money or property requested or demanded; or

                (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729(a), (b).

16.  Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### *Social Security Disability Programs*

17.  Social Security is a set of programs funded by the Federal government and managed by the Social Security Administration. Two of Social Security's programs provide disability insurance, and individuals may apply for benefits under one or both programs.

18. The Social Security Disability Insurance Program pays benefits to persons unable to work due to a medical condition expected to last at least one year or result in death. *See* Social Security Act, Title II (codified at 42 U.S.C. § 401, et seq.) (Title

II). These benefits are available to persons who paid contributions to the Social Security trust fund through a tax on their earnings, and to certain disabled children of such individuals, without regarding to recipients' resources or income.

19. The Supplemental Security Income Program makes payments to disabled people whose income and assets fall below threshold amounts. *See* Social Security Act, Title XVI (codified at 42 U.S.C. § 1381, et seq.) (Title XVI).

### *Applying for Social Security Disability*

20. For all individuals applying for disability benefits under Title II, and for adults applying under Title XVI, the definition of disability is the same: the inability to engage in any *substantial gainful activity* (SGA) by reason of any medically determinable physical or mental impairment(s) which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 416(i)(1), 423(d)(1), 1382c(3).

21. Persons seeking to claim benefits under Title II or Title XVI begin the process by completing an application and submitting it to the Social Security Administration online through a web page, in person at certain state agencies or a Social Security Administration Field Office, or over the telephone. Based on the information in the application, the Field Office in the claimant's geographical area makes an initial determination of eligibility.

22. The following description of the initial process, applicable at all times relevant to this Second Amended Complaint, is quoted from the Social Security Administration's website (available at http://www.ssa.gov/disability/professionals/bluebook/general-info.htm; last accessed on December 5, 2013):

   a. "The [SSA] Field Office is responsible for verifying nonmedical eligibility requirements, which may include age, employment, marital status, citizenship/residency and Social Security coverage information, and additionally, for Social Security Income eligibility, income, resources, and living arrangement information. The field office sends the case to a Disability Determination Services [DDS] for evaluation of disability.

   b. "The DDSs, which are fully funded by the Federal Government, are State agencies responsible for developing medical evidence and rendering the initial determination on whether the claimant is or is not disabled or blind under the law.

   c. "Usually, the DDS tries to obtain evidence from the claimant's own medical sources first. If that evidence is unavailable or insufficient to make a determination, the DDS will arrange for a consultative examination (CE) in order to obtain the additional information needed. The claimant's treating source is the preferred source for the CE; however, the DDS may also

obtain the CE from an independent source. (See Part II, Evidentiary

Requirements, for more information about CEs.)

d. "After completing its initial development, the DDS makes the disability

determination. The determination is made by a two-person adjudicative

team consisting of a medical or psychological consultant and a disability

examiner. If the adjudicative team finds that additional evidence is still

needed, the consultant or examiner may recontact a medical source(s) and

ask for supplemental information.

e. "The DDS also makes a determination whether the claimant is a candidate

for vocational rehabilitation (VR). If so, the DDS makes a referral to the

State VR agency.

f. "After the DDS makes the disability determination, it returns the case to the

field office for appropriate action depending on whether the claim is

allowed or denied. If the DDS finds the claimant disabled, SSA will

complete any outstanding non-disability development, compute the benefit

amount, and begin paying benefits. If the claimant is found not disabled,

the file is retained in the field office in case the claimant decides to appeal

the determination.

g. "If the claimant files an appeal of an initial unfavorable determination, the

appeal is usually handled much the same as the initial claim, except that the

13

disability determination is made by a different adjudicative team in the

DDS than the one that handled the original case."

### *Appealing Decisions*

23. If the Field Office denies the application on reconsideration, too, the claimant may

request a hearing, which is typically conducted by an ALJ based in a Hearing

Office covering the geographical area of the Field Office to which the Claimant

applied. 20 C.F.R. § 416.1414; HALLEX I-2-0-70.

24. If the ALJ affirms the denial, the claimant has additional options for review,

including an appeal to HHS's Departmental Appeals Board (DAB), and, if

unsuccessful there, to a United States District Court. 42 U.S.C. §§ 405(c)(9), (g).

### *Representation of Social Security Disability Claimants*

25. Claimants may, at any point in the process of applying for disability insurance

and appealing adverse decisions, choose to be represented by a qualified person.

Representatives frequently are attorneys, but may be laypersons.

26. A representative must comply with the Social Security Administration's standards

of conduct. *See* 20 C.F.R. §§ 404.1740 (for Title II cases) and 416.1540 (for Title

XVI cases). Those regulations require, in pertinent part:

**§ 416.1540 Rules of conduct and standards of responsibility for representatives.**

(a) *Purpose and scope.* (1) All attorneys or other persons acting on behalf of a party seeking a statutory right or benefit must, in their dealings with us, faithfully execute their duties as agents and fiduciaries of a party. A representative must provide competent assistance to the claimant and recognize our authority to lawfully administer the process. The following provisions set forth certain affirmative duties and prohibited actions that will govern the relationship between the representative and us, including matters involving our administrative procedures and fee collections.

(2) All representatives must be forthright in their dealings with us and with the claimant and must comport themselves with due regard for the nonadversarial nature of the proceedings by complying with our rules and standards, which are intended to ensure orderly and fair presentation of evidence and argument.

(b) *Affirmative duties.* A representative must, in conformity with the regulations setting forth our existing duties and responsibilities and those of claimants (see § 416.912 in disability and blindness claims):

*   *   *

(3) Conduct his or her dealings in a manner that furthers the efficient, fair and orderly conduct of the administrative decisionmaking process, including duties to:

(i) Provide competent representation to a claimant. Competent representation requires the knowledge, skill, thoroughness and preparation reasonably necessary for the representation. This includes knowing the significant issue(s) in a claim and having a working knowledge of the applicable provisions of the Social Security Act, as amended, the regulations and the Rulings; and

(ii) Act with reasonable diligence and promptness in representing a claimant. This includes providing prompt and responsive answers to our requests for information pertinent to processing of the claim; and

(4) Conduct business with us electronically at the times and in the manner we prescribe on matters for which the representative requests direct fee payment. (*See* § 416.1513).

(c) *Prohibited actions.* A representative must not:

(1) In any manner or by any means threaten, coerce, intimidate, deceive or knowingly mislead a claimant, or prospective claimant or beneficiary, regarding benefits or other rights under the Act;

(2) Knowingly charge, collect or retain, or make any arrangement to charge, collect or retain, from any source, directly or indirectly, any fee for representational services in violation of applicable law or regulation;

(3) Knowingly make or present, or participate in the making or presentation of, false or misleading oral or written statements, assertions or representations about a material fact or law concerning a matter within our jurisdiction;

\* \* \*

(6) Attempt to influence, directly or indirectly, the outcome of a decision, determination, or other administrative action by offering or granting a loan, gift, entertainment, or anything of value to a presiding official, agency employee, or witness who is or may reasonably be expected to be involved in the administrative decisionmaking process, except as reimbursement for legitimately incurred expenses or lawful compensation for the services of an expert witness retained on a non-contingency basis to provide evidence;

(7) Engage in actions or behavior prejudicial to the fair and orderly conduct of administrative proceedings, including but not limited to:

(i) Repeated absences from or persistent tardiness at scheduled proceedings without good cause (see § 416.1411(b));

16

(ii) Willful behavior which has the effect of improperly disrupting proceedings or obstructing the adjudicative process; and

(iii) Threatening or intimidating language, gestures, or actions directed at a presiding official, witness, or agency employee that result in a disruption of the orderly presentation and reception of evidence;

(8) Violate any section of the Act for which a criminal or civil monetary penalty is prescribed;

(9) Refuse to comply with any of our rules or regulations;

(10) Suggest, assist, or direct another person to violate our rules or regulations;

(11) Advise any claimant or beneficiary not to comply with any of our rules and regulations;

(12) Knowingly assist a person whom we suspended or disqualified to provide representational services in a proceeding under title XVI of the Act, or to exercise the authority of a representative described in § 416.1510; or

(13) Fail to comply with our sanction(s) decision.

20 C.F.R. § 416.1540 (20 C.F.R. § 404.1740 similar).

27. A claimant notifies the Social Security Administration that he or she has chosen to be represented by signing and submitting SSA Form 1696, *Appointment of Representative*, signed as well by the representative. The instructions for claimants state:

> You and your representative(s) are responsible for giving Social Security accurate information. It is wrong to knowingly and willingly furnish false information. Doing so may result in criminal prosecution.

*Id.* In addition, the representative must certify under penalty of perjury, in part, that "I will not charge or collect any fee for the representation, even if a third party will pay the fee, unless it has been approved in accordance with the laws and rules referred to on the reverse side of the representative's copy of this form." *Id.*; *see also* HALLEX I-1-1-1 to -11. The laws and rules referred to include 18 U.S.C. §§ 203, 205, and 207; 42 U.S.C. §§ 406(a), 1320a-6, and 1383(d)(2); 20 C.F.R. §§ 404.1700, et seq., and 416.1500, et seq.; Social Security Rulings 83-27 and 82-39; and 26 U.S.C. §§ 6041 and 6045(f). SSA Form 1696.

