```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION AT PIKEVILLE

 3
      JENNIFER L. GRIFFITH, et al.,   :  Docket No. CV 11-157
 4                                    :
                 Plaintiffs,          :  Covington, Kentucky
 5                                    :  Monday, September 8, 2014
           versus                     :  9:00 a.m.
 6                                    :
      ERIC C. CONN, et al.,           :
 7                                    :
                 Defendants.          :
 8
                                    - - -
 9
                      TRANSCRIPT OF EVIDENTIARY HEARING
10                      BEFORE AMUL R. THAPAR
                      UNITED STATES DISTRICT COURT JUDGE
11
      APPEARANCES:
12
      For the Plaintiffs:         BENJAMIN VERNIA, ESQ.
13                                The Vernia Law Firm
                                  1455 Pennsylvania Ave. N.W.
14                                Suite 400
                                  Washington, DC 20004
15
                                  BRIAN A. RITCHIE, ESQ.
16                                Wallingford Law, PSC
                                  3141 Beaumont Centre Circle
17                                Suite 302
                                  Lexington, KY 40513
18
                                  MARK A. WOHLANDER, ESQ.
19                                Wohlander Law Office
                                  P.O. Box 910483
20                                Lexington, KY 40591
21
      For the Defendants,         J. KENT WICKER, ESQ.
22    Eric C. Conn and            LESLEY STOUT BILBY, ESQ.
      Eric C. Conn, P.S.C.:       Dressman Benzinger LaVelle PSC
23                                321 W. Main Street
                                  2100 Waterfront Plaza
24                                Louisville, KY 40202
25
```

```
 1   For the Defendant,          RODNEY A. SMITH, ESQ.
     David P. Herr, M.D.:        Bailey & Glasser LLP
 2                               209 Capitol Street
                                 Charleston, WV 25301
 3

 4   For the Defendant,          JONAH LEE STEVENS, ESQ.
     Bradley Adkins, M.D.:       Hamilton & Stevens, PLLC
 5                               117 Caroline Avenue
                                 P.O. Box 1286
 6                               Pikeville, KY 41502

 7
     For the Defendant,          W. KENT VARNEY, ESQ.
 8   Srinivas Ammisetty, M.D.:   130 Division Street
                                 Pikeville, KY 41501
 9

10   For the Movant:            PATRICK M. KLEIN, II, ESQ.
                                U.S. Department of Justice
11                              601 D Street N.W.
                                Room 9548
12                              Washington, D.C. 20004

13
     Court Reporter:            JOAN LAMPKE AVERDICK, RMR-CRR
14                              Official Court Reporter
                                35 W. Fifth Street
15                              Covington, KY 41011
                                (859) 291-9666
16

17         Proceedings recorded by mechanical stenography,
     transcribed by computer.
18

19

20

21

22

23

24

25
```

```
 1          (Proceedings commenced at 9:00 a.m.)

 2               THE COURT:  Please call the case.

 3               DEPUTY CLERK:  Pikeville civil 11-157, Jennifer

 4     Griffith versus Eric Conn, et al.

 5               THE COURT:  Counsel please enter your appearances.

 6               MR. WOHLANDER:  Good morning, Your Honor.  Mark

 7     Wohlander, Ben Vernia, Brian Ritchie and Nick Wallingford on

 8     behalf of the relators in this case.

 9               THE COURT:  Good morning.

10               MR. WICKER:  Good morning, Your Honor.  Kent Wicker

11     and Leslie Bilby for Mr. Conn and the Conn law firm.  I also

12     have with me Mr. Conn and Becky Rose, a representative of the

13     firm.

14               THE COURT:  Okay.  Good morning.  Counsel, we're here

15     for an evidentiary hearing.

16               MR. KLEIN:  Your Honor, I'm sorry.  There are a

17     couple more attorneys.  Patrick Klein for the United States.

18               THE COURT:  Good morning, Mr. Klein.

19               MR. STEVENS:  Jonah Stevens for Dr. Bradley Adkins.

20               MR. VARNEY:  Good morning, Your Honor.  Kent Varney

21     on behalf of Dr. Ammisetty.

22               MR. SMITH:  Good morning, Your Honor.  Rodney Smith

23     on behalf of Dr. Herr.

24               THE COURT:  All right.  Good morning to everyone.  I

25     apologize for cutting that short.
```

1          Mr. Wicker, you have a pending motion to quash, correct?

2                    MR. WICKER:  We do, Your Honor, for a protective

3     order.

4                    THE COURT:  Is it really a protective order?

5                    MR. WICKER:  It's really a motion in limine, Your

6     Honor.

7                    THE COURT:  Yeah, that seems more appropriate.  And

8     why is it -- let me ask you this, because in the motion, you

9     don't argue -- I mean, you focus your argument on a number of

10    things, but why doesn't it just come down to relevance?

11                   MR. WICKER:  It's all relevance, Your Honor.  That's

12    the real issue.  The Court set this hearing for a limited

13    purpose to talk about jurisdictional facts.  Those are the

14    ones that are at issue.

15                   THE COURT:  Yeah.  How is this -- how is Mr. Conn's

16    testimony relevant to the hearing today?

17                   MR. WOHLANDER:  Your Honor, we believe it's relevant

18    in this regard:  The very issue that the Court's talking

19    about, the voluntariness issue.  And you're going to be

20    focusing on Title 5 in the Code of Federal Regulations and

21    HALLEX and then whatever else is out there.

22                   THE COURT:  Is there anything else out there?

23                   MR. WOHLANDER:  I don't think so, other than maybe

24    the Inspector General for the Social Security Administration,

25    their web site where it talks about, you know, that you could

1    do it anonymously and so forth, but other than that.

2         So the reason I think it's relevant -- and certainly the

3    Court, you know, may disagree.  I know Mr. Wicker disagrees

4    with me -- is the fact is, they started reporting this years

5    ago; 2006, 2007.  And I think that the testimony that I want

6    to elicit from Mr. Conn is that during that time, he was in

7    collusion with the chief judge, Chief Judge Andrus, who

8    basically was the firewall in getting it beyond that.  And he

9    was also working with Judge Daugherty.  So we know --

10        THE COURT:  But how does that go to the voluntariness

11   of the disclosure, which is all I care about at this point,

12   right?

13        MR. WOHLANDER:  The reason it goes to the

14   voluntariness is because, okay, say one time, yes; but over

15   and over and over they continued to report it.  So does that

16   not come down to, you know, were their acts voluntary?  Even

17   if they were required under HALLEX to make some report, they

18   made the report.  If you decide that HALLEX requires them to

19   do it, then how about all these other times afterwards that

20   they continued to report it?

21        THE COURT:  Well, Mr. Wicker's argument isn't that

22   they didn't make the report.  His argument is that the reports

23   were mandated and, thus, not purely voluntary.

24        MR. WOHLANDER:  And my argument is, yes, maybe the

25   first time.  And I think there's only one case out there that

1    talks about --

2              THE COURT:  No, I understand what your legal argument

3    is.  What I'm trying to understand is what Mr. Conn's

4    testimony, why that's relevant if Mr. Wicker says -- now,

5    look, if Mr. Wicker puts at issue the number of times they

6    reported, we can discuss it.  Even then, I don't know that I

7    see the relevance.  But at this point, my inclination is not

8    to allow you to call Mr. Conn.

9         If you think during the hearing, for some reason, it

10   becomes relevant, I want to know exactly why, and then we can

11   call him.

12             MR. WOHLANDER:  Okay.  That's fine, Your Honor.  So

13   it appears that there's been a concession by Mr. Wicker that

14   they were the original source.  Then all that's left is the

15   voluntariness, or am I missing that?

16             THE COURT:  Go ahead.

17             MR. WICKER:  Obviously, Your Honor, I don't concede

18   that they're original sources because that's a legal standard,

19   and part of that is whether they came forward under

20   voluntarily or under a legal compulsion.  That's the purpose

21   of the hearing today and argument.

22        There is no dispute that these are the relators and

23   they're the ones who complained to the Inspector General and

24   to the management of the Social Security Administration.

25             MR. WOHLANDER:  I must have just misread Mr. Wicker's

1    motion for protective order.  I thought he was saying in there

2    that there was no question that they were the source of the

3    information.  So I must have misread it.

4                THE COURT:  No, he's saying there is no -- he said

5    the same thing just now; there's no question they're the

6    source of the information.  Whether they're the original

7    source involves a legal interpretation that the Court has to

8    make; and that goes, in part, to the voluntariness of their

9    disclosures.

10                MR. WOHLANDER:  I apologize, Your Honor.  I'm a

11    little bit slow most of the days.

12                THE COURT:  Right, Mr. Wicker?  Did I correctly

13    summarize?

14                MR. WICKER:  Yes.

15                MR. WOHLANDER:  Thank you.  Appreciate it.

16                THE COURT:  Okay.  You can call your first witness.

17                MR. WOHLANDER:  Thank you, Your Honor.

18                MR. VERNIA:  Your Honor, relator calls Jennifer

19    Griffith to the stand.

20                MR. WICKER:  I'd ask to invoke the rule, Your Honor.

21                THE COURT:  Okay.  The rule's been invoked for both

22    sides.

23          Mr. Klein, do you anticipate -- you're welcome to ask

24    questions.  Do you anticipate asking questions?

25                MR. KLEIN:  Your Honor, I don't anticipate asking

 1    questions.  I reserve the right if the need should arise, but

 2    at this present time, I don't have an expectation of asking

 3    questions.

 4         THE COURT:  Okay.  What about -- I'm not calling you

 5    the back row derogatorily, but because you're sitting back

 6    there.  Any of you?  Go ahead.

 7         MR. SMITH:  It's the same here.  I don't anticipate

 8    asking questions but would like to reserve the right.

 9         THE COURT:  Okay.

10         MR. VARNEY:  That's the same, Your Honor.  And also,

11    I kept most of the documents on my computer.  They told me not

12    to turn it on until I have your permission.

13         THE COURT:  You can turn it on.  Just keep it silent.

14         MR. VARNEY:  Okay.

15         THE COURT:  And I'll make sure I have mine in silent

16    mode as well.

17         MR. STEVENS:  The same, Judge.  We just reserve the

18    right to ask questions later.

19         THE COURT:  Okay.  I should note for the record that

20    I think, although I haven't confirmed with my staff, that

21    Judge Daugherty -- Ms. Dallas, are you aware of this?

22         DEPUTY CLERK:  Yes, I talked to him.

23         THE COURT:  You talked to him?

24         DEPUTY CLERK:  On Friday.

25         THE COURT:  He called to talk to me.  I had Tammy,

1      Ms. Dallas, call him back and tell him that would be an

2      ex parte communication.  She explained that to him.  That's

3      all we know.

4              MR. WOHLANDER:  Your Honor, maybe I can enlighten the

5      Court just a little bit.  I talked to Lex Coleman.  He's an

6      assistant public defender in the Southern District of West

7      Virginia.  I apologize.  I talked to him Friday afternoon.

8      And I had a conversation with him, and he said that if Judge

9      Daugherty was to come, he would invoke his right and he would

10     not take the stand and he wasn't going to be doing anything.

11         I told him that the Judge -- that you had issued an order

12     to be here and that I would advise the Court that I talked to

13     you.  It was my impression from talking to Mr. Coleman that

14     Judge Daugherty would not be here today.

15             THE COURT:  Okay.  Maybe that's why he called, to get

16     clarification on whether he had to be here.  I just felt

17     uncomfortable, for obvious reasons, having any communication

18     with anyone at all.

19             MR. WOHLANDER:  And that's exactly why I talked with

20     his assistant public defender, even though he's not

21     representing him on the civil matter.  I just said, look, if

22     you want to advise Judge Daugherty that there's a hearing, and

23     I'll let the Court know that we talked.

24             THE COURT:  Okay.  All right.

25             PLAINTIFF'S WITNESS, JENNIFER GRIFFITH, SWORN

1          MR. VERNIA:  Your Honor, just by way of explanation

2     before I examine Ms. Griffith, my plan this morning was to

3     call Ms. Griffith and then Ms. Carver, her fellow relator, and

4     then we would call retired ALJ Dan Kemper to the stand.

5          THE COURT:  Okay.

6          MR. VERNIA:  Just so that it's clear, Ms. Griffith

7     and Judge Kemper are former Social Security Administration

8     employees.  Ms. Carver is a current Social Security

9     Administration employee.  And the SSA has consented to the

10    testimony of all three of them --

11         THE COURT:  Okay.

12         MR. VERNIA:  -- via letter that I can provide the

13    Court if it's interested.

14         THE COURT:  No, I'll take your word for it.  And

15    Mr. Klein's here anyway to protect the interest of the United

16    States.

17         MR. VERNIA:  Thank you, Your Honor.

18         THE COURT:  Although I don't know that you're here

19    technically as a representative of the SSA, since the

20    government's large and amorphous.

21         MR. KLEIN:  Thank you, Your Honor.  That is correct,

22    I am here to represent the United States, and I've talked with

23    counsel.  To the extent I think the guidelines to the letter

24    may be exceeded, I'll step up, but I'm not here as a direct

25    representative of Social Security on the administrative side.

*Griffith - Direct*

11

```
 1              THE COURT:  Okay.  Thank you.  You may proceed.

 2                         DIRECT EXAMINATION

 3   BY MR. VERNIA:

 4   Q.   Ms. Griffith, can you please state your full name?

 5   A.   Jennifer L. Griffith.

 6   Q.   And where do you currently reside?

 7   A.   427 Muddy Branch, Flatwoods, Kentucky.

 8   Q.   Were you previously employed at the Social Security

 9   Administration?

10   A.   Yes.

11   Q.   And approximately when were you -- did you work there?

12   A.   From 2001 till 2007.

13   Q.   And what was your starting position at SSA?

14   A.   Senior case technician.

15   Q.   Okay.  I'm having a little trouble hearing.

16   A.   Senior case technician.

17   Q.   Thank you.  How long were you a senior case technician?

18   A.   I was a senior case technician from 2001 till probably

19   2004.

20   Q.   Is that sometimes referred to as an SCT?

21   A.   Yes.

22   Q.   And what job did you take after you were an SCT?

23   A.   I transferred into an internal position, master docket

24   clerk or a case intake technician.

25   Q.   And where physically were you located when you were at
```

*Griffith - Direct*

1    these positions?

2    A.   At both times, within the Huntington, West Virginia

3    Office of Hearings and Appeals or ODAR office.  By 2004, we

4    were located at Ninth Street Plaza in Huntington, West

5    Virginia.

6    Q.   Has SSA changed the name of that office from time to

7    time?

8    A.   Yeah.  When we were originally hired in, it was as the

9    Office of Hearings and Appeals, or OHA.  It changed titles to

10   the Office of Disability Adjudication and Review.  I don't

11   remember exactly what year that happened, but it was after --

12   two or three years after I was hired.

13   Q.   And that's sometimes referred to as O-D-A-R, or ODAR?

14   A.   Yes.

15   Q.   Was the function of the office the same?

16   A.   Yes.

17   Q.   Okay.  So you had two positions.  Were there any others

18   that you held at that office?

19   A.   Yes.

20   Q.   What else?

21   A.   No, no other position I held.  Master docket clerk,

22   senior case technician.

23   Q.   So from 2004 on, you were a master docket clerk; is that

24   right?

25   A.   Yeah.  I'm not exactly certain of the specific date, but

1   it was about 2004.

2   Q.   And when did you leave SSA's employment?

3   A.   In October of 2007.

4   Q.   Let's begin with the SCT or senior case technician

5   position.  Overall, what were your responsibilities?

6   A.   The primary job of the senior case technician was to

7   prepare the documents that were present in the claims file for

8   a hearing before the administrative law judge.  Just organize

9   the data, that was a primary function.

10  Q.   Where did the case files come from?

11  A.   From the district offices.  And there were a number of

12  them that fed into the Huntington hearing office, but there

13  were maybe six, if I remember.  Approximately six servicing

14  field offices that fed into the Huntington hearing office.

15  Q.   When you began your employment as an SCT, were those

16  paper files or electronic?

17  A.   They were all paper at the time that I began my

18  employment.

19  Q.   Okay.  Were they all paper throughout that SCT period,

20  2001 to 2004?

21  A.   Primarily, although the new electronic system had started

22  to go online about the same time that I had transferred job

23  positions.  We had a few things that were feeding in

24  electronically; but, by and large, everything was still

25  predominantly paper at that point.

1    Q.   Could you describe for me the process of putting a case

2    file together for an ALJ to review, as an SCT, when you were

3    employed as an SCT?

4    A.   Sure.  There is A through F sections with C section being

5    vacant.  And you predominantly just make sure that you

6    exhibitized or stamped them as exhibits and counted the page

7    numbers of each document.  The A section would be

8    jurisdictional information.  The B section would be

9    correspondence.  C could be empty.  D would be questionnaires

10   filled out by the plaintiff or letters written on behalf of

11   the plaintiff.  And the F section would be the medical

12   information.  You just organize those by provider and date

13   order and stamp them and noted the number of pages.

14   Q.   And after you were done or an SCT was done preparing the

15   file, what happened to the file at that point?

16   A.   The judge would -- if it was assigned to a judge at that

17   point, usually, by and large, it was at that point -- it would

18   simply go into that judge's drawers and await the judge to

19   review it or to do his prehearing preparation.

20   Q.   Approximately, how many of these case files would you do

21   in a typical day as an SCT?

22   A.   In a day?

23   Q.   Yes, ma'am.

24   A.   They liked for you to do four a day.  You know, also at

25   this time, SCTs had other job functions.  Some SCTs did

1    scheduling for the judges, and we also did closing and mailing

2    of hearing decisions.  But an average would be two to three

3    per day, but they really wanted you to do -- they encouraged

4    you to try and get four done a day.

5    Q.  And how voluminous, typically, were these case files that

6    you were working with?

7    A.  I think that depended in large part on whether the

8    plaintiff was represented by an attorney or not, and also it

9    depended on, you know, the medical impairments of the

10   plaintiff, how much they had wrong.  But they could be as

11   little as like an inch thick, and I've seen them be as big as

12   that.  (Indicating.)  I mean, it varied.

13   Q.  And just for the record, what you showed me, it was about

14   six inches, eight inches?

15   A.  Yeah.  I've seen them vary.  I've seen them -- at times,

16   I've had them take up the entire space of this thing, of this

17   desk.

18   Q.  Can you describe to me about how big that is?

19   A.  I don't know.  Thirty-six inches.  I've seen them be

20   very, very voluminous.  Those were typically cases that would

21   go up on appeal and come back.

22   Q.  And how were you trained or how were SCTs trained at ODAR

23   for this job?

24   A.  You mean who trained us internally?

25   Q.  What was the process?

1    A.   Well, when we got there, there really wasn't a training

2    process in place, at least for the Huntington, West Virginia

3    hearing office.  They really didn't know what to do with us at

4    that time.  It was a lot of internal turmoil about whether --

5    the reasons that we were hired.  As a result, no one really

6    wanted to show us what to do, so we spent a couple months

7    stuffing envelopes, one or two months.

8         So then finally it was determined that our lead case

9    technicians for -- there were two groups in the office at that

10   time, group A and group B.  And it was determined that the

11   lead case technicians would be the ones responsible for our

12   training.

13   Q.   Was lead case technician, was that a position above

14   senior case technician?

15   A.   It would have been one level above the senior case

16   technicians.

17   Q.   So eventually, you said it was decided the lead case

18   technician would take care of your training?

19   A.   Yes.

20   Q.   And what did that consist of?

21   A.   It basically consisted of showing us how to work the

22   copier, showing us different programs on the computer.  They

23   showed us where things needed to be mailed to when we closed

24   them, and they showed us how they prepared case analysis or

25   how they prepared any of the exhibit lists that told the ALJ

1    what was in the file.

2    Q.   Was there a point in time where you received additional

3    training as an SCT?

4    A.   Yeah.  It happened, I want to say about a little over two

5    years after we had been working there.  So I think it was

6    approximately 2003 before we received any external training.

7    Q.   And what was that?

8    A.   We went to Birmingham, Alabama, and we received training

9    there.  They gave us training that dealt more with the

10   disability listings than it did necessarily procedure.  But

11   they told us in a training that whatever we learned there,

12   that local rules apply.  So if your office did it differently,

13   then you were to follow your local rules.

14   Q.   Did you receive any additional training beyond what you

15   just described as external training in Birmingham, Alabama?

16   A.   No.

17   Q.   Did any of this training include the detection and

18   reporting of fraud?

19   A.   No.

20   Q.   When you were hired, was it explained to you that part of

21   your job would be to investigate fraud?

22   A.   No.

23   Q.   Were there cases involving fraud that you handled through

24   the normal course of your work as SCT?

25   A.   Periodically, the office would receive overpayment cases

1     or potential cases that had had fraud involved.  But those

2     were developed by the field office and the investigations were

3     conducted at that level.  And typically, what we saw at the

4     hearing office was when someone had, say, for example, not

5     prepared certain internal resources, causing an overpayment,

6     and they were typically appealing the overpayment amounts,

7     trying to get that amount lowered or possibly even get it

8     dismissed.  But not -- you know, we didn't investigate, you

9     know, fraud.

10     Q.  So these cases we're talking about now, these were cases

11     in which the field office made a finding of fraud, and that

12     finding was being appealed in some fashion?

13     A.  Yes.

14     Q.  And did your handling of those cases differ from the

15     other cases that we've previously discussed?

16     A.  Yes.  We did not exhibitize those cases.  We did not work

17     those cases up.  We did not do an analysis on those cases.

18     Those cases were docketed and assigned to whichever ALJ needed

19     to be assigned to.  Typically, the supervisor would give us

20     directions as to who that needed to be, and then they were

21     simply given to the judge for review.  We didn't have any real

22     involvement in cases like that.

23     Q.  So did you have more or less involvement in those fraud

24     cases than you had in the other cases we talked about?

25     A.  Less.

1   Q.   As a Social Security Administration employee, did you

2   also receive annual personnel reminders?

3   A.   Yes.

4   Q.   And can you describe to the Court what those consisted

5   of?

6   A.   That is typically notated in changes in policy.  It, by

7   and large, dealt with personnel reminders about, you know,

8   like using camera inside government work space and about, you

9   know, just general reminders.  They weren't anything specific

10  to a particular type of case or another.

11  Q.   Did any of those reminders involve fraud?

12  A.   They would have included, most likely, if I remember

13  correctly, the number that we were given that we were supposed

14  to provide to an individual who called to us and complained

15  about fraud.  We were supposed to give them the 1-800 number

16  to report that fraud.

17  Q.   So if, respecting some disability case, a tipster called

18  in and said, I want to report fraud, what was your job?

19  A.   To give them the 1-800 number.

20  Q.   Were you supposed to take any of the information down?

21  A.   No.

22  Q.   Let's go back and talk about the master docket clerk

23  position.  And I think that you said that you were in this

24  position from 2004 until you left in October, 2007; is that

25  right?

*Griffith - Direct*

20

1    A.   That's correct.

2    Q.   Please describe for the Court overall what your

3    responsibilities were as a master docket clerk.

4    A.   Overall, the general purpose of master docket clerk is to

5    receive the files in from the varying field offices, place

6    them on our receipt ownership, they can place them on our

7    office's docket and assign an ALJ if needed.

8    Q.   In 2004 when you ascended to this position, was the

9    docket system computerized or on paper?

10   A.   Well, it was on computer, but not -- the files were

11   paper.  We did not have really electronic files in full force

12   by that time.  So I would docket in a system called HOTS, but

13   I would physically hold a paper file.

14   Q.   And when you referred to HOTS, is that an acronym, HOTS?

15   A.   Hearing Office Tracking System.

16   Q.   And we'll come to discuss the CPMS system, but speaking

17   of when you became a master docket clerk, what kind of

18   training did you receive at that position?

19   A.   I didn't receive any additional training at that

20   position.

21   Q.   Were you told part of your job as a master docket clerk

22   was to track and report fraud cases?

23   A.   No.

24   Q.   Did you handle any fraud cases as a master docket clerk?

25   A.   Only if they were one of those cases that we just

*Griffith - Direct*

1  discussed that were referred from the field office on appeal.

2  Q.  Do you know of any -- setting aside the issues that are

3  the subject of this case involving Former ALJ Daugherty and

4  Mr. Conn, do you know of any SCTs or master docket clerks who

5  reported fraud cases --

6  A.  No.

7  Q.  -- during your period of employment there?

8  A.  No, I don't know.

9  Q.  Could you describe to me your experience with the Office

10  of Inspector General, again setting aside the issues in this

11  case?  Prior to that, what experience did you have with the

12  Office of Inspector General?

13  A.  I only had brief contact with them during a prior

14  investigation.  They came in to investigate something, but

15  they did not interview me, and I did not have any contact with

16  them.  I knew -- we knew that they were there investigating

17  something.  We didn't -- I personally did not have any contact

18  with them.

19  Q.  Did you know what they were investigating?

20  A.  Not specifically at that time.  Later, I learned a little

21  bit about it, but not at that time.

22  Q.  And how many of these investigations did you witness OIG

23  perform at ODAR?

24  A.  One.

25  Q.  All right.  Let's turn to the CPMS.  Can you describe to

1    the Court what CPMS was?

2    A.   CPMS replaced our office tracking system.  It was called

3    Case Process Management System, and it was a national sort of

4    change from the way cases were tracked.  It was designed to

5    give everybody more information.  It was Window based and it

6    was more user friendly for people to use.  But it essentially

7    did the same things as our previous tracking system.  It just

8    was -- it was just more current and more user friendly for

9    people to see cases coming in and where they were and what was

10   going on.

11   Q.   And were you selected to be an early user of this system?

12   A.   Say it again, please.

13   Q.   Were you selected to be an early user of this system?

14   A.   I participated in training and assisted in helping train

15   in both CPMS and then later in what they call U-Folder.

16   Q.   When were you selected for this process?

17   A.   I think the selection started in 2004, and then the

18   training and retraining -- the training took place sometime, I

19   think, in 2005.  And then, you know, at that point, we had

20   like a certification period; and through that, we then trained

21   the rest of our staff.

22   Q.   Was former ALJ Daugherty one of the people who was

23   trained early?

24   A.   Yes, he was part of our training.  There was typically

25   one member from each function in the office that did it.

*Griffith - Direct*

1   Q.   When you became trained on CPMS, did your role as a

2   master docket clerk change?

3   A.   No.   I still performed my master docket function.   Just

4   the type of cases began to change.

5   Q.   And how did the type of cases begin to change?

6   A.   We were in a transition period from where our papers

7   were -- from paper folders to transitioning to a combination

8   of paper and electronic.   And then eventually, trying to phase

9   out as many of the paper cases as we could, or that could

10  happen.

11  Q.   When you say type of cases, you're talking about the

12  paper versus electronic?

13  A.   Yes.

14  Q.   As part of the training to use CPMS, did you receive any

15  training with respect to investigating, detecting, or

16  reporting cases of fraud?

17  A.   No.

18  Q.   Was your role in the, what I'll call fraud appeals --

19  those were the lower-level determinations of fraud that were

20  handled by the ODAR -- did your role in those cases change at

21  all?

22  A.   No.

23  Q.   Was there a point in time when you began to be criticized

24  with respect to your work on CPMS?

