UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. JENNIFER L. GRIFFITH and SARAH CARVER, | ) ) ) | |
| | ) | Civil No. 11-157-ART |
| Plaintiffs, | ) ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND ORDER** |
| | ) | |
| ERIC C. CONN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

When you work for the government and discover wrongdoing in your midst, may you recover as a whistleblower under the False Claims Act?  On the one hand, why not?  After all, government employees are often the individuals best positioned to discover wrongdoing in the public sector.  Reducing their incentives to report fraud may mean that egregious wastes of taxpayer dollars go unnoticed.  On the other hand, government employees work on behalf of the public.  As a result, they often have an underlying obligation to report fraud.  And it does not seem fair to reward individuals for simply doing their job, which they are already paid to do.

Jennifer Griffith and Sarah Carver were two such government employees who reported fraud in their workplace on a number of occasions to a number of officials.  They made some reports during the course of their employment and Griffith made some disclosures of the fraud after she resigned.   Before the March 23, 2010, amendments to the False Claims Act, this was fatal to an employee's claims (Carver), but not a former

employee's claims (Griffith).   Thus, for the pre-March 23, 2010, claims, Griffith may proceed, but Carver may not.

## BACKGROUND

What fraud did Griffith and Carver discover that concerned them so much that they would go to great lengths to report it?   They found what they thought was a scheme to defraud the government.   The scheme was straightforward:   Social Security lawyer Eric Conn conspired with Administrative Law Judge David Daugherty to rig the case assignment system.   Conn would tell Daugherty the identity of his clients, R. 63 at ¶¶ 52–54, and Daugherty would pull their records and assign himself those cases, *id.* at ¶¶ 62, 64.   Daugherty would then conduct "sham proceedings," *id.* at ¶¶ 73–83, to give the appearance of an honest hearing, but the result of the proceedings was never in real doubt. In 2010, for example, Daugherty approved 99.7 percent of the applications of Conn's clients.   *Id.* at ¶ 85.   Griffith and Carver allege that doctors David P. Herr, Bradley Adkins, and Srinivas Ammisetty assisted Conn in fabricating medical records used to support an award in the social security cases.   *Id.* at ¶¶ 103–05.

Carver and Griffith both worked in the Huntington, West Virginia, Hearing Office in the Office of Disability Adjudication and Review ("ODAR"), where Daugherty was stationed.   R. 131 at 11–12, 18–19.   ODAR is part of the Social Security Administration ("SSA").   Griffith started out as a senior case technician and later became master docket clerk in 2004.   *Id.* at 11–12.   As master docket clerk, Griffith's responsibilities included keeping track of incoming social security cases.   *See id.* at 20. The Huntington ODAR had a computerized tracking system (the Case Process Management System) for docketing new cases.   That system, however, allowed any individual with access to

change the status of the cases.  *Id.* at 24.  Beginning in 2006, Griffith received complaints from her supervisor about missing information from certain cases.  *Id.* at 23–24.  In response to the criticism, Griffith investigated the issue.  She discovered that some new cases would disappear from the tracking system, but then soon after re-appear as a favorable decision to the claimant.  How did this happen?  According to Griffith, Daugherty was "changing the status" of cases, "placing the case[s] with him, and then deciding those cases favorably on the record."  *Id.* at 26.  At one point, Griffith found "50, 60 [paper] cases . . . assigned to other ALJs" in Daugherty's office.  *Id.* at 26–27.

Griffith initially reported the issues to her supervisor, Kathie Goforth, and then to a supervisor in the Hearing Office Administration, Greg Hall.  *Id.* at 25–26.  When she found the 50 or 60 cases in Daugherty's office, Griffith told both Goforth and Chief ALJ Charlie Andrus.  They then removed the files from Daugherty's office.  *Id.* at 27.  Griffith sent "numerous written e-mails" regarding Daugherty's conduct—apparently too many, as Goforth "told [Griffith] to stop e-mailing her about the issue."  *Id.* at 28.  By 2007, Griffith "had begun to complain almost daily" and alerted another supervisor in the office, Arthur Weathersby, about the issues with Daugherty.  *Id.* at 29.

During this time, Carver, who was a senior case technician, also observed problems with how Daugherty handled cases.  *See* R. 131 at 129–30.  She described how Daugherty would schedule "two days of solid Eric Conn cases . . . 15 minutes apart," while most judges took over an hour to conduct one hearing.  *Id.* at 129.  Through the computerized tracking system, Carver noticed whenever "Judge Daugherty would go in and take a case and change it to his name."  *Id.* at 133.  Carver said she complained to Hall, both verbally and in writing, about the issues from 2006 through 2011.  *Id.* at 131.

