UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | ) | |
| JENNIFER L. GRIFFITH and SARAH | ) | |
| CARVER, | ) | Civil No. 11-157-ART |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | **AND ORDER** |
| | ) | |
| ERIC C. CONN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Relators Jennifer Griffith and Sarah Carver filed a *qui tam* complaint under the False Claims Act against defendants Eric C. Conn and others, alleging that the defendants colluded to rig social security cases in favor of Conn and his clients. No matter how serious the allegations, the relators' complaint still must meet minimal pleading requirements under the federal rules. On several important counts, the relators' complaint fails to satisfy the pleading standards. As a result, the defendants' motion to dismiss must be granted in part.

## BACKGROUND

As the Court's previous opinion includes a full recitation of the facts, a summary here suffices. *See* R. 153 at 2–5. Relators Jennifer Griffith and Sarah Carver allege that Social Security lawyer Eric Conn conspired with Administrative Law Judge ("ALJ") David Daugherty to manipulate the assignment of disability cases and grant disability benefits to undeserving claimants. As part of their scheme, Conn would notify Daugherty when his clients filed claims, R. 63 ¶¶ 52–54, and Daugherty would then assign himself those cases, *id.*

¶¶ 62, 64.  The relators list several examples of cases that Daugherty misappropriated.  *See id.* ¶¶ 70, 71.  Daugherty would then conduct "sham proceedings" or in some cases simply grant benefits without a hearing.  *Id.* ¶¶ 73–83. After his clients received benefits, Conn submitted Forms 1560 and 1696 to the Social Security Administration ("SSA") to receive his fees for his representation.  *Id.* ¶ 72.  Griffith and Carver also allege that doctors David P. Herr, Bradley Adkins, and Srinivas Ammisetty worked with Conn to create false medical records to support the disability claims.  *Id.* ¶¶ 103–05.

On October 11, 2011, Griffith and Carver filed a complaint under the False Claims Act ("FCA").  R. 1; R. 2.  The complaint was unsealed on February 19, 2013.  R. 18.  On December 6, 2013, the relators filed a second amended complaint.  R. 63.  That complaint contains eight counts, and those counts broadly fall into two categories of alleged FCA liability:  (1) Conn's clients' applications for social security benefits, which Daugherty granted, were false or fraudulent, and (2) Conn's requests for representative fees in those matters were also false or fraudulent.  *Id.* ¶¶ 138–42, 148–64.

Conn and the other defendants ("Conn") first filed a motion to dismiss for lack of subject-matter jurisdiction under the public-disclosure bar, arguing that the relators did not voluntarily provide information to the government before filing suit as required by the FCA. *See, e.g.*, R. 137-1.  The undersigned held that, for claims before March 23, 2010, the public-disclosure bar precluded only Carver's claims because her disclosures while an employee of SSA were compelled by the agency's employment policies.  R. 153 at 12–15.  Griffith's claims could proceed because she voluntarily provided the information after she resigned from SSA.  R. 153.

Conn has now filed motions to dismiss for lack of subject-matter jurisdiction, again

under the public-disclosure bar, and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  R. 146; R. 156; R. 158; R. 160; R. 162.

## DISCUSSION

The FCA, 31 U.S.C. §§ 3729–3733, punishes fraud against the United States.  It prohibits knowingly presenting "a false or fraudulent claim for payment or approval" and knowingly making or using "a false record or statement material to a false or fraudulent claim."  *Id.* § 3729(a)(1)(A), (B).  A "claim" is "any request or demand . . . for money . . . [that] is presented to an officer, employee, or agent of the United States."  *Id.* § 3729(b)(2)(A), (A)(i).  While the United States may proceed with a false claims action on its own, the FCA also permits individuals, known as "relators," to file suit on behalf of the United States.  If the claim is prosecuted successfully, the relator may be entitled to a share of the recovery.  *See id.* § 3730(d).

## I.      Subject-Matter Jurisdiction and the Public-Disclosure Bar

When a relator files a claim under the FCA, several jurisdictional hurdles may preclude a court's adjudication of the merits.  In this case, Conn argues that the public-disclosure bar serves as one of those jurisdictional obstacles.  Before the amendments in the Patient Protection and Affordable Care Act ("PPACA"),[1] the public-disclosure bar stated that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or

---

[1] Congress amended the FCA, including the public-disclosure bar, as part of the PPACA on March 23, 2010.  For conduct occurring before March 23, 2010, the pre-PPACA public-disclosure bar applies.  *See United States ex rel. Antoon v. Cleveland Clinic Found.*, No. 13-4348, 2015 WL 3620519, at *6 (6th Cir. June 11, 2015).  For post-March 23, 2010, claims, the United States exercised its authority under the amended FCA to prevent dismissal of relators' claims under the public-disclosure bar.  *See* R. 93; 31 U.S.C. § 3730(e)(4)(A) (2010) ("The Court shall dismiss [a claim based on a public disclosure] . . . unless opposed by the Government.").

investigation, or from the news media, unless . . . the person bringing the action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A) (2006).

Conn contends that the Court lacks jurisdiction due to the public-disclosure bar over three categories of allegations concerning pre-March 23, 2010 conduct: (1) the allegations surrounding his resignation before the Court of Appeals for Veterans Claims ("Veterans Court"), (2) the allegations concerning Conn's conduct occurring after she left SSA, and (3) the allegations that are based on the Senate Report, which detailed Conn's and Daugherty's alleged abuses.  None of those arguments divest the Court of jurisdiction here.

### A. The public-disclosure bar does not preclude the claims related to Conn's failure to disclose his resignation from the Veterans Court.

In the complaint, Griffith alleges that Conn falsely certified various forms submitted to SSA by failing to disclose his resignation from the Veterans Court.  R. 63 ¶ 142.  According to Conn, Griffith based her Veterans Court allegations on publicly disclosed information from the United States Senate's investigatory report into Conn's abuses.  *See* R. 170 at 2–13 (citing U.S. Senate Committee on Homeland Security and Governmental Affairs, How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm 1 (Oct. 7, 2013), *available at* http://www.hsgac.senate.gov/hearings/social-security-disability-benefits-did-a-group-of-judges-doctors-and-lawyers-abuse-programs-for-the-countrys-most-vulnerable (hereinafter "Senate Report")).  As a result, Conn says, Griffith cannot bring those claims because she is not an original source of the allegations.  *See* 31 U.S.C. § 3730(e)(4) (2006).

The public-disclosure bar (pre-March 23, 2010) strips a court of jurisdiction over

actions "based upon the public disclosure of allegations or transactions," except where the relator is an original source or the Attorney General brings the action. 31 U.S.C. § 3730(e)(4)(A) (2006). The phrase "based upon the public disclosure of allegations or transactions" consists of two parts: (1) whether the fraud has been publicly disclosed and (2) whether the relators' allegations are "based upon" the public disclosures. *United States v. Chattanooga-Hamilton Cnty. Hosp. Auth'y*, 782 F.3d 260, 265 (6th Cir. 2015).

Turning first to whether the fraud has been publicly disclosed, that inquiry also consists of two elements. Unsurprisingly, the first requirement of a public disclosure is that the disclosure be "public." *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511 (6th Cir. 2009). A disclosure of fraud is public where it appears in "the news media," a court document, "a criminal, civil, or administrative hearing, [or] in a congressional, administrative, or Government Accounting Office report, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A); *Poteet*, 552 F.3d at 512.

The second element requires the disclosure to "reveal[ ] the same kind of fraudulent activity against the government as alleged by the relator." *Poteet*, 552 F.3d at 511. If the information is "sufficient to put the government on notice of the likelihood of related fraudulent activity," then the public information has disclosed the fraud. *Id.* at 512 (internal quotation marks omitted). One way that the government is on notice is if the public disclosure contains an allegation of fraud. *Id.* For example, if a newspaper reports that Hospital ABC has defrauded the United States government by overinflating medical costs, that story would alert the government to look into whether Hospital ABC has submitted fraudulent bills.