28. Representatives retained by claimants are compensated either by entering into a fee agreement with the claimant (which must be approved by the Social Security Administration) or by petitioning the Social Security Administration for fees upon achieving a successful result. In Title II and Title XVI cases, representatives' fees are generally limited to the lesser of 25% of the back-pay awarded or a specified amount ($6000 for fee agreements approved on or after June 22, 2009). 20 C.F.R. §§ 404.1730(b), 416.1530(b).

29. In order to collect a fee in any disability appeal in which the fee agreement is not approved, the claimant's representative must also complete and submit SSA Form

1560, *Petition to Obtain Approval of a Fee for Representing a Claimant Before the Social Security Administration* (SSA-1560).

30. To qualify for receipt of the fees described in Paragraphs 28 and 29, representatives must complete, and submit a Social Security Administration Form 1699, *Registration for Appointed Representative Services and Direct Payment* (SSA-1699). The SSA-1699 specifically requires representatives to attest, under penalty of perjury, to all of the following:

### Section VI – Attestation and Questions for Representation

\* \* \*

1. **I understand and will comply with** SSA laws and rules relating to the representation of parties, including the Rules of Conduct and Standards of Responsibility for Representatives.

   **I will not** charge, collect, or retain a fee for representational services that SSA has not approved or that is more than SSA approved, unless a regulatory exclusion applies.

   \* \* \*

   **I will not** knowingly make or present, or participate in making or presenting, false or misleading oral or written statements, assertions, or representations about a material fact or law concerning a matter within SSA's jurisdiction.

   **I am aware** that if I fail to comply with any SSA laws and rules relating to representation, I may be suspended or disqualified from practicing as a representative before SSA.

   \* \* \*

**Section VII – General Attestations**

\* \* \*

**I will not omit or otherwise withhold** disclosure of information to SSA that is material to the benefit entitlement or eligibility of claimants or beneficiaries, nor will I cause someone else to do so, if I know or should know, that this would be false or misleading.

\* \* \*

**I am aware** that if I fail to comply with SSA laws and rules, I could be criminally punished by a fine or imprisonment or both, and I could be subject to civil monetary penalties.

*Id.* at 5, 10 (emphases in original).

31. Social Security Administration Form 1696 (*see* Paragraph 27) and Form 1560 (*see* Paragraph 29) specifically requires a representative to state, under penalty of perjury, whether he or she has previously been disqualified from practicing in or appearing before a Federal program or agency; Form 1699 (*see* Paragraph 30) likewise requires a representative to state whether he or she has been suspended or disqualified from practice before the Social Security Administration or any other Federal program or agency. *See also* 20 C.F.R. §§ 404.1770, 416.1570.

### *SSA's Disability Appeals Operations*

32. Social Security Administration's hearing process for Title II and Title XVI cases is managed by the Office of Disability Adjudication and Review (ODAR), comprised of 10 regional offices, 165 hearing offices, 5 national hearing centers,

and 2 national case assistance centers. ODAR employs 1,300 ALJs and 7,000

support staff in the field.

33. One of ODAR's hearing offices is located in Huntington, West Virginia, at 301 9th

Street (the Huntington ODAR). The Huntington ODAR services Social Security

Administration Field Offices in Huntington, West Virginia, as well as Ashland,

Pikeville, and Prestonsburg, Kentucky.

34. Each claim for disability insurance under Title II and Title XVI is housed in a file

created and maintained by the Field Office that handled the initial determination

and reconsideration. Each such file consists of the application, medical and other

supporting documentation (if any), the initial decision and the decision upon

reconsideration.

35. When a Field Office denies benefits after reconsideration, the claimant or his or

her representative files a request for a hearing with the Field Office, which

prepares and transmits the claimant's files to the Hearing Office (such as the

Huntington ODAR).

36. Social Security Administration ODAR Hearing Office operations are governed by

ODAR's Hearings, Appeals and Litigation Law Manual, known by the acronym

HALLEX (available at http://www.ssa.gov/OP_Home/hallex/hallex.html; last

accessed on December 5, 2013). The purpose of HALLEX is as follows:

> Through HALLEX, the Deputy Commissioner for Disability Adjudication
> and Review conveys guiding principles, procedural guidance, and

information to Office of Disability Adjudication and Review staff. HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council, and civil action levels. It also includes policy statements resulting from Appeals Council *en banc* meetings under the authority of the Appeals Council Chair.

*Id.*, § I-1-0-1.

37. SSA ALJs are appointed pursuant to 5 U.S.C. § 3105, which provides, in part, that ALJs "shall be assigned to cases in rotation as far as practicable…."

38. In conformity with 5 U.S.C. § 3105, and because some claimant representatives have developed large disability practices, the Social Security Administration requires, through HALLEX, that cases of such representatives be assigned to ALJs within a Hearing Office on a rotating schedule, to prevent the representative from developing an improper biased relationship with any given ALJ. The HALLEX manual provides:

> [Hearing Offices] maintain a "master docket" which lists all [Requests for Hearing] and remands received. The HOCALJ [Hearing Office Chief ALJ] generally assigns cases to ALJs from the master docket on a rotational basis, with the earliest (i.e., oldest) [Requests for Hearing] receiving priority, unless there is a special situation which requires a change in the order in which a case is assigned.

HALLEX § I-2-1-55 A (the Rotational Requirement).

39. At all times relevant to this Complaint, Charlie Paul Andrus was the Chief ALJ of the Huntington ODAR, directed that the assignment of the claims of Conn's clients (the Conn Claims), were to be rotated among ALJs, and delegated this

22

responsibility to the Huntington ODAR's Master Docket Clerks. Then-Chief ALJ

Andrus reiterated this requirement in an email to all Huntington ODAR staff on

July 31, 2006:

> All,
>
> As you know, we have a large amount of cases from Eric Conn's office and Bill Redd's office. The only way that we can fairly handle these cases is by strict rotation. If we don't assign these cases in rotation we leave ourselves open to charges of favoritism, judge shopping, as well as complaints from the lawyers that they only see "certain judges and not others." These allegations have been raised in the past and we have been able to show that the cases for these lawyers are divided equally among all the ALJs.
>
> In addition, I want to remind everyone of the policy we have followed for several years that these cases are NOT to be reassigned to another judge for any reason other than a judge leaving the office or recusal and then they are to be assigned out in strict rotation. I must personally approve any exception to this rule. In addition, the Case Intake Specialists and anyone else adding cases are to assign these cases to the next ALJ in rotation immediately when they are entered into our system.
>
> Social Security pays these lawyers a lot of money in fees each year due to the size of their caseload (into seven figures). The only way we can refute unfounded allegations of improper assignment of cases to generate more fees for the lawyer is to follow a strict rotation and a "no change" policy.
>
> If anyone has any questions, they can see me.
>
> Judge Andrus

E-mail from Charlie Paul Andrus, HOCALJ Huntington ODAR to "#PH WV ODAR

Huntington All," *FW: Changing judge assignments for Eric Conn cases and Bill Redd*

*cases* (July 31, 2006) (Emphasis in original). Master Docket Clerks at the Huntington

ODAR were primarily responsible for implementing Chief ALJ Andrus's directive.

### *ODAR Changes Its Docket Systems*

40. Prior to 2004, ODAR employed a mainframe computer-based docketing system called the Hearing Office Tracking System (referred to as "HOTTS"). HOTTS provided limited docketing functions, and was accessible by few Hearing Office employees.

41. Beginning in 2004, ODAR began to deploy a new docketing system, the Case Process Management System (referred to as "CPMS"). CPMS had a graphical user interface and greater functionality (including ALJ assignment) than HOTTS.

42. In 2005, the Huntington ODAR selected five employees – an ALJ (Daugherty), a Master Docket Clerk (Ms. Griffith), a Supervisor, a Paralegal, and an Attorney – to be trained as a team (called the "E-file Cadre") in the use and processing of Electronic Disability ("eDib") Claim Files, a CPMS module used by Field Offices to communicate with the ODARs.  Each of the team members received training and access to eDib Claim Files, with the intention that at a future date, these individuals would assist in training their peer employees.

### **The Defendants' Fraudulent Scheme**

43. Beginning no later than 2002, and continuing at least until Daugherty's retirement on July 13, 2011, Defendants conspired, combined, and/or acted in concert in a scheme to defraud the United States' Social Security disability programs through

Daugherty's corrupt and unjustified awarding of disability benefits to the Conn Claims.

44. Defendants conducted the fraudulent scheme in secret, concealing the nature and extent of their collusion from responsible officers and employees of the Social Security Administration.

45. The manner and means of the Defendants' scheme to defraud the United States includes the following:

### Conn Submits and Maintains
### An SSA Registration for Appointed Representative Services

46. At all times relevant to this Second Amended Complaint, Conn had filed and maintained with the SSA a Form 1699 in which he attested to the statements described in Paragraph 30 under penalty of perjury.

47. On information and belief, in each operative SSA Form 1699, Conn falsely stated that he had not previously been suspended or prohibited from practice before a Federal program or agency; in fact, he had voluntarily resigned from practice before the U.S. Court of Appeals for Veteran's Claims in 2002, while under investigation for professional misconduct. *See* Paragraph 6; *see also* 20 C.F.R. §§ 404.1770(a), 416.1570(a).

***Conn Submits Appeals and Fee Agreements***

48. For each of the Conn Claims, Conn requested reconsideration by SSA's Huntington ODAR office from an initial denial of benefits, as described in Paragraph 23.