25  A.   Yeah.   It started in about 2006.   I began to receive some

*Griffith - Direct*

24

1    criticisms from my first-line supervisor that information that

2    should have been input into CPMS during the docketing phase

3    was missing.

4    Q.   And was it implied that you had failed to do your job?

5    A.   Definitely.

6    Q.   And did you discover why this was occurring?

7    A.   Not initially.  It took me quite some time to determine

8    the reason it was happening.  Because when a new case came in,

9    it hit our list of cases that could be docketed, any one

10   person could go in and take a -- change the status of that

11   case.

12        If a person changed the status on the case, then the case

13   would drop off on the master docket clerk's, quote unquote,

14   to-do list.  If that case dropped off, then we didn't know

15   that it had ever been there.  There wasn't -- it wasn't done

16   in a way that you could have a list that was ongoing and know

17   whether that case came off.  If somebody did something to it,

18   it just went into whatever status it was in and you never knew

19   that it was there.  So unless you were constantly checking

20   that list over and over and over again and refreshing,

21   something could come in and go off of it immediately.

22   Q.   When you say that anyone can change it, do you mean

23   literally anyone or anyone with access to CPMS?

24   A.   Anyone within the Huntington office that could change the

25   status of the case.

1   Q.   Was there a point when you began to notice that there was

2   a pattern to these changes?

3   A.   Yeah.  That would have been mid to late -- about

4   mid-2006, when I started to realize that these were coming off

5   in a quantity, like they were coming off like in batches of

6   like, say, ten at a time.  That's just an example.  One day,

7   for example, I noticed 15.  And like I said, there was no way

8   to know where they were coming and where they were going

9   unless you knew to look for that case and had a Social

10  Security number and the claimant's name in which to query.

11          How I figured out what was happening to them is, these

12  cases began to show up as favorable decisions by ALJ Daugherty

13  to be closed.  They were hitting that list.  So the status was

14  being changed, and then shortly thereafter, it was as a

15  favorable decision and ready to be closed and out the door.

16  Q.   Did you begin to complain about this?

17  A.   I began to complain -- I had already been questioning why

18  the information was being missing from CPMS screens that my

19  supervisor was coming to me about.  Once I realized how it was

20  happening, I knew how to look for them a little better; and

21  every time I found those, I reported those to my supervisor.

22  And eventually, I reported them to the supervisor in the HOA.

23  Q.   When you say HOA?

24  A.   Hearing Office Administration.

25  Q.   And who was that?

1    A.    Ray Hall.

2    Q.    And just for the record, who is your supervisor at this

3    point?

4    A.    Kathie Goforth.

5    Q.    You say that it took a while to figure out what was going

6    on.  Had you been trained to detect this kind of behavior?

7    A.    No.

8    Q.    And what ultimately did you conclude was happening with

9    these cases?

10   A.    What I determined was happening was that the cases were

11   coming in.  They had not been docketed.  ALJ Daugherty was

12   querying the Social Security numbers, changing the status of

13   the case, placing the case with him, and then deciding those

14   cases favorably on the record and putting those cases into the

15   status for them to be ready to be mailed out.

16   Q.    Did you come to learn that similar things were happening

17   with paper files or had been happening with paper files?

18   A.    Yeah.  There was a point in time when ALJ Daugherty would

19   bring me paper lists of cases, asking me to reassign those

20   cases to him.  Some of them were cases that were not docketed

21   yet.  Some of those were cases that were on the docket, but

22   they had been assigned to another ALJ.

23         There was one particular instance where I was looking for

24   particular master docket paper files and some files that also

25   had been assigned to another ALJ.  I went into his office --

1    he wasn't there -- looked, and he had a cart that had

2    approximately 50, 60 cases in it that consisted of master

3    docket cases.  They consisted of cases that had been assigned

4    to other ALJs that he had taken possession of and were

5    attempting to write favorable decisions on.

6    Q.  And what did you do about those?

7    A.  I walked down the hallway and got Chief ALJ Andrus and my

8    supervisor, Kathie Goforth, and took them back to his office.

9    And they removed the files from his office; and shortly

10   thereafter, they showed up in the closed files as decisions

11   that he had issued.  So they went back to him.

12   Q.  And approximately when was this incident?

13   A.  That would have been in late 2006, I think.

14   Q.  Through the winter and spring of 2007, did you continue

15   to report these problems that you've just described?

16   A.  Yeah.  I continued to send e-mails, did verbal reporting

17   whenever I would find cases that were coming off the docketing

18   incorrectly.

19   Q.  About how many times, approximately, per week did you

20   complain about this?

21   A.  I don't know.  I did a number of verbal reporting, and I

22   had numerous written e-mails.  I don't -- I don't have a

23   specific quantity in mind.  There was quite a lot of them.

24   Q.  And what did Ms. Goforth, how did she reply?

25   A.  Well, initially, she really didn't do anything.  She just

1    took the information.  Later on, they said that they would

2    talk to him about it.  She advised me at one point that they

3    had spoken with him and he agreed not to do it anymore.

4         And then in 2007, within late 2006, early 2007, the tone

5    began to change, and anytime I came to her with anything or if

6    I e-mailed it, she basically told me to stop e-mailing her

7    about the issue; that they had talked to Chief ALJ Andrus,

8    they had spoken with ALJ Daugherty, and that it didn't do any

9    good to keep sending these to her.

10   Q.   You say that the tone changed.  Did other people in the

11   office notice this as well, these problems?

12   A.   It was during this same time that ALJ Daugherty stopped

13   holding hearings in Prestonsburg on Mr. Conn's cases and began

14   deciding his -- all of his cases on the record favorably.  And

15   that took -- everyone noticed that.  And so they started

16   noticing that the quantity kept increasing.

17   Q.   You say the quantity kept increasing.  The quantity of

18   decided cases?  The quantity of cases that he took away?

19   A.   Well, the judges were also noticing that more of the

20   cases were being taken from them.  And so it was kind of

21   universal.  Everybody began to notice.  The judges began to

22   notice that more of their cases were getting taken.  People

23   began to notice that more cases were missing off the docket.

24   And people began to notice that there was a definite

25   increasing in the amount of favorable decisions that were

*Griffith - Direct*

29

1   going out.

2   Q.  As we head into the summer of 2007, did you step up your

3   efforts to report these problems and to complain to your

4   supervisors?

5   A.  Yeah.  I think that at that point, we had begun to

6   complain almost daily about it.  We had -- at one point, I had

7   made phone calls to -- I think it was to Ray Hall at that

8   point, which we were told -- I was told that there was nothing

9   that he could do; it was not his jurisdiction.

10       We had -- by that point, my complaints had reached the

11  point where when I notified Ms. Goforth, I notified also the

12  other supervisor in the office, which was Arthur Weathersby,

13  and Mr. Hall, and then Chief ALJ Andrus.

14  Q.  You said before that you left Social Security in the

15  summer of 2007.  Why was that?

16  A.  I think it was October 26th, 2007.  I had my progress

17  review; and in that progress review, we'd gone to a new

18  appraisal system.  We had gone from the old appraisal system

19  to our, what they call Packs appraisal system.  And

20  Ms. Goforth presented me with an unsuccessful performance

21  evaluation, and she told me that her goal was to get rid of me

22  by the end of that year and that there was nothing I could do

23  about it.

24  Q.  Was there something deficient about your performance?

25  A.  One of the things that she cited was that I needed to not

*Griffith - Direct*

30

1    help my coworkers because if the shoe were on the other foot,

2    that they would not provide me with any help.  She gave me

3    successful levels in all areas that dealt with the knowledge

4    and performance of my job, but I was deficient in the area of

5    receiving criticism from supervisors.

6    Q.  Is it your impression that this performance evaluation

7    was in part because of complaints that you'd been lodging with

8    her?

9    A.  Yes.

10   Q.  Why do you believe that?

11   A.  As the months increased in 2007, whenever I would make a

12   report, something, in turn, negative would happen to me.  I

13   would receive a pretextual investigation for how long a piece

14   of mail would sit on my desk.  I was timed when I went to the

15   bathroom.  I was timed if I went to the second floor to meet

16   with plaintiffs.  Supervisor would sit across my desk and

17   listen to all the phone calls that took place during the day.

18   She would time how long it took me to docket a case and how

19   long it took me to associate mail.  And that went on for a

20   number of months before I left.

21   Q.  Did you suffer any medical problems as a result of this

22   treatment?

23   A.  Yeah.  I had one hospitalization.  The reason that I

24   ultimately left was under the advice of my physician due to

25   the problems that I was having with anxiety and high blood

1   pressure.  At the time that I left, I was taking four blood

2   pressure medications and anxiety medication just to get

3   through the day.  That didn't continue after I left the

4   agency.

5            MR. VERNIA:  I've got an exhibit, Your Honor.  Would

6   you like me to present it to her?  Would you like me to

7   approach?

8            THE COURT:  Have you shown it to Mr. Wicker?

9            MR. VERNIA:  Mr. Wicker's received this before.

10   Unfortunately, I forgot that there were so many lawyers

11   present.  I have one copy for Mr. Wicker.

12            MR. KLEIN:  Your Honor, can I put something on the

13   record about the scope of how it pertains to documents.  I can

14   do it here in open court or sidebar.

15            THE COURT:  Open court's fine.

16            MR. KLEIN:  In my talking to Mr. Vernia, my

17   understanding is the exhibits to be introduced here are

18   personal e-mails, the Wall Street Journal article, those types

19   of things, but not internal Social Security documents.  Is

20   that fair?

21            MR. VERNIA:  That's right.  This is one that's sort

22   of on the borderline.  It's her resignation letter, Your

23   Honor.

24            THE COURT:  Yeah, that seems fine.  Okay.

25            MR. WICKER:  Your Honor, I've been provided a binder

1    of material that were the documents on the relator's witness

2    list for this hearing.  I hope that my cross-examination is

3    not going to be restricted in any way.

4              THE COURT:  I'm not following you.

5              MR. WICKER:  By the limitations on the *Touhy* letter.

6              THE COURT:  I didn't think that through at this

7    point.

8              MR. KLEIN:  And, Your Honor, I confess I didn't

9    either.  Just looking at what Social Security authorized, they

10   authorized testimony, not documents.  They authorized

11   testimony.  And I understand counsel has provided them, and

12   I'm happy to see if we can work a solution to that.  But my

13   understanding is that the agency has authorized testimony, and

14   so the documents that would be consistent with that, given

15   that there was no advance approval from the agency for

16   internal agency documents, would be personal documents or sort

17   of generally available things, like HALLEX or the Wall Street

18   Journal.

19             THE COURT:  Were you thinking of something different?

20             MR. WICKER:  There have been a number of e-mails and

21   notes that have been produced, Your Honor.  I had intended to

22   use those in my cross-examination.

23             MR. KLEIN:  May I propose a solution that we could --

24   I'm not here to block that testimony.  I'd like to develop the

25   record as much as possible.  To the extent whatever portions

*Griffith - Direct*

33

1      of testimony involve those particular documents, could we

2      somehow seal or close them and then try to seek agency

3      approval so they can be admitted openly?  My only concern is

4      that -- and this impacts, I think, the government going

5      forward.  I don't want to have the record reflect that I'm

6      allowing or not at least objecting to the use of these things,

7      and then at discovery later on, I don't want this to be used

8      against me to say that Social Security has waived any sort of

9      *Touhy* --

10             THE COURT:  Are you comfortable (A) if I seal them,

11     and (B) if Mr. Wicker agrees -- all the other parties agree

12     that you haven't waived any defense that you may later raise

13     or any privilege or anything like that?

14             MR. KLEIN:  I'm comfortable with that.

15             THE COURT:  Mr. Wicker, you're fine with that?

16             MR. WICKER:  Yes, sir, that's fine.

17             MR. VERNIA:  That's fine, Your Honor.

18             THE COURT:  Okay.  Great.  So this is Exhibit 21?

19             MR. VERNIA:  Twenty-eight, Your Honor.

20             THE COURT:  Okay.  You can approach her.

21             MR. VERNIA:  Thank you, Your Honor.

22     BY MR. VERNIA:

23     Q.   Ms. Griffith, I've handed you what's been marked as

24     PX-28.  Do you recognize this document?

25     A.   I do.

1    Q.   What is it?

2    A.   It is my memorandum of resignation.

3    Q.   And if you could read for the record the second

4    paragraph.

5    A.   "Due to the constant harassment by Supervisor Kathie

6    Goforth and the failure of the Hearing Office Director Greg

7    Hall to deal with the hostile work environment created by

8    such, I feel like I am left with no choice.  I feel management

9    has every intention of retaliating against me for bringing to

10   light issues regarding the misconduct of ALJ David Daugherty

11   and for the multiple grievances filed against Kathie Goforth.

12   Such harassment had made an already existing medical condition

13   more severe, all issues management refuses to acknowledge or

14   address."

15   Q.   And when you refer there to the misconduct of ALJ David

16   B. Daugherty, that is what we were previously discussing?

17   A.   Yes.

18   Q.   I'm going to hand you -- Mr. Wicker, this is 30.

19        MR. VERNIA:  And, Your Honor, for the record, I

20   believe that all of the exhibits that I'm referring to are

21   outside of the scope of the SSA.

22        THE COURT:  Okay.

23   Q.   Ms. Griffith, do you recognize Exhibit PX-30?

24   A.   I do.

25   Q.   And what is it?

1   A.   It is an e-mail from me to Greg Hall and my union

2   representative, Sarah Randolph, after I left the agency.

3   Q.   And do you see in the first paragraph where you say,

4   "Regarding ALJ David B. Daugherty's cases and ongoing illegal

5   activity"?  What does that refer to?

6   A.   Say it again, please.

7   Q.   Where you say, "Regarding ALJ David B. Daugherty's cases

8   and the ongoing illegal activity," what are you referring to

9   there?

10  A.   I'm referring to his misappropriation of the cases and

11  deciding those favorably based on the attorneys assigned them.

12  Q.   Immediately after that, it says, "and whether or not I

13  intended to file something."  What does that refer to?

14  A.   After I left, they called Ms. Carver into a meeting with

15  Mr. Hall and Chief ALJ Andrus and conducted an investigation

16  about -- that they had learned that I had intended to go to

17  some agency, whether it be the OIG or elsewhere, and

18  questioned her about what my intentions were.

19  Q.   Is Mr. Hall one of the people to whom you reported these

20  activities while you were employed there?

21  A.   Say that again, please.

22  Q.   Was Mr. Hall one of the people to whom you reported these

23  activities while you were employed at the ODAR?

24  A.   Yes.

25  Q.   And what was his position again?

*Griffith - Direct*

1   A.   He was hearing office director at that time.  Prior to

2   him being hearing office director, he was my supervisor.

3   Q.   And he was Ms. Goforth's supervisor as well, wasn't he?

4   A.   Correct.

5   Q.   So he was -- Ms. Goforth was your supervisor.  He was her

6   supervisor?

7   A.   That's correct.

8   Q.   We've spoken a little bit about the circumstances under

9   which you left.  What did this job mean to you and your

10  family?

11  A.   You know, where we're from, there aren't many federal

12  jobs.  If you get a federal job, you hang on to it.  It means

13  medical benefits for you, number one.  That's a huge thing,

14  just the medical insurance alone.  There is no other job that

15  I could have in my immediate area making what I made there.

16  I've never made what I made there anywhere else, and I never

17  will again.

18  Q.   Was it a hardship to leave that job?

19  A.   Yeah.  I lost my car.  I nearly lost my home.  It has

20  greatly disadvantaged me from my --

21  Q.   Who is ALJ Dan Kemper?

22  A.   He was an administrative law judge that was there at the

23  time that I was employed, during my entire employment, and he

24  left about the same time I did.  He retired.

25  Q.   Was Judge Kemper someone with whom you discussed these

1    issues?

2    A.   Eventually, yes.  Not until shortly, you know, a few

3    months before I left.

4    Q.   Okay.  I'm going to hand you -- Mr. Wicker, this is

5    PX-29.

6              THE COURT:  Thank you.  Are you moving to introduce

7    these, or are you waiting till the end?

8              MR. VERNIA:  I was going to wait until the end,

9    unless you prefer I do it seriatim.

10             THE COURT:  It really doesn't matter to me.  Do you

11   care, Mr. Wicker?

12             MR. WICKER:  No, Your Honor.  I have no objection to

13   any of these exhibits.

14             THE COURT:  In that binder?

15             MR. WICKER:  That's right.

16             THE COURT:  Is that the binder you put together?

17             MR. VERNIA:  I assume that that's the binder of

18   documents that we provided in discovery.

19             THE COURT:  Oh, okay.  So it's different than the

20   marked documents?

21             MR. VERNIA:  There's more documents in that binder

22   than there are -- oh, I see what you're saying.  All the

23   documents in there should be marked, if those are the

24   discovery documents.

25             THE COURT:  Like this?

 1              MR. WICKER:  That's right.

 2              THE COURT:  Okay.  Should I just admit the whole

 3      binder?  Any objection?  And all the documents that Mr. Klein

 4      later identifies as having to be sealed will be sealed and the

 5      U.S. won't waive any protections it has.

 6              MR. WICKER:  That would be fine, Judge.

 7              MR. VERNIA:  That's fine.

 8              THE COURT:  Okay.  Then that will be admitted.  And

 9      Mr. Klein, have you received that binder?

10              MR. KLEIN:  I have, Your Honor.

11              THE COURT:  So we can do one of two things.  If any

12      document that they request -- that they show the witness that

13      you say should be sealed, I'll just seal it, and then we can

14      deal with it later if we have to.

15              MR. KLEIN:  And, Your Honor, may I also ask, to the

16      extent there are exhibits that are not used here today and

17      they won't have to be part of that review, how would you like

18      me to treat those?

19              THE COURT:  You know what, why don't we do this.

20      We'll assume all documents are admitted, and at the end, we'll

21      figure out which ones were shown and we'll say those are the

22      ones admitted and here are the ones that should be sealed.  So

23      everyone can use all the documents in the binder.  At this

24      point, 28, 29, and 30 are admitted.  You don't have to move.

25      As soon as you show it, we'll consider it admitted; and then

1    if you want it sealed, just identify it at that time.

2              MR. KLEIN:  Thank you, Your Honor.

3              THE COURT:  Okay.  Mr. Wicker, same thing.  So

4    you-all don't have to lay a foundation or anything.  Just go

5    right into the documents.

6              MR. WICKER:  Thank you, Your Honor.

7              THE COURT:  Okay.  Great.  I'm sorry.  So we're on

8    29.

9    BY MR. VERNIA:

10   Q.  Do you recognize Exhibit 29?

11   A.  I do.

12   Q.  And what is it?

13   A.  It is an affidavit of Sarah Randolph and an affidavit of

14   myself.

15   Q.  The second page, which ends in Bates number 49, that's

16   your statement?

17   A.  Say it again, please.

18   Q.  The second page of this exhibit, which bears Bates number

19   49, is your statement; is that right?

20   A.  Yes.

21   Q.  And it's not signed, but is it something that you wrote

22   and adopted as your own?

23   A.  I wrote this, yes, sir.

24   Q.  Okay.  What was the purpose of writing these statements?

25   A.  After discussing some things with the Administrative Law

1    Judge Kemper immediately before my departure, he had informed

2    me that he was going to file a complaint with the head of the

3    judges union.  He had prepared some things, and he asked if I

4    would give a statement; and I agreed to do so, and this is

5    that statement.

6    Q.   I'm going to hand you what's been marked as PX-31.

7         MR. KLEIN:  Just one second.  Your Honor, this would

8    be one of the exhibits that I would like to have sealed.

9         THE COURT:  Okay.  It will be sealed.  And every time

10   we see it, seal it.  We're all in agreement that the U.S.

11   retains its protections.

12   Q.   Do you recognize Exhibit 31?

13   A.   Yes.  This is the letter that accompanied the affidavits

14   here that was sent to Judge Habermann, who was, at that time,

15   chief of the ALJ union.

16   Q.   All right.  You didn't write this, did you?

17   A.   No.

18   Q.   It bears a signature of James D. Kemper, Junior on the

19   second page?

20   A.   Yes.

21   Q.   Do you know -- did you receive a copy of this from Judge

22   Kemper?

23   A.   After it was sent.

24   Q.   Would that have been on or around November, 2007?

25   A.   Yeah.  It was within, plus or minus, one or two days of

1     that that I got a copy of it.

2     Q.    Okay.  And Mr. Habermann, to whom this is addressed, is

3     the head of the ALJ union; is that right?

4     A.    At that time, he was.  I don't know if he still is or

5     not.

6     Q.    So you've left -- taking you back in time now, you've

7     left in November of 2007.  Did you continue to work on these

8     issues as a private citizen?

9     A.    I really didn't for a little bit of time.  I continued --

10    at the time that I left, I had open grievances, and so I

11    continued communication with Ms. Carver as a result of those,

12    and I continued communicating with her regarding the issues

13    that were still ongoing.  That was really the extent of my

14    communication for like about -- I don't know, about a year.

15    Q.    When you say open grievances, you mean union grievances?

16    A.    Union management grievances.  We filed several with my

17    first-line supervisor, which was Kathie Goforth.  And

18    coincidentally, the grievances that I filed were primarily

19    against her, and they were filed with her regarding the

20    harassment that she had done against me for reporting these

21    matters.

22    Q.    And what union were you a member of?

23    A.    The AOGE, W610.

24    Q.    And I think you've already mentioned, but Ms. Carver was

25    the union representative for that?

*Griffith - Direct*

42

1   A.   She was the union steward at that time.  I think that's

2   still her title.

3   Q.   So was she the steward over all the union members at the

4   ODAR?

5   A.   No.  That office.  She wasn't like -- she was our union

6   steward in that office.  We had previously had the vice

7   president of the union for 3610 in our office, and she had

8   retired, and so Sarah sort of took her place in assisting

9   internal employees with union management issues.

10  Q.   I'm going to hand you what's been marked as Exhibit 35,

11  PX-35.

12          THE COURT:  So I've got 28, 29, 30, and now 35 are

13  admitted.

14  Q.   Do you recognize again 35?

15  A.   I do.

16  Q.   Just for the record, and for Mr. Klein's benefit, on the

17  front line, you see your name there followed by an e-mail

18  address, on the top of the page?  Do you see your name

19  followed by an e-mail address?

20  A.   Yes.

21  Q.   Is that your personal e-mail address?

22  A.   That was e-mailed from where I worked subsequently.

23  Q.   Okay.  I stand corrected.  But it was not a Social

24  Security Administration e-mail address?

25  A.   No.

1    Q.   And what about Ms. Randolph; was this sent to her at her

2    SSA address?

3    A.   No, it was her SSA address.

4    Q.   Can you tell us what Exhibit 35 is?

5    A.   Exhibit 35, Ms. Carver had a meeting with Mr. Hall, and

6    she asked me to remind her of the outstanding issues that were

7    present at the time that I left and issues that we had

8    previously reported, and that's what this is.

9    Q.   And in terms of Judge Daugherty's taking cases from other

10   judges' dockets and deciding them favorably, can you tell the

11   Court where did you discuss that on this document?

12   A.   Well, there's a section here where I say that Judge

13   Daugherty was reassigning Eric Conn cases that were already

14   scheduled with other judges to himself to get them OTRs when

15   they were scheduled for hearing with, and I've got Judge

16   Gitlow incident.

17        Then I've got there was one incident, he cleaned out

18   cases that were assigned to other dockets for master docket

19   chores and had them in a cart in his office to make his own

20   favorable decisions on.

21        And then down here, I discuss because I personally

22   advised him of the cases he was docketing, because once he

23   would go in the system and make certain changes to a case, the

24   case would then drop from my in cases to be docketed.  Is that

25   what you're referring to?

1    Q.   Yes.  And was it your understanding that Ms. Carver was

2    continuing to raise these issues on behalf of you?

3    A.   Yes.

4    Q.   Did you speak to her frequently about these issues?

5    A.   Quite frequently, yes.

6    Q.   Let's focus really on 2008.  Describe how you interacted

7    with her about these issues during 2008.

8    A.   Typically, because at that point that I left, at least

9    one of the grievances and an EEO complaint that I had filed,

10   she was my union representative on behalf of that situation,

11   and those situations were still left unresolved at the time of

12   my departure, and so I would communicate with her.  If she had

13   a conference call or if she had a meeting with managerial

14   staff in the office regarding those issues.

15   Q.   Were there any demands that SSA made of you after you

16   left the agency?

17   A.   Not until -- not until the MSPB issue.

18   Q.   Was there a request that you pay them back some money?

19   A.   I received a notice in 2009, July of 2009, that upon my

20   departure, that they had overpaid me and that I needed to pay

21   back a certain sum of money.  I don't remember the exact sum

22   at that point, but --

23   Q.   In July of 2009, you said?

24   A.   July, 2009, yeah.

25   Q.   And did you do anything about that, in terms of reporting

1    what had been going on at the Huntington ODAR?

2    A.   At that time, I contacted the Huntington hearing office

3    to get copies of my time-keeping records and all of the things

4    that would have contributed to the overpayment situation; and

5    I got a little angry, and I made an anonymous phone call to

6    OIG and reported just misappropriation of cases.  I didn't

7    leave my name, didn't leave a number.  Just made a phone call.

8    Q.   Did you describe the kinds of things that we've been

9    talking about?

10   A.   I was talking about the cases that were taken off the

11   docket, cases that were assigned to other judges, cases that

12   were decided favorably with little or no medical evidence, the

13   quantity of cases that were decided favorably based on their

14   attorney, those types of things.

15   Q.   Let's fast-forward to another year, in the summer of

16   2010.  Did you meet with anyone outside of the Huntington ODAR

17   concerning what had been going on at Huntington ODAR?

18   A.   Yeah.  We went with -- I went with Sarah, and we traveled

19   to Charleston and met with the staff of Governor Manchin.

20   Q.   And what did you discuss with the staff there?

21   A.   We discussed the very same issues; that there was a

22   proliferation of cases, that cases were being taken from

23   judges, that cases were being decided favorably with very

24   little evidence based on attorney assignment.  We discussed

25   Judge Kemper's letters to the judges' union.  You know,

*Griffith - Direct*

46

1   basically all the things that you see that we discussed just

2   now.

3   Q.  About how long did that meeting last?

4   A.  I would say it lasted about an hour, 45 minutes to an

5   hour.

6   Q.  Did you ask them to do anything about this situation?

7   A.  We asked them to get involved.  We asked them to help us.

8   We had, you know, complained internally for a long time and

9   gotten nowhere.  No response whatsoever.  And we asked them to

10  get involved, and we were told that that was not their

11  jurisdiction.

12  Q.  And is that because it's a state government and not the

13  federal government?

14  A.  Yes.

15  Q.  In 2011, did you make any further reports --

16  A.  In 2011 --

17  Q.  Excuse me.  Let me just finish my sentence.

18  A.  Okay.

19  Q.  Did you make any further reports of the fraud to ODAR?

20  A.  In 2011, I filed an online fraud complaint with the OIG.

21  Q.  What prompted you to file that?

22  A.  There was a news article that ran about Mr. Conn's bid to

23  be appointed to the Social Security Advisory Board, and that's

24  what prompted my response.

25  Q.  I'm going to hand you two exhibits, PX-39 and 59.

 1              THE COURT:  Just so the record's clear, she mentioned

 2    in 2010 she went with Sarah.  Can we just put the last name

 3    in, please?