3

Carver also reported the problems to Goforth and Weathersby.  *Id.* at 133.  As the union representative, Carver also became involved with Griffith's complaints.

In October 2007, Griffith resigned from her position after receiving a negative performance review.  Griffith testified that Goforth, as part of the performance review, "told me that her goal was to get rid of me by the end of that year and that there was nothing I could do about it."  *Id.* at 29.  She also testified that she received the negative review due to her complaints about Daugherty's conduct.  *Id.* at 29–30.

After Griffith resigned, she continued to make complaints about Daugherty's actions.  She assisted ALJ Dan Kemper in filing a complaint with the ALJ union by providing him with a statement.  R. 131 at 39–40.  In her statement, she explained that Daugherty took cases Conn filed and assigned them to himself.  Plaintiffs' Exhibit 29. Further, she stated that "[t]here is no way Judge Daugherty could know those cases existed unless he had prior knowledge provided to him by the attorney [Conn]."  *Id.*

In the summer of 2009, Griffith made an anonymous phone call to the SSA's Office of Inspector General ("OIG") to report the "misappropriation of cases."  R. 131 at 45.  Griffith reported that cases had been "taken off the docket," then "assigned to other judges," and "decided favorably with little or no medical evidence."  *Id.*  She also stated that there was a "quantity of cases that were decided favorably based on their attorney." *Id.*

In 2011, Griffith filed an online fraud complaint with the OIG.  *Id.* at 46.  In that complaint, she alleged that "Mr. Conn and his practice . . . repeatedly fax list[s] to Administrative Law Judge David B. Daugherty before the cases arrive at the hearing." Plaintiffs' Exhibit 59.  Daugherty would then "pull[] the cases from incoming master

4

docket cases and grant[] the cases with little or no evidence in the file." *Id.* When cases were assigned to other ALJs, "Conn w[ould] contact Judge Daugherty and request that the cases be taken away from other judges and assigned to Judge Daugherty" for favorable decisions. *Id.*

Representatives from the OIG also contacted Griffith in April 2011 regarding the issues at the Huntington ODAR. In response to the OIG's requests, Griffith and Carver had three meetings with agents from the OIG. R. 131 at 52–53; R. 63 at ¶ 119. Griffith and Carver then spoke with staff members from the U.S. Senate's Permanent Subcommittee on Investigations, part of the Committee on Homeland Security and Governmental Affairs. R. 131 at 54–55. Griffith and Carver met with staffers and investigators for eight hours. *Id.* at 54.

In June 2011, Griffith wrote a letter to the OIG. *Id.* at 55; Plaintiffs' Exhibit 37. In that letter, Griffith described how she had left the Huntington ODAR due to retaliation for reporting Daugherty's misconduct. She "implore[d] [OIG] to put a stop to this practice." Plaintiffs' Exhibit 37. Around that same time, Griffith also filed a claim of whistleblower retaliation with the Office of Special Counsel, which eventually settled. R. 131 at 55–56.

On October 11, 2011, Griffith and Carver filed a complaint under the False Claims Act. R. 1; R. 2. The complaint was unsealed on February 19, 2013. R. 18. Conn and the other defendants ("Conn") have now filed motions to dismiss for lack of subject-matter jurisdiction. *See, e.g.*, R. 137-1.

## DISCUSSION

The False Claims Act (the "FCA"), 31 U.S.C. §§ 3729–3733, imposes substantial financial penalties on any person who knowingly defrauds the United States. 31 U.S.C.

5

§ 3729(a).   The FCA prohibits knowingly presenting "a false or fraudulent claim for payment or approval" and knowingly making or using "a false record or statement material to a false or fraudulent claim."   *Id.* § 3729(a)(1)(A), (B).   A "claim" is "any request or demand . . . for money . . . [that] is presented to an officer, employee, or agent of the United States."   *Id.* § 3729(b)(2)(A), (A)(i).

The FCA allows private parties, called relators, to file civil actions on behalf of the United States for violations of § 3729.   *Id.* § 3730(b).   If the private party recovers in the Government's name, the party is entitled to a share of the proceeds.   *See id.* § 3730(d).

The FCA also imposes limitations on when relators may file suit.   As is relevant here, the public-disclosure bar, before the amendments in the Patient Protection and Affordable Care Act ("PPACA"),[1] states that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2006).   Conn claims the Court lacks jurisdiction over any pre-March 23, 2010, conduct because the relators' complaint is based on public information and the relators are not original sources.