If the disclosure does not contain an allegation of fraud, the Sixth Circuit, adopting the

5

D.C. Circuit's reasoning, has held that where "the information about both a false state of facts and the true state of facts has been disclosed, we [will] find that there has been an adequate public disclosure because fraud is implied."  *Id.*; *see United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 331 (6th Cir. 1998) (adopting analysis from D.C. Circuit's decision in *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994)); *see also Dingle v. Bioport Corp.*, 388 F.3d 209, 212 (6th Cir. 2004) ("Either a public disclosure which includes an allegation of fraud, or a public disclosure that describes a transaction that includes both the state of facts as they are plus the misrepresented state of facts must be present to eliminate jurisdiction in a case.").  The D.C. Circuit's formulation used a form of legal algebra to explain the necessary showing:  consider $X + Y = Z$, where $Z$ is the allegation of fraud and $X$ and $Y$ are the "essential elements."  *Dingle*, 388 F.3d at 212 (quoting *Springfield*, 14 F.3d at 654).  $X$ represents the true state of facts and $Y$ represents the misrepresented state of facts.  *Id.*  For a disclosure to constitute a public disclosure of fraud, "the combination of $X$ and $Y$ must be revealed from which readers or listeners may infer $Z$, i.e., the conclusion that fraud has been committed."  *Id.*  In the example above, if the newspaper, in one story, reports that patients Jane, Bill and Tom went to Hospital ABC solely for checkups, but also reports in another story that Hospital ABC billed Medicare for expensive surgery for those patients, then the government would be on notice of the hospital's fraudulent billing.  The true state of facts—the procedures Jane, Bill and Tom actually received—and the false state of facts—what the hospital billed—would both have been disclosed.

In assessing whether disclosures reveal $X$ and $Y$ (or $Z$), the disclosures need not come from a single source.  *Poteet*, 552 F.3d at 512.   Instead, a relator's action may be barred

where several sources combine to disclose the allegations or transactions.  *Id.*  Regardless of how many sources disclose the information, the question still remains whether the information from those sources constitutes the "Z" or the "X" and "Y".

Here, the true state of facts, "X," is in the public domain.  The true state of the world is that Conn resigned from practicing before the Veterans Court and, as a result, may never appear before that Court.  Several sources disclosed Conn's resignation from the Veterans Court:  (1) the Veterans Court's order accepting Conn's resignation, (2) the Senate Report, and (3) various news media.  *See* R. 156-3 (Veterans Court decision); R. 172-2 (Senate Report); R. 172-1,3,4 (blogs and other news media).

But simply having "X" in the public realm is not sufficient to bar the relators' claims.  The false state of facts, "Y," must also be disclosed.  In this case, the relators allege that Conn did not disclose that he was disqualified from practicing before the Veterans Court.  That fact publicly appears in the fee claims themselves, several of which are cited in the Senate Report.[2]  *See* Senate Report at 85 n.405, 12 n.665, 134 n.729, 136 n.752, 140 n.795, 143 n.822, 155 n.944.  At least one example of Form 1696 for the Appointment of Representative is attached to the Report and readily available.  *See* Exhibit A-2 to Senate Report (available as part of Exhibit Parts 5) (PDF at pg. 167), Appointment of Representative, Form 1696.  The rest are under seal.  *See* Exhibit List to Senate Report at 6, (available as part of Exhibits Part 1).

Even though the Senate Report contains only one unsealed example of the Form, it is enough to put the government on notice.  *Cf. Dingle*, 388 F.3d at 214 n.3 (holding that single

---

[2] Even though neither the relators nor Conn discusses the disclosure of the fee claims, the Court, in assuring itself of its jurisdiction, may address such arguments not raised by the parties.

quote sufficed to put government on notice).  That Form contains the false state of facts:

Conn's certification that he was not "disbarred or suspended from a court or bar to which [he]

was previously admitted to practice as an attorney" and was not "disqualified from practicing

in or appearing before a Federal program or agency."  Exhibit A-2 to Senate Report.  The

Form is in the Senate Report dedicated to Conn's and Daugherty's alleged abuses, along with

citations to several other fee agreements and forms.  Presumably the government is aware of

the exhibits, as well as the text, of reports by Senate investigative committees.  And the

absence of Form 1560 from the examples is not fatal, because even if the disclosures are

"slightly different" from the allegations in the case, they are still "sufficient to put the

government on notice as to the possibility of fraud."  *Dingle*, 388 F.3d at 215.  One example

of a false statement on a form in an investigative Senate report could put the government on

notice that similar forms contained identical falsehoods.

Because the allegations have been publicly disclosed, the next inquiry is whether the

relators' allegations are "based upon" the public disclosure.  An allegation is based upon a

public disclosure where the allegation is "supported by" or has "substantial identity" with the

public disclosure.  *Poteet*, 552 F.3d at 514.  Even if the complaint is only "partly" based upon

public disclosures, that is enough.  *Id.*

Relators' claims are "based upon" the publicly disclosed allegations.  There is

substantial identity between the complaint and the Senate Report.  The Report contains both

Conn's resignation from the Veterans Court (which is publicly disclosed through other

channels as well) and an example of a false fee form.  The allegations are at least "partly"

based upon the public disclosures, as the complaint also relies on Conn's resignation from the

Veterans Court and false fee forms.

Because the allegations were based upon publicly disclosed information, they may proceed with their claims related to the Veterans Court only if they are original sources. *See* 31 U.S.C. § 3730(e)(4)(B) (2006). At issue here is whether Griffith satisfies the "direct and independent knowledge" prong of the original-source exception. *See id.* Direct knowledge is "marked by absence of intervening agency," while independent knowledge is not "dependant [sic] on public disclosure." *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 941 (6th Cir. 1997). As the Sixth Circuit has recently clarified, direct knowledge does not require first-hand knowledge of the fraud. *United States ex rel. Antoon v. Cleveland Clinic Found.*, No. 13-4348, 2015 WL 3620519, at *9–10 (6th Cir. June 11, 2015) ("First-hand knowledge is not a *necessary* component of direct knowledge."). Under *Antoon*, direct knowledge is "knowledge gained by the relator's own efforts and not acquired from the labor of other people." *Id.* at *10. While eschewing any mathematical formula, *Antoon* did offer examples of when relators satisfy that requirement. *See id.* ("[W]e have never stated whether a relator must possess a certain nature and quantity of information in order to have 'direct and independent knowledge' of her allegations."). Particularly relevant here, the court approved of a relator who has "direct (but not first-hand) knowledge of the billing practices of an institution, and uncover[s] fraud only after consulting a public document that reveals that those practices are fraudulent." *Id.*

Griffith falls squarely within that example, except that she also has first-hand knowledge of Conn's billing practices. Here, Griffith declared in an affidavit that, as part of her duties, she "typically" handled SSA Forms 1560, 1696, and 1699. R. 172-5 ¶ 4. Many of those forms were from Eric Conn. *Id.* ¶ 7 ("[Conn] signed the aforementioned forms (including Form 1696, and others as relevant to each case)."). Griffith "do[es] not recall any

of the . . . forms signed by Mr. Conn in which he disclosed the fact that he had resigned from the bar of the Court of Appeals for Veterans Claims." *Id.* ¶ 8.  Griffith, as an SSA employee who handled Conn's fee claims, had first-hand knowledge that his forms omitted the true nature of his status in the Veterans Court.  That knowledge was likewise independent—her knowledge of Conn's omissions was not dependent on any public disclosure.  The only *dependent* knowledge was Conn's true state of facts: that he resigned from the Veterans Court.  But Griffith need not have direct and independent knowledge "of all of the vital ingredients to a fraudulent transaction"—simply having direct and independent knowledge of the submission of the forms suffices.  *Antoon*, 2015 WL 3620519, at *10 (quoting *Springfield*, 14 F.3d at 656–57); *see also Springfield*, 14 F.3d at 657 (holding that the direct and independent knowledge prong is satisfied if the relator has "direct and independent knowledge of any essential element of the underlying fraud transaction (e.g., Y)").  As a result, she had sufficient direct and independent knowledge to qualify as an original source.

Finally, Griffith also revealed to the government "Conn's failure to disclose his disciplinary record" before the public disclosure in the Senate Report. R. 172-5 ¶ 10.  Sixth Circuit precedent currently requires the relators' disclosure to the United States to occur before the fraud has been publicly disclosed.  *See McKenzie*, 123 F.3d at 942 ("[A] relator must provide the government with the information [upon which the publicly disclosed allegations are based] prior to any public disclosure.").  Under that standard, Griffith is still an original source.  Her affidavit states that she provided the information regarding Conn's misrepresentations to the government in 2011, before the Senate Report was released in October 2013.  R. 172-5; *see also* R. 131 at 53 (transcript of evidentiary hearing) (explaining that she met with government officials in June 2011). The Senate Report is the only

document containing a public disclosure of the false state of facts: that Conn did not disclose his Veterans Court resignation to the SSA.  Because Griffith disclosed her information to the government before all the relevant facts of the fraud had been publicly disclosed, she may proceed as an original source.