49. In addition to the request for reconsideration, for each of the Conn Claims, Conn submitted an SSA Form 1696 in which the claimant appointed Conn (or his employees) as representative, and a fee agreement, as described in Paragraphs 27 and 28, or an Social Security Administration Form 1560, petition for approval of a fee, as described in Paragraph 29.

50. In each such Social Security Administration Form 1696 and Form 1560, Conn attested to the statements described in Paragraphs 27 and 29 under penalty of perjury, and Conn falsely stated that he had not previously been disqualified from participating in or appearing before a Federal program or agency. *See* Paragraphs 6, 46; *see also* 20 C.F.R. §§ 404.1770(a), 416.1570(a).

51. Conn's fee agreements provided for him to receive the maximum fee award permitted by Social Security Administration (the lesser of 25% of past-due benefits or $6000; *see* Paragraph 28), and included the following language:

> If the Social Security Administration favorably decides the claim, the attorney fee will be the lesser of 25 percent of the past-due benefits of _____ (or such higher amount as prescribed by the Commissioner of Social Security pursuant to Section 406(a)(2)(A) of the Social Security Act). I will also have to reimburse my Attorney for any costs he has in representing me, such as costs of getting medical records or reports.

### *Daugherty Assigns Himself the Conn Claims*

52. Because of the HALLEX Rotational Requirement described in Paragraph 38 and then-Chief ALJ Andrus's strict directive to rotate the Conn Claims, Master Docket Clerks routinely assigned only a pro rata portion of the Conn Claims to Daugherty's docket.  The first component of the Defendants' fraudulent scheme, therefore, was Daugherty's misappropriation of the Conn Claims not legitimately assigned him in rotation.

53. Shortly after filing appeals from Field Offices' denial of disability benefits, Conn informed Daugherty of the identity of those clients (e.g., by providing him with their names or Social Security numbers).

54. Daugherty routinely received faxes and other communications containing this identifying information sent either by Conn or others acting on Conn's behalf (such as employees at Eric C. Conn, P.S.C.).

55. Once electronic document submission was operational, ODAR required that representatives submit all correspondence, medical records and other case materials via fax transmissions bearing barcodes. The fax machine receiving these transmissions automatically scanned the barcoded documents and placed the documents in the claimant's electronic claims file.

56. Ms. Carver occasionally performed receptionist duties at the Huntington ODAR, and when doing so was stationed next to a separate fax machine, for general use.

On multiple occasions, Daugherty either informed her that he was expecting to receive a fax from Conn, or came to wait by the receptionist fax machine for a transmission from Conn, despite ODAR's directive that all case-related faxes be sent with barcodes for electronic filing.

57. Despite the requirement that faxes be sent to the dedicated fax machine with barcodes identifying the claim, Daugherty instructed representatives to send faxes directly to him on the receptionist-area fax, circumventing the recording of the transmission in a claimant's file.

58. In addition, on multiple occasions, Ms. Griffith witnessed Daugherty engaged in telephone conversations that – based on statements Ms. Griffith overheard Daugherty make – were with Conn. During and immediately after these conversations, Daugherty asked Ms. Griffith to retrieve Conn's cases.

59. The communications described in the preceding paragraphs that Ms. Griffith and Ms. Carver witnessed Daugherty conducting (including telephone conversations and fax transmissions) included the identity of Conn Claims which had been appealed to the Huntington ODAR.

60. Daugherty frequently asked Ms. Griffith to assist him in locating files of claims assigned to other ALJs, and in transferring those cases to his docket. Daugherty frequently brought to Ms. Griffith lists of Social Security Numbers corresponding to Conn Claims he desired to misappropriate from previously-assigned ALJs.

61. In approximately July or August 2007, Daugherty – knowing of Ms. Griffith's suspicions – began to use another means of communication (such as email) to obtain the identity of Conn's clients.

62. Daugherty – having obtained the identity of the Conn Claims – sought out and obtained control of the Conn Claims both before and after eDib Claim Files came into effect.

63. Prior to the implementation of eDib Claim Files (described in Paragraphs 40-42), Daugherty took control of the Conn Claims not routinely assigned to him by locating the claims' paper files and taking physical possession of them from the desks, files, and workspaces of Hearing Office docket clerks, other employees, other ALJs, and Master Docket cabinets. Docket clerks, other employees, union representatives, and ALJs notified Huntington ODAR management that Daugherty was taking the Conn Claims in this fashion. Daugherty misappropriated these paper files despite clear markings on each file's cover indicating that it had been assigned to another ALJ.

64. The following examples demonstrate Daugherty's misappropriation of Conn Claims prior to the implementation of eDib Claim Files:[1]

_____

[1] Conn's clients have significant privacy interests in both the fact of their application for Social Security disability benefits and the medical and/or psychological bases for their claims. In addition, much of the evidence necessary to fully prove the Relators' claims is in the exclusive possession and control of the Social Security Administration. For these reasons, the Relators provide sufficient information to identify the example claims in the Defendants' and the Social Security Administration's records, but are not including in

29

a. During the period of time in which HOTTS was in use, Daugherty manually rifled through paper files maintained in the Master Docket cabinets, looking for Conn Claims. Working in alphabetical order, he manually removed any such claims he could find.

b. For example, on or about July 31, 2006, Ms. Griffith could not locate Conn Claims she had routinely assigned in rotation to ALJs other than Daugherty, which were missing from their normal location. After searching the Huntington ODAR offices, she located the missing files in Daugherty's office and complained to her supervisor, Kathie Goforth, and Chief ALJ Andrus. She escorted the two to Daugherty's office, showed them the misappropriated files, and together they removed and returned them to their proper location.

65. During and after the implementation of eDib Claim Files (described in Paragraphs 40-42), Daugherty took control of the Conn Claims through direct manipulation of the docket on CPMS.  As a member of the E-file cadre, Daugherty received special training in the operation of docket system, and he used that training to electronically reassign cases to himself.  Daugherty took this opportunity to reassign high numbers of Conn Claims to his docket in violation of the Rotational Requirement.

---

this Second Amended Complaint names, Social Security Numbers, or other information in which the claimants have a privacy interest.

66. The Social Security Administration did not authorize Daugherty to access CPMS
    for the purpose of assigning to his own docket cases that had not yet been assigned
    or had been assigned to other ALJs. Daugherty's access of CPMS for this purpose
    violated HALLEX § I-1-3-1(b)(13) and Federal law, including the Computer
    Fraud and Abuse Act, 18 U.S.C. § 1028, 1030.

67. Rotation of the Conn Claims among the ALJs at the Huntington ODAR was at all
    times practicable under 5 U.S.C. § 3105; Daugherty misappropriated them solely
    to further Defendants' fraudulent scheme.

68. Daugherty misappropriated Conn Claims on CPMS's docket both before and after
    they were docketed and assigned to an ALJ.

69. Because ALJs have no way of knowing that the Huntington ODAR has received a
    case from any given representative until it is docketed, Daugherty's self-
    assignment of cases prior to their docketing and assignment is powerful evidence
    of the collusion between him and Conn:

    a. When a claimant requests a hearing from a Field Office's denial of
       disability benefits, the servicing Field Office inputs the request and
       transfers the claim file to its respective ODAR.

    b. Once the electronic request and file arrives at the ODAR, it must be
       received and docketed by a Master Docket Clerk, who assigns the case to
       the next judge in the rotation.

31

c.  Prior to docketing and assignment, the only persons aware that the claimant
    has requested a hearing are the claimant and their representative, and the
    Field Office staff. Daugherty had no reason to know of the existence or
    identity of a Conn Claim at this procedural stage.

d.  The case is electronically placed in the Master Docket Clerk's New Case
    Item To Do List on CPMS, and removed after docketing and assignment.

e.  On numerous occasions, Daugherty took Conn Claims from the New Case
    Item To Do List prior to docketing and assignment, and assigned himself as
    the reviewing ALJ. He accomplished this by inputting the claimant's Social
    Security Number into CPMS, opening the case record, changing the case
    status and employee initials in the Status & Temporary Transfer Screen,
    and changing the ALJ assignment in the General Information Screen.

f.  The actions described in the preceding paragraph caused the Conn Claim in
    question to drop from the Master Docket Clerk's New Case Item To Do
    List.

g.  In directly manipulating CPMS, however, Daugherty failed to complete
    factual and procedural data fields that CPMS required.  CPMS interpreted
    Daugherty's omissions as errors by Ms. Griffith, which CPMS reported to
    Ms. Griffith's supervisors and Regional Social Security Administration
    officials. Ms. Griffith's supervisor accused her of creating the error, and of

        failing to correctly and timely docket and rotate the assignment of incoming

        Conn Claims.

    h.  Initially the cause of the errors remained unknown.  Ms. Griffith soon

        discovered that Daugherty's reassignment of the Conn Claims caused the

        error reports for which she was being blamed.  She reported Daugherty's

        actions to her supervisors, and personally asked him to stop.

    i.  Daugherty then granted virtually every one of the Conn Claims he

        reviewed.