 4              MR. VERNIA:  Sure.

 5    Q.   Sarah who?

 6    A.   Sarah Carver.

 7    Q.   And that's a different person than Sarah Randolph, right?

 8    A.   No.

 9              MR. VERNIA:  Sorry, Your Honor.  It's the same

10    person.

11    Q.   Do you know when she began to use the different names, if

12    that will help clarify issues?

13    A.   Actually, she changed names three times during the course

14    of this.  She was originally, at the time that this started,

15    she was Sarah Duty.

16              THE COURT:  Sarah what?

17              THE WITNESS:  Sarah Duty, D-u-t-y.

18    A.   She divorced.  I don't remember the year.  And then she

19    remarried.  I don't remember.  It might be -- it was after I

20    left, so it would have been after 2008.  2008, 2009.

21              THE COURT:  And she became what then?

22              THE WITNESS:  What she is now, Sarah Carver.  When

23    she was a Randolph, that was her maiden name.  After the

24    divorce, she went back to her maiden name, so Sarah Randolph,

25    and then got remarried and is now Sarah Carver.

1         THE COURT:  Parker or Carver?

2         THE WITNESS:  Carver, C-a-r-v-e-r.

3         MR. VERNIA:  And I think, Your Honor, what further

4    confuses this situation, sometimes the e-mails print out with

5    an out-of-date user name associated with her Social Security

6    address.

7         THE WITNESS:  Yeah.

8         THE COURT:  So it's more than a little confusing.

9    BY MR. VERNIA:

10   Q.   So a moment ago, we were speaking about you made a

11   complaint through a tip line, an e-mail tip line, to the OIG

12   in early 2011; is that right?

13   A.   Correct.

14   Q.   Did you recognize Exhibit 39?

15   A.   I do.

16   Q.   What is it?

17   A.   It is a printout that I printed out at the time that I

18   filed the OIG hotline complaint.  Thirty-nine is my printout

19   of the OIG hotline complaint, and 59, Exhibit 59, is my -- it

20   didn't allow me to print in a way that I could see the context

21   of what I put in a complaint form, so I copied it out and sent

22   it to myself in an e-mail.  So PX-59 is my narrative that was

23   in the complaint.

24   Q.   So you copied from the online form and pasted it to the

25   e-mail?

1    A.   Um-hmm.  Yes.

2         THE COURT:  And those are both admitted.

3    Q.   Was there any follow-up from the OIG as a result of this

4    submission?

5    A.   Not at that time.  Not until later.

6    Q.   On March 22nd, 2011, are you aware of the Wall Street

7    Journal running an article concerning Social Security

8    Administration office in Puerto Rico?

9    A.   I am now.  I wasn't at the time.

10   Q.   When did you become aware of the Puerto Rico article?

11   A.   Not until late -- mid to late April.

12   Q.   When did you first hear of the Wall Street Journal

13   investigating these issues?

14   A.   Judge Kemper had been contacted by a reporter from the

15   Wall Street Journal; and he, in turn, contacted me.

16   Q.   And who was that reporter?

17   A.   Damian Paletta.

18   Q.   A staff writer for the Wall Street Journal?

19   A.   Yes.

20   Q.   Did you meet with Mr. Paletta?

21   A.   Yes, in April of 2011.

22   Q.   How many times did you meet with him?

23   A.   In person, once, I think.

24   Q.   Did you speak to him on the telephone?

25   A.   Yes, I spoke to him on the phone numerous times.

1    Q.   Did you cooperate with Mr. Paletta in his investigation?

2    A.   I did.

3         MR. VERNIA:   This will be Exhibit PX-42, Your Honor.

4    Q.   Ms. Griffith, do you recognize PX-42?

5    A.   I do.

6    Q.   What is it?

7    A.   It is the Wall Street Journal article that ran May 18,

8    2011.

9    Q.   Concerning the Huntington ODAR?

10   A.   Concerning the Huntington ODAR office, yes.

11   Q.   Okay.  If you could please turn to the page with Bates

12   number ending in 116?

13        THE COURT:   And 42's admitted.  I'm not going to say

14   that if everyone's okay.  As soon as it's introduced, it will

15   be admitted, and then the only thing I'll put on the record is

16   if it's sealed.  Okay.  Great.

17        MR. VERNIA:   Thank you, Your Honor.

18        THE COURT:   Thank you.  Are you giving me what are

19   considered the originals, by the way, or are you giving -- how

20   about the witness gets the originals and these are my copies?

21        MR. VERNIA:   If you're going to admit the entire

22   binder --

23        THE COURT:   No, we agreed -- I think we subsequently

24   agreed, for ease, that we not admit the entire binder but only

25   things actually shown to witnesses.

1    MR. VERNIA:  Okay.  If we end up needing copies, I

2   can always provide them.

3    THE COURT:  Okay.  Great.  Thanks.

4   BY MR. VERNIA:

5   Q.  Ms. Griffith, if you look at a page which ends in Bates

6   number 116 at the bottom, if you could, look down about

7   two-thirds of the way.  Do you see your name there?

8   A.  I do.

9   Q.  And do you see a quote?

10  A.  I do.

11  Q.  Was that something that you told Mr. Paletta?

12  A.  Yes, it is.

13  Q.  What about the rest of the quotations in that paragraph?

14  A.  Yes.

15  Q.  Subsequent to the publication, or around the time of the

16  publication, did you receive any contact from the Office of

17  Inspector General of SSA?

18  A.  Well, I had been contacted by the Office of the Inspector

19  General before this came out.

20  Q.  When about did that happen?

21  A.  It was mid-April.  I don't remember the exact date, but

22  it was right about the same time that Judge Kemper had

23  contacted me about Mr. Paletta and being interested in doing a

24  story.  It was right in that same -- same week.

25  Q.  When you say that Judge Kemper contacted you and told you

1    Mr. Paletta was wanting to do a story on this, was it already

2    known in the community that the Wall Street Journal was

3    investigating this?

4    A.   I think a few people knew at that time, but I don't think

5    it was widely known.  But there were some that knew about it.

6    Q.   So about the same time, you said you met -- you were

7    contacted by the Office of Inspector General?

8    A.   Yes.

9    Q.   And which special agent --

10   A.   Officer Morton contacted me.

11   Q.   Is that Tim Morton?

12   A.   Tim Morton, yes.

13   Q.   And how did he contact you?

14   A.   He contacted me via phone and wanted to meet with me.

15   And we met at the law office where I worked.

16   Q.   How long did the meeting last?

17   A.   I'm not sure how long that first meeting took.  It wasn't

18   an enormously long meeting, maybe half hour to an hour.  I'm

19   not specific of the time.

20   Q.   How many times did you meet with him, say in that

21   two-month period?

22   A.   Three in total before this story came out.

23   Q.   And about how many hours collectively did you talk to

24   him?

25   A.   The first meeting was probably the shortest.  The second

1    one was a little longer, and he brought an additional agent

2    with him.  I apologize, I don't remember his name.  And then

3    the third meeting was probably the longest meeting, and he

4    brought -- I believe it was his supervisor with him at that

5    time.  And that was the longest one.

6    Q.   Did you cooperate with Agent Morton?

7    A.   I did.

8    Q.   Did you answer all the questions?

9    A.   Yes.

10   Q.   Was there a point in time where you also were contacted

11   by Congressional committees?

12   A.   Yes.  Mr. Paletta asked if we would -- asked if I would

13   agree to speak with members of a Congressional committee, and

14   he gave my information to Keith Ashdale, who worked with -- I

15   don't know if he worked for Senator Coburn directly or

16   Permanent Subcommittee on Investigations.  But however that

17   came to be, then he contacted me.

18   Q.   Just so the record's clear, the Permanent Subcommittee on

19   Investigations is part of the Committee on Homeland Security

20   and Governmental Affairs?

21   A.   Yes.

22   Q.   Did you, in fact, speak with staffers from the committee?

23   A.   I did.  I traveled to Washington the first week of June,

24   2011 and met with staff from the committee.  It would have

25   been Senator Coburn and Senator Levin's offices where staff

*Griffith - Direct*

1    members attended the meeting.

2    Q.   Did you meet with either of the senators at that time?

3    A.   Say that again, please.

4    Q.   Did you meet with either Senator Coburn or --

5    A.   No, I did not meet with either senator at that time.

6    Q.   Approximately how long did you spend with staffers with

7    the senators?

8    A.   The first day of meetings lasted a little over eight

9    hours, I believe.  That was the staffs from Senator Coburn and

10   Senator Levin's offices.  It was initially slated to be an

11   hour.  We ended up being there all day.

12   Q.   Just so it's clear, Senator Coburn, Senator Levin are, at

13   that point, members of the Permanent Subcommittee --

14   A.   They were the majority and minority members of the

15   committee at that time.

16   Q.   On the Subcommittee on Investigations or --

17   A.   Of the Subcommittee on Investigations.

18   Q.   So you said you spent most of the day with the senate

19   staff?

20   A.   Yes.

21   Q.   Did you cooperate with their investigation?

22   A.   Yes.

23   Q.   Did you answer their questions?

24   A.   I did.

25   Q.   Who paid for you to go to Washington?

1    A.   Myself.

2    Q.   And who accompanied you to Washington?

3    A.   Ms. Carver accompanied me.

4    Q.   How did you handle that employment-wise?  Did you take

5    vacation time?  Did you take sick leave?  What did you do?

6    A.   At that time, I didn't have vacation time available to me

7    so I got approval to miss work for it, but it was not paid

8    time.  It was just unpaid vacation.

9    Q.   I'm going to show you what's been marked as PX-37.  Do

10   you recognize PX-37, Ms. Griffith?

11   A.   I do.

12   Q.   What is it?

13   A.   It is a letter that I wrote in June of 2011 to the Office

14   of the Inspector General.

15   Q.   What prompted you to write this letter?

16   A.   Frustration.  I was still -- I was still dealing with all

17   of the issues that we dealt with in the story.  I still

18   continued to work with the committee at this point in regards

19   to these issues and still worked with Ms. Carver on bringing

20   those issues to light.

21        And during this same time, I had also filed an Office of

22   Special Counsel claim and was being -- not receiving any

23   feedback.  I couldn't get the individual that was assigned to

24   the case to call me back or give me any idea about the status

25   of the case.  And that's what prompted this.

1    Q.   What was the basis for your Office of Special Counsel

2    complaint?

3    A.   I guess that would be constructive discharge; that I lost

4    my job due to the reporting and the loss of the job and

5    creating the overpayment situation that I was dealing with

6    with Social Security.

7    Q.   So it was whistleblower retaliation?

8    A.   Say that again.

9    Q.   Whistleblower retaliation?

10   A.   Yes.

11   Q.   Ultimately, what happened with that case with the OSC?

12   A.   That case was settled.

13   Q.   Going back to your cooperation with Congress, did you

14   testify before the Senate subcommittee?

15   A.   I did.  In 2013, I was asked to provide testimony in a

16   hearing, and I did so.

17   Q.   In between the time that we were initially talking about,

18   early summer of 2011, and your testimony in 2013, did you

19   cooperate with the committee and the Senate staff?

20   A.   Yes.  I spoke with, e-mailed, and communicated with them

21   regularly.  Anytime they contacted me or anything they asked

22   of me, I complied with.

23   Q.   Did you receive any additional contact from the Office of

24   Inspector General after that third lengthy meeting you

25   described earlier?

1    A.   Only once.  I received a phone call from Officer Morton

2    as we were leaving town the day after we testified, myself and

3    Sarah testified.

4    Q.   So a little over two years later?

5    A.   Say it again.

6    Q.   A little over two years after that last meeting with him?

7    A.   Yes.

8    Q.   Agent Morton.  You decided to be a cam relator?

9    A.   I did.

10   Q.   Was that in the fall of 2011?

11   A.   Yes.

12   Q.   Did you work with your attorneys to provide a disclosure

13   statement to the government?

14   A.   Yes.

15   Q.   Did you meet with the government following that?

16   A.   Yes.  After the suit was filed, we traveled to Washington

17   and had a meeting.

18   Q.   Ms. Griffith, throughout this period, did you ever feel

19   that you were legally obligated to report what you were

20   reporting?

21   A.   No.  I reported what I reported because it was wrong.

22        MR. VERNIA:  Thank you, Ms. Griffith.  I have no

23   further questions.

24        THE COURT:  As soon as you're ready, Mr. Wicker, you

25   can proceed.

1           MR. WICKER:  Your Honor, I'm going to be using

2     exhibits that were provided by the relators, as well as my

3     own.  The ones that I'm going to be using that are not

4     provided by the relators are in binders that I'm going to give

5     the Court and witnesses.

6           THE COURT:  What about Mr. Klein?

7           MR. WICKER:  Sir?

8           THE CORUT:  And Mr. Klein?

9           MR. WICKER:  Yes.

10          THE COURT:  Okay.  So you're giving me your exhibits

11    but not any of the plaintiff's exhibits you're going to use?

12          MR. WICKER:  That's right, Judge.

13          THE COURT:  Okay.  But will you give me copies of

14    those as well?

15          MR. WICKER:  I will or put them on the --

16          THE COURT:  That's fine.  But you'll give the witness

17    a copy?  I'd love, at some point, to have my own stack of

18    everything that's admitted.  That's what I'm --

19          MR. WICKER:  Yes, sir.  I'll put together a binder

20    for you.  I expected that the relators would have their

21    documents in a binder as well so I don't believe I have enough

22    copies for everyone.  So if it's okay with the Court --

23          THE COURT:  For the purposes of this hearing.  Maybe

24    after the hearing, what you-all can do is submit a joint

25    submission, and for yours, of everything admitted.  But what

1    I'd like is, if you're going to give me that binder, you don't

2    have to submit that again, and these you don't have to submit

3    again.  So it's only what you put on the Elmo but don't give

4    me a copy of.

5            MR. WICKER:  Yes, sir.  May I approach?

6            THE COURT:  You may.  Thank you.  And I know I asked

7    this and you just answered it so I apologize.  I guess I can

8    blame it on old age.  You said these were also provided in

9    discovery by the plaintiff?

10           MR. WICKER:  Either that or there is some -- there's

11   a copy of the regulation in here.  There's a copy of the

12   complaint.

13           THE COURT:  Okay.  Well, those things, there's no

14   *Touhy* issue.  The only reason I was asking is for *Touhy*

15   purposes.  But Mr. Klein, you'll just continue to protect the

16   record.  You don't have a copy of this?

17           MR. KLEIN:  I believe counsel's just handed me what's

18   inside the binder, but I believe a copy of what's in the

19   binder.

20           MR. WICKER:  Yes.

21           THE COURT:  Oh, perfect.  Okay.  Thank you.

22                          CROSS-EXAMINATION

23   BY MR. WICKER:

24   Q.   Good morning, Ms. Griffith.

25   A.   Good morning.

*Griffith - Cross*

60

1    Q.   Let's start by seeing what we agree about.  You became a

2    government employee in 2001; is that right?

3    A.   Correct.

4    Q.   And you continued to be a government employee until late

5    2007?

6    A.   Correct.

7    Q.   You held two job positions.  One was senior case

8    technician?

9    A.   Correct.

10   Q.   And the other was master docket clerk?

11   A.   Correct.

12   Q.   Would you turn in the binder that I handed you to

13   Exhibit 1?  And do you see that behind Exhibit 1 is a

14   regulation that has been discussed in this case?  Do you see

15   that?

16   A.   Yes.

17   Q.   And the citation for the regulation is 5 CFR 2635.101; is

18   that right?

19   A.   That's correct.

20   Q.   And you see in kind of the upper left-hand side of the

21   page, that Part 2635, Standards of Ethical Conduct for

22   Employees of the Executive Branch?  Do you see that?

23   A.   I do.

24   Q.   And you were an employee of the executive branch; is that

25   right?

1    A.   I don't know what you mean by that.  I was an employee of

2    the Social Security Administration.

3    Q.   Okay.  And we agree that the Social Security

4    Administration is in the executive branch?

5    A.   If you say so.

6    Q.   It's not part of the judiciary or the Congressional side?

7    A.   Okay.

8    Q.   Okay.  And you see that in paragraph A, it says that,

9    "Public service is a public trust"?  Do you see that?

10   A.   I do.

11   Q.   Do you agree with that?

12   A.   I do.

13   Q.   And it says after that that, "Each employee has a

14   responsibility to the United States Government and its

15   citizens to place loyalty to the Constitution, laws, and

16   ethical principles above private gain."  Do you see that?

17   A.   I do.

18   Q.   Okay.  And you agree with that statement too, don't you?

19   A.   I do.

20   Q.   That's one of your duties as a government employee?

21   A.   I do.

22   Q.   And a little further down, you see on subparagraph (3),

23   on the right column, it says, "Employees shall not engage in

24   financial transactions, using nonpublic government

25   information, or allow the improper use of such information to

1   further any private interest."  You see that?

2   A.   Yes.

3   Q.   Okay.  And you agree with that statement, don't you?

4   A.   Say it again, please.

5   Q.   Do you agree with that statement?

6   A.   Yes.

7   Q.   Okay.  That's also one of your duties as a government

8   employee, true?

9   A.   True.

10  Q.   And then if you turn over to the next page, you see

11  subparagraph (11).  It says, "Employees shall disclose waste,

12  fraud, abuse, and corruption to appropriate authorities."  Do

13  you see that?

14  A.   I see that.

15  Q.   And you agree with that statement, don't you?

16  A.   I do.

17  Q.   That's also one of your duties as a government employee,

18  true?

19  A.   Yes.

20  Q.   Now, you received instruction on these types of issues

21  from time to time; is that right?

22  A.   Periodically, there would be reminders.

23  Q.   Um-hmm.  Well, let's look at Tab Number 2.  And you spoke

24  in your testimony a few minutes ago about annual personnel

25  reminders.  Do you remember that testimony?

1    A.   Yes.

2    Q.   Okay.  And what we're looking at in Tab 2 are portions of

3    the annual personnel reminders?

4          THE COURT:  And we have that same agreement, right,

5    Mr. Vernia and Mr. Wicker, that as soon as you mention them,

6    they're admitted?

7          MR. WICKER:  Yes, sir.

8          THE COURT:  Technically, the reg doesn't need to be

9    admitted, but we'll just admit it for clarity as long as no

10   one cares, because obviously I can look at the law.

11         MR. WICKER:  Yes, sir.

12         THE COURT:  Go ahead.

13   BY MR. WICKER:

14   Q.   Ms. Griffith, you were talking about annual personnel

15   reminders, and I have portions of them copied and placed

16   behind Exhibit 2; is that right?

17   A.   Yes.

18   Q.   The first one is for October, 2006?

19   A.   Yes.

20   Q.   And you were an SSA employee in 2006?

21         THE COURT:  And I'm sorry, Mr. Wicker.  Just since I

22   haven't seen the total volume, when you refer to Exhibit 2,

23   let's just say Defendant's Exhibit 2, only because I don't

24   know if you're subsequently going to introduce Plaintiff's

25   Exhibit 2, but you understand what I'm saying, just for

1    clarity of the record.

2              MR. WICKER:  I do.

3              THE COURT:  Sorry to interrupt.

4    BY MR. WICKER:

5    Q.   Ms. Griffith, I'm showing you Defendant's Exhibit 2.  And

6    that's the annual personnel reminders, true?

7    A.   True.

8    Q.   And the first one is for October, 2006.  Do you see that?

9    A.   Yes.

10   Q.   And the first page is the table of contents.  It says

11   Part 1, Standards of Conduct.  You see that?

12   A.   I do.

13   Q.   Now, if you turn over two pages, you come to section 1.2.

14   Would do you that for me?

15   A.   I see them.

16   Q.   And the title is "Support of SSA Programs," and then

17   there's an introduction under that heading.  Do you see that?

18   A.   I do.

19   Q.   And it says in the second sentence you have, "This

20   obligation exists because public service is a public trust."

21   Do you see that?

22   A.   I'm sorry, where are you at?

23   Q.   The first sentence under Introduction says, "You have a

24   positive obligation to make SSA's programs function."  You see

25   that?

*Griffith - Cross*

65

A.  I see.

Q.  And after that, it says, "This obligation exists because public service is a public trust," correct?

A.  Yes.

Q.  And that's what we just talked about in regulations just a moment ago, correct?

A.  Yes.

Q.  And then after that sentence, the last sentence of that paragraph says, "You must put forth honest effort in the performance of your duties and report any fraud, waste, or abuse in government programs."  Do you see that?

A.  Yes.

Q.  Okay.  So that's an obligation you had as an SSA employee in 2006, right?

A.  Yes.

Q.  Okay.  Now, turn to the next page, and we have the Annual Personnel Reminders for October, 2007.  Do you see that?

A.  I do.

Q.  And if you turn two pages in, we have again section 1.2, "Support of SSA Programs."  Do you see that?

A.  I do.

Q.  And it also says, "You must put forth honest efforts in the performance of your duties and report any fraud, waste, or abuse in government programs."  Is that what it says?

A.  Yes.

*Griffith - Cross*

1    Q.   So that's also an obligation that you had in 2007, 2006,

2    and the entire time that you were a government employee, true?

3    A.   True.

4    Q.   And we have, after this, the annual personnel reminders

5    for 2008, '09, '10, and '11.  And although you weren't a

6    government employee at those times, they had the same exact

7    language for the obligation to report fraud, waste, or abuse

8    in government programs.  Do you agree?

9    A.   I would agree.

10   Q.   Okay.  So the obligation to report fraud, waste, or abuse

11   in government programs existed the entire time you were a

12   government employee and even after you left government

13   service, correct?

14   A.   Yes.

15   Q.   Now, do we agree --

16           THE COURT:  Mr. Wicker, you're not saying her

17   obligation, just so I'm clear, existed?  This doesn't say,

18   right, that her obligation existed after she left government

19   service?

20           MR. WICKER:  It does not, Your Honor.  That's not the

21   point I was making.

22           THE COURT:  Okay.  Just making sure.  Go ahead.

23   BY MR. WICKER:

24   Q.   Now, as a senior case technician, you had a job

25   description; is that right?

1    A.   I did.

2    Q.   And a senior case technician is also the position that

3    Ms. Carver held?

4    A.   Yes, she did.

5    Q.   Okay.  And would you turn to Tab 3 and tell us if this is

6    the job description for legal assistant (senior case

7    technician)?

8    A.   It is the legal assistant position, although this is not

9    the one that was mine.  I don't know if this is the same

10   content because it's not the one I had.

11   Q.   Okay.  This is not your job description?

12   A.   I'm saying that my job description was a legal assistant

13   in Intake position.  Mine did not look like this so I don't

14   know whether the contents of this are the same as the one that

15   I had.

16   Q.   Okay.  Well, just with that caveat, turn over to page 3.

17           MR. KLEIN:  Excuse me, Counsel.  I don't have a copy

18   of this.

19   Q.   Just turn over to page 3 and look at the first paragraph

20   of that.

21           THE COURT:  Page 3.  I'm sorry, what paragraph?

22           MR. WICKER:  The first paragraph at the top of the

23   page.

24           THE COURT:  Thank you.

25   Q.   Do you have that, where it says, "Actions taken"?

*Griffith - Cross*

68

1    A.   I do.

2    Q.   Okay.  It says, "Actions taken on a case may be

3    complicated by situations where the facts are not clearly

4    established; information is likely to be fraudulent;

5    contradictions, conflicts, and inconsistencies must be

6    reconciled; and/or verification or development of information

7    from external sources is required."  Do you see that?

8    A.   I do.

9    Q.   And that is what you experienced in your job when issues

10   were presented or information that was presented to you

11   contained what you believed to be fraudulent information?

12   A.   I wouldn't know.  I didn't deal with fraud cases.

13   Q.   And you handled those by giving those to someone else to

14   review or handle differently?

15   A.   I handled those by docketing the case at the time I was a

16   docket clerk and forwarding those to the judge.  I did not

17   analyze the cases.

18   Q.   Okay.  Well, was your -- was there a manual in effect at

19   the time that you were an SSA employee?

20   A.   I'm sure there were several.

21   Q.   Okay.  The HALLEX manual I'm talking about in particular.

22   A.   Sure.

23   Q.   Okay.  That was in effect during the time that you were

24   there?

25   A.   Yes.

1   Q.   Okay.  And the HALLEX manual is the document that governs

2   the operation of the ODAR office; is that right?

3   A.   It would be one of the them.

4   Q.   Okay.  And you were very familiar with it?

5   A.   Yes.

6   Q.   And it was part of the information that you believed was

7   being violated by Judge Daugherty's actions?

8   A.   You're going to have to rephrase that question.

9   Q.   Okay.  Let me try again.  We agree, don't we, that the

10  HALLEX manual and other documents govern the operations of the

11  ODAR office and its employees, true?

12  A.   True.

13  Q.   Okay.  And you were well familiar with it during the time

14  that you worked there?

15  A.   Yes.  Portions, yes.

16  Q.   Okay.  Would you turn to Exhibit 4?  And there's a

17  portion of the HALLEX manual that's in front of you, and the

18  first page, it's titled, Referring Fraud or Criminal

19  Violations.  Do you see that?

20  A.   I do.

21  Q.   Okay.  And it says last update, 6/27/05.  Do you see

22  that?

23  A.   I do.

24  Q.   Okay.  And it says that -- under Tab A, it's about

25  referring violations to the Office of the Inspector General.

1    Do you see that?

2    A.   I do.

3    Q.   And the first paragraph says, "Individual employees in

4    any Office of Hearings and Appeals component, including OHA

5    headquarters, may observe or discover possible criminal

6    violations of the Social Security Act or other federal

7    statutes."  Do you see that?

8    A.   I do.

9    Q.   And then it tells you what you should do in the next

10   sentence, right?  "Any employee who believes that a criminal

11   violation has occurred must report it and refer the violation

12   to the Office of the Inspector General (OIG) by completing and

13   submitting the electronic version of," a certain form.  Do you

14   see that?

15   A.   I do.

16   Q.   Okay.  And then it goes on to qualify that form of

17   reporting by saying that the use of the form is designed for

18   program form and allegations of employee misconduct should be

19   referred by the following means, and then it lists those

20   means.  Do you see that?

21   A.   I do.

22   Q.   Okay.  And what you believe Judge Daugherty had done was

23   what you thought was employee misconduct, correct?

24   A.   Correct.

25   Q.   So the mechanisms for reporting to the OIG would be the

1   ones that are listed below that sentence?  You see that?

2   A.   Yes.

3   Q.   Okay.  And then behind this section are other versions of

4   the HALLEX manual that came into effect at later times -- or

5   earlier times.  So would you turn with me about four pages in.

6   Do you see the HALLEX manual that has the last update date at

7   10/08/2002?

8   A.   I do.

9   Q.   Do you see that?  And would you look for the same section

10  where it says, Referring Violations to the Office of the

11  Inspector General?

12  A.   Yes.

13  Q.   And it says, as the previous section did, "Any employee

14  who believes that a criminal violation has occurred must

15  report it and refer the violation to the Office of the

16  Inspector General."  True?

17  A.   True.

18  Q.   And then if you turn a few more pages, you come to the

19  HALLEX manual in effect, last update 11/05/99?

20  A.   Yes.

21  Q.   And it has the same language, right?

22  A.   Yes.

23  Q.   Okay.  So the entire time that you were a government

24  employee, the HALLEX manual required you and other Social

25  Security employees to report anything that you believed to be

*Griffith - Cross*

1   a criminal violation to the Office of Inspector General,

2   right?