---

[1] Congress amended the FCA as part of the PPACA on March 23, 2010.  Those amendments included changes to the public-disclosure bar.  This opinion deals with conduct that occurred before March 23, 2010, which means the Court will apply the pre-PPACA public-disclosure bar.  *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010) (concluding that the amended public-disclosure bar is not retroactive).  For post-March 23, 2010, claims, the United States has exercised its authority to oppose dismissal and allow the relators' complaint to proceed.  *See* R. 93; 31 U.S.C. § 3730(e)(4)(A) (2010) ("The Court shall dismiss [a claim based on a public disclosure] . . . unless opposed by the Government.").

I.    **The public-disclosure bar requires dismissal of only Carver's claims.**

The relators concede the information in their complaint was publicly disclosed. *See* R. 63 at ¶¶ 118, 120.  So, to bring this suit, they must be "original source[s]."  To qualify as an "original source," the relators must (1) have "direct and independent knowledge of the information on which the allegations are based," and (2) "voluntarily provide[]" that information to the Government before bringing suit.  31 U.S.C. § 3730(e)(4)(B) (2006).  The defendants do not dispute that the relators timely disclosed the relevant information to the Government.  Nor do the defendants contest that the relators had "direct and independent knowledge of the information."  Rather, the defendants contend that the relators did not "voluntarily provide" the information to the Government because disclosing fraud to the Government was part of the relators' jobs.  *See* R. 137-1 at 11–12.  Accordingly, the question in this case is whether Griffith and Carver "voluntarily" gave the Government information about the defendants' allegedly fraudulent acts.  31 U.S.C. § 3730(e)(4)(B) (2006).  Only if they did so may they proceed as original sources.

As in all statutory construction cases, the starting point is the text.  *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 741 (2014).  The FCA does not define the term "voluntarily," so the Court interprets it "in accordance with [its] ordinary meaning."  *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (internal quotation marks omitted).  In ascertaining the ordinary meaning of voluntarily, dictionaries at the time of the original-source provision's enactment in 1986 provide a useful guide.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012).  Those definitions for voluntary (the adjective form of the adverb voluntarily) range from the metaphysical to the mechanical: "[p]roceeding from the will: produced in or by an act of choice";

"[p]erformed, made, or given of one's own free will"; "[d]one by design or intention; not accidental"; "[a]cting of oneself: not constrained, impelled or influenced by another"; "[a]cting or done of one's own free will without valuable consideration"; "acting or done without any present legal obligation to do the thing done or any such obligation that can accrue from the existing state of affairs." Webster's Third New Int'l Dictionary 2564 (1976). Black's Law Dictionary contains similar definitions. *See* Black's Law Dictionary 1413 (5th ed. 1979).

To determine which of the many definitions of voluntary best fits the FCA, an analysis of the relationship between the original-source provision and the public-disclosure bar is instructive. *See United States v. Branson*, 21 F.3d 113, 116 (6th Cir. 1994) ("Statutes must be read as a whole[.]"). Read together, the provisions preclude a relator from filing suit based on a public disclosure unless she qualifies as an original source. The original-source provision thus functions as an exception to the FCA's public-disclosure bar. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007) (discussing the "original-source exception to the public-disclosure bar"). Because they are an exception, the original-source requirements should be "read narrowly in order to preserve the primary operation" of the public-disclosure bar. *Maracich v. Spears*, 133 S. Ct. 2191, 2200 (2013) (quoting *Commissioner v. Clark*, 489 U.S. 726, 739 (1989)) (alterations omitted). The "primary operation" of the public-disclosure bar prevents relators from filing suit in cases involving a public disclosure. Consequently, a narrow reading of the original-source exception counsels in favor of a definition of voluntary that imposes some meaningful limits on a relator's ability to file a suit. Which definition fits that mold? Defining voluntary as acting or done without any present legal obligation or

8

without valuable consideration would disqualify some individuals from proceeding as original sources. For example, government auditors, who receive a salary in return for investigating and reporting fraud, could not be original sources. *See Little v. Shell Exploration & Prod. Co.*, 690 F.3d 282, 294 (5th Cir. 2012). Similarly, individuals compelled by subpoena to reveal information would also fall outside the original-source exception. *See United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 338 (3d Cir. 2005) (explaining that "there would be no question" that information compelled by subpoena "was not provided voluntarily"). By excluding those relators from the original-source provision, this definition of voluntary still allows the public-disclosure bar to block certain individuals from filing suit, while rewarding those relators who, without any requirement to do so, took the risk to come forward as whistleblowers.