*McKenzie*, however, may be in conflict with the Supreme Court's decision in *Rockwell International Corp. v. United States*, 549 U.S. 457 (2007).  Notably, *McKenzie*, in which the Sixth Circuit first set forth the requirement that the relator's disclosure to the government must come before the public disclosure, explicitly held that it was "adopt[ing] the approach of the District of Columbia Circuit" in *United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675 (D.C. Cir. 1997), *overruled by United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012).  *McKenzie*, 123 F.3d at 942.  As the preceding sentence indicates, the D.C. Circuit has overruled *Findley*'s holding regarding the timing of a relator's disclosure in light of the Supreme Court's decision in *Rockwell.  See Davis*, 679 F.3d at 838–39; *see also United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 24 (1st Cir. 2009) ("*Rockwell* . . . substantially undercuts the conclusion by the D.C. [in *Findley*] and Sixth Circuits.").  Under D.C. Circuit case law after *Davis*, a relator no longer has to disclose to the government before the public disclosure. *Davis*'s overruling of *Findley* would suggest a similar result in this Circuit.  This case does not present the need to delve any more deeply into the issue, as Griffith has satisfied existing Sixth Circuit case law.  Accordingly, the allegations that Conn falsely certified his Veterans Court status on Forms 1560, 1696, and 1699 are not jurisdictionally barred.

**B. Allegations of fraudulent conduct occurring after Griffith left the SSA are not jurisdictionally barred.**

The next jurisdictional argument raised by Conn is that Griffith is not an original source as to any allegations about Conn's conduct occurring after her resignation from the SSA on November 2, 2007, up to the FCA amendments on March 23, 2010.  R. 156 at 3-7. Conn focuses his argument on the "direct and independent knowledge" requirement of the public-disclosure bar, asserting that Griffith could not have had such knowledge when she was not working for SSA.  *See id.*  For the reasons set forth below, Griffith needs only direct and independent knowledge of a substantial or essential portion of the underlying fraud scheme, not of each instance of fraud.  Griffith meets that requirement, and the public-disclosure bar does not preclude jurisdiction over her claims.

The text of the original-source provision does not mandate direct and independent knowledge of every allegation in the complaint.  The statute requires "direct and independent knowledge of *the information* on which the allegations are based."   31 U.S.C. § 3730(e)(4)(B) (emphasis added).  As the Supreme Court explained, the relator needs only the requisite knowledge of the "information underlying the allegations of the relator's action." *Rockwell*, 549 U.S. at 472.  If every allegation in the complaint had to be supported by direct and independent knowledge, Congress could have more easily written "direct and independent knowledge of each allegation."  It did not do so, instead basing the original-source requirements on the information underlying the allegations.

If the relator does not need direct and independent knowledge of each allegation, how much knowledge must she possess?  The Sixth Circuit has not directly addressed the question, but noted that each case "must be analyzed to assess the degree of the relator's

12

original input into the facts disclosed to the government." *Antoon*, 2015 WL 3620519, at *11. As discussed with regards to the Veterans Court issue in Part I.A, the D.C. Circuit standard in *Springfield* requires a relator to have direct and independent knowledge of the "essential information underlying the conclusion that fraud had been committed." 14 F.3d at 657; *see also United States v. N.Y. Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (requiring relator to be original source of "core information"). *Springfield*, however, did not face a situation, like here, where a relator possesses knowledge of the scheme as a whole, but lacks the required knowledge as to a specific time period of the fraud. The Tenth Circuit's "substantiality" approach in assessing direct and independent knowledge provides a more helpful framework. *See In re Natural Gas Royalties*, 562 F.3d 1032, 1046 (10th Cir. 2009). That court eschewed any requirement that the relator have "direct and independent knowledge of every alleged fact in the complaint." *Id.* Nor did the court go with a "pick and choose" approach, which, as Conn would like, "would limit the relator to claims based on allegations for which he had direct and independent knowledge, while the rest would be dismissed." *Id.* Instead, the court held that a relator has the requisite direct and independent knowledge "only if his contribution in terms of direct and independent knowledge was substantial." *Id.* The substantiality approach served the goals of the FCA because, by focusing on the "relative value of the relator's direct and independent knowledge when compared with the rest of the complaint," it would "encourage[ ] the relator not to overreach by tacking reams of publicly disclosed information onto his complaint." *Id.*

Griffith's contribution to the complaint is substantial. Even if she does not have direct and independent knowledge of fraud occurring after she resigned, her knowledge of the fraud during her tenure at SSA is substantial relative to the overall allegations in the complaint.

She had information about how the scheme worked, including how Daugherty manipulated the SSA's computer system to take Conn's cases from other ALJs and, in other situations, took the paper files of Conn's cases. *See* R. 63 ¶¶ 64, 69. As discussed above, she has direct and independent knowledge of Conn's submission of fee forms. And, in the four examples listed in paragraph 70 of the complaint, Griffith was employed through the final disposition of each case. R. 63 ¶ 70. While she was not employed with SSA for any of the twelve examples in paragraph 71, the underlying scheme for all the examples is the same. *Id.* ¶ 71. Griffith has direct and independent knowledge of that information, which suffices for purposes of jurisdiction.

Both sides point to the Supreme Court's decision in *Rockwell* to support their respective positions. In *Rockwell*, the respondent, James Stone, alleged that his employer, Rockwell, committed several environmental violations resulting in the payment of false claims by the government. The relevant claims surrounded "pondcrete," which was a method of toxic waste disposal that mixed the waste with cement. 549 U.S. at 461. The pondcrete system failed in October 1986 (after Stone left Rockwell), but was not disclosed to the Department of Energy until 1988 by the media. *Id.*

Stone filed an FCA complaint, initially alleging that he had predicted that the pondcrete blocks would fail because of an inadequate piping system. After the government intervened, Stone and the government amended the complaint. They removed the inadequate piping allegation and replaced it with an allegation that the cement-to-toxic-waste ratio was incorrect. *Id.* at 465. But the new allegation relied on errors made by Rockwell after Stone left the company. *Id.* The case went to trial, and the jury found Rockwell guilty of submitting false claims. *Id.* at 466.

The Supreme Court reversed as to Stone, holding that he was not an original source of the pondcrete allegations. Stone lacked the requisite direct and independent knowledge because he had no knowledge of the only underlying false claim at issue: the insolidity of the pondcrete. He had only predicted, based on a faulty assumption (inadequate piping), that the pondcrete would be insolid. Instead, the pondcrete leaked because of an incorrect cement-to-toxic-waste ratio. The Court acknowledged that a "relator's misunderstanding of *why* a concealed defect occurred would normally be immaterial as long as he knew the defect actually existed." *Id.* at 475. Stone, however, did not actually know that the pondcrete failed, he simply guessed it might, and his guess did not predict the right reason for the failure. *Id.*

Stone then attempted to jurisdictionally "smuggl[e]" the insolid pondcrete claim by piggybacking off his original-source status for a separate claim involving spray irrigation. *Id.* at 476. The Supreme Court held that jurisdiction over the spray-irrigation claim could not confer jurisdiction on the separate pondcrete claim. The Court expressed its concern with allowing a relator the "free[dom] to plead a trivial theory of fraud for which he had some direct and independent knowledge," who could then "amend the complaint to include theories copied from the public domain or from materials in the Government's possession." *Id.* at 473. It noted that the United States "concede[d] that new allegations regarding a *fundamentally different fraudulent scheme* require reevaluation of the court's jurisdiction." *Id.* (emphasis added).

Griffith's allegations do not suffer from the same flaws as Stone's. Griffith has knowledge of the actual scheme—she did not simply predict or guess that Conn and Daugherty misappropriated cases or that Conn falsified his representative fee forms. She

15

actually observed the misappropriation and Conn's submission of those forms.  *Cf. Rockwell*, 549 U.S. at 475 ("But here Stone did not *know* that the pondcrete failed; he *predicted* it.").  As such, she possesses "direct and independent knowledge."  *Rockwell* concerned a relator's attempt to use jurisdiction from one scheme to confer jurisdiction on a completely different scheme.  Griffith does nothing of the sort.

Finally, the out-of-circuit cases Conn relies on are too scarce on reasoning to alter the result here.  The Fourth Circuit held, without much analysis, that a relator could not be an original source for claims concerning the period of time after he left his employment.  *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 352 (4th Cir. 2009); *see also United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.,* No. 03–12189, 2010 WL 3810858, at *2–3 (D. Mass. Sept. 27, 2010); *United States ex rel. Gravett v. Methodist Med. Center of Illinois*, No. 12-1008, 2015 WL 1004679, at *3 (C.D. Ill. Mar. 4, 2015).  *Vuyyuru* cited *Rockwell*, but did not acknowledge cases like *Natural Gas Royalties* or *Springfield*.  As discussed above, *Rockwell*'s holding was not as broad as *Vuyyuru* and Conn suggest.  Rather the Tenth Circuit's "substantiality" approach more closely adheres to *Rockwell* and the text of the original-source provision by not requiring direct and independent knowledge of each individual allegation of a fraudulent scheme.