70. The following examples demonstrate Daugherty's self-assignment and granting of

    Conn Claims prior to their docketing and assignment:

    a.  Case #1
       *Hearing Request Date:* February 13, 2007
       *Date of Disposition:* May 7, 2007
       *Disposition:* Fully favorable
       *Description:* Daugherty removed the case from the Master Docket, changed
       its status to UNWK ("unworked"), then assigned the case to his own
       docket. He successively moved the case to AWPC ("ALJ Writing on PC")
       status, then FINL ("final"), then wrote a fully favorable decision.

    b.  Case #2
       *Hearing Request Date:* February 20, 2007
       *Date of Disposition:* May 7, 2007
       *Disposition:* Fully favorable
       *Description:* (Same as for Case #1.)

    c.  Case #3
       *Hearing Request Date:* March 6, 2007
       *Date of Disposition:* May 7, 2007
       *Disposition:* Fully favorable
       *Description:* (Same as for Case #1.)

    d.  Case #4
        *Hearing Request Date:* March 6, 2007
        *Date of Disposition:* May 7, 2007
        *Disposition:* Fully favorable
        *Description:* (Same as for Case #1.)

71. In a similar fashion, Daugherty reassigned to himself cases that had already been docketed and assigned to another ALJ. The following examples – all from the Spring of 2011 – illustrate this misconduct:

    a.  On April 28, 2011, Ms. Carver noted that CPMS records showed that Daugherty had 50 Conn Claims in an AWPC ("ALJ Writing on PC") status, indicating that he was in the process of writing decisions in the cases. CPMS records showed, however, that Daugherty had already written the opinions – all fully favorable, and all conducted without a hearing.

    b.  According to date and timestamp entries recorded in CPMS, Daugherty wrote most of the decisions in these 50 Conn Claims mere minutes apart on April 13 and 14, 2011. He wrote 19 decisions on April 13, and 17 decisions on April 14. (In contrast, typical ALJs average writing two to three decisions per day.) The details of these claims are documented in CPMS and the files of the Huntington ODAR and are known to Ms. Carver.

    c.  On April 29, 2011, Ms. Carver noticed – by reviewing CPMS entries – that Daugherty's decisions were complete but had remained in AWPC status for

34

over two weeks. She emailed Huntington ODAR employees and

management asking why the cases were not being processed appropriately.

d.   That same day, then-Chief ALJ Andrus emailed the Huntington Office

employees to remind them of his long-standing directive about reassigning

cases between judges. E-mail from Charlie Paul Andrus, HOCALJ

Huntington ODAR to "#PH WV ODAR Huntington All," *Reassignment of*

*cases between judges* (April 29, 2011).

e.   On May 2, 2011, at 2:36 p.m., Daugherty emailed Andrus, describing 23

cases that "had been assigned to me from another ALJ," and stating that

most of the cases had been returned to their original ALJ. E-mail from

David B. Daugherty, ALJ Huntington ODAR, to Charlie Paul Andrus,

HOCALJ Huntington ODAR, *et al.*, *Re: Reassignment of cases between*

*judges* (April 29, 2011). Daugherty lists the names, Social Security

Numbers, and originally assigned ALJs in his e-mail.

f.   On May 2, 2011, at 4:40 p.m., Daugherty emailed Andrus again, notifying

him that Daugherty had located 19 more "reassigned" cases. E-mail from

David B. Daugherty, ALJ Huntington ODAR, to Charlie Paul Andrus,

HOCALJ Huntington ODAR, *et al.*, *Re: Reassignment of cases between*

*judges* (May 2, 2011). Daugherty lists the names, Social Security Numbers,

and originally assigned ALJs in his e-mail. In an effort to mislead others at

the Huntington ODAR to believe that he was not involved in the cases'
reassignment, Daugherty wrote in this e-mail, "Thank goodness I don't
have to do these cases!" As described above, however, Daugherty had
already written fully favorable decisions in each.

g.  In fact, Daugherty himself had reassigned the 42 cases described in the
preceding three paragraphs, placing them on his own docket. CPMS date
and timestamp fields bearing his employee identification number document
his misappropriation of these cases.

h.  Daugherty misappropriated cases that had already been assigned to other
ALJs on numerous other occasions, as the following examples illustrate:

  i.  Case #5
      *Hearing Request Date:* April 2, 2008
      *Date of Disposition:* June 29, 2009
      *Disposition:* Fully favorable
      *Age of the Case at Disposition:* 453 days
      *Description:* The case was assigned in rotation to Chief ALJ Charlie
      Paul Andrus on April 4, 2008. Daugherty reassigned the case to
      himself on May 27, 2009. Daugherty wrote a fully favorable on-the-
      record decision on June 29, 2009.

  ii. Case #6
      *Hearing Request Date:* April 27, 2009
      *Date of Disposition:* June 29, 2009
      *Disposition:* Fully favorable
      *Age of the Case at Disposition:* 63 days
      *Description:* The case was assigned in rotation to ALJ Gordon
      Griggs on April 28, 2009. Daugherty reassigned the case to himself
      on May 29, 2009, and placed it in an AWPC status on June 22, 2009.
      He wrote a fully favorable on-the-record decision on June 29, 2009.

iii.   Case #7
       *Hearing Request Date:* May 6, 2009
       *Date of Disposition:* June 29, 2009
       *Disposition:* Fully favorable
       *Age of the Case at Disposition:* 54 days
       *Description:* The case was assigned in rotation to ALJ Gordon
       Griggs on May 7, 2009. Daugherty reassigned the case to himself on
       May 19, 2009, and placed it in an AWPC status on June 22, 2009.
       He wrote a fully favorable on-the-record decision on June 29, 2009.

iv.   Case #8
       *Hearing Request Date:* May 12, 2009
       *Date of Disposition:* June 29, 2009
       *Disposition:* Fully favorable
       *Age of the Case at Disposition:* 48 days
       *Description:* The case was assigned in rotation to ALJ Andrew J.
       Chwalibog on May 13, 2009. Daugherty reassigned the case to
       himself on May 19, 2009, and placed it in AWPC status on June 22,
       2009. He wrote a fully favorable on-the-record decision on June 29,
       2009.

v.   Case #9
       *Hearing Request Date:* May 12, 2009
       *Date of Disposition:* June 29, 2009
       *Disposition:* Fully favorable
       *Age of the Case at Disposition:* 48 days
       *Description:* The case was assigned in rotation to ALJ James S.
       Quinliven on May 13, 2009. Daugherty reassigned the case to
       himself on May 19, 2009, and wrote a fully favorable decision on
       June 29, 2009.

vi.   Case #10
       *Hearing Request Date:* August 5, 2009
       *Date of Disposition:* November 30, 2009
       *Disposition:* Fully favorable
       *Age of the Case at Disposition:* 110 days
       *Description:* The case was assigned in rotation to ALJ William H.
       Gitlow on August 6, 2009. Daugherty reassigned the case to himself
       on October 14, 2009, and placed it in an AWPC status on November

3, 2009. He wrote a fully favorable on-the-record decision on November 30, 2009.

    vii.  Case #11
         *Hearing Request Date:* August 6, 2009
         *Date of Disposition:* December 1, 2009
         *Disposition:* Fully favorable
         *Age of the Case at Disposition:* 117 days
         *Description:* The case was assigned in rotation to ALJ William H. Gitlow on August 7, 2009. Daugherty reassigned the case to himself on October 14, 2009, and placed it in an AWPC status on November 3, 2009. He wrote a fully favorable on-the-record decision on December 1, 2009.

    viii.  Case #12
         *Hearing Request Date:* September 25, 2009
         *Date of Disposition:* December 1, 2009
         *Disposition:* Fully favorable
         *Age of the Case at Disposition:* 67 days
         *Description:* The case was assigned in rotation to ALJ Mark Mates on September 30, 2009. Daugherty reassigned the case to himself on October 14, 2009, and placed it in an AWPC status on November 3, 2009. He wrote a fully favorable on-the-record decision on December 1, 2009.

The details of the claims described above can be found in the records of the Social Security Administration by querying CPMS for cases with the relevant dates (and status change dates as described) and ALJ assignments.

72. In each of the cases enumerated in Paragraphs 70 and 71, Conn submitted either a Form 1696 or 1560 and a fee agreement entitling him to the maximum representative fee allowable by the Social Security Act, and in each case, Daugherty approved the fee (using SSA Form HA-L15), and granted the claimant's disability appeal.

### *Daugherty Conducts Sham Proceedings*

73. Once Daugherty seized control of a Conn Claim to which he would not have been assigned routinely, he conducted a sham proceeding to make it appear that he was performing a bona fide review of the claim.

74. Under the Social Security Act, ODAR ALJs must offer to claimants whose disability applications have been denied an opportunity for a hearing and "shall, on the basis of evidence adduced at the hearing, affirm, modify, or reverse the Commissioner's findings of fact and such decision." *Id.* § 205 (42 U.S.C. § 405).

75. Each hearing typically consists of an opening statement by the ALJ, the submission of documentary evidence, testimony by the claimant, medical and vocational experts, and other witnesses, and an argument by the claimant or his or her representative. Social Security Administration regulations provide: "At the hearing, the administrative law judge looks fully into the issues, questions you and the other witnesses, and accepts as evidence any documents that are material to the issues." 20 CFR §§ 404.944 and 416.1444. Assigned Contract Hearing Reporters create audio recordings of the hearings.