3   A.   According to HALLEX, yes.

4   Q.   Okay.  Now, is it fair to say that you reported your

5   allegations about Judge Daugherty and what he was doing quite

6   a bit to the management and others at the Social Security

7   Administration?

8   A.   That's true.

9   Q.   Okay.

10          MR. WICKER:  And, Your Honor, I'm going to be putting

11   on the Elmo Plaintiff's Exhibit 2.

12          MR. KLEIN:  This would be an exhibit which I would

13   like sealed.

14          THE COURT:  Okay.  This will be sealed.

15   BY MR. WICKER:

16   Q.   Okay.  This is Plaintiff's Exhibit 2, and this is an

17   e-mail that you wrote to Kathie Goforth?

18   A.   Yes.

19   Q.   In January of 2007?

20   A.   Yes.

21   Q.   And what you're complaining about is what you called the

22   misappropriation by Judge Daugherty about cases that are in

23   the office; is that right?

24   A.   That's correct.

25   Q.   And you not only reported this to management, but you

*Griffith - Cross*

73

1    discussed it with them quite a few times; is that right?

2    A.   I did.

3    Q.   Are these your notes of a discussion with Greg Hall about

4    the same time about the same kind of allegations that you have

5    been making here today?

6    A.   I don't know if these are my notes or Ms. Carver's, but

7    they are notes that were taken regarding discussions that had

8    taken place.

9    Q.   So in January, 2007, you and Ms. Carver had discussed the

10   issue, and both of you were reporting it to management and

11   others on a variety of occasions; is that right?

12          THE COURT:   You didn't reference the exhibit number

13   of the notes.   I'm sorry.

14          MR. WICKER:   I'm sorry.

15   Q.   I'm showing you Plaintiff's Exhibit 3.

16          THE COURT:   Thank you.

17          MR. KLEIN:   I'd like to ask, can this also be sealed?

18          THE COURT:   Okay.   It will.   Thank you, Mr. Klein.

19   A.   I would initiate discussions at this point.   There were

20   grievances in place regarding these matters, and Sarah was

21   entering into discussions with management based on her

22   representation of me and our discussions of these issues.

23   Q.   Okay.   So regardless of who was actually in the

24   discussions, what you were talking about was the same kind of

25   thing that we've talked about today, your allegations that

*Griffith - Cross*

74

1  Judge Daugherty was misappropriating cases from other judges

2  and giving favorable treatment to Mr. Conn's cases; is that

3  correct?

4  A.  Yes.

5  Q.  And here we have specific mention of Mr. Conn in

6  paragraph number 1?

7  A.  Yes.

8  Q.  I'm going to show you Plaintiff's Exhibit 9.  Do you

9  recognize that document?

10  A.  I do.

11  Q.  That's a memorandum to Mr. Hall?

12  A.  It was a portion of an e-mail that was sent to Mr. Hall.

13  Q.  Okay.  And you talk about a variety of issues, but one of

14  the things that you're talking about is in paragraph 5.  Do

15  you see that?

16  A.  I do.

17  Q.  "Management has been made aware on numerous occasions,"

18  about the significant amount of Eric Conn cases which Judge

19  Daugherty has assigned to himself?

20  A.  I see that.

21  Q.  Okay.  That's an issue that you talked about with

22  management?

23  A.  This is not my e-mail, but I'm familiar with it.

24  Q.  Okay.  But it's an issue that you and Ms. Carver talked

25  about with management on a variety of occasions?

1   A.   Yes.

2          MR. KLEIN:  Your Honor, I'd also ask Exhibit 9 be

3   sealed.

4          THE COURT:  It will be.

5   Q.   I'm going to show you another e-mail, which is at

6   Plaintiff's Exhibit 6.  And you see that's an e-mail to and

7   from Ms. Randolph, Ms. Sarah Carver, but you're familiar with

8   it; are you not?

9   A.   I am.

10  Q.   Okay.  And the e-mail exchange is between Ms. Carver and

11  Arthur Weathersby.  Do you see that?

12  A.   Yes.

13  Q.   And you've told us he was another supervisor in the

14  office?

15  A.   Yes.

16         THE COURT:  I assume you're going to want this

17  sealed?

18         MR. KLEIN:  I do.  I just didn't want to interrupt

19  the question.

20         THE COURT:  It's sealed.  Go ahead, Mr. Wicker.

21  BY MR. WICKER:

22  Q.   And what he's doing, in the paragraph 1B in the middle of

23  the page, is responding to complaints that you and Ms. Carver

24  had made about the actions of Judge Daugherty; is that right?

25  A.   That's correct.

1    Q.   And what he's saying is that, beginning in the middle of

2    the paragraph, "Judge Daugherty is the most productive ALJ we

3    have on the staff."  Do you see that?

4    A.   Yes.

5    Q.   Okay.  And later, toward the last of that paragraph, "If

6    it wasn't for that fact, we probably would be hard-pressed to

7    come close to meeting the agency's organizational goals."  You

8    see that?

9    A.   I do.

10   Q.   So the management of the Social Security Administration

11   had heard your complaints and just decided for whatever

12   reason, good or bad, that they didn't want to take action on

13   them, right?

14   A.   I would assume so, yes.

15   Q.   Now, we just saw that you had an obligation from the

16   HALLEX manual to report things that you think are criminal

17   conduct for fraud, waste, and abuse, right?

18   A.   Yes.

19   Q.   Okay.  Both from the HALLEX manual, from the annual

20   personnel reminders, from the regulation.  They all told you

21   that you have an obligation to report fraud, waste, and abuse

22   and possible criminal conduct to the Office of the Inspector

23   General, right?

24        MR. VERNIA:  Objection, Your Honor.  Mischaracterizes

25   the CFR.  CFR does not describe to whom she should make a

*Griffith - Cross*

1    report.

2              THE COURT:  Okay.  Well, that's a fair statement.

3    Q.   To the appropriate authorities, correct?

4    A.   Yes.

5    Q.   Okay.  And one of those appropriate authorities is the

6    Office of the Inspector General, true?

7    A.   True.

8    Q.   Okay.  And you did, in fact, make a report to the Office

9    of Inspector General?

10   A.   Yes.

11   Q.   In 2010?

12   A.   No, I don't think it was 2010.

13   Q.   Was it 2009 that you made the anonymous complaint?

14   A.   2009 would have been the anonymous complaint.

15   Q.   Okay.  And then you did get a response from the Office of

16   Inspector General?

17   A.   Not in 2009, I did not.

18   Q.   Um-hmm.  You made another report to them at a later time?

19   A.   In 2011.

20   Q.   In 2011.  And you got a response from them in 2011?

21   A.   I did, in April of 2011.

22   Q.   Okay.  Was it your belief in 2007 as well that the OIG

23   should be contacted?

24   A.   No, it was my belief that I needed to report that Judge

25   Daugherty was taking my cases to my supervisor.

1    Q.   Um-hmm.  But was it your belief in 2007 that the OIG

2    should be contacted?

3    A.   No.  It was my belief in 2007 that ALJ Daugherty was

4    taking my cases and that needed to go to my first-line

5    supervisor.

6    Q.   Okay.  I'm going to show you Plaintiff's Exhibit 27.  And

7    is this an e-mail from you to Greg Hall and Sarah Randolph

8    Carver?

9    A.   It is.

10   Q.   Okay.  And this is an e-mail that you sent in October of

11   2007?

12   A.   It is.  And I did say that the OIG needed to be contacted

13   and a grievance needed to be filed.  And I did those things.

14        MR. KLEIN:  I'd also ask this to be sealed, Your

15   Honor.

16        THE COURT:  Okay.  It will be.

17        MR. WICKER:  I'm sorry, I think I pressed the wrong

18   button.

19        THE COURT:  You did.

20   Q.   And what you said in 2007, Ms. Griffith, is that, "It is

21   my firm belief that a grievance needs to be filed on the issue

22   and the OIG contacted," true?

23   A.   I did.

24   Q.   Okay.  So as early as 2007, you had decided that this is

25   something that you believed needed to be reported to the OIG,

*Griffith - Cross*

1   true?

2   A.   I decided that this was an action that needed to be

3   stopped.

4   Q.   Okay.  And as part of doing that, the OIG needed to be

5   contacted?

6   A.   And grievances filed, which I did.

7   Q.   Yeah, but I've just got one question pending.

8   A.   And I answered your question.

9   Q.   Do we agree that in 2007, you decided that the OIG should

10  be contacted, true?

11  A.   If nothing was done by grievances, yes.

12  Q.   Now, you believed that what you were seeing was fraud; is

13  that right?

14  A.   What I believed I was seeing was that there was

15  misconduct within the office.

16  Q.   Um-hmm.  And you believed that to be fraud?

17  A.   I believed it could potentially be.

18  Q.   Okay.  And, in fact, that's how you and Ms. Carver

19  discussed it in the conversations that you were having with

20  various people that you were reporting --

21  A.   At times.

22  Q.   Okay.  And I'm going to show you some of Ms. Carver's

23  notes, which are at Plaintiff's Exhibit 36.  You recognize

24  those as Ms. Carver's notes?

25  A.   I do.

*Griffith - Cross*

1    Q.   Do you see that?

2    A.   I do.

3    Q.   Okay.  And do you see point 1, she talks about being

4    discriminated against for reporting fraud?  Do you see that?

5    A.   I do.

6    Q.   Okay.  And that's what you thought you were seeing with

7    Judge Daugherty and Mr. Conn, right?

8    A.   I believed that could potentially be what it was, yes.

9    Q.   Okay.  And what she writes in point 2 is she wants

10   guidance on massive amount of fraudulently-allowed claims?

11   A.   Yes.

12   Q.   Do you see that?

13   A.   I do.

14   Q.   Okay.  So no question that in 2006 and 2007, you believed

15   that what you were seeing was fraud?

16   A.   It could potentially be, yes.

17   Q.   Okay.  You know that fraud is against the law?

18   A.   I do.

19   Q.   Okay.  And fraud is a criminal violation, right?

20   A.   Yes.

21   Q.   Okay.  And that's why it would be appropriate, in your

22   view, if you saw that, to report it to the Inspector General?

23   A.   I do.

24   Q.   True?

25            MR. KLEIN:  Also ask that Exhibit 36 be sealed.

1    Excuse me.

2              THE COURT:  Granted.

3              MR. VERNIA:  Your Honor, I'm going to make a

4    foundational objection.  I'm not exactly sure when this

5    document was written, and I don't believe that this witness

6    can establish that.  I'd just object to its admission for the

7    purpose of what he's saying now with respect to timing because

8    there's no indication on this of a date.  Ms. Carver will

9    testify.  He can ask her about it.

10             THE COURT:  Okay.  Why don't, absent that, you can

11   establish the same thing through your questions, correct?  You

12   don't need Exhibit 36?

13             MR. WICKER:  Are you asking me, Judge?

14             THE COURT:  Yes.

15             MR. WICKER:  I think she answered the questions about

16   Exhibit 36 competently.  I believe the point was made without

17   an exhibit as well.

18             THE COURT:  Right.  But his point was to the timing

19   of when the exhibit was made.  Do you understand what I'm

20   saying?  Why don't you just ask her general timing questions.

21             MR. WICKER:  Okay.

22             THE COURT:  And that way, the record will be clear.

23             MR. WICKER:  Okay.

24             THE COURT:  Am I making sense?

25             MR. WICKER:  Yeah, I think so.

*Griffith - Cross*

1    BY MR. WICKER:

2    Q.   Ms. Griffith, we've shown you some notes by Ms. Carver.

3    And that relates to the discussions that you and she were

4    having beginning in late 2006 and continuing to the time that

5    you left Social Security Administration in late 2007; is that

6    right?

7    A.   One of those was not.

8    Q.   Well, the issues that are described in that document

9    relate to those same issues, true?

10   A.   They relate to the same issues.

11   Q.   Okay.  So you believed that what you were seeing could be

12   fraud and could be, as she described it, massive amounts of

13   fraud, true?

14   A.   Potentially, yes.

15   Q.   Okay.  Other times, you've called what you were seeing a

16   misappropriation.  Do you recall using those words?

17   A.   Yes.

18   Q.   Okay.  If you'd look at Tab 5 in the defense binder.

19   A.   Um-hmm.

20   Q.   That's the second amended complaint that you and

21   Ms. Carver have filed in this action.  Do you see that?

22   A.   I do.

23   Q.   And if you look at page 57, it says, in describing

24   Count 1, it talks about cases misappropriated by Daugherty.

25   You see that?

1    A.   I do.

2    Q.   That's what you were complaining about in 2007, right?

3    A.   Correct.

4    Q.   Okay.  And "misappropriate" means to steal, true?  To

5    take what's not yours?

6    A.   In some instances, yes.

7    Q.   Okay.  And misappropriate or stealing is a criminal

8    violation, true?

9    A.   I don't think the characterization of that in this

10   sentence is correct.  By reporting cases were being removed

11   from the docket --

12   Q.   Um-hmm.

13   A.   -- outside of what was procedure.

14   Q.   Okay.  And you told us that you thought that was

15   fraudulent.  Did you think it was a theft or stealing?

16   A.   I don't think it qualifies as a definition of theft.

17   Q.   Okay.

18   A.   He was not performing his duties and preventing me from

19   performing my duties.

20   Q.   Okay.  Well, at other times, you --

21        THE COURT:  Wait.  Mr. Wicker, I have a legal

22   question for you.  You agree with her characterization that

23   misappropriation can be stealing, but if I have two law clerks

24   and one takes the work that another's supposed to do and does

25   it, I would never consider that a crime, correct?

 1          MR. WICKER:  Yes, sir.

 2          THE COURT:  You agree, just like judges would.  And

 3   if I took another judge's work and did it, I would probably

 4   get a thank you.  I can tell you if someone took mine and did

 5   it, I'd say thank you.  So you agree with that?

 6          MR. WICKER:  I agree with that completely, Your

 7   Honor.  And, you know, we are operating under the complaint as

 8   it is alleged.  As I understand it, the allegation that is

 9   misappropriation of these cases was an illegal act.  I don't

10   agree with that, but I believe that's the plaintiff's

11   position.

12          THE COURT:  They're alleging it was an illegal act

13   because it was done with a malevolent purpose, so to speak,

14   which is more of a fraud than it is a pure misappropriation.

15   Am I fairly characterizing it?

16          MR. WICKER:  Yes, sir, I think that's a fair

17   characterization.

18          THE COURT:  All right.

19   BY MR. WICKER:

20   Q.  Would you turn a couple more pages into the complaint,

21   Ms. Griffith?  And do you see in paragraph E in your

22   complaint, you say that the claims were false or fraudulent?

23   You see that?

24   A.  I do.

25   Q.  And a couple of points, a couple of lines later down, it

*Griffith - Cross*

1    says they were, instead, for collusion and corruption.  Do you

2    see that?

3    A.   I do.

4    Q.   And corruption is one of those things that the regulation

5    tells you that you're required to report to the appropriate

6    authorities.  Do you recall that?

7    A.   I do.

8    Q.   Okay.  And collusion is another word for conspiracy,

9    true?

10   A.   True.

11   Q.   And if you collude or conspire to commit a crime, then

12   that conspiracy or collusion is a crime as well.  Do you agree

13   with that?

14   A.   Yes.

15   Q.   Okay.  And all those things -- collusion, conspiracy,

16   fraud -- are things that you're required to report to the

17   Office of Inspector General, true?

18   A.   True.

19   Q.   So what you believed you were seeing in 2007 was fraud

20   and collusion and corruption, all those things that you

21   thought were wrong, right?

22   A.   Potentially.

23   Q.   And that's why you reported them to your supervisors and

24   to the Office of Inspector General, correct?

25   A.   I reported it to my supervisor and eventually reported it

*Griffith - Cross*

1    to the Office of Inspector General.

2    Q.   Correct.  For the reasons I just described, because you

3    believed them to be fraud --

4    A.   For a variety of reasons.

5    Q.   Including the reasons that you believed it to be fraud,

6    conspiracy, collusion, criminal conduct?

7    A.   My job was threatened by the actions of those two

8    individuals.

9    Q.   Um-hmm.

10   A.   I continually reported it.  I continually received

11   reprimands for something that I didn't cause.

12   Q.   Okay.  Do you recall that you and, through your counsel,

13   provided a disclosure statement at about the time you filed

14   your lawsuit in this case?

15   A.   Yes.

16   Q.   Okay.  Would you turn to Tab 6, which I believe contains

17   that disclosure statement?  And this is Exhibit 6 in the

18   defense binder.  Is this the disclosure of material evidence

19   that you filed in this case?

20   A.   Yes.

21   Q.   Okay.  And do you see on page -- would you turn with me

22   to page 3?  And you say in the first line that, "This case

23   involves an extensive and hugely successful scheme to defraud

24   Social Security," right?

25   A.   It does.

*Griffith - Cross*

87

1    Q.   And turn on page 8 with me.

2    A.   You said 8?

3    Q.   Yes, ma'am, page 8.  It says, "The relators discovered

4    the defendant's fraudulent scheme."  You see that at the top?

5    A.   Yes.

6    Q.   And that's how you described it in this case, right?

7    A.   Yes.

8    Q.   You believed what you discovered in 2006 and 2007 was a

9    fraudulent scheme?

10   A.   We discovered portions of it throughout a period of time.

11   Q.   Okay.  And on page 9, you see in the header, you call

12   what you're complaining about "Daugherty's Misconduct"?

13   A.   I do.

14   Q.   You see that?

15   A.   I do.

16   Q.   Turn on page 12.  You see the header is "Daugherty's Sham

17   Proceedings"?

18   A.   I do.

19   Q.   Okay.  And those were also part of the fraudulent scheme

20   in your view; is that right?

21   A.   They were.

22   Q.   Okay.  And on page 14, you talked about evidence of a

23   conspiracy between Daugherty and Conn.  Do you see that?

24   A.   I do.

25   Q.   Okay.  And what you're talking about there is the same

1   thing that you complained about in 2006 and 2007,

2   misappropriating cases and taking them for Daugherty to rule

3   on instead of other judges.  Is that right?

4   A.   That's correct.

5   Q.   And on page 19 -- would you go a few more pages to page

6   19?  You see in about the middle of the page, it says, "The

7   relators brought their concerns regarding Daugherty's

8   conduct."  Do you see that?

9   A.   I do.

10  Q.   And that's a complaint that you had been making about

11  what you believed to be fraud to your supervisors, to your

12  supervisor's supervisors, to the Office of Inspector General.

13  True?

14          MR. VERNIA:  Objection.  Mischaracterizes prior

15  testimony.  It was something she believed to be fraud.  I

16  think she's been fairly careful about that.

17          MR. WICKER:  She just answered the question yes.

18          THE COURT:  I didn't get an answer.  Where on the

19  page are you talking about first?  I'm sorry.

20          MR. WICKER:  Middle of the page, middle of the line.

21  "The relators brought their concerns regarding Daugherty's

22  conduct."

23          THE COURT:  The middle of the page, they reported

24  them to their supervisors.  You see where that is?  Page 19,

25  right?

*Griffith - Cross*

89

1              MR. WICKER:  Yes, sir.

2              THE COURT:  With an intense -- can you read the

3    sentence again?

4              MR. WICKER:  "The relators brought their concerns

5    regarding Daugherty's conduct and favorable treatment of

6    Conn's clients to the government.  They reported them to their

7    supervisors."

8              THE COURT:  Oh, at the bottom of the document, on

9    multiple issues.  Okay.  I was looking for a sentence starting

10   with "the relators."  I'm sorry.

11   BY MR. WICKER:

12   Q.  And that's what you did, right, ma'am?

13   A.  I did.

14   Q.  Okay.  Because you believed it to be fraudulent conduct

15   as you had described before?

16   A.  I do.

17   Q.  Okay.  Now, was the reason for your reporting because you

18   wanted to divert attention from complaints about your job

19   performance?

20   A.  No.

21   Q.  Was the reason that you reported because you were angry

22   at Judge Daugherty for some reason?

23   A.  No.  I actually had a great working relationship with

24   Judge Daugherty.

25   Q.  Okay.  And was the reason that you reported because you

1   wanted to cash in on a qui tam case?

2   A.   I didn't know about the qui tam law at the time.

3   Q.   Okay.  Or, ma'am, was the reason that you reported these

4   things because you were a good and honorable public servant

5   doing your duty to report waste, fraud, and abuse?

6   A.   I've explained to you the reasons that I reported.

7   Q.   Okay.  Well, bear with me a couple more questions.

8   Wasn't it because you believed, as a good and honorable public

9   servant, you had a duty to report fraud, waste, and abuse,

10  just as the regulations in the HALLEX manual required you to?

11  A.   I reported it because my job was affected and threatened

12  by the actions of the individuals in question.

13  Q.   Okay.  So it was a purely defensive measure?

14  A.   Had I never been approached about the CPMS statuses, I

15  may have never even seen this.

16  Q.   Um-hmm.  Okay.  But you certainly agree that as a good

17  and honorable public servant, you did have a duty to report

18  fraud, waste, and abuse, true?

19  A.   That isn't part of the HALLEX.

20  Q.   Okay.  And that's the manual that governs your behavior

21  and your actions as a Social Security employee, true?

22  A.   True.  And I reported the problems that I saw to my

23  supervisor.

24  Q.   Okay.  As you were required to do as a Social Security

25  employee?

*Griffith - Cross*

1    A.   As directed by my supervisor, as directed by my hearing

2    office director, as directed by anyone.

3    Q.   Okay.  As directed?

4    A.   Pardon?

5    Q.   As directed?

6    A.   As directed by my supervisor, if there's an issue at hand

7    with my job, my performance, I reported to.

8    Q.   Okay.  Now, we've been looking at your disclosure

9    statement that's at Defendant's Exhibit 6.  And you're

10   familiar with that document; are you not?

11   A.   Yes.

12   Q.   Okay.  It doesn't say anything in the disclosure

13   statement about false medical opinions, does it?

14   A.   I don't know.

15   Q.   Are you familiar with Exhibit 6?

16   A.   It's been quite some time since I read it.

17   Q.   Okay.  Well, look through it if you like, but my question

18   is going to be, do you agree with me that there's nothing in

19   here about Mr. Conn filing false medical opinions?

20   A.   I don't know until I read the whole document.

21   Q.   Okay.  Well, I don't necessarily want to slow down the

22   proceedings, but it's kind of an important point.

23   A.   Well, unless I read this word for word, I can't tell you,

24   it's been so long since I've seen it.

25   Q.   Okay.  Read it as much as you need to.

1          MR. VERNIA:  Your Honor, I'm going to object on

2     relevance grounds.  I don't see how this relates to

3     voluntariness of her --

4          MR. WICKER:  Your Honor, part of the requirements of

5     a relator, a jurisdictional requirement, is that before filing

6     suit, the relator has to disclose all the material issues that

7     are the basis of a suit to the government.

8          Second amended complaint, which was filed after the

9     Congressional hearing and the Senate report came out, doesn't

10    say anything about a number of -- the disclosure statement

11    doesn't say anything about a number of important

12    allegations --

13         THE COURT:  But why don't the documents speak for

14    themselves?  Why does she need to answer that question?  In

15    other words, you could point to the disclosure and say, look,

16    Judge, you can't consider this because it doesn't -- I don't

17    know the law on it.  I'm just saying if that's the law, why

18    does it matter what she says?

19         MR. WICKER:  That's right.

20         THE COURT:  Because what if she said, yeah, it's in

21    there.  Where?  I don't know, but I told them.  So you're

22    going to live with that versus the document itself?

23         MR. WICKER:  Maybe I can do this a different way,

24    Your Honor, and I'll just make a statement and can be

25    corrected by opposing counsel at a later time if I'm wrong.

1    But it doesn't say anything about the false medical opinions

2    that are alleged in paragraph 97 of the complaint.

3              THE COURT:  But again, why do we need this witness

4    for that?

5              MR. WICKER:  We don't need this witness for that.

6              THE COURT:  Okay.  So I'll trust your representations

7    for now; but if you want to raise this issue, I think I'm

8    probably going to require briefing.

9              MR. WICKER:  Sure.

10             THE COURT:  Because, to be candid, I don't know, have

11   you raised this before?  You can, of course, raise

12   jurisdictional issues at any time, so I'm not faulting you.

13   I'm just asking because I wasn't aware of it.

14             MR. WICKER:  We weren't aware of what was in the

15   disclosure statement until it was ordered produced, Your

16   Honor, and it was just in preparation for this hearing.

17             THE COURT:  Okay.  So that's a new issue that you can

18   brief.  Let me do it this way.  Like we did with the

19   voluntariness, if we later discover there's a reason we need

20   testimony, I'll allow you to re-call her on that issue.

21             MR. WICKER:  Okay.

22             THE COURT:  That way, you're not prejudiced.  But I

23   do agree for the purposes of this hearing, it's not relevant.

24             MR. WICKER:  Okay.  And with that, Your Honor, I'll

25   close my questions.

1          THE COURT:  Okay.  Thank you.  Redirect?

2          MR. SMITH:  Your Honor, before we move on to

3    redirect, we would also like to reserve the right to inquire

4    about that subject at a future time.

5          THE COURT:  That's fine.  Like Mr. Wicker, it hasn't

6    been briefed so no one's -- everyone's rights are reserved on

7    that regard.  Do any of you want to question her about the

8    voluntariness?

9          MR. SMITH:  No, Your Honor.

10          MR. VARNEY:  No, Your Honor.

11          MR. KLEIN:  No, Your Honor.

12          MR. STEVENS:  No, Judge.

13          THE COURT:  Okay.  Thank you.  Redirect.

14                    REDIRECT EXAMINATION

15    BY MR. VERNIA:

16    Q.  Ms. Griffith, I'll refer you to Defense Exhibit Number 1,

17    which begins -- is page 2 of 3, so I'm actually going to refer

18    to --

19    A.  Say it again, please.

20    Q.  Exhibit Number 1, Defense Exhibit Number 1 in the binder.

21    I'm looking at the second -- there's actually two separate

22    page numbers.  I'm looking at the second physical page, where

23    you see at the top left, (11) "Employees shall disclose waste,

24    fraud, and abuse and corruption to appropriate employees"?

25    A.  Yes.

1    Q.   Did you, when you were an employee, disclose what was

2    happening with Judge Daugherty and Mr. Conn's cases to your

3    supervisor?

4    A.   Yes.

5    Q.   Did you believe that those were appropriate authorities?

6    A.   Yes.

7    Q.   I'm going to refer you to Exhibit Number 4, Defense

8    Exhibit Number 4, in the binder again.  And I'm going to draw

9    your attention to, in paragraph A, the second full sentence.

10   I'll just read it.  "Any employee who believes that a criminal

11   violation has occurred must report it and refer the violation

12   to the Office of Inspector General (OIG) by completing and

13   submitting," and they refer to a form.  You see that?

14   A.   I do.

15   Q.   Okay.  Were you trained at any time in the content of the

16   criminal violations of the Social Security Act or other

17   federal statutes?

18   A.   No, we were not.

19   Q.   And you see the reference there where it says any

20   employee who believes that a criminal violation has occurred?