By contrast, a broader view of voluntary—such as acts "done by design or intention" and "not accidental," or as the product of one's free will—would impose no limitations on relators and render the word insignificant. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Consider a disclosure that even the relators agree is not voluntary: information compelled by subpoena. When a witness summoned by subpoena arrives for court, she has arrived "by intention," not by accident. And when she takes the stand, her testimony, even if compelled by subpoena, was the product of her free will. Thus, even compliance with a subpoena would constitute a voluntary act under a broad interpretation of "voluntarily." Indeed, it strains the imagination to conjure up disclosures to the Government that would not be voluntary

under those definitions. Perhaps the only true "involuntary" disclosure would be where the relator, through some muscle twitch, hits "send" on an email to a government employee. Or perhaps it is where the relator accidentally leaves a memo about his company's fraud at a coffeehouse, only for it to be later picked up by a government employee. Any other disclosure—whether from a subpoenaed witness or a government auditor—would be voluntary. Because such all-encompassing definitions would classify virtually all disclosures as voluntary, they would not limit the original-source exception in any meaningful way. *See Maracich*, 133 S. Ct. at 2200 ("[E]xceptions ought not operate to the farthest reach of their linguistic possibilities if that result would contravene the statutory design.").

The Ninth Circuit's decision in *Fine* supports the limited definition of voluntary. *See United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740 (9th Cir. 1995) (en banc). The relator in *Fine* was an auditor in the Office of the Inspector General at the U.S. Department of Energy. *Id.* at 741. Unhappy with his supervisors' delay in taking action on certain audits, Fine quit his job and filed various *qui tam* lawsuits. The Ninth Circuit's en banc opinion held that Fine did not "voluntarily provide" the information regarding fraud to the Government because he was a "salaried government employee, compelled to disclose fraud by the very terms of his employment." *Id.* at 743, 744 ("[T]he fact that Fine was employed specifically to disclose fraud is sufficient to render his disclosures nonvoluntary."). The majority opinion adopted the definition of "voluntary" as "done[] of one's own free will without valuable consideration" and "done without any present legal obligation to do the thing done." *Id.* at 744. Under either definition, Fine was not an original source. Fine "acted in exchange for valuable consideration—his

salary—and under an employment-related obligation to do the very acts he claims were voluntary." *Id.*

In the face of the statute's plain language and the case law, the relators contend that all disclosures are "voluntary" except those compelled by subpoena. R. 142 at 12. The relators rely only on a floor statement by Senator Grassley, the sponsor of the public-disclosure bar and original-source exception. Senator Grassley said that the "voluntarily provided" provision applied to a relator who "was a source of the allegations only because the individual was subpoenaed to come forward." *Id.* at 13 (quoting 132 Cong. Rec. S11238 (Aug. 11, 1986)). Such statements, however, by an individual legislator "should not be given controlling effect." *Grove City College v. Bell*, 465 U.S. 555, 567 (1984), *superseded by statute on other grounds*, Civil Rights Restoration Act of 1987, Pub. L. 100-259, 102 Stat. 28. Rather, when such statements are consistent with the plain language, courts may treat them as a guide to the statute's construction. *Id. But see Aldridge v. Williams*, 44 U.S. (3 How.) 9, 24 (1845) ("The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself[.]"). Senator Grassley's statements are not consistent with the plain language. No ordinary construction of "voluntarily provide" would both exclude disclosures compelled by subpoena but include disclosures required by job-related obligations. A subpoena imposes an obligation on its recipient, much like a job-related duty imposes an obligation (in return for a salary) on the employee. The relators cannot take one without the other. Indeed, no court has adopted the relators' interpretation. *See Fine*, 72 F.3d at 744 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979)) ("[A] single floor statement could not convince us to adopt so tortured a construction of a commonly understood word."). And

the relators point to no other source—case, dictionary, or even another Senator—supporting their constricted construction of voluntary.

### A.  Griffith's and Carver's disclosures while employed were not voluntary.

With the understanding that "voluntary" is limited to acts taken without a corresponding obligation, Griffith's and Carver's disclosures to the Government while employees of the SSA were not voluntary.  The employee requirements of the SSA as well as testimony from Griffith and Carver establish that they had a duty to report fraud.