### C.  The Senate Report does not bar relators' allegations.

In the motion to dismiss, Conn argues that "allegations pertaining to any conduct derived from the Senate report and alleged to have occurred before March 2010 should not be considered in support of Relators' efforts to survive a motion to dismiss."  R. 156-1 at 17.  In an earlier order, the Court dismissed claims that the relators conceded were based on the Senate Report and thus blocked by the public-disclosure bar.  *See* R. 145 (dismissing conduct

pertaining to Counts 5 and 6 that occurred before March 23, 2010). Conn does not specifically describe any other allegations that also fall within that bar. And further review reveals no other such claims.

### III.    Motion to Dismiss under Rule 12(b)(6) and Rule 9(b)

Because the FCA requires relators to prove fraud against the government, a relator's complaint must comply with Federal Rule of Civil Procedure 9(b). *See Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876–77 (6th Cir. 2006). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the context of the FCA, Rule 9(b) requires that a plaintiff allege "(1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011) (internal quotation marks omitted). To satisfy the pleading requirements, the relator "must identify with specificity characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme." *Id.* at 470. Further, a violation of regulations or internal policies "does not create liability . . . unless, as a result of such acts, the [defendant] knowingly asks the Government to pay amounts it does not owe." *Sanderson*, 447 F.3d at 877. Where the basis of liability is a defendant's failure to follow certain statutes or regulations, then that "noncompliance constitutes actionable fraud only when compliance is a prerequisite to obtaining payment." *Chesbrough*, 655 F.3d at 468.

The amended complaint describes in considerable detail the steps taken by Conn and Daugherty to manipulate the assignment system. The complaint is light on specifics, however, regarding whether any particular demand for payment presented to the SSA was

false or fraudulent.  The complaint identifies two possible categories of false claims: Conn's requests for representation fees and Conn's clients' applications for disability benefits.  R. 63 ¶¶ 141, 148, 158.  In conjunction with those false claims, the relators allege three counts of false records liability, a count of conspiracy and a count of retaliation.  The relators agree that they cannot state a claim for retaliation, R. 167 at 56, so the Court dismisses that claim.

With the exception of the Veterans Court claims and the conspiracy claim, the relators' allegations all suffer from a similar flaw: the failure to allege a specific claim submitted by Conn that was false or fraudulent in a manner that was material to the government's decision to pay the claim.  While the relators identify several cases in which Daugherty granted Conn's clients disability benefits, they never tie a specific case to a specific false or fraudulent claim.  As a result, the relators fail to satisfactorily allege FCA liability.

### A.  Count 1: Conn's Request for Representation Fees

To receive fees for the representation of Social Security clients, representatives file several forms.  First, the claimant and the representative sign Form 1696 (titled "Appointment of Representative"), which notifies the SSA that the claimant has selected the representative for assistance in the disability proceedings.  R. 63 ¶ 27.  If the claimant receives disability benefits, the representative collects his fees by submitting Form 1560 (titled "Petition to Obtain Approval of a Fee for Representing a Claimant Before the Social Security Administration").  *Id.* ¶ 29.  To be eligible to collect a fee, the representative must have registered with the SSA using Form 1699 (titled "Registration for Appointed Representative Services and Direct Payment").

Only two of the relators' allegations refer to falsity on Forms 1560, 1696, and 1699.

*See* R. 63 ¶ 141(b) ("Conn's attestations and certifications on SSA Forms 1699, 1696, and 1560 . . . were false when made."); ¶ 141(g) ("Conn expressly misstated his disciplinary history before a Federal program or agency, the [Veterans Court]."). The rest of the allegations in paragraph 141 instead focus on the alleged collusion between Daugherty and Conn.

*Forms 1560, 1696, and 1699*

Forms 1560, 1696, and 1699 require the social security claimant's representative to state, under penalty of perjury, whether he has been disqualified from practicing before a federal program or agency. R. 63 ¶ 31. The Social Security statute provides that the Commissioner, after notice and an opportunity for a hearing, "may refuse to recognize as a representative, and may disqualify a representative already recognized, any attorney . . . who has been disqualified from participating in or appearing before any Federal program or agency." 42 U.S.C. § 406(a)(1). Moreover, 20 C.F.R. § 404.1745 states that the SSA "may begin proceedings to suspend or disqualify" an "individual from acting in a representational capacity before" the SSA if the representative "[h]as been, by reason of misconduct, disqualified from participating in or appearing before any Federal program or agency." 20 C.F.R § 404.1745(e) (citing *id.* § 404.1770(a)); *see also* 20 C.F.R. § 404.1705. Social Security regulations also explain what conduct might disqualify an individual from acting as a representative: If a representative's disbarment, suspension, or disqualification before another court or federal agency was "taken for solely administrative reasons (e.g., failure to pay dues or to complete continuing legal education requirements)" that would not be grounds for disqualification by the SSA. 20 C.F.R. § 404.1770. "However, this exception to disqualification does not apply if the administrative action was taken in lieu of disciplinary

proceedings (e.g., acceptance of a voluntary resignation pending disciplinary action)." *Id.*

At issue here is whether Conn submitted false claims by omitting from Forms 1560 and 1696 his resignation before the Veterans Court. The relators list several claims in paragraphs 70 and 71 of the complaint, with specific dates, for which they allege Conn submitted falsely certified Forms 1696 and 1560. R. 63 ¶ 72. Conn contends that the claims were not false because his resignation was of an administrative nature, not in lieu of disciplinary proceedings, and thus the SSA would not have considered Conn to have been disqualified from practice before the Veterans Court. *See* R. 156-1 at 27–30.

In 2002, Conn resigned from the Veterans Court during a disciplinary investigation. As the Veterans Court explained, Conn resigned "from the [Veterans Court's] Bar *in lieu of further investigatory proceedings* on allegations of professional misconduct in cases before this Court." R. 156-3 at 1 (emphasis added). In deciding whether to accept Conn's resignation, the Veterans Court held that, though its rules did not provide for resignation "while investigation *as part of a disciplinary proceeding is pending*," the court "ha[d] the inherent power to accept a resignation *during the pendency of a disciplinary proceeding*." *Id.* (emphasis added). As a result of that authority, the court accepted Conn's resignation. *Id.* at 2.

Because an investigation as part of a disciplinary proceeding was pending at the time, Conn's resignation was "in lieu of" a disciplinary proceeding before the Bar of the Veterans Court. *See also id.* at 2 (Steinberg, J., concurring in part and dissenting in part) ("I agree with the majority that it is proper for the Court to accept the respondent's resignation from the Bar of this Court and that we possess the authority to allow him to resign *while under disciplinary investigation*." (emphasis added)). Phrased another way, Conn resigned instead of going

20

through the disciplinary proceeding. That action is the exact example the Social Security regulations contemplate—"acceptance of a voluntary resignation pending disciplinary action"—as grounds for disqualification. *See* 20 C.F.R. § 404.1770. Consequently, the relators have sufficiently alleged that Conn submitted false claims by failing to disclose that disqualification on Forms 1560 and 1696.

Conn contends that his resignation was not in lieu of disciplinary proceedings because "the court made no findings with respect to that investigation." R. 156-1 at 28. But Conn confuses "disciplinary proceedings" with "disciplinary findings." Nothing in the Social Security regulations requires the voluntary resignation to have occurred as a result of a finding of misconduct. Indeed, such an interpretation would be nonsensical: once an attorney is guilty of misconduct and faces possible disbarment, it is highly unlikely that he could still have the opportunity to resign voluntarily (take as a comparison a more common situation: after a defendant is found guilty of a crime, he cannot then plead guilty). Instead, the Social Security regulations capture the precise situation at issue: where a representative has resigned from a court or federal agency while a disciplinary investigation of his misdeeds is ongoing, the representative may be disqualified from practice before the SSA. *See [Name Redacted] v. SSA*, No. 12-016R (May 29, 2014), at R. 166-1.