76. Genuine hearings typically last 30 to 60 minutes each. Other ALJs, conducting genuine hearings, were able to schedule only six to eight hearings per day, and tasked Senior Case Technicians and Case Technicians with assigning claims to hearing days.

77. ODAR staff are instructed to assign hearings in "first-in, first-out" order, taking into account the length of time the claimant had been waiting for a hearing, pursuant to HALLEX, §§ I-2-1-40-5; I-2-3-10.

78. Daugherty scheduled his own hearings, giving priority to Conn Claims over other claimants who had waiting longer for a hearing. Other representatives typically waited a year or more for a hearing date; Daugherty scheduled hearings for Conn's clients within weeks of the Huntington ODAR receiving the request.

79. For Conn Claims, Daugherty held perfunctory proceedings: merely opening the record, identifying those in attendance (typically himself, the Assigned Contract Hearing Reporter, and a Vocational Expert), reading the Social Security number and naming the claimant and their attorney, then granting the case and closing the record, before moving on to the next Conn Claim. Daugherty typically concluded his schedule of up to twenty hearings by 11:00 a.m.

80. Daugherty routinely scheduled up to 20 Conn Claims for sham hearings on the same day at ten-minute intervals. In addition, although the claimants would be listed on the schedule at intervals throughout the day, Conn and Eric Conn, P.S.C., instructed them all to arrive at 9:00 a.m., knowing that the hearings would be bogus and of short duration, because prior to the hearing Daugherty had decided to grant disability benefits in decisions announced from the bench, in contravention

to HALLEX requirement that such decisions be made at the hearing itself. HALLEX I-5-1-17.

81. On February 22, 2006, for example, Daugherty scheduled 20 Conn Claims for hearings at 15-minute intervals from 9:00 a.m. to 2:45 p.m. (with a 75-minute lunch break). The details of these claims can be found on the Itinerary and Schedule of Hearing form, for February 22, 2006, for Prestonsburg, Kentucky, in the possession of the Huntington ODAR.

82. In 2007, other claim representatives complained that Daugherty's hearing procedures were favoring the Conn Claims. Daugherty responded by issuing decisions on Conn Claims without holding a hearing, using a procedure known as an "on-the-record" decision. (In Social Security Administration parlance, this refers to a decision on a claim made on the basis of the existing written submissions, and not to a recorded hearing.)

83. Under ODAR regulations, on-the-record decisions are to be used only in exceptional circumstances, and Master Docket Clerks are responsible for screening for on-the-record review. *See* HALLEX § I-2-1-40-5. Despites these restrictions, Daugherty chose to make decisions on-the-record in virtually all Conn Claims from 2007 to 2011.

### *Daugherty Awards Benefits to the Conn Claimants Without Justification*

84. Although ALJs differ in their rate of claim approval (i.e., reversal of denials), the average is approximately 60-65%. ALJ caseloads vary, too, but the majority of ALJs average 200-250 cases per year.

85. During his tenure as ALJ, Daugherty approved the vast majority of the Conn Claims, with a caseload averaging several greater than the typical ALJ's. In some years, his caseload greatly exceeded even that inflated number. For Fiscal Year 2010, for example, Daugherty reviewed 1,284 cases, and granted benefits in all but 4 (an approval rate of 99.7%).

86. As a result of the fraudulent diversion and reassignment of cases to Daugherty, and his sham consideration of their merits, the Social Security Administration awarded disability benefits to Conn Claim claimants who would otherwise have not received them (specific examples are described in Paragraphs 84-108, below).

### *The Relators Discover that Conn's Medical Experts*
### *Provide False or Fraudulent Testimony*

87. In virtually all Conn Claims, Conn offered medical evidence in the form of letters from non-treating (consulting) physicians and psychologists purportedly hired to review claimants' detailed medical records, examine the claimants, and opine on their disabilities.

88. The letters described in Paragraph 87 typically recite that the physician or psychologist who signed them reviewed the claimants' medical history and examined the claimant, and identify the date on which he or she purportedly performed this work.

89. In fact, for many, if not most of the Conn Claims, the letters described in Paragraph 87 were false or fraudulent in that the consulting physician or psychologist's review of records and/or examination of the claimant was perfunctory or nonexistent, in contradiction to the letters' description.

90. On at least one occasion, a psychologist who signed letters described in Paragraph 87 claimed to have performed an incredible number of reviews and examinations given the time and complexity of the effort required. Conn submitted medical letters in 14 of the 50 Conn Claims discovered by Ms. Carver, as described in Paragraph 71(a)-(b). Each of these 14 letters were signed by Defendant Herr, and each claimed that he examined and reviewed the records of the claimant on March 17, 2011 at Conn's offices. *See also* Paragraph 103, below.

91. Despite the perfunctory or nonexistent nature of the consulting physicians' or psychologists' review of the claimants' medical condition, Conn charged his clients between $400 and $650 for each consultation.

92. Daugherty issued favorable decisions in these and 18 other cases between May 2 and May 6, 2011. These claims can be identified in the CPMS system by accessing

the claimants' electronic claims folder, and locating the name of the examining physician/psychologist and the date of the exam in the "F Sections".

93. Daugherty's favorable decisions resulted in payment of representative fees to Conn, and payment of disability benefits to his clients.

94. Subsequent to the exposure of Conn and Daugherty's fraudulent conduct, the Social Security Administration sent several of the Conn Claims that Daugherty had approved to the agency's Appeals Council, in Falls Church, Virginia.

95. In at least two such cases, the Appeals Council remanded Daugherty's favorable decision to the Huntington ODAR:

    a.  Reviewing a decision written by Daugherty on April 13, 2011 at 1:52 p.m., the Appeals Council determined that Daugherty's decision was not supported by medical evidence, and that the medical report (by Defendant Ammisetty), was inconsistent with medical evidence in the record. The Social Security Administration transferred the case to its Charleston, West Virginia, ODAR.

    b.  Reviewing a decision written by Daugherty on April 14, 2011 at 10:18 a.m., the Appeals Council found that Defendant Herr's report was insufficient and that Daugherty's decision was contrary to the medical evidence in the record.

96. In addition, Relators have learned that, subsequent to the disclosure of the
Defendants' fraudulent scheme, the Social Security Administration contracted
with Unum US, a disability insurance company, to review a sample of additional
Daugherty decisions in Conn Claims, and that many of these disability awards
have been identified as medically unjustified.

### *Conn Falsifies Claimants' Conditions*

97. Conn himself, his employees under his direction, and physicians and psychologists
he employed falsified documentation of claimants' medical and/or psychological
diagnoses and prognoses in numerous cases.

### Conn Submits Falsified Residual Functional Capacity Forms

98. A claimant in a Title II or Title XVI case who lacks any of several listed medical
impairments (or their equivalent) – *see* 20 C.F.R. § 404.1505(a), and 20 C.F.R.
Part 404, Subpart P, Appendix 1 – must undergo a residual functional capacity
(RFC) test to determine if he or she is capable of performing past relevant work or
any other substantial gainful work that exists in the national economy. *Id.*, §§
404.1505(a), 404.1520(a)(4), 404.1545 (Title II cases); *id.*, §§ 416.905(a),
416.920(a)(4), 416.945 (Title XVI cases).

99. Conn directed his employees to create, copy, and use 15 different prefilled RFC forms for claimants with purported medical impairments, and five different prefilled RFC forms for claimants with purported psychological impairments.

100.    Conn's employees followed his instructions, and randomly (or by rotation) chose one of the prefilled medical or psychological RFC forms for each of Conn's clients, without regard to the claimant's medical or psychological conditions, if any. Conn's employees wrote each claimant's name and Social Security Number on the prefilled form selected.

101.    Conn's employees presented the prefilled forms bearing the claimants' names to physicians and psychologists Conn employed, who signed the forms without reviewing or revising them to ensure that they accurately reflected the claimants' actual conditions (if any).

102.    *Dr. Frederic Huffnagle* – Conn employed Dr. Huffnagle, a physician, until Dr. Huffnagle's death in October 2010. Dr. Huffnagle performed cursory examinations of Conn's clients at Conn's offices, and, in the overwhelming majority of cases, signed one of the 15 prefilled medical RFC forms without reviewing or revising it.

103.    *Dr. David P. Herr* – Conn employed Defendant Herr to examine and issue reports on claimants' purported medical impairments. Dr. Herr performed cursory examinations of Conn's clients and, in the overwhelming majority of cases, signed

one of 11 (of the 15 total) prefilled medical RFC forms without reviewing or revising it.

104.    *Dr. Bradley Adkins* – Conn employed Defendant Adkins to examine and issue reports on claimants' purported psychological impairments. Dr. Adkins performed cursory examinations of Conn's clients and, in the overwhelming majority of cases, signed one of the five prefilled psychological RFC forms without reviewing or revising it.

105.    *Dr. Srinivas Ammisetty* – Following Dr. Huffnagle's death, Conn employed Defendant Ammisetty to examine and issue reports on claimants' purported medical impairments. Dr. Ammisetty performed cursory examinations of Conn's clients and, in the overwhelming majority of cases, signed one of 6 (of the 15 total) prefilled medical RFC forms without reviewing or revising it.