21   I want to compare that for you with the bottom of the page,

22   for internal OHA, refer to internal violations.  You see where

23   I'm reading there?  This is part B.

24   A.   Part B?

25   Q.   Number 1, Employee Violations, where it says, "If not

1    referred to the OIG in accordance with A above, suspected

2    violation by employees will be referred as set forth below."

3    You see that?

4    A.   Yes.

5    Q.   And then if you turn the page -- actually, if you could,

6    look at the bullet points on this, and you'll see that the one

7    on the bottom of the page refers to an employee in the

8    District of Columbia hearing office?

9    A.   Yes.

10   Q.   The next one refers to an employee at an HO or regional

11   office.  Is that where you were located?

12   A.   I was in a hearing office.  I wasn't in a regional

13   office.

14   Q.   Okay.  But that second bullet -- or the first bullet

15   point that appears on -- page 3 of 13, you see it along the

16   top, there's a stamp beginning case number 7:11-CV.  You see

17   where it says page 3 of 13 there?  The first bullet point that

18   appears there, "An employee in an HO."  That would apply to

19   you, right?

20   A.   Yes.

21   Q.   Okay.  It says, "must report a suspected violation to an

22   immediate supervisor," right?

23   A.   Yes.

24   Q.   And you reported what we described before to your

25   immediate supervisor, correct?

1    A.   Yes.

2    Q.   And, in fact, you went beyond that and reported to your

3    supervisor's supervisor, Mr. Hall, right?

4    A.   I did.

5    Q.   Did you receive any training on the difference between

6    believing that a violation has occurred and suspecting that a

7    violation has occurred?

8    A.   No.

9    Q.   And throughout this entire time period, did you have any

10   responsibilities for detecting fraud?

11   A.   No.

12   Q.   Did you have any responsibilities as part of your job

13   duties -- I understand the government and Mr. Conn's position

14   is every federal employee has a responsibility to report it.

15   But as part of your day-to-day job responsibilities, what you

16   did, did you have any role in detecting fraud?

17   A.   No allegations of fraud were developed by the field

18   offices.

19   Q.   Did you have any role in investigating fraud?

20   A.   No.

21   Q.   Did you have any role in reporting fraud that you found?

22   A.   Other than to report something to my supervisor, but

23   not -- we weren't trained to look for instances of fraud and

24   compare them to something.

25        MR. VERNIA:  Thank you, Your Honor.  I have no

1    further questions.

2             THE COURT:  Anything further?

3             MR. WICKER:  Very briefly.

4             THE COURT:  Limited to redirect, correct?

5             MR. WICKER:  Yes.

6                    RECROSS-EXAMINATION

7    BY MR. WICKER:

8    Q.  Ms. Griffith, just stay with us on Defendant's Exhibit 4.

9    A.  Um-hmm.

10   Q.  And your counsel was asking you about the first

11   paragraph, paragraph A?

12   A.  Yes.

13   Q.  You see that second sentence says, "Any employee who

14   believes that a criminal violation has occurred must report

15   it"?  Do you see that?

16   A.  I do.

17   Q.  And then the "must" refers to the Office of Inspector

18   General in that paragraph, right?

19   A.  It does.

20   Q.  And then on the second paragraph, in the middle of the

21   page, there's a bullet point for an employee in an HO or

22   regional office?

23   A.  True.

24   Q.  And that's you, correct?

25   A.  Yes, it is.

1    Q.   Okay.  And that also says "must," true?

2    A.   Must report the violation to any supervisor.

3    Q.   Must report.  So the obligation in both paragraphs that

4    we looked at both say "must," right?

5    A.   It does.

6    Q.   It's not discretionary; you must do it?

7    A.   It says that, yes.

8              MR. WICKER:  Okay.  That's all.

9              THE COURT:  Anything further?

10             MR. VERNIA:  No, Your Honor.

11             THE COURT:  May she be released?

12             MR. WICKER:  Yes.

13             MR. VERNIA:  Yes, sir.

14             THE COURT:  Okay.  Thank you, ma'am.  You're free to

15   go.

16             THE WITNESS:  Do I leave these here?

17             THE COURT:  Yeah.  Leave all that there.

18        (The witness was excused.)

19             THE COURT:  Is the next witness shorter, longer,

20   same?

21             MR. VERNIA:  Probably -- I'll try to avoid retreading

22   the same ground, but I suspect -- so shorter but only by a

23   little bit.

24             THE COURT:  Okay.  And then what about the ALJ?

25             MR. VERNIA:  Brief.

1          THE COURT:  Brief.  And then do you anticipate any

2     witnesses?

3          MR. WICKER:  No, Your Honor.

4          THE COURT:  Okay.  Mr. Klein?

5          MR. KLEIN:  No, Your Honor.

6          THE COURT:  Okay.  How about 11:30, we start back and

7     be ready to go until we finish?  Is that okay with everyone?

8          MR. VERNIA:  Yes, Your Honor.

9          THE COURT:  Okay.  I will see you then.

10        (Recess at 11:20 a.m. until 11:39 a.m.)

11         THE COURT:  Please call your next witness.

12         MR. VARNEY:  Your Honor, I was going to ask the Court

13    if I could be excused.  The only issue that we were going to

14    discuss for my client is a jurisdictional issue that we were

15    going to raise with the last witness the Court's not going to

16    hear today.  I don't see -- I can request anything from any

17    transcripts, and I have no more questions if we can't get into

18    that area.

19         THE COURT:  Okay.  That's fine.  You're welcome to be

20    excused.

21         MR. VARNEY:  Thank you, sir.

22         THE COURT:  Thank you.

23         MR. VERNIA:  Your Honor, before Mr. Wohlander calls

24    our next witness, I'd just like to clarify something on the

25    record.  Mr. Wicker used Exhibit 5, which was our second

1    amended complaint, Defense Exhibit 5, and Defense Exhibit 6,

2    which is our disclosure statement.  That disclosure statement,

3    just for clarification, accompanied the first complaint that

4    was filed in October, October 11th, 2011.  The second amended

5    complaint was filed in December of 2013, which is after the

6    hearing.

7              THE COURT:  Okay.

8              MR. VERNIA:  Just a clarification.

9              MR. WOHLANDER:  Thank you, Your Honor.  We call Judge

10   James Kemper.

11             PLAINTIFF'S WITNESS, JAMES D. KEMPER, SWORN

12             MR. WOHLANDER:  And, Your Honor, we also state on the

13   record that Judge Kemper, we filed a *Touhy* letter as it

14   relates to Judge Kemper, and we're going to limit it to just

15   some background questions.  He'll be a very brief witness.

16   And I know Mr. Klein, he's already asked to have sealed Number

17   31, and we will refer to that just very briefly.

18             THE COURT:  Okay.  That will be sealed.

19             MR. WOHLANDER:  Thank you, Your Honor.

20                       DIRECT EXAMINATION

21   BY MR. WOHLANDER:

22   Q.   Sir, would you state your name and your address where you

23   live?

24   A.   James D. Kemper, Junior, 54 Mayfair Way, Huntington, West

25   Virginia.

Kemper - Direct

1   Q.   And, sir, are you here today pursuant to a subpoena that

2   we sent to you last week, and you're here voluntarily?

3   A.   Yes, sir.

4   Q.   And you're here, sir, to testify, as we discussed with

5   you previously, just about your employment during the time

6   that you were with the Social Security Administration; is that

7   correct?

8   A.   That's correct.

9   Q.   Will you just tell the Court, if you will, to begin with,

10  your background and your relationship with the Social Security

11  Administration?

12  A.   Okay.  I took the job as an administrative law judge in

13  1990, after taking a test, a written test, and going through

14  the oral interview, and was selected in August of 1990 under

15  the condition that I serve in Huntington.  So my wife and

16  children and I moved to Huntington in August, and we've been

17  there ever since.

18  Q.   Okay.  And just briefly, your role at the Office of

19  Disability Adjudication, what was your actual role there?

20  A.   I was an administrative law judge.

21  Q.   Were you there to review cases that were initially

22  declined by -- in the process?

23  A.   Yes.  I reviewed the cases, we had an oral hearing after

24  the review, and then I made a decision and helped -- went over

25  the decision writer's draft and approved the final.

*Kemper - Direct*

1    Q.   Okay.  And did there come a time, sir, that you

2    ultimately retired from your position?

3    A.   Yes.  I retired in November, 2007.

4    Q.   Okay.  And are you employed at this point in time?

5    A.   I'm retired.

6    Q.   Retired?

7    A.   Yes.  Just do volunteer work.

8    Q.   Should have taken your advice.  I retired November, 2007,

9    and I'm still here.

10        When you were at the Huntington office, did you know

11   Jennifer Griffith?

12   A.   Yes, I did.

13   Q.   How did you learn to know Jennifer Griffith?

14   A.   Jennifer was one of the administrative assistants who

15   reviewed the files, and she would come to me oftentimes if

16   there was any questions she had or problems or whatever.

17   Q.   Was she also involved in the process of docketing?

18   A.   Yes, docketing cases.  Yes.

19   Q.   Just generally, how did that work?

20   A.   Well, she would be responsible for getting cases and then

21   determining if they could have hearings on particular cases,

22   docket them for hearings in Prestonsburg, Kentucky or

23   Huntington, West Virginia.

24   Q.   Okay.  Were those set up on a rotating basis?

25   A.   Yes.  They were supposed to have been -- as the cases

Kemper - Direct

104

1    came in, they were supposed to be given to each judge on a

2    rotating basis.  And we had nine judges at the time.

3    Q.   And did all of the nine judges at the time that you were

4    there and that Ms. Griffith was there, did you all take cases

5    at the Prestonsburg office?

6    A.   Yes, we did.  Um-hmm.  We also took some video cases as

7    well from all over the country.

8    Q.   Okay.  Did you also come to know Sarah Carver?

9    A.   Yes.

10   Q.   How did you learn to know Sarah Carver?  Where did you

11   meet her?

12   A.   Well, she was also working in the office, and I knew

13   her -- she was also a docketing clerk, but I also knew her

14   because she was the union representative for employees in the

15   office, and I was the union representative for administrative

16   law judges in the office.  So if there were problems relating

17   to either the regular members of the staff or the judges,

18   sometimes we would talk about those problems.

19   Q.   Okay.  And when you had problems or Sarah had problems or

20   you had problems, was there a procedure that you had to follow

21   as the union steward?  Did you have somebody that you went to

22   with issues?

23   A.   Well, yeah.  If I had an issue with a judge, I would

24   usually go straight to Judge Charles Andrus, who was the chief

25   judge at the time.

Kemper - Direct

105

Q.   Okay.  How long was Charles Andrus the chief judge?

A.   I'd say probably late '90s to when he was still the judge
when I retired in 2007.  I'd say maybe '95, because he took
over after the death of the chief judge at the time.

Q.   Would Chief Judge Andrus, would he have been considered
the final level of management in the Huntington office?

A.   Yes.

Q.   So if you have something that you had to report within
the Huntington office or within that region and you took it to
Judge Andrus, that was the highest level there?

A.   Yeah.  Well, actually, no, let me correct myself.  If I
really wanted to take it beyond Judge Andrus, I'd go to the
regional chief judge, who was Judge Prostato at the time, in
Philadelphia.

Q.   Okay.  But from the office level, it was Judge Andrus?

A.   Yes, from the office level, he was the top person.

Q.   Did you have an opportunity to get to know Judge
Daugherty during your time there?

A.   Yes.

Q.   What was your relationship with Judge Daugherty?

A.   At first, friendly.  And then later on, it became more
distant.

Q.   And why did it become more distant?

A.   Because I would see him doing things that were, in my
view, completely unprofessional.

1    Q.   Beyond unprofessional, were there any other complaints

2    that you grew to know about?

3    A.   Well, we raised -- I raised this issue with Judge Andrus

4    about Judge Daugherty, as did a couple of other judges in the

5    office at the time.  And that was his time and attendance.  He

6    would come in -- and I witnessed this many times.  He would

7    come in, sign his name, and then leave and be gone most of the

8    day.  And at the same time, he was getting credit for deciding

9    all of these cases.

10   Q.   Okay.  When you say deciding all of these cases, what was

11   the average caseload per judge at the time you were there?

12   A.   I would say the average caseload was probably 40 to 50

13   cases a month.

14   Q.   And when you say he was getting credit for a lot more,

15   what would you say --

16   A.   I'd say he had up to a hundred, or over.

17   Q.   And when you say he was not around a lot, explain that,

18   if you will.

19   A.   Well, he would sign in, go in his office maybe for a few

20   minutes, then leave and not come back for hours, maybe the

21   whole day, and then sign back in like he had been there the

22   whole day.

23   Q.   Okay.

24   A.   And one thing in particular, he really wanted to get that

25   eight hours in and he wanted to be credited for the time he

Kemper - Direct

107

1    allegedly came in, let's say at 7:00 in the morning, until he
2    signed out at 4 or 5.
3         One time, I was the first one in the office, and I think
4    I signed in at 8.  Well, he took that sheet, tore it up, made
5    a new one, and forged my initials on that time sheet as coming
6    in after him.  So he put 6:30, 7, whatever the time was, and
7    then put mine -- falsified my name and initials right below
8    coming in at 8.
9    Q.  Did there come a time that either Sarah or Jennifer came
10   to you to talk to you about what they were noticing as far as
11   the docket?
12   A.  Yeah.  They were telling me that Daugherty was taking
13   cases off the master docket without giving them the
14   opportunity to distribute those cases or to assign those cases
15   to a particular judge on a rotating basis like they were
16   supposed to do.  So I -- they told me about this problem.
17   They even showed me e-mails where they had complained about
18   this problem to the staff director.
19   Q.  Who was the staff director?
20   A.  At the time, Kathie Goforth I think her name was.  And
21   then it was Greg Hall who took over after her.  He was like
22   the assistant, and then he became the staff director after she
23   left.
24   Q.  They would be for the administrative side of the house?
25   A.  Yes.

1    Q.   Okay.  And that would have been Kathie Goforth.  Would

2    she have been the highest level for --

3    A.   She would have -- yeah, she would have been right under

4    Andrus as far as the administrative part of the office,

5    correct.

6    Q.   And would that have been the same for Greg Hall?

7    A.   Yes.  When he took over as staff director, yes.

8    Q.   So hypothetically, if I'm either Jennifer or Sarah and I

9    have an issue with what's going on in the office, something

10   that I believe I need to report, their highest level from the

11   administrative side would have been either Kathie or Greg; is

12   that a fair statement?

13   A.   Correct.  Yeah.  And then if they didn't get any

14   satisfaction from them, they had a right to complain to Judge

15   Andrus.

16   Q.   Okay.  And when it came to your reporting, who did you go

17   to?  Was it just Judge Andrus?

18   A.   I just went straight to Judge Andrus, yes.

19   Q.   When did you first learn about any irregularities as it

20   relates to the docketing, and who was the one who first

21   reported it to you, if you recall?

22   A.   I don't recall whether it was Jennifer or Sarah, but I

23   believe both of them showed me this and told me about these

24   problems.

25   Q.   Was that once or twice or three times?

Kemper - Direct

1   A.   Many times.

2   Q.   Okay.

3   A.   And they also told me they didn't receive any help from

4   their supervisor, Greg Hall or Kathie Goforth.

5   Q.   What did you do with the information that you received

6   from Jennifer and Sarah?

7   A.   I suggested to them, since Sarah was the union

8   representative for the employees in the office, I suggested to

9   her that she take this directly to Judge Andrus.

10  Q.   Okay.  And did you do anything with it?  Did you take it

11  to Judge Andrus?

12  A.   I mentioned it to him on -- I might have -- I can't

13  recall how many times, but I remember mentioning it to him

14  about the problems with the docketing, Daugherty taking cases

15  off of the master docket or even having his cases that had

16  been assigned to another judge changed to him, to his name.

17  Q.   Did you see a pattern of the cases he was taking?  Was

18  there any particular attorney that was part of those cases?

19  A.   Primarily, Eric Conn.

20  Q.   Did you know Eric Conn at the time?

21  A.   Yes, I did.

22  Q.   Did you ever have any cases with Eric Conn?

23  A.   Oh, I had many cases with him, yes.

24  Q.   Okay.  But the cases you're talking about that were being

25  moved, the docketed cases, before they were docketed, those

*Kemper - Direct*

110

1   were particularly, from your recollection, Conn cases?

2   A.   Yes.

3   Q.   Did Judge Andrus --

4   A.   And that was information I had received from Jennifer and

5   Sarah.

6   Q.   Also?

7   A.   Yeah.

8   Q.   In addition to what you observed?

9   A.   Well, I didn't know whether they had been assigned to

10   another judge or not until they told me.

11   Q.   Okay.  What did you do with that information?  Did you

12   take that to Judge Andrus also?

13   A.   I can't recall if I did or not.  I think I was sort of

14   relying on them to do it many times and didn't.  Because,

15   again, I was trying to focus on complaints I had received from

16   other judges.  Yes, I did mention it.  There were a couple

17   judges that came to me and complained about that, and that's

18   when I did take it to Judge Andrus.

19   Q.   Okay.

20   A.   That issue.

21   Q.   Did you ever take it beyond Judge Andrus?  Did you ever

22   take it to the Office of Inspector General?

23   A.   I mentioned it to the Office of Inspector General when

24   they were investigating a lot of this, yes.

25   Q.   Was that after you had already retired though, Judge?

*Kemper - Direct*

111

A.  Yes, it was.

Q.  Going back to Judge Daugherty, and you indicated that he could do as many as a hundred cases a month, would that be something that you could do if you were putting in the hours that you suggested that Daugherty --

A.  Unless I granted every single case, I could never have done that many cases.

Q.  Okay.

A.  And particularly when you're not in the office but half the time.

Q.  Do you know whether or not, during that period of time, whether there was any retaliation against either Jennifer or Sarah for their reports?

A.  They complained to me about that, too.  You know, everybody else in the office was getting awards and promotions, and all they got was criticism for the complaints they had made.

Q.  Finally, Judge, let me ask you if you can pick up there in front of you, it should be Plaintiff's Exhibit Number 31. I believe it's the letter that you wrote, and it's already been put under seal.  You wrote it to Bob Habermann on November 1st, 2007.

A.  In this book here or?

Q.  It should be one of the loose forms.

A.  Loose forms here?

Kemper - Direct

112

1           THE COURT:  It's in the stack.

2           THE WITNESS:  Okay.

3    Q.   It should be Plaintiff's Exhibit Number 31 in the lower

4    right-hand corner.  It's the letter I think you'll recognize.

5    It's your letter to Bob Habermann.

6    A.   Oh, yes, dated November 1st, 2007.

7    Q.   If you could just take a look at that for a moment.

8    A.   Okay.

9    Q.   Do you recognize that letter, Judge?

10   A.   Yes, I do recognize it.

11   Q.   Okay.  And do the statements therein fairly characterize

12   what was going on at the time in the office just before your

13   retirement?

14   A.   Yeah.

15   Q.   In particular, I think on the first page -- and it's

16   paragraph 4, fourth paragraph, you put in there that

17   Ms. Griffith voluntarily informed you about Daugherty; is that

18   correct?

19   A.   That's correct.

20   Q.   And then you were passing that on to Bob -- what's Bob's

21   position?  Was he your union --

22   A.   He was the union rep in Philadelphia in the region.

23   Q.   Okay.

24   A.   And I sent this to him with all the tabs and never got

25   any response.

1   Q.   Okay.  And the information that was put in all those

2   tabs, was that information that both Jennifer and Sarah helped

3   you gather?

4   A.   Yes.

5   Q.   Okay.

6   A.   Matter of fact -- and I hate to admit this -- but we did

7   it undercover because Andrus and Kathie Goforth did not --

8   they saw me making copies of things and they said, what are

9   you doing, you know, like we want to have everything that

10  you've made copies of.  And I essentially said to them, you've

11  got everything I'm going to give you.

12  Q.   Was there a basic acceptance of what was going on in the

13  office with Judge Daugherty and Mr. Conn?

14  A.    I think most the people in that office, except for a few

15  of us, just threw up our hands and said, you know, if the

16  chief judge doesn't want to do anything about it, if the staff

17  director doesn't want to do anything about it, if the regional

18  chief doesn't want to do anything about it, then what can we

19  do.  Our hands are tied.

20       And matter of fact, one day, Judge Prostato, the chief

21  judge at the time, came in to my office with Andrus.  And, you

22  know, he had just talked to the entire office before he came

23  in to my office.  He said, is there anything else you'd like

24  to talk about?  I said, "Yeah.  When are you going to do

25  something about this man's time and attendance?"  And he just

*Kemper - Cross*

1  turned to Andrus, said, "Yeah, we got to do something about

2  that."  And that was it.

3  Q.  After the regional judge, you talked to him, what was the

4  next level available to you if no one else would listen?

5  A.  I guess the number one judge in the country, the chief

6  administrative law judge in Washington, number one.  But I

7  never went that far.

8  Q.  Or the director of the Social Security Administration?

9  A.  Yes.  Correct.

10  Q.  Did you ever take it that far?

11  A.  No, I did not.

12        MR. WOHLANDER:  Can I have just a moment, Your Honor?

13  Thank you, Your Honor.  We're done with this witness.

14        THE COURT:  Thank you.  Cross?

15                    CROSS-EXAMINATION

16  BY MR. WICKER:

17  Q.  Good morning, Your Honor.  You retired from the Social

18  Security Administration in what year?

19  A.  2007, November of 2007.

20  Q.  Okay.  So you've been gone about seven years or so?

21  A.  Yes, sir.

22  Q.  Now, you told us about an instance in which you found

23  that a time and attendance sign-in sheet had been destroyed

24  and your name forged to it?

25  A.  Right.

*Kemper - Cross*

115

1   Q.   Okay.  Was that in about 2003?

2   A.   Correct.

3   Q.   And did you report that to the Inspector General?

4   A.   I can't recall whether I did or not, to be perfectly

5   honest.

6   Q.   Okay.

7   A.   Because there was, you know, like a -- there was quite a

8   few years after that I spoke to the Inspector General.

9   Q.   Okay.  But do you recall reporting that actually in 2003,

10  that particular incident?

11  A.   I reported it to Judge Andrus, yes.

12  Q.   Okay.  And you thought it was appropriate to report

13  because it was fraud?

14  A.   Yeah.

15  Q.   Forgery?

16  A.   Absolutely.

17  Q.   Violation of the rules of the office?

18  A.   Yes.

19  Q.   Okay.  And when you see things like that, as a good and

20  honorable public servant, you have an obligation to report

21  that to the appropriate authorities?

22  A.   Correct.

23  Q.   Now, you told us that Ms. Griffith and Ms. Carver

24  reported the things that Mr. Daugherty -- that Judge Daugherty

25  was doing to you many times; is that right?

1    A.   Yes.

2    Q.   They complained to you many times?

3    A.   Yes.

4    Q.   And they appeared -- would it be fair to say that they

5    appeared to you to have great concern about what was going on?

6    A.   Yes.

7    Q.   And they believed that what was happening was fraud, or

8    other kinds of illegal activities?

9    A.   Yes.

10   Q.   And the reason that they saw what was happening before

11   you did was because in their positions as docket clerks, they

12   would be the person most likely to recognize or detect any

13   irregularities in the rotation for the assigning of cases?

14   A.   That was their very position, yes.  They were the ones

15   responsible for assigning the cases to the individual judges

16   on a rotating basis.

17   Q.   Okay.  So if anybody was going to detect fraud in the

18   assigning of cases, it would be someone like Ms. Carver and

19   Ms. Griffith, who is actually doing that job, correct?

20   A.   Yes.

21   Q.   It wouldn't be someone who -- it would be more difficult

22   for an ALJ to detect that kind of conduct, true?

23   A.   If we detected it, it would be after the fact, when maybe

24   it was too late.

25   Q.   Okay.  Certainly more likely to be detected by someone

*Kemper - Cross*

117

1    like Ms. Griffith and Ms. Carver, correct?

2    A.   Yes.

3    Q.   And the Inspector General, they're not in your office

4    every day, right?

5    A.   No.  No.

6    Q.   So they wouldn't be in a position to detect it, right?

7    A.   No.

8    Q.   And the only way the Inspector General or other

9    authorities would know about fraudulent activity is if someone

10   like Ms. Carver and Ms. Griffith reports it to the appropriate

11   authorities, true?

12   A.   Correct.  And to my knowledge, they did that.  They went

13   to the Chief Judge Andrus.

14   Q.   Okay.  And you've had training and instruction on your

15   ethical obligations as a government employee and as an ALJ?

16   A.   Um-hmm.  Yes.

17   Q.   And that's one of your duties?

18   A.   Correct.

19   Q.   If you see something, say something, correct?

20   A.   Correct.  And following the chain of command as best you

21   can.

22   Q.   Okay.

23            MR. WICKER:  That's all.  Thank you.

24            MR. WOHLANDER:  Your Honor, nothing further.  May

25   this witness be finally excused so he can remain in the

1   courtroom, unless he wants to leave?

2          THE COURT:  Any objection to him being excused?

3          MR. WICKER:  No, Your Honor.

4          MR. KLEIN:  No, Your Honor.

5          THE COURT:  Thank you, sir.  You're free to go.

6       (The witness was excused.)

7          THE COURT:  Please call your next witness.

8          MR. VERNIA:  Your Honor, the relators call Ms. Sarah

9   Carver.  She's just outside.  I'll get her.

10       Your Honor, is there any objection to the witnesses that

11  have been excused remaining in the courtroom?

12          THE COURT:  No.  They may.  And Mr. Wicker, you have

13  no objection to them remaining in the courtroom?

14          MR. WICKER:  I don't, Your Honor.

15          PLAINTIFF'S WITNESS, SARAH CARVER, SWORN

16                       DIRECT EXAMINATION

17   BY MR. VERNIA:

18  Q.   Good afternoon, Ms. Carver.  Could you state your name

19  for the record, please?

20  A.   Sarah Carver.

21  Q.   And where do you live?

22  A.   I live in South Point, Ohio.

23  Q.   Who is your current employer?

24  A.   The Office of -- what's ODAR, the Social Security

25  Disability hearing office.

1    Q.   And where is that located?

2    A.   In Huntington, West Virginia.

3    Q.   How long have you been employed at the Huntington ODAR?

4    A.   Since 2001, 12 years.

5    Q.   Do you know Jennifer Griffith?

6    A.   Yes, I do.

7    Q.   And did you and Ms. Griffith start at the same time at

8    the ODAR?

9    A.   Yes.

10   Q.   Did you work together before you went to the ODAR?

11   A.   Yes, we did.

12   Q.   Where was that?

13   A.   It was at a law firm in Greenup, Kentucky, for McGinnis,

14   Leslie & Kirkland.

15   Q.   What was the first position that you took when you went

16   to Social Security Administration?

17   A.   It was the position of senior case technician.

18   Q.   I may refer to that as SCT.  Is that okay with you?

19   A.   Yes.

20   Q.   And what is your current position?

21   A.   Senior case technician.

22   Q.   So have you been a senior case technician at the

23   Huntington ODAR for the entire time since 2001 going forward?

24   A.   Yes.

25   Q.   If you could, describe for the Court your overall

*Carver - Direct*

1   responsibilities as an SCT.