As employees of the SSA, Griffith and Carver were subject to the Hearings, Appeals, and Litigation Law manual (the "HALLEX manual").  The HALLEX manual is published by the SSA, and it provides "guiding principles, procedural guidance, and information to Office of Disability Adjudication and Review Staff."  HALLEX I-1-0-1, 2005 WL 1863821 (S.S.A. June 21, 2005).  The manual states that "[a]ny employee who believes that a criminal violation has occurred must report it and refer the violation to the Office of the Inspector General."  R. 109-1 at 2 (HALLEX I-1-3-3 S.S.A. June 27, 2005). When an employee suspects a violation by another employee or representative, the employee must report that violation to a supervisor.  *Id.* at 3 ("An employee in [a hearing office] . . . must report a suspected violation to an immediate supervisor.").  Annual Personnel Reminders from the SSA also required employees to "report any fraud, waste or abuse in government programs."  Exhibit 2, Part 1.2. [2]

Griffith and Carver testified that they understood their obligations to report fraud. Both Griffith and Carver explained how they reported violations to their supervisors and

---

[2]  Because the HALLEX manual and Annual Personnel Reminders suffice to establish that the relators did not voluntarily provide information while employed, the Court need not determine the effect of the general executive-branch regulation requiring employees to disclose fraud, 5 C.F.R. § 2635.101(b)(11) (2013).

the OIG (Griffith made her disclosure to the OIG only after she left the SSA). *See, e.g.*, R. 131 at 25–27, 44, 131, 140–41. Griffith said she was "very familiar" with the HALLEX manual. *Id.* at 69. She also believed Daugherty's actions to constitute "employee misconduct." *Id.* at 70; *see also id.* at 79 ("I believed it could potentially be [fraud]."). At the time of the violations, she emailed a supervisor that "[i]t is my firm belief that a grievance needs to be filed on the issue and the OIG contacted." *Id.* at 78. Carver testified similarly. *See id.* at 154–75. ALJ Kemper also agreed that Griffith and Carver believed they were witnessing fraud. *Id.*

Additionally, Kemper explained that Griffith and Carver were in the best position to detect the alleged fraud by Daugherty and Conn. *See* R. 131 at 116. The job description for Senior Case Technician, which applies to Carver and was once Griffith's position, supports that testimony. The description explains that "information [in a case] is likely to be fraudulent" requiring the employee to "choose an appropriate course of action from among several possible outcomes." Exhibit 3 at 3. Thus, a Senior Case Technician was expected to identify and resolve instances of fraud, even if the job description did not contemplate the allegedly fraudulent scheme between Conn and Daugherty.

Under the plain meaning of the original–source exception, Griffith and Carver did not voluntarily disclose the information about Conn and Daugherty during their SSA employment. They understood that they had an obligation to reveal that information to the Government. That obligation emanated from the HALLEX manual and, to a lesser extent, their job description and Annual Personnel Reminders. Moreover, Griffith and Carver did not need the additional incentive of a *qui tam* suit to disclose fraud because, in

return for their salary from the SSA, Griffith and Carver were expected to follow those rules and report fraud if they saw it.

That result is also supported by the case law. Several courts of appeals have held that a relator's disclosures cannot be voluntary where the relator's specific job duties compelled disclosure of fraud. *See, e.g.*, *Little*, 690 F.3d at 294 ("[T]he fact that a relator was employed specifically to disclose fraud is sufficient to render his disclosures nonvoluntary." (internal quotation marks omitted)); *United States ex. rel. Biddle v. Bd. of Trs. of the Leland Stanford, Jr. Univ.*, 161 F.3d 533, 542 (9th Cir. 1998) ("[W]here a government employee is paid to [report potential fraudulent activities], the employee should not receive a windfall for merely doing his job."); *Fine*, 72 F.3d at 744 ("[T]he fact that Fine was employed specifically to disclose fraud is sufficient to render his disclosures nonvoluntary."). While some of those cases involved government auditors, the Ninth Circuit's decision in *Biddle* extended that duty to an employee whose duties were similar to Griffith's and Carver's. The relator in *Biddle* was a government administrative contracting officer. In holding that he had a duty to disclose fraud, the court relied on the Federal Acquisition Regulations, which stated that "[n]o contract shall be entered into unless the contracting officer ensures that all requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met." *Id.* at 541 (citing 48 C.F.R. § 1.602-1(a)). The regulations also said that "[c]ontracting officers are responsible for . . . *safeguarding the interests of the United States in its contractual relationships.*" *Id.* (citing 48 C.F.R. § 1.602-2) (emphasis in original). Finally, the contracting officer was required to refer any fraud to an agency official. *Id.*

14

Like in *Biddle*, regulations required Griffith and Carver to detect and report fraud as part of their job duties.  Specifically, the HALLEX manual created an obligation to disclose fraud.  *See Biddle*, 161 F.3d at 542 (explaining that Biddle "had a duty . . . to disclose fraud" under federal regulations).  That Griffith and Carver, like the relator in *Biddle*, were not auditors does not render their disclosures voluntary.  Instead, Griffith's and Carver's duties were "defined by the applicable regulations and other official documentation of [their] position."  *Id.*  Because those regulations required divulging the fraud, Griffith and Carver did not "voluntarily provide" information to the Government.