Conn then maintains that even if he resigned "in lieu of disciplinary proceedings," the SSA still would have held a hearing to determine whether Conn should be disqualified. R. 156-1 at 29–30; *see* 20 C.F.R. § 404.1750 (setting out the procedures for a hearing on disqualification charges). Thus, Conn says, he may have been allowed to continue representation and collect fees until the final decision from SSA after his hearing. *See* HALLEX I-1-1-57 ("A representative may be entitled to payment for services before his or

21

her suspension or disqualification . . . .").  It is unclear, however, what result Conn believes follows from his argument:  is it that the Court should find out the first date on which Conn was required to disclose his resignation, calculate how long the SSA would have taken to bar him from practice, and find that the claims in that interim period were not fraudulent?  Assuming that were possible or advisable on a motion to dismiss, Conn has offered no basis to make such a calculation.  Moreover, the SSA recently determined that similar conduct—resignation from a state bar while disciplinary action was pending—disqualified a Social Security representative.  *See [Name Redacted] v. SSA*, No. 12-016R (May 29, 2014), at R. 166-1.  Accordingly, Conn's motion to dismiss claims related to his certification on Forms 1560 and 1696 regarding his status before the Veterans Court must be denied.[3]

With respect to Form 1699, Conn argues that no FCA liability may attach to his submission of that Form because it is merely a condition of participation, not a condition of payment.[4]  Unlike Forms 1560 and 1696, Form 1699 is submitted when the representative registers with the SSA.

Relators assert that FCA liability attaches to Conn's submission of Form 1699 under the theory of promissory fraud.  As the relators explain, the Sixth Circuit has not yet weighed in on the viability of the promissory fraud theory in the FCA context.  One of the leading FCA treatises recognizes such a claim, but explains that "courts have recognized significant limits on this theory of FCA liability."  John T. Boese, Civil False Claims and *Qui Tam* Actions, § 2.01A, at 2-20 (4th ed. 2015 Supp.); *see also United States ex rel. Hopper v.*

---

[3] In his reply brief, Conn raises a new argument: allowing relators' claims to proceed might produce an absurd result because the SSA Appeals Council could still conclude that Conn should *not* be disqualified.  R. 170 at 23.  Conn offers no authority that the relators must wait for an Appeals Council decision to bring their claim, but, regardless, arguments raised for the first time in replies are forfeited.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 536, 553 (6th Cir. 2008).

[4] Conn's motion to dismiss did not make this argument with respect to Forms 1560 and 1696.

*Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (warning that a promissory-fraud theory is actionable only in "rare circumstances under the FCA").

An integral requirement under promissory fraud is that the "claim must be false." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006). The only subcount in paragraph 141 that mentions Form 1699 states: "Conn's attestations and certifications on SSA Forms 1699, 1696, and 1560 . . . were false when made, in that he had no intention to comply with them." R. 63 ¶ 141(b). In one paragraph of their complaint, the relators mention, on "information and belief," that Conn falsely represented his Veterans Court status on Form 1699. R. 63 ¶ 47. But in their response to the motion to dismiss, the relators do not argue that Conn's resignation before the Veterans Court is relevant to the promissory fraud theory for Form 1699. The complaint is also devoid of any allegations that the omission of his resignation on Form 1699 created FCA liability. *Cf.* R. 63 ¶ 141(g) (alleging that Conn misstated Veterans Court history); *id.* ¶ 140 ("The claims relevant to this Count include SSA Forms 1696, 1560, and fee agreements . . . ."). And even if the relators adequately alleged that the false certifications on Form 1699 were false or fraudulent and that was the basis for liability, the relators do not allege when Conn submitted Form 1699, which precludes FCA liability. *See Chesbrough*, 655 F.3d at 467 (requiring relators to plead "time, place, and content of the alleged misrepresentation"). Instead, the relators conclusorily state that their complaint "clearly alleges that when Conn submitted these forms, he lacked any present intention of complying with agency rules," with no citation to the complaint. R. 167 at 45; *see also id.* at 46 (stating, without citation, that Conn "fraudulently induc[ed] the agreement of SSA to pay him representative fees, by misrepresenting his intent to comply with SSA's rules and regulations"). Accordingly, the relators cannot make out an FCA claim

under any theory of liability for Form 1699.

*Collusion Claims*

Relators allege five separate "subcounts" in paragraph 141 that relate to the misappropriation of Conn's cases by Daugherty. *See* R. 63 ¶ 141(a), (c), (d), (e), (f). The main thrust of those subcounts is that Conn's scheme to rig the assignment system tainted his claims for representative fees. But the relators must allege more than a fraudulent scheme, they must "plead[ ] an actual false claim with particularity." *United States ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007). Because the relators fail to allege what was false about the claims for fees, those subcounts must be dismissed.

*Fraud per se*

The relators' first subcount alleges that the defendants' "collusion constitutes fraud per se, and their unlawful conduct tainted each and every of the claims relevant to this Count." R. 63 ¶ 141(a). In their response to the motion to dismiss, relators state that their "complaint alleges a scheme, including Daugherty, Conn, and Conn's law practice to circumvent an essential and common-place safeguard: rotating the assignment of cases to prevent an attorney from 'judge-shopping.'" R. 167 at 33.

The relators do not allege how judge-shopping or alleged collusion violated any federal law or regulation that was a prerequisite to the government's decision to pay Conn his fees. The only statute in the complaint is 5 U.S.C. § 3105, which states, in part, that ALJs "shall be assigned to cases in rotation so far as practicable." Courts have interpreted § 3105 as allowing reassignment among ALJs only by the agency itself and where "the departure [from the rotation] is made to further the interests of administrative efficiency." *Roadway Express, Inc. v. Reich*, 34 F.3d 1068 (6th Cir. 1994) (unpublished); *see also Aaacon Auto*

24

*Transp., Inc. v. I.C.C.*, 792 F.2d 1156, 1163 (D.C. Cir. 1986) ("The Supreme Court has held, however, that the word 'practicable' is broad enough to encompass factors such as the complexity of the case and the experience and ability of the ALJ."). The relators do not discuss this case law, and more critically, do not explain how § 3105 was a prerequisite to the government's payment of representative fees. *See Chesbrough*, 655 F.3d at 468 ("[A] relator cannot merely allege that a defendant violated a standard—he or she must allege that compliance with the standard was required to obtain payment."); Boese, 2.03C, at 2-161 ("The fact that a defendant may violate one or more laws or regulations is relevant to FCA liability only if, had the government known of the violation, it would not have provided the funding."). Indeed, it is not clear that the Appeals Council, which can review ALJ decisions on its own motion, would have done so in cases involving violations of the rotational requirement without some evidence that the claimant should not have received benefits. *Compare* SSR 82-13, 1982 WL 31370, at *2 ("The Appeals Council will not ordinarily review a hearing decision where the end result would remain unchanged unless there is a compelling need to do so."), *with id.* at *3 ("The Appeals Council will review a hearing decision if there appears to be an abuse of discretion by the administrative law judge[,] [which] may also occur where there is a failure to follow procedures required by law.").

      *Chesbrough* provides on-point reasoning. There, the relators alleged that the defendants ran afoul of the Health Insurance Portability and Accountability Act ("HIPAA") by violating their patients' confidentiality. 655 F.3d at 469. The Sixth Circuit dismissed the clam because the relators did "not cite to a statute or regulation that conditions payment of a claim on compliance with HIPAA." *Id.* Similarly, Griffith and Carver do not identify what statute or regulation conditions payment of Conn's fees on the absence of Daugherty's

seizure of cases in violation of the rotational requirement.  The crucial piece of the puzzle—the falsity of the claim—is conspicuously absent from the claims dealing with collusion. Without such information, the relators cannot state a claim under the FCA.

In an attempt to circumvent the requirements of Rule 9, the relators rely primarily on *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943).  The relators, however, ignore the key facts of *Hess*.  There, the defendants colluded with each other for government contracts. Their collusion "remove[d] all possible competition from 'competitive bidding.'"  *Id.* at 543. And, critically, "many if not most" of the defendants had "certified that their bids were 'genuine and not sham or collusive.'"  *Id.*  The Court concluded that the government would have never paid out money for the contracts "had its agents known the bids were collusive." *Id.*  As a result, the defendants were liable under the FCA.

The glaring difference between *Hess* and the relators' allegations is that the *Hess* defendants *certified* that their bids were not collusive.  And payment was contingent on that certification.  Relators' fraud per se theory does not articulate any similar circumstances with the requisite particularity.  To be analogous to *Hess*, relators' complaint needed to allege that Conn certified he would not collude with anyone in representing his clients and explain how the claims would not have been paid had the government known of the collusion.  Instead, the relators' theory focuses solely on the collusive scheme.  Without a connection between the scheme and payment, the relators do not state an FCA claim.