<u>Conn Writes Medical Opinions for Dr. Huffnagle</u>

106.    As described above, Dr. Huffnagle examined Conn's clients in Conn's offices. When a claimant failed to make his or her appointments with Dr. Huffnagle, Conn himself drafted a medical report that purported to describe the claimant's impairments and concluded that the claimant was permanently disabled. Dr. Huffnagle routinely signed these reports, without requesting any revisions to them.

<u>Conn Forges Physicians' Signatures on Records</u>

107.     In 2010, Conn referred some of his clients to Dr. Ira B. Potter, a radiologist
in Lackey, Kentucky, for x-ray examinations. Conn and his staff marked the forms
requesting these films with "WE DO NOT WANT THESE FILMS READ BY
ANYONE!!!!"

108.     Upon receiving the unread x-rays from Dr. Potter, Conn wrote the analysis
of each film himself, using descriptions of medical conditions he found through
Internet searches. Conn inserted these descriptions into medical records and
opinions that Dr. Huffnagle signed without reviewing or revising.

### *Conn Uses Daugherty to Get a "Second Bite of the Apple"*

109.     On numerous occasions, Daugherty was unable to take control of a Conn
Claim, and another Huntington ODAR ALJ denied disability benefits to Conn's
client.

110.     In several of these cases, Conn, upon receiving an unfavorable decision,
dismissed his client's claim and refiled for benefits at the Field Office level. When
the servicing Field Office denied the claim, Conn and Daugherty colluded to
ensure that Daugherty assigned or reassigned the appeal to himself, then issued a
favorable decision as described in Paragraphs 52-86, above.

### *Conn Pays Daugherty for Rigging His Docket and For Favorable Decisions*

111.    On information and belief, Conn made substantial monthly cash withdrawals from his law firm's operating account and from safe deposit boxes he maintained for the purpose of storing cash. *See* Staff of S.Comm. on Homeland Security and Governmental Aff., How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm at 158-160 (Oct. 7, 2013).

112.    On information and belief, Conn routinely and periodically made cash payments to Daugherty, who caused the money to be deposited in bank accounts controlled by himself, his wife, and his daughter. *Id.*

### *Relators Report the Fraud, and Expose Conn and Daugherty's Scheme*

113.    On numerous occasions between 2006 and 2011, the Relators reported Daugherty's fraudulent misconduct.

114.    As described in Paragraph 69(h), Ms. Griffith first reported Daugherty's misconduct on or about January, 2006, after her supervisor complained to her of errors in the CPMS system that were caused by Daugherty's reassignment of cases.

115.    On numerous occasions, both Ms. Griffith and Ms. Carver brought their concerns about Defendants to their supervisors at the Huntington ODAR.

116.     In 2007, Ms, Griffith reported Daugherty's misconduct to ALJ James D. Kemper.

117.     Ms. Griffith resigned from the Social Security Administration, effective November 2007. After her resignation, she continued to report the Defendants' misconduct:

    a.   In 2009, after resigning from the SSA, Ms. Griffith reported Daugherty's misconduct to SSA's Office of Inspector General (OIG) via its anonymous telephone hotline.

    b.   In 2011, Ms. Griffith again reported Daugherty's misconduct to the OIG via an email tip.

118.     On May 19, 2011, the *Wall Street Journal* published an article, "Disability-Claim Judge Has Trouble Saying 'No'," written by reporter Damian Paletta, describing Daugherty's high claim approval rate, and linking him to the Conn Claims. As described in that article, Ms. Griffith was an original source of information to Mr. Paletta.

119.     On several occasions in 2011, the Relators together reported their concerns to the SSA's OIG. Ms. Griffith and Ms. Carver were contacted by and met with OIG fraud investigators several times in the three weeks preceding the article's publication. Following the *Wall Street Journal's* publication of the Paletta article, a large number of agents arrived unannounced at the Huntington ODAR and

interviewed current and former employees. Both Ms. Griffith and Ms. Carver

cooperated fully in the OIG's investigation, and have complied fully with all

requests for information and documents.

120.     Following the *Wall Street Journal's* publication of the Paletta article, the

Permanent Subcommittee on Investigations of the Senate Committee on

Homeland Security and Government Affairs commenced an investigation into the

conduct of Daugherty and the operations of the Huntington ODAR. Both Ms.

Griffith and Ms. Carver cooperated fully in the Subcommittee's investigation.

(The investigation was subsequently conducted under the aegis of the Committee

itself.)

121.     Ms. Griffith and Ms. Carver also met with then-West Virginia Governor

Joe Manchin and explained the fraudulent scheme underway at the Huntington

ODAR.


### *Conn and Daugherty Destroy Evidence, and Refuse to Answer Investigators' Questions*

122.     Following the *Wall Street Journal's* May 2011 publication of its article on

Daugherty and Conn, Conn instructed his employees, and employed contractors

(including document shredding companies) to destroy evidence of the Defendants'

fraudulent scheme on a massive scale:

c.  Conn destroyed, or directed the destruction, of paper financial records, including financial records maintained by his mother (who sometimes worked for him at his office), disability claim case files, lists of Conn Claims cases ("DB Lists") communicated by Daugherty to Conn and his employees, medical records, and records relating to contributions to state officials and their electoral campaigns.

d.  Conn destroyed, or directed the destruction of electronic records, including emails in his business and personal email accounts with ALJs Daugherty, Andrus, and others, and computers and hard drives (which he instructed by physically destroyed with a hammer and by burning outside his office).

123.    Following the *Wall Street Journal's* May 2011 publication of its article on Daugherty and Conn, Daugherty attempted to contact Conn, sometimes calling him several times a day. Subsequently, the two Defendants agree to purchase prepaid cellular telephones and used these to communicate about the investigation into their scheme, free of concern for wiretaps placed on known business or personal telephone lines.

124.    Both Conn and Daugherty have invoked their Fifth Amendment rights against self-incrimination when investigators have asked them questions about their scheme:

e.   In 2012, counsel for the United States served on Daugherty a subpoena to testify at a deposition under the False Claims Act's Civil Investigative Demand provision, 31 U.S.C. § 3733; Daugherty asserted his Fifth Amendment privilege against self-incrimination and did not answer any questions. Docket No. 13.

f.   On October 7, 2013, the Senate Committee on Homeland Security and Governmental Affairs held a hearing titled *Social Security Disability Benefits: Did a Group of Judges, Doctors, and Lawyers Abuse Programs for the Country's Most Vulnerable?*, and subpoenaed Conn and Daugherty to provide testimony regarding the Defendants' scheme to defraud the Social Security Administration. (The Committee provided Conn and Daugherty with draft copies of its report describing the Defendants' scheme.) Conn invoked his Fifth Amendment privilege against self-incrimination; Daugherty failed to appear for the hearing.

**Conn Targets Ms. Carver in Retaliation for Her Whistleblowing**

125.   Following the *Wall Street Journal's* May 2011 publication of its article on Daugherty and Conn, then-Chief ALJ Andrus called Conn on the telephone. During the conversation, Conn and Andrus discussed the *Wall Street Journal* article, and the cooperation of SSA employees, including Ms. Carver, with the

reporter, Damian Paletta. In addition, Conn and Andrus were aware at this time of investigations by the SSA's Office of Inspector General and the Permanent Subcommittee on Investigations of the Senate's Committee on Homeland Security and Governmental Affairs. Both men also suspected that Ms. Carver had been cooperating with those investigations, too.

126.    During the conversation described in the preceding paragraph, Conn and Andrus discussed how to silence Ms. Carver. The men decided to conduct surveillance of Ms. Carver in order to obtain evidence that she had violated Flexiplace rules. (Flexiplace is an SSA program under which employees perform work away from SSA offices, at a management-approved Alternate Duty Station – typically the employee's home. Ms. Carver occasionally performed work for SSA on a Flexiplace basis.)

127.    Conn and Andrus agreed that Andrus would arrange for a Huntington ODAR employee to notify Conn when Ms. Carver went on Flexiplace status. Conn provided Andrus with a note containing a cellular telephone number for Melinda Hicks (née Martin), one of Conn's employees, to use for these communications.

128.    Andrus asked a co-worker of Ms. Carver, Sandra Nease, to watch Ms. Carver and to call one of Conn's employees when it appeared to Nease that Ms.

Carver would be working on Flexiplace. Andrus knew that Nease disliked Ms. Carver. Nease agreed to Andrus's request.

129.     For the first communication, Ms. Hicks was present in Conn's office, and put Nease's call on the cellular telephone's speaker. In addition to the date on which Ms. Carver would be working on Flexiplace from her home, Nease provided Conn and Ms. Hicks with Ms. Carver's home address in Ohio, the types of cars Ms. Carver and her husband drove, directions to Ms. Carver's home, a description of a tall privacy fence at Ms. Carver's home (which might impede videorecording Ms. Carver), and what Ms. Nease believed was the band rehearsal schedule of Ms. Carver's children.

130.     Thereafter, Nease periodically telephoned Ms. Hicks, to report the days when Ms. Carver worked from her home in Ohio. On those occasions when Nease could not reach Ms. Hicks, she left voicemails with that information.

131.     Conn tasked several employees with following Ms. Carver and videorecording her movements and activities, and they did so on several occasions.

132.     Despite months of this surveillance, Conn and his employees failed to observe and record Ms. Carver leaving her home on a day when she was scheduled to be working on Flexiplace. Conn and Andrus grew increasingly frustrated at their failure to obtain evidence to use with SSA against Ms. Carver.