2   A.   We basically prepare the files for the judges in

3   preparation of hearing, we schedule the cases, and we also do

4   any type of pre- or post-development.  If the Judge wants us

5   to get specific records, like medical records or order

6   consultative examinations, we do those also.  And then we also

7   mail and close the cases.

8   Q.   Do you have any responsibilities for detecting fraud in

9   disability claims?

10  A.   No.

11  Q.   Do you have any responsibility for investigating or

12  reporting fraud?

13  A.   No.  When we get cases, anything that would have to do

14  with fraud, it would be something that the district office had

15  already investigated and the claimant would have asked for an

16  appeal of their decision.  And that basically goes directly to

17  the Judge.

18  Q.   I may refer to those as fraud appeals.  Does that make

19  sense to you?

20  A.   Yes.

21  Q.   Please describe to the Court the training you received

22  for an SCT when you first arrived.

23  A.   When we first arrived, we didn't really receive too much

24  training.  We did a lot of just mailing out cases, which

25  required making copies, mailing out the decisions, basically

1    by putting them in an envelope.

2        Then after we were there for a little while, our lead

3    case technicians somewhat trained us.  We kind of had a little

4    bit of hostility when we first came there because we were the

5    first outside hires that had been hired for long time and we

6    were hired in over other employees there, so a lot of people

7    didn't really want to help us.  And then we eventually, when

8    the Social Security Administration got the funding, we

9    eventually were sent to a two-week training in Birmingham,

10   Alabama.

11   Q.   Did either of this training that you're talking about,

12   either the LCT training or the program in Alabama training,

13   receive training in detecting fraud?

14   A.   No, not at all.

15   Q.   What about investigating fraud?

16   A.   No.

17   Q.   Setting aside the allegations in this suit involving

18   former ALJ Daugherty and Mr. Conn, do you know of any SCTs or

19   master docket clerks at the Huntington ODAR who have reported

20   fraud on their own?

21   A.   No.

22   Q.   Did you sometimes -- let me rephrase that.

23        Did Huntington ODAR sometimes receive complaints from

24   outside sources that a case under appeal was tainted by fraud?

25   A.   If we received any kind of call, like a call like that,

*Carver - Direct*

1    we were supposed to refer them to the 1-800 number.

2    Q.   Were you supposed to take any information down about the

3    call?

4    A.   No.   That wasn't our responsibility.

5    Q.   Did you receive annual personnel reminders?

6    A.   Just in general, we received annual personnel reminders

7    on different subjects.

8    Q.   I'm going to refer you to -- you should have a number of

9    exhibits up there.   I don't know what kind of order they're

10   in.   The defense exhibits are all in this white binder like

11   this, and I'm referring first to Defense Exhibit Number 2, if

12   you could turn to that, please.

13   A.   Yes.

14   Q.   And just for clarification, this is a -- appears to be

15   annual personnel reminders from October, 2006 through 2011.

16   Do you recognize these documents that make up this exhibit?

17   A.   Not right offhand, no.   I mean, we get several personnel

18   reminders during the year, like the disclosing your personnel

19   records, handling -- I mean personal records.   Some of this, I

20   do recall.

21   Q.   Do you recall receiving a document in the form that these

22   appear to be in on an annual basis?

23   A.   Do I actually recall them?   Some of them.   I mean,

24   because we get them every year.   So generally, we'll get, you

25   know, on handling PII and stuff like that, we get personnel

1    reminders.  So, I mean, we get so many of them, specifically,

2    I mean, I can't say that I remember each specific one of them.

3    Q.   If you could, go to the third page of this exhibit, which

4    begins 1.2, Support of SSA Programs.  Do you see that?  Do you

5    see that page?

6    A.   The 1.2?

7    Q.   Yes.  This is in the October, 2006 personnel reminder.

8    Do you see the last sentence of that first introductory

9    paragraph, "You must put forth honest effort in the

10   performance of your duties and report any fraud, waste, or

11   abuse in government programs"?

12   A.   Correct.

13   Q.   Do you recall seeing this before?

14   A.   Yeah, I believe so.  And we, in general -- and this is

15   how I perceive this -- in general, if we would see a file come

16   to us that had report of contact notes in it from the district

17   office, that had maybe something about, you know, the claimant

18   had -- if they had noticed that he had, you know, unreported

19   income sources or had worked, we would note that type of

20   information on our case analysis so the judge would know.

21   Q.   So that involves information provided by the district

22   office?

23   A.   By the district office, yes.

24   Q.   Did you receive any specific training -- in addition to

25   getting this document, did you receive any specific training

1   on how to identify waste, fraud, or abuse?

2   A.   No.  When we're given a file, generally we're -- like

3   when it was paper filed, before it turned over to electronic,

4   you were generally just -- you were handed a file, and your

5   responsibility for that file was just to organize what was

6   there, put it in date order, get rid of duplicates, and

7   exhibitize it.  I mean, there was -- you did nothing further

8   on that file unless the judge told you to do it.

9   Q.   If you could, look at Defendant's Exhibit 4.  And for

10  reference, do you see on the top of Exhibit 4, there's a

11  stamp?  I'm going to refer to those page numbers that appear

12  on that stamp, because otherwise it's hard to point you where

13  I want you to go on this.

14  A.   Okay.

15  Q.   What is HALLEX?

16  A.   It's like a list of regulations for the Social Security

17  Administration.

18  Q.   How do you access HALLEX at work, if you do?

19  A.   Via our like intranet.

20  Q.   And is HALLEX a voluminous document?

21  A.   A very large -- large document that changes quite often.

22  I mean, when we receive reminders, we don't receive -- we

23  don't get this.  We'll just get a cite.  We'll get like a --

24  from, say, like headquarters, it will be an e-mail, and it

25  will just say -- maybe it will say like HALLEX I-1-3-3, and

1    that's what it lists.  It does not go through and say, this is

2    regarding fraud or criminal violations and these are the

3    changes that have been made.  No, we don't get that.

4    Q.   So I think a moment ago, you used the word "reminder."

5    Are you talking about a reminder or an update?

6    A.   Well, it's an update, yeah.

7    Q.   So the headquarters sends out updates to HALLEX

8    periodically?

9    A.   They'll send the updates like to HALLEX and sometimes to

10   POMS or even like personnel reminders every year, you know,

11   just about handling PII and so forth.

12   Q.   Is it fair to say -- I understand you have access to this

13   document as a paper document.  You access it online, right?

14   A.   Pardon?

15   Q.   Not this specific document, but HALLEX.  You access it

16   online?

17   A.   Correct.  It's there.

18   Q.   Does it have hundreds of sections?

19   A.   Oh, gosh, it's very voluminous.

20   Q.   Is hundreds a fair number?

21   A.   Yeah.  I mean, hundreds.

22   Q.   What about thousands?

23   A.   Yeah.  Most of which a lot doesn't pertain to us.

24   Q.   Would you look, please, at the second page of this

25   document, again at the top.  It says page 2 of 13 in that same

*Carver - Direct*

126

1    stamped area.

2    A.   Um-hmm.

3    Q.   It's titled, Referring Fraud or Criminal Violations.

4    Prior to this case coming up, do you recall having this

5    section brought to your attention as part of your work?

6    A.   No.

7    Q.   If you look in the first section, A, Referring Violations

8    to the Office of Inspector General.  I'm going to read for you

9    a portion, a beginning portion of the second sentence.  It

10   reads, "Any employee who believes that a criminal violation

11   has occurred must report it and refer the violation to the

12   Office of Inspector General," and then it goes on to describe

13   how to do that.

14        Did you receive any training, as a senior case

15   technician, in possible criminal violations of the Social

16   Security Act or other federal statutes?

17   A.   No.

18   Q.   If you look on the bottom of the page, under B, Internal

19   OHA Referrals of Violations.

20   A.   Just a second.  Where?  You're on page 3 of 13?

21   Q.   Page 2 -- I'm at the bottom of page 2 of 13.

22   A.   Oh, I'm sorry.

23   Q.   Part B, Internal OHA Referrals of Violations.

24   A.   Yes.

25   Q.   There are two sections.  The first one on this page,

1   which is on this page, is number 1, Employee Violations.  Do

2   you see that?

3   A.   Um-hmm.

4   Q.   Read for me the first sentence, please.

5   A.   "If not referred to the OIG in accordance with A above,

6   suspected violations by employees will be referred as set

7   forth below."

8   Q.   That's fine.  And then the next page, you'll see that

9   there's several bullet points, and it appears to distinguish

10  between, you know, where the employee works and what they

11  should be doing.  Is it accurate to say that if you turn the

12  page, page 3 of 13, that first bullet that you see there,

13  where it says, "An employee in an HO or regional office must

14  report a suspected violation to an immediate supervisor,"

15  would that apply to you?

16  A.   Yes.

17  Q.   Okay.  Under Representative Violations, do you see that

18  at the bottom?

19  A.   Yes.

20  Q.   The first bullet point, would that apply to you?  "An

21  employee in an HO must report a suspected violation to an

22  immediate supervisor"?

23  A.   Yes.  A hearing office, yes.

24  Q.   And who, during this time period, let's say 2007 to 2011,

25  was your immediate supervisor?

*Carver - Direct*

128

1    A.   It would have been probably Arthur Weathersby or Kathie

2    Goforth.   I had several supervisors during that time frame.

3    But also our hearing office director, Greg Hall, because I was

4    the union representative, I could go directly to him if I

5    wanted to report, you know, employee complaints or issues.

6    Q.   Did you receive any training in how to distinguish

7    between belief that a criminal violation has occurred and

8    suspicion that a violation has occurred?

9    A.   No.

10   Q.   Before the events that are the issue in this lawsuit came

11   up, did you have any interactions with the Office of Inspector

12   General of SSA?

13   A.   No.

14   Q.   Do you know whether they were ever in the office?

15   A.   Yes.   When we first started our employment with Social

16   Security, the Office of Inspector General was interviewing

17   people.   And then sometime I think around 2005 -- I'm not

18   positive on that -- there was another investigation.   And it

19   had something -- I believe it had something to do with hearing

20   request dates and a few other things that the supervisors

21   selected certain employees to talk to them.

22   Q.   Were you involved in any of those investigations?

23   A.   No.

24   Q.   Prior to these events, did you ever refer any cases of

25   fraud, waste, or abuse to the Office of Inspector General?

*Carver - Direct*

129

A.   No.

Q.   So let's talk about the events that are at issue in this case.  When did you first begin to believe that something was not correct about Judge Daugherty's cases or Mr. Conn's cases?

A.   I started noticing about the same time frame that Jennifer was having problems with a supervisor.  I was scheduling cases, and I would get -- Judge Daugherty would hand me completed -- like we would pencil-schedule.  Like we'd have a time slot down, and we would call an attorney and see if he could do that time slot, and we would do it by hearing request date order.

However, when you were scheduling for Judge Daugherty, he would hand you in his own pencil handwriting a pencil schedule.  And whereas we would normally schedule six hearings a day and allow the judges about an hour, hour and 15 minutes -- some judges took an hour and a half -- Judge Daugherty would hand us Eric Conn, like maybe like two days of solid Eric Conn cases that were scheduled 15 minutes apart.  He already had the claimant's name, Social Security number and time, and, you know, the attorney's name, Eric Conn, already written down in those slots.

And we would have -- when we would call to fill out the rest of the week, certain representatives, we would start receiving -- and I say we because other people also.  Other employees would also receive complaints from other

*Carver - Direct*

130

1    representatives about why Eric Conn basically, you know, had

2    so many, like say 20 cases in a day, and then they may have

3    one case that whole day.  So that's when it kind of, you know,

4    noticed that that was kind of unusual.  And that was probably

5    2006.

6        And then as the union representative, I also got involved

7    with Jennifer and the issues she was having of getting in

8    trouble for and constantly being pulled into her supervisor's

9    office for cases that she had not docketed.

10   Q.   Why were you, as union representative, being involved in

11   those?

12   A.   Because she was -- anytime that they tell you that this

13   meeting may result in disciplinary action, you're allowed to

14   have a union representative present.

15   Q.   And so I think you said in 2006 was when the issues began

16   with the scheduling; is that correct?

17   A.   Pretty much.  Pretty much so.  We received so many -- so

18   many complaints, and it was brought to the attention of the

19   supervisors, Greg Hall and Judge Andrus.  And I noticed that

20   shortly thereafter, that no hearings at all were scheduled for

21   Eric Conn cases.

22   Q.   Did you complain about this yourself?

23   A.   Yes, I did.

24   Q.   And how did you do that?

25   A.   I talked with Greg Hall and asked him why there were no

*Carver - Direct*

1    hearings being scheduled and they were all on-the-record

2    decisions, because no other representative got that, had that

3    privilege.  And I did ask him how can all, every case that he

4    has, be favorable.

5    Q.   About when was that?

6    A.   Between later on in 2008 to probably maybe 2011.  I'm not

7    positive on the two thousand -- if it continued after 2011.

8    I'm pretty sure it was up to 2011.

9    Q.   When did you first start complaining to Mr. Hall?

10   A.   About -- end of 2006 verbally, and then 2007, I started

11   documenting as far as -- I mean just e-mailing him.  I'd

12   e-mail in writing, even follow-ups with Jennifer and her

13   supervisor regarding issues or like discussions that we had.

14   Q.   I think a few minutes ago, we were talking about your

15   supervisor.  Mr. Hall was not your immediate supervisor,

16   right?

17   A.   No, he was not.  But he was the person that I would

18   report to if I was -- as a union representative, I could go

19   directly to Greg Hall.  But the supervisors were always --

20   generally, the supervisors were cced on any e-mails that were

21   sent out.

22   Q.   So during this period of time, you had sort of a dual

23   role.  You were both an employee of Social Security and a

24   union rep, correct?

25   A.   Correct.

1   Q.   Did the problems get worse or get better after 2007,

2   after the --

3   A.   The problems -- the problems got worse.

4   Q.   And how did they get worse?

5   A.   It got worse for me because I started receiving a lot of

6   retaliation from different supervisors.  A lot of -- I mean, I

7   was in a way -- I mean, I was ostracized.  Every new employee

8   that came in was told to stay away from me.  And some of the

9   judges would joke with me about, you know, where I sat being

10  the dark side because it was just -- you know, they just

11  portrayed me as being a troublemaker.

12       And I later found out from individual employees, when

13  they were each hired or even during their evaluations, they

14  were told specifically to stay away from me.  But, yet, my PAX

15  evaluations, you know, were passing, where, you know, I never

16  failed an evaluation for not doing my work.  It was just

17  literally, I mean, like one supervisor told -- before she

18  left, Kathie Goforth told an employee who had asked her, you

19  know, any advice to me personally, you know, as you leave as a

20  supervisor, and she said yes.  She said, always be pro

21  management and stay away from Sarah Carver and stay away from

22  the union.

23  Q.   CPMS is an electronic system?

24  A.   Yes.

25  Q.   Did the rollout of CPMS affect the nature of the problems

1   that you were incurring?

2   A.   It brought it to our attention even more so because you

3   were able to see when Judge Daugherty would go in and take a

4   case and change it to his name.  You could see the date that

5   it went out of that judge's name, and then a status would be

6   in his name.

7        You were also -- we had access also to reports.  You

8   know, like how many cases were closed each month, you know,

9   the date, the disposition, the attorney.  There was just a lot

10  more information that we could view than whenever it was paper

11  filed.

12  Q.   When did Ms. Griffith resign?

13  A.   2007, I believe.

14  Q.   Do you recall the time of year?

15  A.   Not the exact date.

16  Q.   During 2007, had you continued to report problems that

17  you were incurring to Mr. Hall?

18  A.   Yes, I did.

19  Q.   What about to your immediate supervisors; did you report

20  them to Ms. Goforth?

21  A.   Yes.

22  Q.   And Mr. Weathersby?

23  A.   Yes.

24  Q.   If you could, look, please, at the plaintiff's exhibit

25  which is PX Number 31, which I don't know if the pile up there

*Carver - Direct*

134

1   is organized or not.  Do you have it in front of you?

2   A.  Yes.

3   Q.  Do you recognize this document?

4   A.  Yes, I do.

5   Q.  What is the document?

6   A.  It's a letter that Judge Kemper had sent to -- I believe

7   that was the president of the judges' union.

8   Q.  And had you discussed the problems you were observing

9   with Judge Kemper?

10  A.  Yes.

11  Q.  In November of 2007 or before November of 2007?

12  A.  Yeah, kind of prior to that.  It was an accumulation of

13  different events.

14  Q.  Please look at Exhibit Number 29.  Do you recognize this

15  document, the first page?

16  A.  Yes.  It was the affidavit that we provided for the

17  package that he sent to Bob Habermann.

18  Q.  Was it your hope or expectation that when Judge Kemper

19  provided this -- let me just stop.  Did this, in fact, to your

20  knowledge, accompany the letter to Mr. Habermann?  Did

21  Exhibit 29 go with Exhibit 31?

22  A.  Yes.

23  Q.  And was it your hope or expectation that this would cause

24  someone to take notice of the problems that you were observing

25  in Huntington?

1    A.   Yes, it was.

2    Q.   In 2008, fast-forward a little bit.  If you look at

3    Exhibit Number 35, I think it's just one page.

4    A.   Thirty-five, yeah.

5    Q.   Do you have it?

6    A.   Yes.

7    Q.   Do you recognize this document?

8    A.   Do I recognize it, yes.

9    Q.   What was the purpose of Ms. Griffith e-mailing you in

10   June of 2008?

11   A.   Because I was going to have a follow-up conversation with

12   Greg Hall, the hearing office director, and I had asked her to

13   make a list of things that she had been having issues and

14   having problems with.  You know, I had my own notes too, but

15   she had her notes, and this is what it was -- the issues that

16   she wanted me to discuss with him.

17        And it was -- and when I say discuss, it was just issues

18   to try to get resolved so that the employees' flow of work

19   could -- because it was affecting their jobs.  Like when

20   Jennifer was getting hassled by her supervisor, it was

21   affecting her job.

22        When another employee came to me and she had already

23   scheduled cases for Judge Gitlow and they were Eric Conn cases

24   and Judge Daugherty came and took them all.  So she spent so

25   much time scheduling these cases.  Now she had to call all the

1    attorneys back and tell them that these are no longer

2    scheduled cases, Judge Daugherty took them and did all

3    on-the-record decisions.  So it affected the workflow of

4    employees.

5         The purpose of discussing this with Mr. Hall is to try to

6    make the caseflow purpose -- the caseflow to move smoothly and

7    in the direction and in the way that it was supposed to move.

8    And when Judge Daugherty would do this, it would cause

9    problems all the way down the line.  I mean, because he did it

10   at different intervals; you know, not only at master docket

11   level.  It may have made it through master docket level and

12   then a bunch of cases would just disappear either from

13   someone's desk or out of a judge's name.  Like Judge Gitlow

14   may have already reviewed the file and all the sudden, this

15   file was switched over to Judge Daugherty's name.

16        So it affected not only, you know, Jennifer and I, but

17   other people in the office.

18   Q.   Just for clarification, at this point, Ms. Griffith was

19   no longer employed at the agency, right?

20   A.   No, she was not.

21   Q.   So these were things that you both had raised already

22   with Mr. Hall; is that right?

23   A.   Yes.

24   Q.   And did you, in fact, have this follow-up discussion with

25   Mr. Hall?

*Carver - Direct*

137

1   A.  Yes, I did.

2   Q.  Did you have subsequent conversations with Mr. Hall about

3   the same topic?

4   A.  Lots.

5   Q.  And are there e-mails to Mr. Hall?

6   A.  Yes.

7   Q.  In 2010, did you meet with anybody outside of the federal

8   government concerning these concerns?

9   A.  Yes.  We went to meet with -- it was the then governor,

10  Joe Manchin.

11  Q.  And did you rely on this Exhibit Number 35 as sort of an

12  agenda for that conversation?

13  A.  Yes, we had it with us.

14  Q.  What was the upshot of that conversation?

15  A.  We spent quite a bit of time with them.  They were very

16  shocked, very interested; however, you know, they said that

17  our hands are kind of tied because it's not within our

18  jurisdiction.

19  Q.  Okay.  I'm going to hand you what will be marked as PX or

20  Plaintiff's Exhibit 38.  Do you recognize Exhibit 38,

21  Ms. Carver?

22  A.  Yes.

23  Q.  What is it?

24  A.  It is a confirmation of where I filed a report to the OIG

25  hotline.

*Carver - Direct*

138

1   Q.   And why did you file an OIG hotline report?

2   A.   Because I was having a lot of problems with management

3   retaliation for just -- I mean, various instances.  I mean,

4   whenever I was reporting this information, they were getting

5   angry.  It's like every supervisor I had, I had kind of the

6   same reaction to that.  But then after I filed this, it really

7   got really, really bad.  I was a single mother with two

8   children and putting one through college and couldn't lose my

9   job.

10  Q.   So what happened with this?

11  A.   I withdrew it.

12       MR. KLEIN:  Your Honor, Exhibit 38 should also be

13  sealed.  Thank you.

14       THE COURT:  That motion's granted.

15  BY MR. VERNIA:

16  Q.   Just so the record's clear, did you send this from your

17  personal or Social Security e-mail address?

18  A.   I believe I sent it from my Social Security address.

19  Yeah, this would have been through my Social Security.

20  Q.   In 2011, were you aware of a complaint that Ms. Griffith

21  filed with the Inspector General's office?

22  A.   Yes, I was.

23  Q.   And what did you know about that at the time that

24  happened?

25  A.   At the time it happened, I knew about it.  I didn't

1    know -- I don't really recall what specific things were in it.

2    I mean, I kind of knew the gist of it, but I was aware of it.

3    Q.   Okay.  I'm going to hand you -- before I go to the next

4    exhibit, were you aware of an article in the Wall Street

5    Journal regarding the Social Security office in Puerto Rico in

6    March of 2011?

7    A.   Was I aware of it?  I don't think I was aware of it at

8    that time.

9    Q.   Okay.  I'm going to hand you what we've marked as

10   Plaintiff's Exhibit Number 40.  I'm anticipating --

11            MR. KLEIN:  This is to be sealed too, Your Honor.

12            THE COURT:  It will be.

13            MR. KLEIN:  Thank you.

14   BY MR. VERNIA:

15   Q.   Ms. Carver, what is Exhibit Number 40?

16   A.   This is my own handwritten notes of something that I

17   noticed I had come across on one of our case listings that I

18   had pulled from our CPMS system.

19   Q.   So these were notes that you created yourself?

20   A.   Um-hmm.  Yes.

21   Q.   Did they go in to some Social Security file?

22   A.   They didn't go in to a Social Security file, no, but they

23   were reported to -- that was later reported to the OIG.

24   Q.   Okay.  Just describe for me what led to the creation of

25   this page of notes.

1    A.   I had noticed -- at the end of the month, there is a big

2    surge in trying to close out any cases that are in mail

3    status, which means the judge has already signed them and

4    they're ready to be mailed to the claimant, but we have to go

5    through a process of closing this file out.

6         And I noticed it was the last day of the month, and I'm

7    usually one of the later employees there, last employees

8    there, and it concerned me.  I noticed that there were a

9    lot -- there was -- they were all favorable, some decisions,

10   that were being held back.  And what I was afraid of is that

11   these cases, which they should -- they were already, you know,

12   completed and signed by Judge Daugherty -- that I was going to

13   have to close these 50 cases and it was like an hour before I

14   left.

15        And I noticed that all of them -- when I started looking,

16   all of them, all 50 cases, were all Eric Conn.  I mean, I

17   started looking into it further -- were all Eric Conn cases.

18   They were all written on a matter of three days.  They were

19   all completed and being held -- when I say completed, they

20   were already signed.  And once they're signed, they're

21   supposed to go into mail status.  So that's whenever I made

22   note of this, because we were told that, you know, we were not

23   supposed to hold cases at the end of the month.

24   Q.   Did you complain about this situation?

25   A.   Yes, I did.  My supervisor at the time was Steven Hays.

*Carver - Direct*

1  Q.  How did you complain to him?

2  A.  I went directly to him.  Well, actually, on this time, I

3  had sent an e-mail out to everybody and asked does anybody

4  know why these cases were setting in -- it was AWCC, which

5  was -- basically, that just meant awaiting a decision from the

6  judge.  And it was in Judge Daugherty's name.

7      And I was brought into the supervisor's office and

8  basically got in trouble (1) for writing the e-mail.  He

9  wanted to know why I wasn't doing my own, you know, job and

10 why I wrote this -- what the purpose of this e-mail was.  He

11 questioned my work, basically.

12 Q.  Were you genuinely curious about this, or did you believe

13 that Judge Daugherty was holding the opinions so that the next

14 month's numbers could be satisfied?

15 A.  It was apparent -- it was obvious why he was doing it.

16 But at the time, I was -- like I said, you know, if those

17 cases were turned over at the last minute, then, you know,

18 we're expected to stay there until all the cases are closed

19 out.

20     But it was also to let management know that this was

21 still going on.  I mean, this had happened before, you know,

22 on several occasions, and it was also to let management know

23 that it was still -- it was still happening; and in spite, you

24 know, how many times it had been reported, he was still

25 holding those cases.

1  Q.   So even though the e-mail is worded sort of in the "I

2  wonder why this is happening" kind of fashion, it really was a

3  disclosure or complaint?

4  A.   Yeah.  Oh, yeah.  Yeah.  I did use -- this information

5  later was given to the Office of the Inspector General.

6  Q.   Are you familiar with the Wall Street Journal reporter

7  investigating the Huntington ODAR --

8  A.   Yes.

9  Q.   -- in the spring of 2011?  What was his name?

10  A.   Damian Paletta.

11  Q.   When did you first become aware of Mr. Paletta's

12  investigation?

13  A.   That he was investigating it?  I received a phone call

14  from him.  I believe it was from him.  It was either -- I

15  can't remember if Jennifer told me first or if it was Damian,

16  he had called me.

17  Q.   Would you look, please, at Plaintiff's Exhibit 42?

18  That's a fairly thick one that's up there.

19  A.   Thirty-two?

20  Q.   Forty-two.  It's the one that it's fairly big.  It has

21  this picture of Judge Daugherty.

22  A.   Oh, okay.  Yeah.  Yes.

23  Q.   That is Mr. Paletta's article?

24  A.   Yes.

25  Q.   You said you spoke to him on the telephone.  How many

1    times did you speak to him?

2    A.   Several.

3    Q.   Did you cooperate with him and answer his questions?

4    A.   Yes.

5    Q.   Did you also meet with the Office of Inspector General

6    around the same period of time?

7    A.   Yes.

8    Q.   And who was that?

9    A.   Tim Morton.

10   Q.   About how many times did you meet with Agent Morton?

11   A.   Gosh, I've lost count.  I've met with him several times,

12   talked with him several times, e-mailed, telephone, all the

13   way through.  I would say all the way through the

14   investigation.  I mean, probably for two years at least.

15   Q.   Did he ask you for documents?

16   A.   Yes.

17   Q.   Did you provide those?

18   A.   Yes.  He provided me a document, sort of like a subpoena,

19   you know, allowing me to provide the documents.

20   Q.   Did you answer all of his questions?

21   A.   Yes.

22   Q.   To your knowledge, was there a connection between the

23   timing of the Office of Inspector General investigation and

24   the Wall Street Journal article?

25   A.   Yes.  It was like the day before, I think it was, that we

1    actually met at Jennifer's office.  I believe it was the day

2    before.