The relators contend that this case is more like *Hagood*, where the Ninth Circuit held that a government lawyer had no duty to disclose fraud.  *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465 (9th Cir. 1996).  According to the Ninth Circuit, the lawyer's "job was not to expose fraud, but to draft contracts and perform other legal services."  *Id.* at 1476 n.19.  As a result, the lawyer voluntarily disclosed information to the Government pursuant to the original-source exception.

 Griffith and Carver are different than the relator in *Hagood* because the HALLEX manual and Annual Personnel Reminders created a job-specific duty.  No similar duty was present in *Hagood*.  Unlike this case and *Biddle*, the lawyer in *Hagood* was not subject to any specific regulations related to his government employment requiring disclosure of fraud.  Rather, the relator in *Hagood* had only a common-law or professional duty to report fraud.  *See Hagood*, 81 F.3d at 1479–80 (Kleinfeld, J., concurring).  Thus, *Biddle*, not *Hagood*, is the more persuasive authority and supports the conclusion that Griffith and Carver were not original sources while employed at the SSA.

15

**B.  Griffith's post-SSA employment disclosures were voluntary.**

The Court's conclusion that neither Griffith nor Carver, while employees of the SSA, could "voluntarily" disclose information does not end the public-disclosure bar analysis.  While Carver remained at the SSA throughout the time of her disclosures, Griffith continued to report the allegedly fraudulent conduct of Daugherty and Conn after she resigned in October 2007.  That leaves an issue of first impression:  do Griffith's post-employment disclosures constitute voluntary disclosures under the FCA?  Under the plain language of the original-source exception, the answer is yes.

After Griffith left the SSA, she did not have an obligation to report fraud.  Griffith no longer received any consideration, like her salary, from the SSA.  The rules that created her duty applied only to SSA employees.  *See* R. 109-1 (HALLEX manual I-1-3-3) (directing "[a]ny employee" to report fraud); Annual Personnel Reminders, Exhibit 2 Part 1; *see also* 5 C.F.R. § 2635.101(b)(11) ("*Employees* shall disclose waste, fraud, abuse and corruption to appropriate authorities." (emphasis added)).   Neither the defendants nor the United States identify any post-employment duty to disclose fraud.  Without an obligation to report, whether from HALLEX, Griffith's job description, or other regulations, there is no statutory basis to classify Griffith's post-employment disclosures as non-voluntary.[3]  Accordingly, when Griffith reported fraud after her resignation, she "voluntarily provided the information" about the fraud to the Government as required by the original-source exception to the public-disclosure bar.  31 U.S.C. § 3730(e)(4)(B) (2006).

---

[3] Voluntary can also mean an act done without "any such obligation that can accrue from the existing state of affairs."  Webster's Third New Int'l Dictionary 2564 (1976).  No testimony or other evidence suggests that Griffith had an obligation that accrued from her SSA employment.

*Fine* does not countenance a different result.  While the relator in *Fine* filed his lawsuits after quitting his government job, none of the opinions from the decision indicates that he disclosed information to the Government after leaving his job.  Rather, the opinions rely on his disclosures while he was employed.  *See Fine*, 72 F.3d at 743 ("Fine concedes that he based his claims on reports he furnished to his superiors."); *id.* at 749 (Leavy, J., dissenting) ("Fine . . . reported the fraud to his supervisors.").

The United States suggested at oral argument that the relevant inquiry is limited to the voluntariness of the *first* disclosure.  So long as that disclosure was not voluntary, the United States says, the relator cannot be an original source, regardless of whether other, later-in-time disclosures were voluntary.

That interpretation lacks any mooring to the text of the original-source exception.  The exception states solely that the individual must have "voluntarily provided the information to the Government before filing an action."   31 U.S.C. § 3730(e)(4)(B) (2006).  Nothing in the text requires or implies that only the first disclosure is germane to the inquiry—the statute does not impose a one-and-done condition.  *See Whitfield v. United States*, 135 S. Ct. 785, 789 (2015) ("And even if we thought otherwise, we would have no authority to add a limitation the statute plainly does not contain.").  Rather, the voluntariness requirement reads more like an exhaustion principle.  The relator must give the information, without any obligation to do so, to the Government.  Here, Griffith's post-employment disclosures satisfied that condition.