As a last salvo, the relators ask for a relaxation of the Rule 9(b) pleading standard.  R. 167 at 35–41.  The Sixth Circuit has suggested that a lessening of Rule 9(b)'s strictures might apply in some cases, *see Chesbrough*, 655 F.3d at 470–71, but this case is not one of them. Relaxation is appropriate where "the relator is unable to produce an actual billing or invoice,

[but] he or she has pled facts which support a strong inference that a claim was submitted." *Id.* at 471.   As an example of a proper relaxation of Rule 9(b), the Sixth Circuit has approvingly cited *United States ex rel. Lane v. Murfreesboro Dermatology Clinic*, *PLC*, 2010 WL 1926131 (E.D. Tenn. May 12, 2010).   *See Chesbrough*, 655 F.3d at 471.   In *Lane*, the relator specifically alleged what was false about the claims: the defendants avoided certain Medicare reimbursement restrictions by falsely labeling their patients' conditions in submissions to Medicare.   2010 WL 1926131, at *5.   The relator identified the precise conditions that the defendants falsified.   *Id.*   That scheme allowed the defendants to get more money than what they would have received had they correctly identified the conditions.   *Id.* Given those allegations, the *Lane* court relaxed Rule 9(b) where the relator did not have access to the claims actually submitted because she no longer worked for her employer and revealing patient information might violate certain privacy laws.   *Id.* at *6.   Thus, *Chesbrough* and *Lane* allow relaxation where the relator has properly alleged falsity, has personal knowledge that false claims were submitted, but cannot identify a specific false claim.

     The issue with Griffith's and Carver's complaint, however, is not whether a claim has actually been submitted.   Rather, they face a much more fundamental problem:  they have not adequately alleged that any claim was false or fraudulent.   The complaint is full of allegations of case seizures but empty on allegations of how those seizures created a false claim. Relators do not cite a case where a court relaxed Rule 9(b) even though the relator could not plead falsity with particularity.   In that scenario—where the centerpiece of an FCA claim is missing from the table—relaxation of Rule 9(b) is not appropriate.

     *Withholding of Collusion from SSA*

Paragraph 141(c) alleges that Conn's "claims" were fraudulent because the defendants "withheld from the Social Security Administration the nature of their collusion despite affirmative obligations under Social Security and other Federal law." R. 63 ¶ 141(c). As with their fraud per se claim, the relators do not identify any law or regulation that required the disclosure of the collusion and was material to the payment of fees. In their response brief, the relators cite to 18 U.S.C. § 201(b)—dealing with the bribery of public officials— with no explanation of its applicability. R. 167 at 47. The complaint has no specific allegations that bribery rendered certain claims false. *Cf.* R. 63 ¶¶ 111–12 (alleging that Conn made cash payments to Daugherty, but not alleging any bribery). Accordingly, paragraph 141(c) does not state a violation of the FCA.

*Daugherty's Acquisition of Cases Violated SSA Regulations*

Paragraph 141(d) suffers from identical problems. In their briefing on this subcount, the relators ask the Court to "not accept Conn's invitation to consider the rotational requirement in isolation from the context" of the complaint. R. 167 at 48. But the complaint alleges only that the claims were "false or fraudulent because Daugherty's acquisition of the cases not assigned to him was in contravention to Social Security Administration policy, and his failure to objectively consider the merits of each was in contravention of his responsibilities as an ALJ." R. 63 ¶ 141(d). Even if the Court considered the acquisition-of-cases allegation in conjunction with the rest of the complaint, the relators still have not overcome a fatal infirmity: the absence of an allegation detailing how the acquisition of cases resulted in a false claim. A conclusory allegation that Daugherty's acquisition of cases "was in contravention of Social Security Administration policy" is not adequate. Until the relators can allege that a specific claim (such as a form for fees) violated a specific law or regulation

28

and compliance with that law or regulation was required for fee payment, the relators cannot survive a motion to dismiss on paragraph 141(d).

*Worthless Services*

Somewhat changing gears, the relators allege a "worthless services" claim in paragraph 141(e). A worthless services claim is usually seen in Medicare cases, where a doctor bills Medicare for a procedure that has no medical value. *See Chesbrough*, 655 F.3d at 468 ("A test known to be of 'no medical value[]' that is billed to the government would constitute a claim for 'worthless services,' because the test is 'so deficient that for all practical purposes it is the equivalent of no performance at all.'" (*quoting Mikes v. Strauss*, 274 F.3d 687, 702–03 (2d Cir. 2001))). Worthless services is an inapplicable theory here. Conn's clients received disability benefits. He rendered "valuable" services to those individuals, even if, according to relators, the result was procured through potentially fraudulent conduct. Because Conn's clients received benefits from his services, his services were not "worthless" and paragraph 141(e) does not state a claim.

*De Facto Representative*

The relators' next subcount alleges that the claims were false because Daugherty "acted as a de facto representative of Conn's clients, in violation of Social Security and other Federal law." R. 63 ¶ 141(f). Again, the relators do not identify what Social Security or other federal law Daugherty violated by acting as an alleged "de facto representative." Thus, the relators do not allege how any specific claim was false and subcount (f) must be dismissed.

### B. Count 2: False Records

Count 2 alleges that Conn "knowingly made, used, or caused to be made or used, false

records or statements material to false or fraudulent claims for representative fees."  R. 63 ¶ 144 (citing 31 U.S.C. § 3729(a)(1)(B)).  The allegations in this Count focus on the misappropriation of cases and Form 1699—none of the allegations involve Forms 1696 and 1560.  *See id.* ¶ 146.  But a requirement for false-record liability is a false claim.  *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 447 (6th Cir. 2008).  As discussed above in Count 1, the relators have not identified any claims that are false by virtue of the misappropriation of cases and have failed to adequately allege that Form 1699 is false.  *See Chesbrough*, 655 F.3d at 473 (explaining the "need to plead a connection between the alleged fraud and an actual claim made to the government").  Because those are the only bases for the false records theory of liability, Count 2 must be dismissed.

### C.  Counts 3 and 4: Claims for Disability Benefits and Related False Records

The relators' allegations that the submission of disability benefits created false claims are based on the same theories as the representative fees.  R. 63 ¶ 151 ("[T]h[e] misconduct [in paragraph 141] tainted not only the representative fees, but the underlying claims for disability benefits.").  As with the claims for representative fees, the relators do not identify how the government's decision to pay disability benefits was conditioned on compliance with the rotational requirement.  Their allegations go only to the flaws in the assignment system.  Thus the relators' argument never connects their allegations of Daugherty's acquisitions of cases with a particular false claim.

The only claim for *representative* fees that survives the motion to dismiss involves the certification on Forms 1560 and 1696 of Conn's status before the Veterans Court.  Relators have not alleged that Conn's resignation from the Veterans Court is relevant to disability benefits.  No paragraph in the complaint alleges that a claim for disability benefits is false

because Conn did not disclose his resignation from the Veterans Court.  As a result, relators cannot state a claim under the FCA based on disability benefits.

In their response to the motion to dismiss, the relators do not contest the disability status of Conn's clients.  Rather, they insist that the "fraudulent scheme undermined SSA's and taxpayers' confidence in each and every of Conn's claims which were part of his" conspiracy with Daugherty.  R. 167 at 53.  But falsity, not a lack of confidence, is what the FCA requires.  The relators then attempt to analogize to *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998), but that case is inapposite.  There, the defendant was liable for failing to perform quality control tests on brake shoe kits for Army vehicles.  *Id.* at 301–04.  The quality control tests were mandated by the contracts the defendant signed with the government.  *Id.* at 301.  Thus, *Compton* stands for the unremarkable proposition that a defendant who knowingly or recklessly fails to comply with the explicit requirements of a contract may be liable under the FCA.  *Id.* at 304 ("[A] manufacturer who knowingly supplies nonconforming goods to the government, based on a belief that the nonconforming goods are just as good as the goods specified in the contract, is liable.").  The relators here have not alleged anything similar to the facts or circumstances of *Compton*.  Thus, the relators have failed to adequately plead a false claim for disability benefits, and, as a result, also cannot state a claim for false records related to disability benefits (Count 4).

### D. Counts 5 and 6: Claims for Disability Benefits Based on False Medical Records and Related False Records

Counts 5 and 6 are similar to Counts 3 and 4 except they assert that Conn's submission of false medical and psychological records resulted in false or fraudulent claims

for disability benefits.  *See also* R. 145 (dismissing Counts 5 and 6 insofar as they relate to conduct occurring before March 23, 2010).  In their brief, the relators appear to confine these two counts to records "signed by Dr. Herr, submitted by Conn, and seized by Daugherty."  R. 167 at 55.  As with their allegations on previous counts, the relators fail to allege that a specific claim for disability benefits was actually false or involved the submission of false or fraudulent medical data.