133.    Thereafter, one of Conn's employees, Curtis Wyatt, recorded Ms. Carver entering the Huntington ODAR office on a day when she was scheduled to work in the office. In order to make the videorecording appear to be occurring on a prior day when Ms. Carver had worked on Flexiplace, Wyatt held up a newspaper and played an audio recording of a radio show, both from that earlier Flexiplace day.

134.    Conn submitted the falsified videorecording described in the preceding paragraph to the Social Security Administration and its OIG.

135.    Thereafter, Andrus informed Conn that he had sent the recording to the wrong address. Andrus provided the correct address to Conn, who mailed a second copy of the recording.

136.    The Social Security Administration and its OIG received the videotape and opened an investigation, which remains ongoing. In addition, the Social Security Administration's Office of General Counsel launched its own investigation.

137.    Upon learning that someone had been clandestinely following her, watching her home, videorecording her for an unknown period of time, and may be continuing to do so, Ms. Carver suffered, and continues to suffer significant emotional distress.

## COUNT I – SUBMISSION OF FALSE CLAIMS FOR FEES – CASES MISAPPRROPRIATED BY DAUGHERTY FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.

138.    Relators repeat each and every allegation of Paragraphs 1 through 137 of this Complaint with the same force and effect as if set forth herein.

139.    Through the foregoing conduct, Defendants Conn, Eric C. Conn, PSC, and Daugherty ("Count I Defendants") knowingly presented, or caused to be presented, false or fraudulent claims for representative fees for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

140.    The claims relevant to this Count include SSA Forms 1696, 1560 and fee agreements for all Conn Claims under Title II and/or Title XVI that were not initially assigned to Daugherty but which he took over or reassigned to himself and subsequently granted.

141.    Count I Defendants' claims were false or fraudulent, and were knowingly so, for the following alternative and complementary grounds:

  a.  First, because Count I Defendants' collusion constitutes fraud *per se*, and their unlawful conduct tainted each and every of the claims relevant to this Count *ab initio*; Count I Defendants colluded knowing that their conduct was contrary to Social Security and other Federal law, yet submitted and approved the claims.

b.  Count I Defendants' claims were further false or fraudulent because Conn's attestations and certifications on SSA Forms 1699, 1696, and 1560 (see Paragraphs 27, 29 and 30) were false when made, in that he had no intention to comply with them (and was in fact not complying with them in hundreds of cases), rendering the claims fraudulent *ab initio*; Count I Defendants acted knowingly because they knew at the time Conn made the statements that he would not comply with them.

c.  Count I Defendants' claims were further false or fraudulent because Count I Defendants withheld from the Social Security Administration the nature of their collusion despite affirmative obligations under Social Security and other Federal law, and under Conn and Daugherty's ethical obligations to report that information in the course of the Conn Claims' proceedings; Count I Defendants acted knowingly because they were aware of the nature of their relationship at the time they were under an obligation to report it.

d.  Count I Defendants' claims were further false or fraudulent because Daugherty's acquisition of the cases not assigned to him was in contravention to Social Security Administration policy, and his failure to objectively consider the merits of each case was in contravention of his responsibilities as an ALJ; Count I Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' false or

fraudulent nature because each knew that the claims were initially assigned to other ALJs, and that Daugherty's consideration of them was a sham intended to award benefits without satisfying the requirement of factfinding by a neutral decisionmaker.

e.  Count I Defendants' claims were further false or fraudulent because the services that Conn provided and for which Conn sought reimbursement were not for representation reimbursable under the Social Security Act, but instead were for collusion and the corruption of Daugherty, a Federal ALJ, in violation of Social Security and other Federal law; Count I Defendants acted knowingly because they were aware of the true nature of the services and the collusion between Conn and Daugherty when Conn submitted the claims.

f.  Count I Defendants' claims were further false or fraudulent because Daugherty, by colluding with Conn, acted as a *de facto* representative of Conn's clients, in violation of Social Security and other Federal law, and the SSA Forms 1696 and 1560 failed to disclose Daugherty's *de facto* representation; Count I Defendants acted knowingly because at the time Conn submitted the claims, they knew that Daugherty would be serving in that role, and not as an independent ALJ.

g.  Count I Defendants' claims were further false or fraudulent because Conn

expressly misstated his disciplinary history before a Federal program or

agency, the U.S. Court of Appeals for Veterans Claims; Conn knew at the

time he submitted the claims including this false statement that he was

barred for life from appearing as a representative before that Court.

142.     With respect to each and every of the foregoing false or fraudulent bases of

the claims relevant to this Count, had responsible officials of the Social Security

Administration known the truth, they would have disapproved the claims.


### COUNT II – USE OF A FALSE RECORD FOR FEES– CASES MISAPPRROPRIATED BY DAUGHERTY FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.

143.     Relators repeat each and every allegation of Paragraphs 1 through 137 of

this Complaint with the same force and effect as if set forth herein.

144.     Through the foregoing conduct, Defendants Conn, Eric C. Conn, PSC, and

Daugherty ("Count II Defendants") knowingly made, used, or caused to be made

or used, false records or statements material to false or fraudulent claims for

representative fees, in violation of the False Claims Act, 31 U.S.C. §

3729(a)(1)(B).

145.    The claims relevant to this Count include all Conn Claims under Title II or

Title XVI that were not initially assigned to Daugherty but which he took over or

reassigned and subsequently granted.

146.    Count II Defendants' records were false or fraudulent, and were knowingly

so, for the following alternative and complementary grounds:

   a.   Daugherty's records of assignment and reassignment of these claims were

        false or fraudulent because HALLEX 1-2-1-55, and then-Chief ALJ

        Andrus's directives required the Conn Claims to be assigned to ALJs in the

        Huntington ODAR on a rotating basis, and Daugherty assigned or

        reassigned them to himself without adequate justification, and because in

        entering data into fields in CPMS that were intended for the use of Master

        Docket Clerks, Daugherty exceeded his authorized use of that system;

        Count II Defendants had knowledge (as defined by the False Claims Act,

        31 U.S.C. § 3729(b)(1)(A)) of the records' or statements' false or

        fraudulent nature because Daugherty was aware of HALLEX's Rotational

        Requirement and Chief ALJ Andrus's directives, and that he lacked

        justification for assigning or reassigning the Conn Claims to himself.

   b.   All of the disposition listings, hearing audiotapes, contents of the Conn

        Claims files, all records of decision made by Daugherty with respect to the

        these claims, were false or fraudulent insofar as they omitted or concealed

the collusive nature of the relationship between the Count II Defendants; these records were knowingly made or used because they were aware of the nature of their relationship at the time they were under an obligation to report it.

c.  All written communications by Daugherty to other Huntington Office employees, which were intended to mislead them regarding the nature of his misappropriation of Conn Claims which either were unassigned and which he assigned to himself, or were originally assigned to other ALJs, and which he misappropriated to his own docket; these records were knowingly made or used because Daugherty knew the true, collusive nature of the relationship between him and the other Count II Defendants and omitted or concealed its true character in these records.

d.  Social Security Administration Forms 1699 (to the extent these records do not themselves constitute claims under the False Claims Act) were false or fraudulent because Conn's attestations and certifications them (see Paragraph 30) were false when made, in that he had no intention to comply with them (and was in fact not complying with them in hundreds of cases), rendering the Count II Defendant's claims in those cases fraudulent *ab initio*; Count II Defendants acted knowingly because they knew at the time Conn made the statements that he would not comply with them.

147.     The false or fraudulent nature of the foregoing records or statements was material to the SSA's decision to approve the representative fee claims for payment because had responsible officials of the Social Security Administration known the truth, they would have disapproved the claims to which they relate.

**COUNT III – SUBMISSION OF FALSE CLAIMS FOR DISABILITY BENEFITS – MISAPPROPRIATION OF CASES BY DAUGHERTY FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.**

148.     Relators repeat each and every allegation of Paragraphs 1 through 137, and 138 through 142 of this Complaint with the same force and effect as if set forth herein.

149.     Through the foregoing conduct, Defendants Conn, Eric C. Conn, PSC, and Daugherty ("Count III Defendants") knowingly presented, or caused to be presented, false or fraudulent claims disability benefits for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

150.     The claims relevant to this Count those described in Paragraph 140.

151.     Count III Defendants' claims were false or fraudulent for the reasons given in Paragraph 141, and because that misconduct tainted not only the representative fees, but the underlying claims for disability benefits under Title II or Title XVI of the Social Security Act.

152.     With respect to each and every of the foregoing false or fraudulent bases of the claims relevant to this Count, had responsible officials of the Social Security Administration known the truth, they would have disapproved the claims for disability benefits.

**COUNT IV – USE OF A FALSE RECORD FOR DISABILITY BENEFITS – MISAPPROPRIATION OF CASES BY ALJ DAUGHERTY FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.**

153.     Relators repeat each and every allegation of Paragraphs 1 through 137, and 143 through 147 of this Complaint with the same force and effect as if set forth herein.

154.      Through the foregoing conduct, Defendants Conn, Eric C. Conn, PSC, and Daugherty ("Count IV Defendants") knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for representative fees, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

155.     The claims relevant to this Count those described in Paragraph 145.

156.     Count IV Defendants' claims were false or fraudulent for the reasons given in Paragraph 146, and because that misconduct tainted not only the representative fees, but the underlying claims for disability benefits under Title II or Title XVI of the Social Security Act.