3    Q.   I'm talking about the -- when did the OIG arrive in

4    Huntington to start looking into these charges?

5    A.   April -- maybe April, 2011.

6    Q.   Was it before the publication of Mr. Paletta's article?

7    A.   It was right before.  I'm pretty sure it was right

8    before.

9    Q.   Did you also cooperate with Congressional committees?

10   A.   Yes.

11   Q.   And did you meet with Senate investigators?

12   A.   Yes.  Jennifer and I both took off work and paid our own

13   way and went to Washington for three days and met with Levin,

14   Hatch, and Coburn's staff.

15   Q.   Did you answer all their questions?

16   A.   Yes.

17   Q.   Did you provide information if they asked you for it?

18   A.   We had provided, you know, information as far as what --

19   we had to go through the whole process with them, so we would

20   provide them with, you know, diagrams of what the process was,

21   because they didn't know what the hearing process was, and so

22   forth.

23   Q.   Did you subsequently testify before the Senate committee?

24   A.   Yes.

25   Q.   When was that?

Carver - Direct

145

1    A.   I think that was October 7th.

2    Q.   Of what year?

3    A.   Gosh, was that 2011, 2012?  I'd have to refer to the

4    actual report.  The dates are confusing for me.

5    Q.   That's all right.  So you worked there both before the

6    news broke about this and after.  Have there been changes in

7    the instructions that the agency has given its employees about

8    reporting fraud, waste, or abuse?

9    A.   Oh, yes, definitely.  In fact, it's on their main -- when

10   we pull up the main ODAR page, it's their new campaign of see

11   something, say something.

12        We got a letter from, I believe it was the Commissioner.

13   It came out of headquarters.  And if I recall, it even

14   mentioned due to the Huntington, Puerto Rico, and New York

15   investigations, that they were developing a new committee.

16   And there's also a new fraud unit that they now have in place

17   in different regions.  And the campaign now is to see

18   something, say something.  And then there's like a web site

19   that you can go to and report it.

20        And then there's already been one awarded recipient for a

21   lady that had noticed a discrepancy in like a contractor's

22   invoice, and she got rewarded for it.  We've never, ever had

23   any documentation in our e-mails or anything like that that

24   anybody in ODAR had been awarded for discovering fraud.

25   Q.   You mean the Huntington ODAR?

1    A.   I'm talking about ODAR across like Region 3.  Because

2    this lady was not out of the -- she was out of Region 3, I

3    think.  No, she wasn't even a Region 3 because I think she was

4    from New York.

5    Q.   Were all these changes that you just described after you

6    filed --

7    A.   Yeah, there's been a lot of changes implemented after the

8    investigation and after the Senate hearings.

9    Q.   I'm going to hand you two exhibits which will be

10   Plaintiff's Exhibits 65 and 66.  And Ms. Griffith, these

11   are -- I'll just represent to you that these are printouts of

12   web sites, web site captures of Social Security Administration

13   HALLEX provision I-1-1-50, Processing Alleged Violation.

14   Did you, in the time period of 2006 to 2011, did you have

15   occasion to read this section at all?

16   A.   No, not at that time.

17   Q.   If you would look, please, at Exhibit 65, on the first

18   page, under Initial Referral in the A section, I'll just read

19   this, the first two sentences.  "Staff in any OHA office may

20   observe or detect suspected violations of the rules pertaining

21   to a representative's conduct.  When this occurs, the staff

22   should fully develop violations as described below before

23   referring them to the Office of General Law," and then it goes

24   on and gives the address.  Do you see that?

25   A.   Um-hmm.

1   Q.   And then on the next Exhibit 66, you'll see that this is

2   the same section, right?

3   A.   Right.

4   Q.   Do you see the last update entry there?

5   A.   Is that the 10/13/11?

6   A.   Right.

7   Q.   And then in the same two sentences it refers to ODAR.

8   And that's just basically reflecting a name change of the

9   office, right?

10  A.   Right.

11  Q.   "Staff in any Office of Disability Adjudication Review

12  (ODAR) component may observe or detect suspected violations of

13  the rules pertaining to a representative's conduct.  If this

14  occurs, the staff must fully develop."  Is that consistent

15  with what we were talking about just a minute ago about the

16  change in direction from SSA to its employees?

17  A.   Yes.

18  Q.   I just want to touch on a couple of things briefly.  Were

19  you investigated for a flexi-place violation that allegedly

20  occurred in August of 2012?

21  A.   Yes.

22  Q.   Just briefly, could you describe what flexi-place is?

23  A.   That's when we were allowed to work at home from our

24  home.  We take generally the paper files, because we do still

25  have some paper files even though we went electronic, and we

1    would take paper files home and we would be allowed to work

2    from our home.

3    Q.   And what was the nature of the allegation?

4    A.    Well, whenever I was told that they wanted to meet with

5    me regarding -- well, they didn't say at first what it was

6    regarding -- that it may result in disciplinary action and I

7    may, you know, obviously have a union representative present.

8    I had to get a rep out of the AFG national office because, you

9    know, to me, the seriousness of this, because they had done

10   this, you know, before for other reasons.

11        I was then told, when my representative asked what

12   specifically it was regarding, and it was said, they told me

13   it was regarding my flexi-place day on August 1st.  Still

14   never told me, you know, what it was regarding.

15        And then when we got in the meeting -- well, then before

16   the meeting, my representative and I asked for any

17   documentation, you know, that they had, any evidence that they

18   had regarding, you know, what the issue was.  And we were

19   given basically my sign-in and out sheet.  You know, what time

20   I signed in, what time I signed out.  That's something that we

21   completed when we came back from flexi-place.  And that's all

22   I was given.

23        And then when I went into the meeting, I was asked about

24   my -- if I left my house.  You know, if I did, you know, where

25   did I go, what time was it.  It was questions like that.  And

1    I asked why I was being asked this, and they told me that it

2    was because they had received an anonymous call.

3    Q.   Did you subsequently learn from any of the people

4    involved how that anonymous call came about?

5    A.   Yes, I did.  I learned that from two of Eric Conn's

6    ex-employees that were involved.

7    Q.   And what did they say?

8    A.   They told me that Judge Andrus -- and at the time, he was

9    the assistant regional judge in Region 3 for the Philadelphia

10   region, too -- that they had a conference call or a call

11   wherein they were discussing with -- it was Eric Conn and

12   Judge Andrus -- what they were going to do with the Sarah

13   Carver situation.

14   Q.   Did you become aware of an affidavit that Judge Andrus

15   signed about this situation?

16   A.   Not until the Senate hearing.

17   Q.   What did you find out at the Senate hearing?

18   A.   Hmm?

19   Q.   I'm sorry.  Does Judge Andrus still work for the Social

20   Security Administration?

21   A.   No.

22   Q.   What happened to him?

23   A.   He -- well, he had to step down.  First he stepped down

24   from being the assistant regional chief judge and from being

25   our chief judge to where he was just an ALJ in our office.

*Carver - Direct*

1    Then he was able to -- well, he said he resigned.

2         And then I later found out that through the MSPD hearing,

3    he was basically being charged with improper conduct.  There

4    was like four different charges; behavior unbecoming of a

5    federal employee.  I mean, there was -- I got a copy of --

6    someone had sent me a copy of what the charges were.

7    Q.   You still work in Huntington, correct?

8    A.   Yes.

9    Q.   Do you report to Huntington ODAR management?

10   A.   No.

11   Q.   Who do you report to?

12   A.   I report to the -- it's like a national hearing center in

13   St. Louis, Missouri, and I report to two supervisors there.

14   However, I've been placed in like a hearing room in the

15   Huntington ODAR office with -- like separated from everybody,

16   all of my coworkers, and I'm not allowed to attend any kind of

17   staff meetings or even on behalf of the union.  I have to

18   attend via telephone.  I mean, it's in a big room so you can't

19   hear the conversations.

20   Q.   Was it your choice to be removed from --

21   A.   I asked to be removed from the situation.  I asked Judge

22   Bice to do something about the situation.  I first requested

23   her to put me on paid admin, not disciplinary but admin leave,

24   while these investigations and so forth had concluded, because

25   management continued their retaliation to the point, I mean, I

1     was miserable, and that I was upset that she was allowing this

2     still to occur, you know, while the supervisors were under

3     investigation.

4          So she told me that I was to report to hearing room B

5     during what she was going to conduct; the administration was

6     going to have to conduct their own investigation.  And they

7     sent two people out of, I think it was Region 7, and we had

8     like a four-hour conference, kind of like a teleconference

9     call.

10          They didn't tell me -- all they told me, that they were

11     not going to investigate anything that had been under prior

12     investigation, but they didn't tell me what had already been

13     prior -- what that prior investigation was.

14          I got just kind of a form letter back several months

15     later that they didn't find anything, but then I'm still in

16     that hearing room kept away from all other employees.

17     Q.   A couple of quick questions.  Have you supervised

18     employees from 2006 to 2011?

19     A.   No.

20     Q.   So during that period as an SCT, you did not supervise

21     any employees?

22     A.   No.

23     Q.   Do you know whether Ms. Griffith did during her period of

24     employment from --

25     A.   No, she did not.

*Carver - Cross*

1    Q.   And finally, did you feel -- throughout reporting this,

2    did you feel you were legally obligated to do so?

3    A.   No.  I mean, we -- like I said, the majority of the

4    reporting was just to try to make the supervisors, you know,

5    make the changes, because of how it was affecting other

6    employees.  And just like I said, it just escalated to the

7    point where it was so bad at our office for what we were doing

8    that we were -- I mean, we had to go outside of the office.

9              MR. VERNIA:  Nothing further, Your Honor.

10             THE COURT:  Cross.

11                        CROSS-EXAMINATION

12   BY MR. WICKER:

13   Q.   Good afternoon, Ms. Carver.  As I understand it, your

14   position throughout the time that you worked for Social

15   Security Administration was as an SCT; is that right?

16   A.   Correct.

17   Q.   Senior case technician?

18   A.   Yes.

19   Q.   And that's the position that you held from the time that

20   you started in 2001?

21   A.   Yes.

22   Q.   And that you continue to hold today?

23   A.   Yes.

24   Q.   As a senior case technician, you would be in a position

25   to see how cases were assigned, right?

1   A.   How they were assigned?

2   Q.   Assigned to administrative law judges, true?

3   A.   How they were assigned, I didn't have any involvement in

4   how they were assigned.

5   Q.   Okay.  Let me ask a better question.  You would see to

6   whom you were assigned, correct?

7   A.   Yes, we could see who they were assigned to.

8   Q.   Okay.  So if there was any unusual pattern in the

9   assigning of cases or the switching of cases from one judge to

10  another, that would be something that you would be able to see

11  as a senior case technician?

12  A.   Not necessarily unless -- I mean, if you had a problem or

13  an issue or it kind of, it affected you in scheduling or it

14  fell off of your list that you were given to schedule cases

15  for and it wasn't on there.

16  Q.   But you would be in a position to find out the reason for

17  that, true?

18  A.   Not as -- no.  I mean, not to just go in and see why this

19  case was changed.  It wasn't like some kind of flag that came

20  up on the system or anything like that.

21  Q.   But you had access to the portions of the system that

22  would allow you to see which judge had a particular case,

23  right?

24  A.   Yes, I could tell who the case was assigned for.

25  Q.   Okay.  Could you also see if it had been assigned to

*Carver - Cross*

154

1    someone and then assigned to someone else?

2    A.   Yes.

3    Q.   Okay.  And that would be something that a senior case

4    technician would be in a position to acquire that information

5    if you had a reason to want to look for it?

6    A.   If we wanted to look for it, yes.

7    Q.   Now, at some point in time, you and Ms. Griffith decided

8    that you were seeing things in the office that you thought

9    were wrong; is that right?

10   A.   Well, things that were affecting her job duties.

11   Q.   Okay.  But in particular, things that were violations of

12   the rules or violation of policy or violations of the law,

13   right?

14   A.   No, that is not correct.  We would see something that if

15   it was just not following the case processing in which the way

16   that the case flowed.

17   Q.   Well, is it your testimony that you never believed that

18   what you were seeing was a violation of internal policy?

19   A.   Well, eventually, yes, it would be.

20   Q.   Okay.  And I'm not asking, you know, in particular here,

21   but over the course of time, you came to decide that what you

22   were seeing was a violation of internal policy, true?

23   A.   Over a period of time when it got worse, you could see

24   that it was a violation of the way the cases were supposed to

25   be processed in the office.

*Carver - Cross*

1   Q.   Um-hmm.  And eventually, you concluded that what you were

2   seeing was fraud, true?

3   A.   Eventually, down the road, it appeared that way.

4   Q.   And I want to show you a portion of Plaintiff's Exhibit

5   36.  This is a document that we've already looked at.  And

6   according to Ms. Griffith, this is your handwriting.  Is that

7   right?

8   A.   Yes.

9   Q.   Okay.  And you're making these notes in preparation for a

10  meeting; is that right?

11  A.   Let me read it first here.

12  Q.   Sure.  I'm going to move this up so you can see it a

13  little bit better.

14  A.   Okay.

15  Q.   Is that, in fact, your handwriting?

16  A.   Yes, it is.

17  Q.   And these are your notes in preparation for a meeting

18  with your supervisors?

19  A.   Yes.

20  Q.   And you're talking about the situation that has brought

21  us here today, allegations about Judge Daugherty

22  misappropriating cases that involved Eric Conn; is that right?

23  A.   No, I don't see that dictation in there.  Correct me if

24  I'm wrong.  I can see that it was directly about workers who

25  were being discouraged against participating in protected

 1    activity or even speaking or associating with me as a union

 2    member.  That's a problem that I had with several employees

 3    that would not -- were afraid to be seen associating with me.

 4    Q.  Okay.  What you say in the first paragraph is that you're

 5    talking about employees who are being discriminated against

 6    for utilizing the union and reporting fraud; is that right?

 7    A.  Well, it was associating with the union.  I don't -- I

 8    couldn't say -- I mean, reporting fraud, I don't know exactly

 9    what that was during that time.  There's no date on here so I

10    don't --

11    Q.  Okay.  Well, you wrote it, correct?

12    A.  Right, I wrote it.  But like I said, it's been written

13    some time ago.  Like I said, I don't remember exactly what I

14    was referring to as reporting.  The fraud could have been

15    anything from, you know, reporting Judge Daugherty signing in

16    on time sheets, falsifying time sheets, and employees had

17    reported that to me.  I mean, there's different issues within

18    the office.  It does not necessarily mean anything about why

19    we're here today.

20    Q.  Okay.  So would you look at the second paragraph that has

21    the 2 and the circle.  And that's your handwriting there also,

22    true?

23    A.  Yes.

24    Q.  And it says, "Guidance on massive amount of

25    fraudulently-allowed claims," right?

*Carver - Cross*

1    A.    Um-hmm.

2    Q.    And what you're talking about there is the claims that

3    are allowed -- that had been allowed by Judge Daugherty, true?

4    A.    I don't want to give a positive response to that, but I

5    assume that would be the number of -- the volumes of favorable

6    decisions that we would get to meet the numeric goals, because

7    yet Judge Daugherty did have -- would do the work of three

8    judges.

9    Q.    Okay.  Because he had reassigned cases to himself from

10   other judges, including claims in which Eric Conn was

11   involved, true?

12   A.    I don't know if that's what -- I don't know what the date

13   of this document is so I'm not really for sure if that's what

14   that was about.

15   Q.    Okay.  Well --

16   A.    I mean, there was a series of misappropriation of cases,

17   like the process, you know, along the lines.  So as far as,

18   you know, we found out more and more as we got the CPMS

19   system, but I don't know when this was written.  I don't know

20   when this was written.

21   Q.    Were there other judges who were misappropriating claims?

22   A.    Not to my knowledge.

23   Q.    Okay.  And so you had to be talking about Judge Daugherty

24   here, true?

25   A.    Possibly.

1   Q.   We've already heard from Ms. Griffith on this issue so

2   there's no doubt you're talking about Judge Daugherty here.

3   A.   Yeah.  I just don't know the date and exactly what we're

4   talking about.

5   Q.   I understand.  I understand.  And you also reference that

6   this is a very serious allegation and it's a very

7   well-documented claim?  Do you see that?

8   A.   Yes.

9   Q.   And you believed that this was a very serious allegation,

10  true?

11  A.   I guess at the time I did.  I don't really recall this,

12  the actual date of the document --

13  Q.   Okay.

14  A.   -- and what it was specifically about.

15  Q.   And then below that, there was a reference to "OIG,

16  Kemper OIG-2002."  Do you see that?

17  A.   You'll have to move that up just a little bit.

18  Q.   Yeah, sorry.

19          THE COURT:  It's not doing anything.  It must have a

20  freeze button on it.

21          MR. WICKER:  If I could just approach.

22          THE COURT:  You may.

23  Q.   I'm sorry, ma'am.  If you could read the bottom of the

24  page starting with OIG.

25  A.   "OIG, Kemper's?  OIG," and it looks like 2002.

1    Q.   Okay.  May I get that back from you?

2         MR. WICKER:  May I approach?

3         THE COURT:  You may.

4    Q.   Okay.  And you were aware that Judge Kemper had filed an

5    OIG complaint about Judge Daugherty in about 2002; were you

6    not?

7    A.   That, I think, was referring to the OIG that had come

8    into the office a time before and management was allowed to

9    select individuals to testify -- or to talk with the OIG.  I

10   had mentioned that when Ben was speaking with me.

11   Q.   Okay.  Was that related to Judge Kemper's allegation that

12   Judge Daugherty had falsified a time sheet and forged his

13   signature on a time sheet?  Are you aware of that?

14   A.   Yes, I am aware of that.

15   Q.   Okay.

16   A.   But that's not what I was obviously referring to in here.

17   Q.   Okay.

18   A.   The Kemper part, yes, but then from what that says, the

19   OIG it said was allowed to select individuals.  And at that

20   time, that was a prior investigation that they had come in to

21   our office.

22   Q.   Okay.  So do you now know, Ms. Carver, what you were

23   required to do if you see what you believe to be a massive

24   fraud?

25   A.   The see something, say something?

*Carver - Cross*

160

1   Q.   Um-hmm.  And we looked at Defense Exhibit 2 a minute ago,

2   the annual personnel reminders.  You said you recall seeing

3   those?

4   A.   Yes.

5   Q.   Okay.  And turn in your binder to them, if you would.

6   A.   What number was that?

7   Q.   Defense Exhibit 2.  That's behind Tab 2.

8        And the third page, I think you've told Counsel that you

9   recalled receiving this one in particular.  You see that where

10  it says, "You must put forth honest effort in the performance

11  of your duties and report any fraud, waste, or abuse in

12  government programs"?

13  A.   I'm trying to -- you said partway?

14  Q.   Yeah, page 3.  Are you on page 3?

15  A.   Yeah.  Where it says the October, 2007?

16  Q.   Um-hmm.  Turn to page 3.

17  A.   Okay.

18  Q.   You see the introduction?

19  A.   Yes.

20  Q.   Okay.  And it says beginning on the third line, "You must

21  put forth honest effort in the performance of your duties and

22  report any fraud, waste, or abuse in government programs."

23  A.   Correct.

24  Q.   You see that?

25  A.   Yes.

1    Q.   Okay.  We don't disagree that your obligation was to do

2    just what it says there, do we?

3    A.   I don't understand what you're asking.

4    Q.   Well, do you agree with that statement that you must put

5    forth honest effort in the performance of your duties and

6    report any fraud, waste, or abuse in government programs?

7    A.   Yeah.  I mean, I understand, yeah, if we see something.

8    Like I said before, when we see things in district office

9    notes or reports of conduct, if we realize that a person, you

10   know, may be possibly working in the quarter of his alleged

11   onset date, that would be what I would interpret that as

12   being.

13   Q.   Okay.  And it says you are to report any fraud, waste, or

14   abuse in government programs.  We agree about that, right?

15   A.   Yes.

16   Q.   Okay.  And we could look at the annual personnel

17   reminders for '07 and the years later, but they have identical

18   language.  Do you just want to check me on one of those?  Just

19   turn about four pages in to the 2007.

20   A.   I'm in 2008 now.

21   Q.   Same language?

22   A.   What is your --

23   Q.   Yes.  Is it the same language that we just looked at for

24   2006?

25   A.   Yes, it's the same language pretty much.

1    Q.   Yes.  Okay.  So during this whole period of time, the

2    instructions that you were given from your agency was that you

3    must report fraud, waste, or abuse in government programs,

4    true?

5    A.   That's what it says, yes.

6    Q.   Okay.  And then let's look for a minute at Defense

7    Exhibit 4.  Okay.  If you'll turn to the -- you see the first

8    page is for the section that was last updated 6/27/2005?

9    A.   Yes.

10   Q.   Okay.  And we don't have any -- you don't disagree that

11   this was the HALLEX section that was in effect on that date in

12   2005, true?

13   A.   Do I not disagree, or what are you saying?

14   Q.   Tell me if you do disagree.  This is a HALLEX manual --

15   A.   No, I don't disagree, but when you said in 2005, when we

16   first started talking about our things that were affecting our

17   jobs, it was just to -- I don't think that we considered that

18   fraud.  That was just -- you know, we were to go to our

19   supervisors.  That's their sole responsibility, is to try to

20   help us and to provide us with the correct tools to enable us

21   to do our job and do it correctly.

22   Q.   Okay.  Wait for my question.  I'll let you answer, but

23   you've got to let me ask a question first.  Okay?

24       This HALLEX manual section that's in front of you, it

25   says referring violations to the Office of the Inspector

1    General.  Do you see that?

2    A.   Yes.

3    Q.   Okay.  And it applies to any individuals in any Office of

4    Hearing and Appeals component.  Do you see that?

5    A.   Yes.

6    Q.   Okay.  And you were one of those employees, right?

7    A.   Correct.

8    Q.   Okay.  And it says, "Any employee who believes that a

9    criminal violation has occurred must report it and refer the

10   violation to the Office of Inspector General."  Do you see

11   that?

12   A.   Correct.

13   Q.   Okay.  And then would you turn over to the next page?  In

14   the middle of the page, it says, "Any employee in an HO or

15   regional office (RO)."  Which one were you in?

16   A.   The hearing office.

17   Q.   Okay.  That's the HO.  And it says, "must report a

18   suspected violation to an immediate supervisor," correct?

19   A.   Correct.

20   Q.   Okay.  And you did, in fact, report what you saw to your

21   immediate supervisors, right?

22   A.   Correct.

23   Q.   Okay.  Many times?

24   A.   Correct.

25   Q.   You reported it to your immediate supervisor, your

1   supervisor's supervisor, the other administrative law judges

2   in the office, true?

3   A.   True.

4   Q.   Okay.  Because you thought it was a serious problem,

5   right?

6   A.   It was a problem, yes.

7   Q.   Okay.  Well, was it serious, in your opinion?

8   A.   Well, yeah.  It was affecting our jobs.

9   Q.   Okay.  And you had called it, in the notes that we looked

10  at a minute ago, massive fraud, right?

11  A.   I don't -- like I said, I don't know what that specific

12  note, what the date was and what I was -- I don't recall what

13  that was specifically about so I don't know that I could

14  associate with that what --

15       THE COURT:  Can I ask a question, Mr. Wicker?  Was

16  there any other massive fraud going on in the office that we

17  don't know about at this time?

18       THE WITNESS:  Yes.  Judge Daugherty was signing in

19  and out; and I had been reprimanded -- in fact, suspended,

20  for -- they told me that it was for falsifying a government

21  document.  And that suspicion was later overturned.  So, yes,

22  that was -- he was signing in and leaving.

23       THE COURT:  Wait.  When you're talking about you were

24  suspended, you're talking about the flex thing?

25       THE WITNESS:  Yes, but that's what they suspended me

*Carver - Cross*

1   for, one of the things I said on there, that I falsified a

2   government document, my flexi-place card.

3           THE COURT:  Right.  But that has nothing to do with

4   this note?

5           THE WITNESS:  No, but it would in that he was doing

6   the same thing, that management ignored it; that he was

7   falsifying a government document, our sign-in sheets.  I'm

8   just saying that could have been during that time, because

9   only reason I'm associating that is because Kemper's name is

10  here, and that was one of the issues at that time that not

11  only Kemper raised, but that Judge Gitlow raised and that I

12  had raised.

13          THE COURT:  So you're saying the massive amount of

14  fraudulently-allowed claims which are processed --

15          THE WITNESS:  No, I was talking about this down here.

16  It says OIG and it says Kemper, 2012.

17          THE COURT:  No, I understand that, but the part above

18  it.  "In order to meet and exceed SSA commissioners' numeric

19  goals."

20          THE WITNESS:  No, that wouldn't have been about the

21  time sheets, no.

22          THE COURT:  So the massive amount -- because that's

23  where it says it.  I can't see the bottom on this.  But does

24  it say massive amount of fraud by Kemper?

25          MR. WICKER:  No, Your Honor.  You're looking at the

1    right portion.

2            MR. VERNIA:  Your Honor, I have copies of some of the

3    plaintiff's exhibits.

4            THE COURT:  Okay.  We can do those later.  I think I

5    figured out what I want.  Just so I'm clear, the massive

6    amount of fraud is related to the claims, in order to increase

7    the commissioners' goals.  And that portion in the middle of

8    your notes right next to 2, there was no other massive fraud

9    going on other than what you-all reported?

10           THE WITNESS:  I don't recall that there was any, no.

11   I mean, there was several things going on when management was

12   taking cases out of hearing requests date order.  I mean, I'm

13   the union rep so, I mean, there was several issues over the

14   period of time.

15           THE COURT:  I understand that.  But I guess when you

16   put maybe --

17           THE WITNESS:  Yeah, I see what you're saying.  I just

18   can't say with 100 percent certainty that it was regarding

19   Judge Daugherty.  In all probability, it could have been, but

20   there was also other issues.

21           THE COURT:  But were there -- okay.  So one of the

22   allegations about Judge Daugherty that has come out in the

23   complaint, come out today, is that he processed -- I don't

24   know what you said -- 300 claims or whatever when someone else

25   had processed 50, or 100 when someone else had processed 50.

1    And he'd do that by fraudulently agreeing that the benefits

2    were warranted, not having a hearing, all this stuff that's

3    come out today.

4         What I want to know is, you met with senators' staff, you

5    testified on the Hill, you're talking here today.  Is there

6    some other massive amount of fraudulently-allowed claims that

7    none of us are aware of to date that this relates to?

8              THE WITNESS:  No.

9              THE COURT:  You may proceed.

10   BY MR. WICKER:

11   Q.  Ms. Carver, if you see massive amounts of fraud, do you

12   understand that you should report it to the Office of

13   Inspector General?

14   A.  I reported it to my management, and then I did file an

15   OIG report at one time.

16   Q.  Okay.  So you did understand that if you see massive

17   amounts of fraud, you should report it to the Office of

18   Inspector General, correct?

19   A.  I really don't know how -- I don't really know how to

20   answer that.

21   Q.  Well, let's break it down.  Do you see -- well, did you

22   make a report to the Office of Inspector General?

23   A.  Yes, I did make one.

24   Q.  Okay.  And was it about this situation, about Judge

25   Daugherty misappropriating cases?

1   A.   It was -- basically, a lot of it was about the

2   retaliation I was receiving from reporting information to

3   management.