In a similar vein, the defendants argue that Griffith learned the information while an employee, so she could not have voluntarily disclosed the information even post-employment.  R. 144 at 15–16.  As with the United States' argument above, the

defendants have no statutory basis for their position.  Nothing in the original-source exception focuses on the time the relator acquired the information.  The only relevant timing condition is that the relator must voluntarily disclose before filing suit.  There is no dispute that Griffith complied with that timing requirement.

The defendants also contend that the Court's conclusion leads to absurd results. According to the defendants, government employees will now quit their jobs in droves to file *qui tam* lawsuits.  R. 144 at 16.

Courts, however, "must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).  In curbing the reach of the original-source exception to the public-disclosure bar, Congress chose to exclude individuals who did not "voluntarily provide[ ]" the relevant information to the Government.  Congress could have explicitly excluded all government employees, or even all current and former government employees.  *Cf.* 31 U.S.C. § 3730(e)(1) ("No court shall have jurisdiction over an action brought by a former or present member of the armed forces . . . against a member of the armed forces arising out of such person's service in the armed forces."); 12 U.S.C. § 4224 (disallowing declarations regarding assets to be seized by United States from "a current or former officer or employee of a Federal or State government agency or instrumentality who discovered or gathered the information in the declaration, in whole or in part, while acting within the course of the declarant's government employment").  Instead, Congress chose "voluntarily" as the limiting factor, a decision the Court cannot second-guess.  The most apt definition of that word, as discussed above, is an act done "without a present legal obligation" or "without valuable consideration."  Applying that definition to the statute,

18

the straightforward conclusion is that Griffith had no obligation to disclose the information after she left employment.

The Court's interpretation is not absurd because the FCA currently allows former, and most current, government employees to bring *qui tam* suits where there has been no public disclosure.  No court has held that the FCA bans *qui tam* suits by current or former government employees.  *See United States v. A.D. Roe Co.*, 186 F.3d 717, 722 n.5 (6th Cir. 1999) ("[N]o court has accepted the argument that government employees *per se* can never be relators in a *qui tam* action."); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1501 & n.14 (11th Cir. 1991) (implicitly rejecting "the United State's [sic] assertion that a government employee who brings an action based upon information he learns within the scope of his government duties can *never* qualify as an original source" (internal quotation marks omitted)).  In cases where there is no public disclosure (which means the "voluntarily provide[ ]" requirement drops out), current and former government employees are free, at least under the FCA, to bring a *qui tam* suit.[4]  Given the parade of horribles that the defendants and the United States envision from the Court's construction of "voluntarily" in this case, one would expect a similar cascade of calamity in cases without a public disclosure.  Government employees, at this very moment, could withhold certain information from their superiors to prevent any public disclosure and file a *qui tam* suit.  There is no indication, however, that government employees are *en masse* withholding information and going off to file *qui tam* suits.  Because the FCA already allows government employees to pursue *qui tam* suits, permitting those same employees

---

[4] Other provisions, such as conflict-of-interest regulations, may prevent those employees from filing suit, but the Court's discussion is limited to the FCA.

to file a *qui tam* suit if there is a public disclosure and they meet the original-source requirements is not inconsistent with the FCA.

The Court also declines to accept the defendants' view that individuals, like Griffith, would give up hard-earned and valued government jobs for a chance at winning the lawsuit lottery. *See* R. 131 at 36 ("If you get a federal job, you hang on to it. . . . There is no other job that I could have in my immediate area making what I made there."). Griffith did not leave her job to become a *qui tam* relator. According to her testimony, she was forced to resign because of the horrid treatment she received—all for reporting fraud in an effort to save the tax dollars of the American public. *See, e.g.*, R. 131 at 34. Instead of being met with receptive arms, she was allegedly pushed away and punished. According to Griffith, the inefficacy of and dilatory actions by her supervisors led her to repeatedly report the alleged fraud. Indeed, after her resignation she did not immediately file a *qui tam* suit, but continued to report the fraud to the SSA, the OIG, and eventually Congress. She persisted in her complaints because of the injustice to herself and to the system; not so that in eight or ten years she might reap a *qui tam* reward.

The plain language of the original-source exception requires that the relator "voluntarily provided the information to the Government." Griffith complied with that requirement through her post-employment disclosures, and may proceed with her FCA claims that relate to pre-March 23, 2010, conduct.

### C. Carver's disclosures to Congress were not voluntary.

Carver contends that her disclosures to Congress were voluntary because they were not mandated by the HALLEX manual or any other regulation. *See* R. 142 at 30–31. But the Annual Personnel Reminders "required" employees "to assist the Inspector General

and *other investigative officials* in the performance of their duties or functions." Exhibit 2, Part 1.2 (emphasis added). Carver assisted and testified before the Permanent Subcommittee on Investigations in its inquiry into the alleged fraud by Daugherty and Conn. Carver testified at the evidentiary hearing in this case that she met with Senate investigators from the Committee and answered all their questions. R. 131 at 144.