The relators make several general allegations that Herr did not adequately review medical records.  In paragraph 90 of the complaint, the relators allege that Conn submitted medical letters signed by Herr in 14 of the 50 cases described in paragraph 71(a) and (b) (cases Daugherty allegedly misappropriated).  Out of those 50 cases, the relators do not identify the 14 that involved Herr.  Separately, in paragraph 103, the relators state that Herr, "in the overwhelmingly majority of cases" signed medical forms without review or revision.

The critical defect, however, is that the relators do not tie a false or fraudulent form from Herr to a certain case in which Daugherty granted disability benefits to Conn's clients.  At a minimum they must plead that, in a specific case, Daugherty granted benefits based on Conn's submission of false or fraudulent medical records.  While the relators need not show that a claimant was in fact disabled, they must link a specific case where Daugherty granted benefits to a false or fraudulent medical record submitted by Conn (or physicians working for Conn).  The allegations in the complaint do not meet that threshold.  For example, the relators do not allege whether the 14 letters in paragraph 90 were part of the "overwhelming majority" of cases where Herr did not review or revise medical forms; nor do the relators connect the 14 letters to a certain case or grant of disability benefits.  And the relators do not contend that a specific misappropriated case resulted in a grant of benefits to an individual

who was not actually disabled. While the relators list several cases in which Daugherty granted benefits, they do not allege with particularity that one of those cases involved a false or fraudulent medical record. Thus, the relators have not identified a specific claim that was false.

The closest relators come to satisfying their pleading burden is by identifying one case involving Herr that the Appeals Council overturned (after deciding to reevaluate some of Conn's cases) due to insufficient medical evidence. R. 63 ¶ 95. According to the relators, the Appeals Council determined that "Herr's report was insufficient." *Id.* ¶ 95(b). But the complaint does not allege that Conn submitted false or fraudulent information for that case. Even though Herr supplied the medical evidence, the complaint does not state that Herr's report was the same as one of the 14 letters in paragraph 90 or that Herr submitted a fraudulent report in that case. As a result, the allegation does not meet the Rule 9 pleading standards.

Even though the relators rely only on Herr in their brief, the rest of the related allegations in the complaint are similarly infirm. The relators allege that in "many, if not most of the Conn Claims" letters by psychologists and physicians "were false or fraudulent." R. 63 ¶ 89. Nowhere do the relators state that a specific case that Daugherty granted was based on such a false or fraudulent letter. Elsewhere, the relators allege that Conn and his employees filled out medical forms or forged physicians' signatures. *Id.* ¶¶ 99–107. Again, the relators make no connection between a fraudulently filled out medical form and a specific claim for disability benefits. Finally, relators identify another Daugherty case reversed by the Appeals Council due to insufficient evidence in which defendant Ammisetty authored the relevant medical report. But there is no allegation that the report was false. Because the

relators do not plead the "time, place, and content of the alleged misrepresentation," Counts 5 and 6 must be dismissed. *Chesbrough*, 655 F.3d at 467.

As with Count 1, the relators also ask for the relaxation of the Rule 9(b) standard. R. 167 at 42. Relaxation is inappropriate here because the relators lack personal knowledge of the circumstances surrounding the preparation of the medical reports. *See Marlar*, 525 F.3d at 446 (dismissing relator's complaint where relator did not have personal knowledge). A court may relax the Rule 9(b) standard where the relator observed the falsification of claims. For example, a relator who had "firsthand information about [the defendant's] internal billing practices and the manner in which the fraudulent billing schemes were implemented," might receive the benefit of a more lenient pleading standard. *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003) (cited in *Bledsoe*, 501 F.3d at 504 n.12, and *Chesbrough*, 655 F.3d at 471). Here, the relators merely received the cases at SSA and observed alleged collusion. Their positions at SSA did not enable them to determine whether the defendants actually performed medical examinations of Conn's clients or submitted fraudulent medical records. Without personal knowledge of the underlying falsity, relaxation is not warranted.

### E. Count 7: FCA Conspiracy

Conn's only argument on the conspiracy count is that the absence of a false claim requires the dismissal of this count. But a conspiracy claim does not require the presentment of a false claim. *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009). And even if it did, the relators have adequately alleged that Conn's submission of Forms 1560 and 1696 without disclosing his Veterans Court resignation violated the FCA. As a result, a false claim exists. Because Conn does not make any other arguments regarding

dismissal of the conspiracy claim, the Court finds no basis to dismiss Count 7.

## III. Government Knowledge Does Not Bar Relators' Claims

Conn also argues that the Court should dismiss the case under a theory of "government knowledge." R. 156-1 at 52. Under that defense, the "Government's knowledge [i]s used to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement with the Government." *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 454 n.21 (6th Cir. 2005). In *Homecare*, the Sixth Circuit quickly dismissed a similar argument where there was "no evidence that [a fiscal intermediary] had altered the understanding of what kind of expenses could be reimbursed under the Medicare regulations." *Id.* The same logic applies here. Even if certain officials knew about the alleged fraud or the false certifications regarding Conn's Veteran Court status (the only remaining claim), that knowledge did not modify the relevant federal law and regulations. Conn's obligation to truthfully represent that he had been disqualified did not disappear because members of the Huntington Office of Disability Adjudication and Review allegedly looked the other way. *See, e.g.*, R. 156-1 at 52–53. Certain government officials' ignorance or acquiescence does not categorically absolve a defendant of FCA liability. Only when the government, through its knowledge, affects the terms of dealing such that the defendant no longer has the *intent* necessary for FCA liability is the knowledge defense viable. Indeed, as *Homecare* explained: "the Government's knowledge is relevant if the defendant 'did merely what the [Government] bid it [to] do, that the [defendant] had no knowledge that the contract was based on . . . false information.'" *Homecare*, 400 F.3d at 454 n.21 (quoting *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)). By failing to disclose his

disqualification from the Veterans Court, Conn did not do what the government asked him to do.  The government knowledge theory is not an adequate basis for dismissal.

## IV. Statute of Limitations Bars Claims Before October 11, 2005

The relators allege that the actions by Conn and others began no later than 2002—nine years before the relators filed their complaint.  R. 63 ¶ 43.  Conn contends that claims brought more than six years before the relators filed their complaint (so, claims before October 11, 2005) are barred under the FCA's statute of limitations.

Relators first urge that adjudication of this issue is premature.  R. 167 at 60; *see Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("[A] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.").  Where the "allegations in the complaint affirmatively show that the claim is time-barred," however, courts may dismiss a claim.  *Cataldo*, 676 F.3d at 547.  Here, the complaint, on its face, alleges violations beginning in 2002.  No further factual inquiry is necessary.  Instead, the disagreement is solely on a matter of law: the length of the applicable limitations period.

The statute of limitations provision is as follows:

A civil action under section 3730 may not be brought—
(1) more than 6 years after the date on which the violation of section 3729 is committed, or
(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
whichever occurs last.

31 U.S.C. § 3731(b).  The dispute centers on paragraph (2). *See United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 510 (6th Cir. 2008) (declining to resolve "whether the § 3731(b)(2) tolling provision applies to private party relators").  The relators contend that

they may take advantage of the limitation period in that paragraph, which extends the period up to ten years, so long as the relators filed their action no more than three years after the relevant government official knew or should have known the material facts.  R. 167 at 61. Several courts—but no courts of appeals—have adopted this interpretation.[5]  *See, e.g.*, *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 474 F. Supp. 2d 75, 82–84 (D.D.C. 2007).  Conn disagrees, arguing that paragraph (2) is inapplicable to the relators, as by its terms it applies only to the United States.   The majority of courts have adopted this interpretation.  *See United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 296 (4th Cir. 2008); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 724–25 (10th Cir. 2006); *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 35 (D.D.C. 2014).

The Court follows the majority rule that § 3731(b)(2) does not apply to relators.  The language of § 3731(b)(2) applies solely to the United States, as the time period for the limitations period is based on the knowledge of a United States official.  Only in the rare case would a relator be privy to information of when "the official of the United States charged with responsibility to act in the circumstances" knew or reasonably should have known the "facts material to the right of action."  31 U.S.C. § 3731(b)(2).  To have a relator's statute of limitations turn on the knowledge of a government official—knowledge that the relator would often never be able to discover—would be an odd, if not absurd, result.  *See Sanders*, 546 F.3d at 294 ("The government's knowledge of 'facts material to the right of action' does

---

[5] Two courts of appeals have adopted a third approach: § 3731(b)(2) applies to relators but is based on when the relator knew or reasonably should have known of the material facts.  *See United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1214–18 (9th Cir. 1996); *United States ex rel. Malloy v. Telephonics Corp.*, 68 F. App'x 270, 272–73 (3d Cir. 2003).  Relators here do not argue for that interpretation, and the Court would not adopt it as it departs the furthest from the statutory text.

not notify the relator of anything, so that knowledge cannot reasonably begin the limitations period for a relator's claims.").