157.     With respect to each and every of the foregoing false or fraudulent bases of the claims relevant to this Count, had responsible officials of the Social Security Administration known the truth, they would have disapproved the claims for disability benefits.

## COUNT V – SUBMISSION OF FALSE CLAIMS FOR DISABILITY BENEFITS AND FEES – FALSE MEDICAL AND PSYCHOLOGICAL RECORDS FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(A), et seq.

158.     Relators repeat each and every allegation of Paragraphs 1 through 137 of this Complaint with the same force and effect as if set forth herein.

159.     Through the foregoing conduct, all Defendants knowingly presented, or caused to be presented, false or fraudulent claims disability benefits for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

160.     The claims relevant to this Count include all Conn Claims under Title II and/or Title XVI in which Conn submitted medical and/or psychological records containing false, fraudulent, or fictitious information concerning the diagnoses and prognoses of Conn's clients, or on which Conn signed the name of a physician or psychologist without their authorization, and without their review of the diagnosis or prognosis to which their purported signature attested.

161.     Defendants' claims were false or fraudulent insofar as RFCs and other medical and/or psychological opinions and records contained false descriptions of claimants' medical and/or psychological conditions and prognoses.

162.     Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the foregoing paragraph's claims' false or fraudulent nature because Conn expressly directed his employees to use preprinted RFCs and because Conn, a layperson, knew when he wrote medical and/or psychological diagnoses and prognoses that he lacked any skill or training in making such conclusions, and because physicians and/or psychologists hired by Conn to provide opinions signed these documents without reviewing or modifying them.

163.     Defendants' claims were further false or fraudulent insofar as Conn himself signed the names of physicians or psychologists to medical records of claimants.

164.     Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the foregoing paragraph's claims' false or fraudulent nature because Conn knew at the time he signed them that he was not authorized to do so, and because he knew that the physicians or psychologists whose names he signed had not, and would not, review those records before Conn submitted them to SSA.

**COUNT VI – USE OF A FALSE RECORD FOR DISABILITY BENEFITS
AND FEES – FALSE MEDICAL AND PSYCHOLOGICAL RECORDS
FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(B), et seq.**

165.    Relators repeat each and every allegation of Paragraphs 1 through 137 of

this Complaint with the same force and effect as if set forth herein.

166.    Through the foregoing conduct, Defendants knowingly made, used, or

caused to be made or used, false records or statements material to false or

fraudulent claims for disability benefits, in violation of the False Claims Act, 31

U.S.C. § 3729(a)(1)(B).

167.    The claims relevant to this Count include all Conn Claims under Title II

and/or Title XVI in which Conn submitted medical and/or psychological records

containing false, fraudulent, or fictitious information concerning the diagnoses and

prognoses of Conn's clients, or which Conn signed the name of a physician or

psychologist without their authorization, and without their review of the diagnosis

or prognosis to which their purported signature attested.

168.    The false or fraudulent records or statements relevant to this Count include

all RFCs and other medical and/or psychological opinions and records that

contained false descriptions of claimants' medical and/or psychological conditions

and prognoses.

169.    Defendants' records were false or fraudulent insofar as RFCs and other medical and/or psychological opinions and records contained false descriptions of claimants' medical and/or psychological conditions and prognoses.

170.    Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the foregoing paragraph's records' false or fraudulent nature because Conn expressly directed his employees to use preprinted RFCs and because Conn, a layperson, knew when he wrote medical and/or psychological diagnoses and prognoses that he lacked any skill or training in making such conclusions, and because physicians and/or psychologists hired by Conn to provide opinions signed these documents without reviewing or modifying them.

171.    Defendants' records were further false or fraudulent insofar as Conn himself signed the names of physicians or psychologists to medical records of claimants.

172.    Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the foregoing paragraph's records' false or fraudulent nature because Conn knew at the time he signed them that he was not authorized to do so, and because the physicians or psychologists whose names he signed had not, and would not, review those records before Conn submitted them to SSA.

173.    The false or fraudulent nature of these records or statements was material to the SSA's decision to approve the claims for payment because the types of

68

medical and/or psychological diagnoses and prognoses they contained had a natural tendency to influence, or were capable of influencing the determination of disability benefits under Titles II and XVI of the Social Security Act.

### COUNT VII – FALSE CLAIMS CONSPIRACY
### FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729(a)(1)(C), et seq.

174.     Relators repeat each and every allegation of Paragraphs 1 through 173 of this Complaint with the same force and effect as if set forth herein.

175.     Through the foregoing conduct, Defendants Conn, Eric C. Conn, PSC, and Daugherty (the "Count VII Defendants") conspired to commit a violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (B), in violation of the False Claims Act, *id.*, § 3729(a)(1)(C).

176.     The Count VII Defendants entered into an agreement to submit false claims for representative fees and disability benefits to the SSA, for the misappropriation of Conn's cases by Daugherty, and for Daugherty's approval of those fees and granting of those benefits.

177.     The Count VII Defendants committed overt acts in furtherance of the conspiracy, including the submission of false and fraudulent claims for disability, reconsideration, and requests for hearing, the communication by Conn and Eric Conn, P.S.C., to Daugherty of lists of claims to enable him to take them over, the holding of sham hearings and other proceedings to provide the appearance of

legitimate process, the rendering of corrupt decisions granting disability benefits

to clients of Conn and Eric Conn, P.S.C., and the concealment of the true nature of

Daugherty's misappropriation of Conn Claims.

## COUNT VIII – FALSE CLAIMS RETALIATION
## FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3730(h)

178.     Plaintiff Sarah Carver repeats each and every allegation of Paragraphs 1

through 130 of this Complaint with the same force and effect as if set forth herein.

179.     Through the foregoing conduct, Defendant Conn and Eric C. Conn, PSC,

(the "Count VIII Defendants") harassed Ms. Carver in violation of the False

Claims Act, 31 U.S.C. § 3730(h)(1).

180.     Ms. Carver was, at all times relevant to this Count, an employee of the

SSA, and entitled to protection from retaliation under the False Claims Act.

181.     Ms. Carver was, at all times relevant to this Count, engaged in protected

activity under the False Claims Act, by reporting the Count VIII Defendants'

ongoing violations of the Act and misconduct to the SSA, its OIG, Committee

staff of the United States Senate, then-Governor Joe Manchin, and the *Wall Street

Journal,* all in an effort to stop the Count VIII Defendants' violations of the False

Claims Act.

182.     Conn and Andrus's efforts to silence Ms. Carver were done because of her

protected activities.

183.　　Conn had knowledge of Ms. Carver's protected activities when he and

Andrus retaliated against her.

184.　　As a result of Conn's harassment in violation of the False Claims Act, Ms.

Carver suffered special damages, including but not limited to emotional distress.

## JURY TRIAL DEMAND

185.　　Relators demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray that the Court enter judgment against Defendants as

follows:

(a) that the United States be awarded damages in the amount of three times the

damages sustained by the United States because of the false claims alleged within

this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.,

provides;

(b) that civil penalties of $11,000 be imposed for each and every false claim that

Defendants caused to be presented to the United States and/or its grantees, and for

each false record or statement that Defendants made, used, or caused to be made

or used that was material to a false or fraudulent claim;

(c) that attorneys' fees, costs, and expenses that the Relators necessarily incurred in

bringing and pressing this case be awarded;

(d) that the Relators be awarded the maximum amount allowed to it pursuant to the

False Claims Act;

(e) that, pursuant to the False Claims Act, Ms. Carver be awarded damages from

Conn for his unlawful retaliation against her in an amount to be determined at

trial; and

(f) that this Court award such other and further relief as it deems proper

Respectfully submitted,


*/s/ Mark A. Wohlander*
Mark A. Wohlander
Wohlander Law Office, PSC
wohlanderlaw@insightbb.com
P.O. Box 910483
Lexington, Kentucky 40591
Telephone: (859) 361-5604

Brian A. Ritchie
brian@wallingfordlaw.com
William Nicholas Wallingford
nick@wallingfordlaw.com
Wallingford Law, PSC
3141 Beaumont Centre Circle, Suite 302
Lexington, Kentucky 40513
Telephone: (859) 219-0066

Benjamin J. Vernia
bvernia@vernialaw.com
The Vernia Law Firm
1455 Pennsylvania Ave., N.W.,
Suite 400

Washington, D.C.  20004
Telephone: (202) 349-4053
***Pro Hac Vice***

CO-COUNSEL FOR RELATORS
JENNIFER GRIFFITH AND
SARAH CARVER

Date: December 6, 2013

## Certificate of Service

I hereby certify that a copy of the foregoing Second Amended Complaint was sent

to the following:

Hon. Eric Holder                         Hon. Kerry B. Harvey
Attorney General                         United States Attorney
  of the United States                     for the Eastern District
U.S. Department of Justice                 of Kentucky
950 Pennsylvania Avenue, NW              260 West Vine Street, Suite 300
Washington, D.C. 20530-0001             Lexington, Kentucky, 40507-1671
*[Via Priority Mail]*                    *[Via Priority Mail]*


                                         */s/ Mark A. Wohlander*
                                         CO-COUNSEL FOR RELATORS
                                         JENNIFER GRIFFITH AND
                                         SARAH CARVER