4   Q.   Okay.  The information that you were reporting is that

5   you were receiving fraud involving one of the administrative

6   law judges, true?

7   A.   Well, at a point in time, I think that it became apparent

8   that it was fraudulent, but I wouldn't -- I couldn't really

9   put a time period on when I would have considered that.

10   Q.   Okay.  Well, it was certainly at the time that you wrote

11   this note, right?

12   A.   Right.  And I don't know what time -- I don't know when

13   that was written.

14   Q.   Well, let's try to put this in a little more context.

15   This document we have called Exhibit 36, it was produced to us

16   by your counsel.  Okay?  Now I'm going to show you Exhibit 35.

17   A.   Okay.

18        MR. WICKER:  Your Honor, I'm not really sure how to

19   clear the screen here.

20        THE COURT:  I have no idea.  Now maybe you should

21   take Mr. Vernia up on his offer of extra documents.

22        MR. WICKER:  Do you have Exhibit 35?

23        THE COURT:  Yeah, 35 is admitted and in front of her.

24        MR. WICKER:  Okay.  Wonderful.

25   BY MR. WICKER:

*Carver - Cross*

169

1   Q.   Do you see Exhibit 35, ma'am?

2          THE COURT:  This is the list, the e-mail, the

3   one-page e-mail you looked at earlier.

4   A.   Thirty-five, okay.

5   Q.   Okay.  Do you have 35?

6   A.   Yes.

7   Q.   You've talked about this document already today, and I

8   think your testimony was that it was created in preparation

9   for a meeting with management.  Is that right?

10  A.   Correct.

11  Q.   And what Ms. Griffith was telling you was all those

12  things that you and she had already complained about to

13  management, true?

14  A.   True.

15  Q.   Okay.  And you used this in preparation for the meeting

16  that you were going to have with Mr. Hall and other people in

17  management, right?

18  A.   Correct.

19  Q.   Okay.  And the date is Tuesday, June 24th, 2008, right?

20  A.   Correct.

21  Q.   And that's in preparation for the meeting that is related

22  to the notes that we just saw in Exhibit 36, right?

23  A.   Yes.

24  Q.   Okay.  So is it fair to say that the meeting you had with

25  management was shortly after June 24th, 2008?

Carver - Cross

1    A.   It should have been, yes.

2    Q.   Okay.  So does that help put in context when you came to

3    believe that what you were seeing was massive fraud?

4    A.   No, because, I mean, truthfully, I would say at this

5    point in time, it was a reason for her having to leave her

6    position or getting ready to be punished for what management

7    was saying that she was failing to docket cases.  So I think

8    that at this point in time -- and I'm just going from these

9    notes here -- that it looks like it was more so of a

10   processing, a misappropriation of cases.

11        So to me, at that point in time, that's what we were

12   trying to accomplish, was to get that fixed, which, at the

13   time, prior to her leaving.  But after she -- I mean, that was

14   a big reason why -- that was the reason why she left, was

15   because of she was getting blamed for these misappropriation

16   of cases.

17   Q.   Okay.  But what you wrote in June of 2008 was that it was

18   a massive amount of fraudulently-allowed claims.

19   A.   I don't know that that was written in 2008.

20   Q.   You just told us it was.

21   A.   Well, no.  This right here, this was written in 2008.

22   The e-mail was written in 2008.

23   Q.   And isn't Exhibit 36, which comes in the binder right

24   after 35, notes that you created from the meeting with your

25   management, which is also the subject of Exhibit 35?

1  A.   Now you're talking about a different exhibit?

2  Q.   No, I'm talking about Exhibit 36.  I thought we had just

3  established that this was the meeting that occurred shortly

4  after Exhibit 35 was created.

5  A.   I'm kind of confused at what you're saying.

6  Q.   I don't think you are.

7  A.   I've got the Exhibit 35 here, and that was prior to the

8  meeting.

9  Q.   Um-hmm.

10  A.   Okay.  So then you're talking about Exhibit -- the PX

11  exhibit?

12  Q.   Exhibit 36.  It's on the screen.

13  A.   Oh, this one's 36 that's on the screen?

14  Q.   Um-hmm.

15  A.   Now, what was your question?

16  Q.   I think you just told us that this was the meeting that

17  was referred to in Exhibit 35, right?

18  A.   No, I don't know that that was my notes from this

19  meeting, the same meeting.  Because I can't confirm with that

20  only because I've met with Greg Hall and management several

21  times.

22  Q.   Okay.  So you believe that at an earlier time, you came

23  to believe that this was a massive amount of

24  fraudulently-allowed claims?

25  A.   I don't know if this was prior to is what I'm saying.  I

*Carver - Cross*

 1   do agree that those are my notes for a meeting, but I don't

 2   know if this meeting would be after.  There's nothing -- I'm

 3   trying to look on here to see if there's anything that would,

 4   you know, say that it was something that may have happened

 5   after she left or if it was prior to.

 6   Q.   Um-hmm.  Well, at some point, ma'am, you did make a

 7   report to the Office of Inspector General?

 8   A.   Yes.

 9   Q.   And you have Exhibit 39 in front of you?  I'm sorry,

10   Exhibit 38.  Is that one of the ones that you already have?

11   A.   Yes.

12   Q.   Okay.  So you understood the mechanism for making the

13   complaint to the OIG, right?  You knew how to do it?

14   A.   Yes.

15   Q.   And you knew that you could do it if you saw something

16   that you believed to be fraud, true?

17   A.   Well, this was kind of -- like I said --

18   Q.   No, listen to my question.

19   A.   Well, I mean, I don't -- rephrase the question.  I don't

20   understand.

21   Q.   You understood that you could make a complaint to the

22   Office of Inspector General if you saw something you believed

23   to be massive fraud, right?

24   A.   Yes.

25   Q.   Or little fraud, right?

1   A.   Yes.

2   Q.   Or waste and abuse, true?

3   A.   Okay, but that's not what that complaint was.

4   Q.   Okay.  So you understood you had the ability to make a

5   complaint to the OIG if you saw any of those things?

6   A.   I guess.  I mean, yeah, I guess so.

7   Q.   Sure.  And you made this complaint in 2010, true?

8   A.   This one?  Yes, it was August 30th of 2010.

9   Q.   Okay.  And then you withdrew it eight days later; is that

10  right?

11  A.   Yes.

12  Q.   And was the reason that you withdrew it because you were

13  considering filing a federal lawsuit?

14  A.   No.

15  Q.   Okay.  It never entered your mind?

16  A.   No.  Can I explain why I filed this complaint?

17  Q.   Answer my question and I'll let you explain, but let me

18  ask you the question first.

19       So when you withdrew the OIG complaint, you had no

20  intention of filing a federal lawsuit?

21  A.   No.

22  Q.   So look at the handwriting on the right side of the page.

23  Do you see that?

24  A.   Um-hmm.

25  Q.   Is that your handwriting?

1   A.   Yes.

2   Q.   And the words that are right above the typed paragraph,

3   "fed suit," question mark.  Is that right?

4   A.   That's what it says, but that's not what it was

5   regarding.  The federal suit was a personnel matter, and

6   that's why I called Peter Broida.  It was a labor question

7   that I had on a supervisor, Jerry Meade.

8   Q.   Okay.  So you were thinking about filing a different type

9   of federal suit?

10  A.   Yeah.  It was whether or not, because we had a tape

11  recording of Mr. Meade saying very harmful things about me,

12  and I wanted to know if that was like an unfair labor practice

13  or prohibited.  I just didn't know what we could do with what

14  he was doing.

15  Q.   Okay.  So at all times that are relevant to this case --

16  2006, 2007, 2008, and up to the present date -- you knew and

17  understood that if you see massive fraud, you should report it

18  to the Office of Inspector General, correct?

19  A.   No, I didn't know that.

20  Q.   You didn't have any idea about that?

21  A.   I'm not going to say I didn't have any idea about OIG.  I

22  thought I was doing the correct thing of going to management.

23  Q.   Okay.  Well, let me ask a better question then.  Did you

24  understand the entire time that's relevant to this case, that

25  if you see massive fraud, you should report it to someone,

1    either in management or the Office of Inspector General?

2    A.   Correct.

3              MR. WICKER:  Okay.  That's all.

4              THE COURT:  Redirect.

5              MR. VERNIA:  Thank you, Your Honor.

6              THE COURT:  No one else has questions, right?  Okay.

7              MR. VERNIA:  I did.  For the sake of clarity -- I'll

8    keep this fairly brief; but, Your Honor, if you don't mind,

9    I'll approach and give you paper copies of the --

10             THE COURT:  That would be great.

11             MR. VERNIA:  I believe that I've gotten them all, but

12   I'll just give the numbers to Mr. Wicker and he can let me

13   know if I've missed one.  I just handed Your Honor Plaintiff

14   Exhibits 2, 3, 4, 6, 9, 27, and 36.

15             THE COURT: Hold on.  2, 3, 4, 6 --

16             MR. VERNIA:  9, 27, and 36.

17             THE COURT:  27 and 36?

18             MR. VERNIA:  Yes, sir.

19             THE COURT:  Okay.  Thirty-six is more than the page

20   Mr. Wicker showed.  It is a pretty thick stack, right?

21             MR. VERNIA:  That is correct, Your Honor.  That is

22   one thing I wanted to just go through briefly with Ms. Carver.

23             THE COURT:  All right.

24                         REDIRECT EXAMINATION

25    BY MR. VERNIA:

1    Q.   Ms. Carver, do you have a full Exhibit 36 -- it's

2    probably thirty-plus pages there -- or do you just have the

3    first page?  This is the notes that you and Mr. Wicker were

4    discussing, beginning with "appreciate your time" across the

5    top.

6    A.   Are these the plaintiff exhibits or one of his?

7    Q.   These are ones that Mr. Wicker had up on the display here

8    that he couldn't move.

9    A.   Is that in his exhibit book?

10   Q.   No, no, no.  It's a separate one.  I have another copy I

11   can give you.

12        MR. VERNIA:  I'm sorry.  May I approach, Your Honor?

13        THE COURT:  You may.

14        MR. VERNIA:  So the record is clear, do you want me

15   to mark this in some way?  It may be different.  I don't know.

16   Did you give her the entire 36?

17        THE COURT:  He just put a page up on.

18        MR. VERNIA:  Oh, okay.

19        THE COURT:  And then when he handed it to her, it was

20   one page.  Just give it to her.  It's admitted.  Go ahead.

21   BY MR. VERNIA:

22   Q.   That's Exhibit 36, Ms. Carver.  Do you recognize the

23   first page from speaking with Mr. Wicker?

24   A.   Right.

25   Q.   Could you just sort of flip through here and tell me what

1    the rest of this exhibit is?  There's several different types

2    of documents.  There's a second page.  Is that a second page

3    to the notes, or is that a different set of notes?

4    A.   It's the second page to that; and it talks about, like I

5    said before, number 1, complaint, decisions to ignore the

6    delay of responses to union correspondence.

7    Q.   You don't need to read it out loud.

8    A.   Okay.

9    Q.   And then the next page with Bates numbers 60 at the

10   bottom, what was that?

11           MR. VERNIA:  You know, Your Honor, as long as I have

12   it in the record, I think I'm satisfied.

13           THE COURT:  All right.

14           MR. VERNIA:  I don't think I have any further

15   questions, Your Honor.  I withdraw the question.  Thank you,

16   Your Honor.  And I have no further questions for Ms. Carver.

17           THE COURT:  All right.  May she be excused?

18           MR. WICKER:  Yes, Your Honor.

19           THE COURT:  Okay.  Thank you, ma'am.  You're free to

20   go.

21       (The witness was excused.)

22           THE COURT:  Do you have any other witnesses?

23           MR. VERNIA:  We do not, Your Honor.

24           THE COURT:  Mr. Wicker?

25           MR. WICKER:  No, Your Honor.

1            THE COURT:  Okay.  On the voluntariness issue, do

2    you-all want to file supplements; and if so, how much time do

3    you need?

4            MR. WICKER:  We do, Judge, and we'd also like to

5    address the other point that I brought up on the disclosure

6    statement.

7            THE COURT:  Yeah, but that would be a different

8    brief, right?

9            MR. WICKER:  When you had set the schedule, I think

10   you envisioned another round of briefing on this issue, and I

11   understood it to be perhaps an entirely new motion to dismiss.

12           THE COURT:  I'm fine with it.  Do we have one

13   pending, do you even know?  I don't.

14           MR. WICKER:  It's pending.  Is it pending or not?

15           MS. BILBY:  Your Honor, I believe that the motion to

16   dismiss was denied without prejudice so that we could refile.

17           THE COURT:  That makes more sense to me.  Can we

18   get -- I hate to do this.  I've got 13 pages of single-spaced

19   notes.  I'm happy to verify everything through my notes, but

20   I'm also happy to have you get a transcript and then file it.

21           MR. WICKER:  I prefer that.

22           THE COURT:  You get to make that call.

23           MR. WICKER:  I prefer a transcript.

24           THE COURT:  Okay.  So you-all can order a transcript.

25   It takes 30 days; is that right?

1          MR. WICKER:  I'd prefer not to order it expedited.

2          THE COURT:  What I'd prefer you do is do a motion to

3    dismiss.  Let me ask you this:  In the first instance, can we

4    limit it to jurisdiction?  In other words, I think it would be

5    a 12(b)(1) instead of 12(b)(6).  And then if I deny the

6    jurisdictional motions, which everyone agrees I have to decide

7    first --

8          MR. WICKER:  Yes.

9          THE COURT:  -- if I deny those, then we could set the

10   12(b)(6) briefing.  I think that makes the most sense, but you

11   tell me if I'm wrong, because it could be that I grant in part

12   and deny in part, right?  I mean, what we know is the

13   post-2010 claims on the voluntariness issue will survive.  Is

14   it 2010 was the amendment?

15         MR. KLEIN:  Your Honor, it's March, 2010.

16         THE COURT:  Is that right, Mr. Wicker?

17         MR. WICKER:  On that issue alone, right.

18         THE COURT:  Right.  So my point is that you're going

19   to have -- on jurisdiction, as I envision it, you're going to

20   have a pre-2010 voluntariness issue.  You're going to have an

21   entire jurisdictional issue, I assume, although I don't know,

22   that relates to particular claims in the complaint.

23         Once those are parsed out, your 12(b)(6) could look

24   different, assuming you win.  Assuming you lose those claims,

25   then your 12(b)(6) doesn't look any different.  Are we in

1    agreement on that?

2              MR. WICKER:  Yes, sir.

3              THE COURT:  Okay.  So it makes sense.  So if you have

4    30 days for the transcript, what if I give you 51 days total?

5    Or do you need less time?  In other words, I didn't offer the

6    more time.

7              MR. WICKER:  If we need less time, we'll file it

8    before that.

9              THE COURT:  Okay.  So you don't want a particular

10   date then?  How about this:  I like setting date definitive

11   because attorneys always file on the last date, which I don't

12   blame you for.  I just know how it goes.  If you thought you

13   were going to file sooner, what I'll do is say September --

14   what is it, September 8th today, something like that?  The

15   8th.  So October 6th would be about 30 days.  I could say your

16   brief is due October 27th.

17             MR. WICKER:  That's fine.

18             THE COURT:  Okay.  Response due November 17th.  Fine?

19   U.S., what's your position?  Are you going to want to file

20   anything?

21             MR. KLEIN:  I suspect we will, Your Honor.

22             THE COURT:  Do you want to file in the response time?

23   I think that makes sense, because you could agree, right, on

24   things like voluntariness?  You may have a different view on

25   the other jurisdictional point.

1          MR. KLEIN:  I think that's correct, Your Honor, yes.

2     If I could respond in the response time, that would be

3     sufficient.

4          THE COURT:  November 17th.  And then reply -- gosh, I

5     hate to do it.  It typically would be December 1st, but that's

6     right after the Thanksgiving holiday.  How about December 5th?

7          MR. WICKER:  Yes, sir, that's fine.

8          THE COURT:  Is everyone in agreement with that?

9          MR. VERNIA:  Yes, Your Honor.  Do you intend to have

10    oral argument on that?

11         THE COURT:  That's your-all's call.  What do you

12    prefer?

13         MR. WICKER:  I like oral argument, Judge.

14         THE COURT:  Okay.  I'd like to set it in December,

15    then, as awful as that may sound to you all.  Where do you

16    want to do the oral argument?  I'm all over in December so I

17    can pick a location that's probably -- not that all over.

18         MR. WICKER:  Covington or Lexington I would prefer,

19    Judge.

20         THE COURT:  Mr. Vernia, where do you come from, DC?

21         MR. VERNIA:  It's fine, Your Honor.

22         THE COURT:  And Mr. Klein, DC?

23         MR. KLEIN:  DC is fine as well, although I found this

24    remarkably easy to get to.

25         THE COURT:  Okay.  Let's do it here then.

1    Mr. Wohlander, I guess you have to drive then.

2              MR. WOHLANDER:  I'm happy with wherever the Court

3    wants to be, I want to be, Your Honor.

4              THE COURT:  So I have that bench trial the 17th and

5    18th; is that right?

6              DEPUTY CLERK:  Yes.

7              THE COURT:  Oh, 16th.  It's the 16th and 17th?

8              DEPUTY CLERK:  Yes.

9              THE COURT:  How bad would it be to do -- I'll give

10   you two offers with the one I prefer, and I'll tell you why.

11   One is December 15th.  Actually, that's not the end of the

12   world except I know I'll spend the weekend working on it.

13   That's the only down side to that, because I've got a bench

14   trial starting the 16th that I guarantee you is going to go.

15   Or the 19th, just to be safe.  I assume the bench trial will

16   only take two days, but I'd love to have the 18th to prepare.

17   The down side to the 19th is it's right before Christmas week.

18   The 15th is fine, 19th's fine.  You all decide.

19             MR. WICKER:  I don't have a problem with doing it on

20   the 19th.

21             MR. VERNIA:  That's fine.

22             THE COURT:  What about the 15th?

23             MR. WICKER:  That's fine, too.

24             MR. VERNIA:  Either one is fine with me.

25             THE COURT:  You get to pick.  Well, I can do it the

183

1    15th afternoon and that way you could fly in on the morning.

2          MR. KLEIN:  Are those Monday and Thursday?

3          THE COURT:  Monday and a Friday, unfortunately.

4          MR. KLEIN:  I would prefer the Friday.

5          THE COURT:  You do, right before Christmas?

6          MR. KLEIN:  It doesn't matter.  Personal preference,

7    nothing critical.

8          THE COURT:  Let me ask you this.  If I do Friday, are

9    you going to come in the night before?

10         MR. KLEIN:  What time of day, because if it's in the

11   afternoon, we can come in that morning from DC.

12         THE COURT:  Well, my thought for you and Mr. Vernia,

13   because that's the weekend before Christmas week, is to do it

14   early, like 8:30 in the morning, so that you guys could get

15   out right afterwards.  Mr. Wohlander and Mr. Wicker can just

16   get up early and drive.

17         MR. KLEIN:  I'm happy with whatever, whatever Your

18   Honor wants.

19         THE COURT:  Because you'll have more options from

20   here than Lexington and you probably can get three or four

21   flights that afternoon.  Whereas if we do it the afternoon,

22   you might get trapped into a late evening Friday flight, as

23   long as you don't mind coming in late evening Thursday.

24         MR. KLEIN:  That's fine.

25         THE COURT:  Okay.  We'll do it the 19th at 8:30 in

184

1     the morning.

2              MR. WICKER:  That's fine, Judge.

3              MR. VERNIA:  That's fine.

4              THE COURT:  And I'll anticipate, just so you know,

5     being done at 10 because I have a call, but the call's a --

6     it's a mid-discovery conference.  You-all know what those are

7     like so I can get rid of that worst case or bump it an hour.

8     How long do you think argument will take?  If you had to

9     guesstimate, how long would you like?

10             MR. WICKER:  An hour total.

11             THE COURT:  Okay.  Good.  Then we can get done.  I

12    won't lose that call.

13        Okay.  Great.  Thank you all.  Look forward to the

14    briefing.  I appreciate your time today.  Sorry I didn't give

15    you much in the way of breaks, but I most apologize to my

16    court reporter who had to sit through and type all this stuff.

17             MR. KLEIN:  Your Honor, I'm sorry.  Can I just

18    briefly read into the record the exhibits I believe that I

19    asked to be sealed, so I have a clear copy of my record?

20             THE COURT:  Yeah, that will be great.

21             MR. KLEIN:  These are all plaintiff's exhibits.

22             THE COURT:  Wait.  Let me do this, if you don't care.

23    I'm going to go through my notes to make sure they coincide.

24    I'm going to go to the top and hit "control find seal" so as

25    you do it.  Are you going to do it in order numerically or the

1    order you sealed them?

2              MR. KLEIN:  I was going to do it from the start to

3    the bottom.

4              THE COURT:  Same as in my notes, yeah.  Okay.  Hold

5    on.  Okay.

6              MR. KLEIN:  Plaintiff's 29.

7              THE COURT:  Okay.  All right.  Good.  I missed that

8    one.  Hold on.  Did you do that like a second time?

9              DEPUTY CLERK:  I didn't have that either.

10             THE COURT:  Okay.  I'm glad you're doing this.  Okay,

11   29's sealed.  They're all sealed as soon as you announce them.

12   Thirty-one is next on mine.

13             MR. KLEIN:  Thirty-one was next on mine.  Plaintiff's

14   2.

15             THE COURT:  Okay.  Got it.

16             MR. KLEIN:  Plaintiff's 3.

17             THE COURT:  Got it.

18             MR. KLEIN:  Plaintiff's 9.

19             THE COURT:  Got it.

20             MR. KLEIN:  Plaintiff's 6.

21             THE COURT:  Got it.

22             MR. KLEIN:  Plaintiff's 27.

23             THE COURT:  Got it.

24             MR. KLEIN:  Plaintiff's 36.

25             THE COURT:  Got it.  Then 31 again I had.

1        MR. KLEIN:  Right.  And then Plaintiff's 38.

2        THE COURT:  Got it.

3        MR. KLEIN:  And Plaintiff's 40.

4        THE COURT:  Perfect.

5        MR. KLEIN:  Great.  Thank you, Your Honor.

6        MR. VERNIA:  Your Honor, I apologize, but I believe

7   Plaintiff's 4 was used as well, and I think that's an SSA

8   document.

9        THE COURT:  You gave me 4.  I don't know if it was

10  ever introduced.  Hold on.

11       MR. KLEIN:  I don't have Plaintiff's 4 in my notes.

12       THE COURT:  Yeah, Exhibit 4 I have is Defendant's

13  Exhibit 4.  So 4 was not introduced.  Do you want it back, or

14  do you want me to keep it?  It just says, "I have issues that

15  we discussed before that we need to address about Judge

16  Daugherty and the electric file and the representative

17  offices."

18       MR. VERNIA:  You can just throw it away.

19       THE COURT:  All right.  One other thing and I'll let

20  you go.  I know it's been long.  But if you're going to cite

21  exhibits, even though I have them, you don't have to provide

22  them, but I appreciate pin cites to the exhibits.  I mean, if

23  you're going to reference them, cite them.  If you're going to

24  cite a particular page and passage, like you did with a

25  witness, do the same thing; i.e., the HALLEX manual or

187

1   whatever you're saying.

2          Okay.  Thank you all.  We're in recess.

3          (Proceedings concluded at 2:01 p.m.)

4                          -   -   -

5                  C E R T I F I C A T E

6          I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the
    foregoing is a correct transcript from the record of
7   proceedings in the above-entitled case.

8    \s\ Joan Lampke Averdick              October 22, 2014
     JOAN LAMPKE AVERDICK, RMR-CRR          Date of Certification
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX
     PLAINTIFF'S WITNESSES
2

3    JENNIFER GRIFFITH
             Direct examination........................... Page  11
4            Cross-examination............................ Page  59
             Redirect examination......................... Page  94
5            Recross-examination.......................... Page  98

6    JAMES KEMPER
             Direct examination........................... Page 101
7            Cross-examination............................ Page 114

8    SARAH CARVER
             Direct examination........................... Page 118
9            Cross-examination............................ Page 152
             Redirect examination......................... Page 175
10

11   PLAINTIFF'S EXHIBITS

12
     Exhibit No. 28, Jennifer Griffith memo of resignation
13   Admitted......................................... Page  33

14   Exhibit No. 30, Griffith e-mail to Hall & Randolph 11/9/07
     Admitted......................................... Page  34
15
     Exhibit No. 29, SEALED Affidavit of Carver and Griffith
16   Admitted......................................... Page  37

17   Exhibit No. 31, SEALED 11/1/07 letter Kemper to Habermann
     Admitted......................................... Page  40
18
     Exhibit No. 35, 6/24/08 Griffith e-mail to Sarah Randolph
19   Admitted......................................... Page  42

20   Exhibit No. 39, 8/30/10 e-mail OIG Hotline to Sarah Carver
     Admitted......................................... Page  46
21
     Exhibit No. 59, 2/3/11 Griffith Narrative, from OIG complaint
22   Admitted......................................... Page  46

23   Exhibit No. 42, Wall Street Journal article
     Admitted......................................... Page  50
24
     Exhibit No. 37, 6/29/11 Griffith ltr to Office of Insp General
25   Admitted......................................... Page  55

189

1   Exhibit No. 2, SEALED 1/25/07 Griffith email to Goforth & Hall
    Admitted......................................... Page  72
2
    Exhibit No. 3, SEALED 1/25/07 Handwritten notes of J. Griffith
3   Admitted......................................... Page  73

4   Exhibit No. 9, SEALED portion of e-mail to Greg Hall
    Admitted......................................... Page  74
5
    Exhibit No. 6, SEALED 5/9/07 Griffith e-mail to Hall, Randolph
6   Admitted......................................... Page  75

7   Exhibit No. 27, SEALED 10/25/07 Griffith email Hall, Randolph
    Admitted......................................... Page  78
8
    Exhibit No. 36, SEALED Sarah Carver's handwritten notes, etc.
9   Admitted......................................... Page  79

10  Exhibit No. 31, SEALED 11/1/07 Kemper letter to Habermann
    Admitted......................................... Page  40
11
    Exhibit No. 38, SEALED 8/30/10 OIG confirmtn of filing report
12  Admitted......................................... Page 137

13  Exhibit No. 40, SEALED Carver handwrittn notes on case listgs
    Admitted......................................... Page 139
14
    Exhibit No. 65, Sectn I-1-1-50 HALLEX manual, updated 5/19/05
15  Admitted......................................... Page 146

16  Exhibit No. 66, Sectn I-1-1-50 HALLEX manual, updated 10/13/11
    Admitted......................................... Page 146
17

18  DEFENSE EXHIBITS

    Exhibit No. 1, Reg 5CR 2635.101 Standards of Ethical Conduct
19  Admitted......................................... Page  60

20  Exhibit No. 2, Excerpts of Annual Personnel Reminders
    Admitted......................................... Page  63
21
    Exhibit No. 3, Job descriptn Legal Assistant Senior Case Tech
22  Admitted......................................... Page  67

23  Exhibit No. 4, Excerpts of HALLEX manual
    Admitted......................................... Page  69
24
    Exhibit No. 5, Second Amended Complaint
25  Admitted......................................... Page  82

-  -  -