Under the Annual Personnel Reminders, Carver was required to cooperate with that investigation. A reasonable understanding of "investigative officials" includes congressional investigators. The Subcommittee undertook an investigation into the fraud: its report discussed how the Committee's "two-year investigation" into Conn revealed misconduct. *See* U.S. Senate Committee on Homeland Security and Governmental Affairs, How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm 1 (Oct. 7, 2013) ("The Committee initiated an investigation to evaluate how Judge Daugherty was able to process so many cases," *id.* at 4.). There is no reason to exclude congressional investigative officials from the scope of "investigative officials" in the Annual Personnel Reminders. Congress may just as well investigate fraud and wrongdoing as the various agencies of the executive branch. *See In re Grand Jury Proceedings*, 841 F.2d 1048, 1054 (11th Cir. 1988) (holding that a congressional committee, in impeachment proceedings, "falls within the definition of 'investigative officer' contained within 18 U.S.C. § 2517(1)"). Because Carver was required to cooperate with the congressional investigation, her disclosure was not voluntary.

II.     **The post-PPACA public-disclosure bar is constitutional.**

Some of the relators' claims accrued after March 23, 2010.  *See supra* note 1.  As to those claims, the post-PPACA public-disclosure bar applies.  That bar allows the United States to oppose any dismissal based on a public disclosure, and the United States has exercised that right in this case.  *See* R. 93; 31 U.S.C. § 3730(e)(4)(A) (2010) ("The Court shall dismiss [a claim based on a public disclosure] . . . unless opposed by the Government.").

Defendant Adkins contends that the post-PPACA public-disclosure bar is unconstitutional and that the pre-PPACA bar should apply to all conduct.  R. 136 at 9.  Adkins, however, makes this argument only in passing.  While the Court will not add substance to Adkins' position, *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997), it will address the one concrete claim he makes:  that the bar is unconstitutional because it "permit[s] the executive branch to function as a judicial body to determine jurisdictional outcomes."  R. 136 at 9.  The flaw in his argument is that the post-PPACA public-disclosure bar is no longer jurisdictional.

Although the pre-PPACA public-disclosure bar is jurisdictional, *Rockwell*, 549 U.S. at 467–70, the PPACA amendments to the FCA removed the bar's jurisdictional characteristics.  The section used to begin:  "No court shall have jurisdiction over an action . . . ."  31 U.S.C. § 3730(e)(4)(A) (2006).  It now provides that "[a] court shall dismiss an action or claim under this section, unless opposed by the Government, . . . ."  31 U.S.C. § 3730(e)(4)(A).  The absence of the jurisdictional language proves fatal to any claim that the bar remains jurisdictional.

The Supreme Court has explained that "absent . . . a clear statement" that a rule is

jurisdictional, "courts should treat the restriction as nonjurisdictional in character." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (internal quotation marks omitted).  Not only does the post-PPACA public-disclosure bar lack clear jurisdictional language, it actually *removed* the clear statement of jurisdiction.  With the deletion of the jurisdictional language, "[i]t is apparent . . . that the public-disclosure bar is no longer jurisdictional." *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013); *United States ex rel. Osheroff v. Humana, Inc.*, No. 13-15278, 2015 WL 223705, at *4 (11th Cir. Jan. 16, 2015).  Because the bar is no longer jurisdictional, the executive branch does not have control over the jurisdiction of the courts.  As a result, the post-PPACA public-disclosure bar poses no separation-of-powers concerns.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1)    The defendants' motions to dismiss for lack of subject-matter jurisdiction, R. 135, R. 136, R. 137, R. 138, R. 139, R. 140, R. 150, are **GRANTED IN PART** as to Carver's claims as they relate to conduct of the defendants occurring before March 23, 2010.

(2)    The defendants' motions to dismiss for lack of subject-matter jurisdiction, R. 135, R. 136, R. 137, R. 138, R. 139, R. 140, R. 150, are **DENIED IN PART** as to Griffith's claims.

(3)    Defendant Adkins' motion, R. 150, is also **GRANTED IN PART** as to claims related to false medical records under Count V and Count VI that accrued before March 23, 2010, as the Court held in its prior order, R. 145.

(4)    To the extent defendant Adkins' motion to dismiss raises non-jurisdictional

issues, R. 136, those portions of the motion are **DENIED WITHOUT PREJUDICE.**

This the 24th day of February, 2015.

Signed By:

*Amul R. Thapar*

**United States District Judge**