Indeed, in two other instances where Congress has used a formulation similar to "an action may not be brought more than [X] years after the date when facts material to the right of action are known or reasonably should have been known" to a certain individual, that individual was the same as, or a part of, the individual or entity bringing suit.  For example, in 15 U.S.C. § 78u-6 ("Securities whistleblower incentives and protection"), the statute of limitations expired 3 years "after the date when facts material to the right of action are known or reasonably should have been known *by the employee alleging a violation* of subparagraph (A)."  15 U.S.C. § 78u-6(h)(1)(B)(iii)(I)(bb) (emphasis added).  And in 28 U.S.C. § 2416(c), which applies only to the United States, the limitations period excludes the time during which "facts material to the right of action are not known and reasonably could not be known *by an official of the United States* charged with the responsibility to act in the circumstances."  *Id.* (emphasis added).  Both § 78u-6 and § 2416 comport with the general understanding of statutes of limitation:  that the knowledge of the individual or entity bringing suit is the relevant consideration for starting the clock.  *See also* 29 U.S.C. § 1113 (ERISA statute of limitations) ("No action may be commenced . . . after the earlier of —(1) [six years], or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation.").  While a *qui tam* relator is in some sense an agent of the government, she is not the government.  *Cf. United States ex rel. Eisenstein v. City of New York*, 129 S. Ct. 2230, 2233 (2009) (holding that, if the United States has not intervened in an FCA case, relators may not take advantage of the appellate filing deadline that applies when "the United States or its officer or agency is a party").  And a relator cannot be said to know when the United

States should have known information about a case.  Applying relators' view (and a view adopted by some courts) would result in tying the length of a relator's statute of limitations to knowledge that she, in most cases, cannot have.

The only circumstance in which a relator might know when the government learned of the material facts to an FCA action is when the relator is the first one to alert the responsible government official.  But a statute of limitations that allows the allegedly bound party to extend that period at its whim creates another bizarre result.  In every case in which the government's knowledge comes from the relator, the relator would have an extra three years, up to ten years after the violation, to file suit.  Thus, the relator could always wait until year seven to alert the government (assuming the government's knowledge comes only from the relator) and then file suit in year ten.[6]  As the Fourth Circuit explained, such a resolution would render the six-year limitations period "superfluous in nearly all FCA cases"—violating the "duty to give effect, if possible, to every clause and word of a statute."  *Sanders*, 546 F.3d at 295 (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

The relators' main argument for their understanding of the FCA's statute of limitations revolves around the government's ability to intervene in a *qui tam* suit, even after initially declining to do so, if it shows good cause.  *See* 31 U.S.C. § 3730(c)(3).  While the relators do not finish their argument, presumably the thought is that it would be odd, under the majority approach, for the statute of limitations to change halfway through the litigation due to the government's intervention (because, once the government intervenes, it may be able to take advantage of § 3731(b)(2)).  Even assuming the government's late intervention

---

[6] Allowing relators to toll their own statute of limitations through their delay in notifying the relevant government official would also be in tension with the goals of the FCA to incentivize relators to quickly file suit.  *See, e.g.*, 31 U.S.C. § 3730(b)(5) (first-to-file bar).

could extend the statute of limitations under § 3731(b)(2), the relators do not articulate what concerns flow from such a result.  And allowing the government's late intervention to enlarge the limitation period seems reasonable in contrast to the alternative, where the relator's limitation period is based on the unknown government official's knowledge.  Accordingly, the relator's argument does not offer a sufficient basis on which to adopt their reading of § 3731(b).

The FCA's statute-of-limitation provision is admittedly a linguistic puzzle, with each potential resolution seemingly missing a relevant piece.  But excluding relators from § 3731(b)(2) is supported by the text of the provision, a natural understanding of statute of limitations, and the wording of similar statutes.  As a result, claims accruing before October 11, 2005, are barred.

*Statute of Limitations and the Conspiracy Claim*

Conn next contends that the conspiracy claim must be dismissed under the statute of limitations because the complaint alleges that the conspiracy formed in 2002.  *See* R. 63 ¶ 43.  According to Conn, the limitations period for an FCA conspiracy begins from the formation of the conspiracy.  R. 156-1 at 56 (citing *Blusal Meats v. United States*, 638 F. Supp. 824, 829–30 (S.D.N.Y. 1986)).  *Blusal Meats*, the only case Conn cites directly supporting his argument, relied on Second Circuit precedent in holding that "the last overt act rule is not applicable to actions for civil conspiracy."  *Blusal*, 638 F. Supp. at 829.  Other courts have held that the last overt act rule—allowing the statute of limitations to run from each overt act—applies to FCA conspiracies.  *See United States ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 195 (D.D.C. 2002) (applying the "the prevailing law in this circuit that the statute of limitations in a civil damages action for conspiracy runs

40

separately from each overt act that is alleged to cause damage" (internal quotation marks omitted)); *see also United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 255 F. Supp. 2d 351, 415 (E.D. Pa. 2002) (reaching same conclusion by applying Third Circuit law for civil conspiracy).  Thus, the question here is whether the Sixth Circuit follows the last overt act rule for civil conspiracies.  If the last overt act rule is applicable, then the complaint cannot be dismissed because there is no information in the complaint regarding the timing of the overt acts, and the relators did not need to affirmatively plead around the statute of limitations in the complaint.  *See Cataldo*, 676 F.3d at 547.

For civil conspiracies in the antitrust context, the Sixth Circuit adopted the last overt act rule.  *See Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233 (6th Cir. 1974); *Garelick v. Goerlich's Inc.*, 323 F.2d 854, 855 (6th Cir. 1963) ("All the authorities are in accord that a right of action for a civil conspiracy under the antitrust laws accrues from the commission of the last overt act causing injury or damage.").  Moreover, the last overt act rule applies in criminal cases in the Sixth Circuit, *see United States v. Schaffer*, 586 F.3d 414, 423 (6th Cir. 2009), and the Sixth Circuit has applied the standards from criminal conspiracies to civil conspiracies.  *See, e.g.*, *Watson Carpet & Flooring Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) ("The cases supporting this rule are criminal ones about the affirmative defense of withdrawal from a conspiracy, but their logic is equally sensible in the civil context.").  Conn has not cited a case in the Sixth Circuit applying the *Blusal Meats* understanding of statute of limitations for a civil conspiracy. Because the only case law favors starting the limitations period from the date of the last overt act, the conspiracy claim cannot be dismissed at this stage.

## VI. Dismissal Without Prejudice

Whether the inadequately pled claims should be dismissed with or without prejudice depends on "(1) whether Relator had sufficient notice that his amended complaint was deficient, and (2) if so, whether Relator had an adequate opportunity to cure the deficiencies." *United States ex. rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003). Here, the two factors recited in *Bledsoe* weigh in favor of dismissal without prejudice. This case involves numerous complex issues and theories, and this opinion is the first time the Court has detailed the deficiencies in the relators' pleadings. As a result, the relators have not had an opportunity to address the problems identified in this opinion. *See id.* at 644–45. If the relators file a new pleading that fails to cure these deficits, the Court will dismiss with prejudice. The defendants should not be required to play a part in Groundhog Day litigation, so the relators should make sure they comply with the relevant pleading rules before seeking leave to amend.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1)     Conn's and Daugherty's motions to dismiss, R. 156, R. 160, are **GRANTED IN PART** and **DENIED IN PART.** The motions are **DENIED** as to allegations in Count 1 relating to Conn's statements on Forms 1560 and 1696 regarding his resignation from the Veterans Court. The motion is also **DENIED** as to the conspiracy claim in Count 7. The remaining portion of Count 1, and all of Counts 2, 3, 4, 5, 6, and 8 of the complaint are **DISMISSED WITHOUT PREJUDICE**.

(2)     The motions to dismiss from defendants Herr, Ammisetty, and Adkins, R. 146,

R. 158, R. 162 are **GRANTED**.  The counts related to those defendants are

**DISMISSED WITHOUT PREJUDICE**.

(3)     Any claims accruing before October 11, 2005, are **BARRED**.

This the 27th day of July, 2015.

**Signed By:**

*Amul R. Thapar*

**United States District Judge**