UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JENNIFER L. GRIFFITH and SARAH CARVER, <br><br> Plaintiffs, <br><br> v. <br><br> ERIC C. CONN, et al., <br><br> Defendants. | Civil No. 11-157-ART <br><br> **MEMORANDUM OPINION AND ORDER** |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Patience is a virtue but it has its limits. Nearly a half-decade ago, Jennifer Griffith and Sarah Carver filed this suit. The government took its time to decide whether to get involved, but ultimately chose to watch from the bench. Last year, things changed. The government brought a criminal case against the defendants and then moved to intervene in this one. It appears, however, that the government has only stepped onto the court to grab the ball, hold it, and delay the game. The government now moves to stay this case. So does Conn. Thus, the Court must determine, first, whether the Court can stay the case, and second, whether it should.

I.

This story has been told many times. Griffith and Carver allege that Eric Conn, a social security attorney and local celebrity, and David Daugherty, an administrative law judge, conspired to defraud the government. R. 2. The scheme was simple: Conn would bring social security cases on behalf of people seeking disability benefits, Daugherty would

assign those cases to himself, and Daugherty would grant the benefits irrespective of the merits. *Id.* ¶¶ 30–35. Conn would then submit claims to the Social Security Administration (SSA) to collect attorney's fees for bringing those cases. *Id.* at 2. Those submissions, according to the plaintiffs, violated the False Claims Act ("FCA"). *Id.* at 21–22.

For good reason, those who submit false claims to the government are liable to it. *See* 31 U.S.C. § 3729(a)(1). But the government does not always choose to prosecute such fraud. When the government abstains, individual citizens can take its place in a so-called "qui tam action." *Id.* § 3730(b). If successful, a qui tam plaintiff (called "the relator") can collect up to $10,000 (per claim) for the government, and take home up to thirty percent of the judgment for herself. *Id.* §§ 3730(a), (d).

But qui tam litigation is not simple. Instead of serving her complaint on the defendant—like normal—the relator serves the government. *Id.* § 3730(b)(2). The government then gets sixty days to investigate the case and decide whether to intervene. *Id.* While the government decides (and the relator waits), the case remains under seal. *Id.* The government, of course, rarely makes a decision within sixty days. So the FCA allows for extensions, *id.* § 3730(b)(3), which the Court granted to the government four times in this case. *See* R. 6; R. 8; R. 10; R. 13. If the government ultimately decides not to intervene, the relator may serve the complaint on the defendant. 31 U.S.C. § 3730(c)(3). The case then proceeds as usual. But, the government is never quite out of the picture. Rather, it sticks around, like the 800-pound gorilla in the room—ready to intervene at any time—as long as it has good cause. *See* § 3730(b)(3).

When the government intervenes, it takes control of the litigation. *Id.* § 3730(c)(2). Although the relator stays involved, under certain circumstances the government can try to

limit her participation.  One such circumstance is relevant here:  The government may move to stay "certain actions of [a relator's] discovery" for sixty days—if those acts would interfere with a different government investigation "arising out of the same facts."  *Id.* § 3730(c)(4).

The government has already put to good use the FCA's tools for slowing down this case.  After taking 429 days to investigate the relators' complaint, the government chose not to intervene.  *See* R. 2 (complaint filed October 11, 2011); R. 14 (notice of government's decision not to intervene).  So the relators moved forward.  Two months later, however, the government tried to put the case on hold by requesting a stay.  R. 17.  But the Court denied that request because the FCA did not allow it.  R. 18.  The government rode the bench for the next three years.  This year, however, the government changed its mind and moved to intervene in the case, a motion the Court granted.  R. 223; R. 252.  But now that the government has finally left the bench and grabbed the ball, it wishes to call a timeout yet again.

Why the delay?  As is common for false claims suits, the government is simultaneously prosecuting Conn and Daugherty in a criminal case.  And that case is just getting started.  In April 2016, federal agents arrested Conn and Daugherty, and a grand jury indicted them.  *See United States v. Conn*, No. 5:16-cv-00022-DCR-REW, D.E. 18, 27 (E.D. Ky.).  The government—and Conn—believe that litigating both cases at the same time would

be harmful. Thus, they each move to stay this case until the criminal case ends.[1] R. 265; R. 266. But the relators—still awaiting trial after five years—oppose the stay. R. 268.

II.

Courts have the power to control their own dockets. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962). Within that general power, courts have an inherent, specific power to stay the proceedings before them. *Landis*, 299 U.S. at 254. But because that power comes from the courts themselves—rather than from any rule or statute—the power is potentially limitless. Thus, courts must exercise that power with "caution." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). Further, courts remain bound by their duty to "administer" litigation in a "just, speedy, and inexpensive manner." *See* Fed. R. Civ. P. 1.

Along with Rule 1's implicit limit, Congress can expressly limit courts' inherent power. *See Diez v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (stating that a court cannot use its inherent power contrary to Congress's express limitation of that power); *see also United States v. Williams*, 790 F.3d 1059, 1070 (10th Cir. 2015) (explaining that, because Congress created the lower courts, it can "statutorily limit their inherent powers"). And when Congress does so, courts must respect that limitation. *See Diez*, 136 S. Ct. at 1892.

The relators argue that Congress has expressly limited the Court's inherent power here. R. 255 at 2–3. In their view, the FCA's stay provision strips the Court of its inherent power to stay a case. *Id.* That provision allows the Court to stay relator discovery for sixty days, if the government can show that such discovery will interfere with another related

---

[1] Conn also moves for a protective order postponing responses to the relators' discovery requests until the Court has ruled on the motions to stay. R. 262. Magistrate Judge Atkins denied that motion. R. 269. And Conn has objected. R. 273. Because the Court will deny Conn's motion to stay, his objections are now moot.

4

investigation. 31 U.S.C. § 3730(c)(4). Thus, the Court must first determine whether, and to what extent, the provision limits the inherent stay power.

Both the government and Conn concede that their request to stay the entire case does not fall under Section 3730(c)(4). Not discouraged, they each argue that the Court may still grant the stay. In Conn's view, the stay provision does not mention—and therefore does not restrict—a defendant's right to request a stay. R. 266-1. In the government's view, the provision only addresses stays of "certain acts of discovery," so it does not speak to—and therefore does not preclude—a stay of the entire case. R. 265. Thus, both parties believe the Court retains its inherent power to grant the requested stay.

A.

Congress can expressly limit the inherent stay power. The Court must therefore determine whether Congress has done so here. When enacting statutes, Congress is presumed to be aware of existing law. *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct 736, 742 (2014). So, Courts require Congress to clearly express any intent to change an established common law or equitable principle, such as the inherent stay power. *See Link*, 370 U.S. at 630; *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 318 (2012) ("[S]tatutes will not be interpreted as changing the common law unless they effect the change with clarity."). Thus, absent a clear expression, the Court will not assume that Congress has abrogated the inherent stay power. *Link*, 370 U.S. at 631.

The FCA makes no such clear expression. True, the FCA says that the Court "may" grant a stay of "certain acts of discovery" by the relator, if those acts will interfere with a related matter. 31 U.S.C. § 3730(c)(4). It does not say, however, that the Court may grant a

5

stay only in that one circumstance. The language is permissive, not mandatory. As discussed above, Congress presumably knew of the Court's inherent stay power when it wrote the FCA. And the Court cannot read into the text of the statute a limit that Congress has not put there.

Further, the scope of the FCA shows that Congress did not intend to wholly displace the inherent stay power. When a statute addresses one specific exercise of an inherent power, courts do not assume that Congress intended to eliminate the entirety of that power. *See Chambers*, 501 U.S. at 49. Rather, they assume Congress was speaking to just one part of the whole. For example, when Usain Bolt's coach tells him to "run a fast first ten meters," that does not mean that Bolt can—or should—stop before running the rest of the race. That means that Usain should run the first ten meters quickly, and apply the other skills he has learned to finish the race. Like Bolt, courts can use their inherent power to confront situations that a statutory provision does not address. *See, e.g.*, *id.* (upholding inherent power to sanction attorney conduct when statute was both broader and narrower than that power); *Link*, 370 U.S. at 630–32 (upholding inherent power to dismiss a case sua sponte because Rule 41(b) only spoke to specific exercise of the power).

Here, the FCA's stay provision does not completely eliminate the inherent stay power because it addresses only one specific type of stay. The provision is much narrower than the inherent stay power because it imposes several requirements that the inherent power does not. *See* 31 U.S.C. § 3730(c)(4). The provision restricts the who (government), what (relator discovery), when (sixty days), where (in camera), and why (interference) of the stay request. *Id.* The provision says nothing about the Court's power to stay a case for a different movant, a different reason, or a different length. The stay provision even reaches beyond the inherent

power: It allows the Court to entertain a non-party's motion to stay the qui tam action. *Id.* (permitting the government to request a stay "[w]hether or not [it] proceeds with the action"). So, when the FCA's stay provision does not apply, the Court may turn to its inherent power. *See, e.g.*, *United States ex rel. Lacorte v. Puckett Lab., Inc.*, No. 96-civ-1044, 2000 WL 98119 (E.D. La. Jan. 26, 2000) (using the court's inherent power to stay FCA proceedings when the Supreme Court granted cert on a related issue).

The relators agree that the provision's scope is unequal to the inherent stay power, but, in their view, that is because Congress meant for Section 3730(c)(4) to describe the only situation in which the Court can stay an FCA case. R. 268. According to them, the stay provision bars any requests exceeding its narrow confines. The relators offer three reasons in support of this argument.

First, the relators argue that, by expressly including a specific stay provision, Congress intentionally excluded any other type of stay. *Id.* at 18. Their argument relies on a canon of statutory construction—*expressio unius est exclusio alterius*—which reasons that if Congress makes a list and does not include something, then Congress meant to exclude that thing. *Id.*; *see Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 81 (2002). To work, the canon requires two things: First, there must be a series, or list, of two or more items that "go hand in hand." *Id.* Second, the relevant series must support a "sensible inference" that Congress actually meant to exclude any unlisted terms. *Id.*

The relators boldly contend that the "relevant series" includes not just the stay provision, but all of the provisions in 31 U.S.C. § 3730(c). R. 268 at 18. The argument goes like this: The FCA provides a comprehensive list of every party's rights in a qui tam action. *Id.* And that list does not mention the right to request a stay outside of the stay that Section

7

3730(c)(4) authorizes. *Id.* Thus, in the relator's view, the government can seek a stay under that provision only, and Conn, as a defendant, cannot seek a stay at all. *Id.* at 18–19.

But the relators' characterization of the statute as a "series" is unworkable. Section 3730(c) is not as "comprehensive" as the relators assert. *See id.* at 18. The statute addresses the role of the relator in qui tam actions, and it provides some ways for the government to curtail intrusive activity. The statute does not, however, provide an exhaustive list of the Court's powers to grant a stay or otherwise control its docket.

Further, the different parts of Section 3730(c)(4) do not lead to the inference that anything excluded is prohibited. Following the relators' argument, whenever a statute authorizes a court to exercise its powers in a specific way in a specific situation, the court may no longer exercise that power in a different way or in a different situation—even if the exercise would be justified by another source of law.

That cannot be the case. Say, for example, that a person is driving her car along a highway. She passes numerous signs, including the speed limit, a construction warning, and a deer crossing. She then passes a sign that says "trucks allowed." It would not be reasonable for the driver to believe that cars are no longer permitted on the highway. Although the Department of Transportation has posted some regulations governing her commute, that list does not support "a sensible inference" that any actions or rules left out "must have been meant to be excluded." *See Chevron*, 536 U.S. at 81. So, just as the car driver need not pull off the highway, the Court need not toss aside the full scope of its inherent stay power when Congress has spoken only to one part of it. In the absence of a seemingly comprehensive series, the *expressio unius* canon does not work. Thus, the relators' first argument fails.

Second, the relators argue that, when it comes to the FCA, the Court does not retain its inherent stay power because accessing that power would make Section 3730(c)(4) "superfluous." R. 268 at 12. This argument, too, relies on a statutory canon: Generally, a court should construe a statute "so that effect is given to all its provisions." *Corley v. United States*, 556 U.S. 303, 314 (2009). Thus, a court's interpretation of a statute should not render any provision within "inoperative[,] superfluous, void[,] or insignificant." *Id.*

But the Court's inherent stay power does not make Section 3730(c)(4) superfluous; the inherent power and the provision serve different purposes. As discussed above, the provision creates a path that is unavailable under the inherent power—the Court may grant a stay on the motion of the non-intervening, non-party government. Even exercising its inherent power to the fullest, the Court could not otherwise do what the provision allows it to do. The statute is therefore not redundant as to an existing inherent power. Although the relators argue that Congress would not have passed this provision if it had known of the inherent power, R. 268 at 13, the more likely scenario is that Congress did know about the power—that is why it expressly included something that the power does not already cover. So the relators' second argument fails.

Finally, the relators contend that the Court's inherent stay power cannot survive the FCA because the statute's legislative history suggests that Section 3730(c)(4) wholly abrogates the inherent power. R. 268 at 15. Given "the limited utility and reliability of legislative history," the Court is hesitant to rely on it.[2] *See City of Cookeville v. Upper*

---

[2] Despite the frequent reliance on legislative history, many judges and scholars debate its utility and appropriateness—given that it is not subject to the same democratic controls (bicameralism and presentment) as the enacted text. *See generally* Caleb Nelson, *Judicial Review of Legislative Purpose*, 83 N.Y.U. L. REV. 1784 (2008); John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 COLUM. L. REV. 673 (1997). Moreover, when the statutory language is clear, "the authoritative statement is the statutory text, not the legislative history or any other

*Cumberland Elec. Membership Corp.*, 484 F.3d 380, 390 n.6 (6th Cir. 2007). Even setting that hesitance aside, consulting the FCA's legislative history does not change the result here. In 1986, Congress amended the qui tam provisions of the FCA to "encourage more private enforcement suits." S. Rep. 93-345, at 23–24, *reprinted in* 1986 U.S.C.C.A.N. 5266. To do this, Congress added some provisions—like Section 3730(c)(4)—to ensure that "the private individual is able to advance the case to litigation." *Id.* at 24. According to the relators, the Court's exercise of its inherent power to stay would thwart Congress's goal "to give relators a greater role in these actions." R. 268 at 15.

In support, the relators rely on a Northern District of California case that analyzes the FCA's legislative history. *See United States ex rel. McCoy v. Cal. Med. Rev., Inc.*, 715 F. Supp. 967 (N.D. Cal. 1989). In *McCoy*, the government moved—under Section 3730(c)(4)—to halt an entire civil proceeding while it concluded a criminal investigation. *Id.* at 968. The court denied the government's motion because that provision only provides for stays of "certain acts of relator discovery," not the entire proceeding. *Id.* at 970. The court also reasoned that halting the entire proceeding would run contrary to the legislative history stating that the FCA grants relators "substantial power to force the prosecution of cases." *Id.*

But *McCoy*'s dicta about congressional intent is unpersuasive here. The government's request in *McCoy* fell squarely within the FCA. There, the government asked the court to exercise the stay power granted in Section 3730(c)(4). Here, the government asks the Court to use its separate inherent stay power. R. 265. Thus, *McCoy* does not speak to the question at issue here: What, if any, inherent power do courts retain beyond the power

---

extrinsic material." *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005); *see also Solis v. Freedom Energy Mining Co.*, 756 F. Supp. 2d 835, 836 (E.D. Ky. 2010) (explaining that a court need not resort to legislative history when the statutory language is plain).

granted to them by Section 3730(c)(4)? Because *McCoy* does not answer that question, its analysis of legislative history does not, either. In any event, *McCoy* does not point to any legislative history showing that Congress meant the substantial power it gave to the relators to overcome the inherent power of the courts. And, because the only party to request a stay in *McCoy* was the government, *McCoy* also does not speak to whether the stay provision prohibits defendants from seeking a stay, as Conn does here. Thus, the relators' third argument fails.

In sum, Section 3730(c)(4) does not provide a "clear expression" of Congress's intent to abrogate the Court's inherent power to stay proceedings like these. Although Congress has clearly granted a specific power in a specific situation, it has said nothing about the Court's power outside of that situation. The Court cannot assume that Congress meant to say anything more than what it did say. Section 3730(c)(4) notwithstanding, the Court retains its inherent power to stay qui tam actions.

B.

Having a power is one thing; exercising it is another. The Court may not exercise its inherent stay power "in a way that conflicts with [a] federal statute[]." *See United States v. Young*, 424 F.3d 499, 507 (6th Cir. 2005). The FCA clearly dictates how the Court may exercise its stay power when, specifically, the government is concerned that relator discovery will interfere with a criminal proceeding. *See* 31 U.S.C. § 3730(c)(4). To warrant a stay, the government must point out the "certain act[s] of [relator] discovery" that would cause the interference. *Id.* And if granted, the stay can last only sixty days. *Id.* When Congress lays such a clear path, it would seem that path is the way to go.

But the government would rather go another way. The government argues that the Court can and should invoke its inherent stay power because the government's request exceeds the scope of—and is therefore not limited by—Section 3730(c)(4). R. 265 at 8. But if the government requests the very type of stay that Section 3730(c)(4) specifically provides—a stay of certain acts of relator discovery that will interfere with a criminal prosecution—then the limits of the statute apply. So the Court must consider whether the government's request falls within the scope of Section 3730(c)(4). Only if the government's request attempts to address something other than halting relator discovery, can the Court turn to its inherent stay power. Otherwise, the government is limited to requesting a sixty-day stay of certain relator discovery. The government offers two arguments in support of its request.

First, the government asserts that the relators' discovery will interfere with the parallel criminal prosecution. The government and Conn have already "produced thousands of documents" for the relators. R. 242 at 3. The government worries that any further discovery will enable the defendants to "obtain evidence pertinent to their criminal proceedings." *Id.*

That concern is precisely what Section 3730(c)(4) addresses—that "certain actions" of relator discovery will "interfere with the government's . . . prosecution" of its criminal matter. *See* 31 U.S.C. § 3730(c)(4). Thus, there is a yellow-brick road for the government to follow: It can make an in camera showing of the "certain act[s] of discovery" that will cause the interference, and if it does, it may receive a sixty-day stay. *See id.* The government chose not to follow that road. Unlike Dorothy, the government cannot merely click its heels

three times and expect a stay of the entire case on these grounds. Thus, the government's first argument fails.

Second, the government makes the same argument, but in reverse—that the criminal proceedings might interfere with this civil case. As grounds, the government states that Conn, Daugherty, and Adkins—the criminal defendants—may "invoke their Fifth Amendment rights in this case if it is not stayed." R. 242 at 7. In other words, key witnesses may refuse to testify in this case, hindering the government's ability to litigate it. R. 265 at 21–22.

The government is correct that Section 3730(c)(4) does not address this concern. The provision prevents interference with other cases; the government wants to prevent interference with this one. Because the provision does not apply to this request, neither do its limits. The Court must therefore consider whether this concern warrants exercising the Court's inherent stay power.

### III.

The government and Conn both argue that the ongoing parallel proceedings impermissibly burden the defendants' Fifth Amendment rights. R. 244-1; R. 265. Indeed, Conn and Daugherty have an important choice to make: If the defendants take the Fifth, they will be unavailable to testify in the civil proceeding. If they testify, they risk self-incrimination. Conn argues that this choice is constitutionally impermissible. R. 244. The government argues that the potential unavailability of key witnesses hinders its ability to litigate this case. R. 265. Thus, the government and Conn ask the Court to relieve these burdens by staying this case until the criminal case ends.

When defendants are litigating a civil and criminal case simultaneously, courts will sometimes stay the civil one so that the defendants can assert their Fifth Amendment rights in the criminal one without issue. *See SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375–76 (D.C. Cir. 1980). But the stay is not automatic. *See FTC. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 627 (6th Cir. 2014). Even when a defendant mentions his Fifth Amendment rights, a court must exercise its inherent stay power "with restraint and discretion." *See Roadway Esp., Inc. v. Piper*, 447 U.S. 752, 764 (1980); *see also Degen v. United States*, 517 U.S. 820, 823–24 (1996) ("Principles of deference counsel restraint in resorting to inherent power . . . and require its use to be a reasonable response to the problems and needs that provoke it."). And this makes sense. The Court's job is to move cases along, not to stop them. *See* Fed. R. Civ. P. 1. A court may stay the case "only when justice [] requires" because it is an "extraordinary remedy." *Chao v. Fleming*, 498 F. Supp. 2d 1034, 1037 (W.D. Mich. 2007).

Justice requires a stay when there is a "pressing need for delay" and "neither the other party nor the public will suffer harm." *See Ohio Envtl Council v. U.S. Dist. Court*, 565 F.2d 393, 396 (6th Cir. 1997). To evaluate whether that standard is met, courts generally balance six factors: (1) the overlap between the civil and criminal cases; (2) the status of the civil case; (3) the defendants' interests; (4) the plaintiffs' interests; (5) the court's interests; and (6) the public's interests. *FTC*, 767 F.3d at 627 (citing *Chao*, 498 F. Supp. 2d at 1037). The burden is on the parties seeking the stay to show that the balance weighs in their favor. *Ohio Envtl. Council*, 565 F.2d at 396.

First, courts will typically only stay proceedings if "the issues in the criminal case overlap with those in the civil case." *Chao*, 498 F. Supp. 2d at 1037. The overlap here is clear. The criminal indictment alleges the same facts as the relators' complaint: that Conn

and Daugherty conspired to fraudulently approve social security benefits and submit false forms to the government.  *See* R. 242-2 (indictment); R. 1 (complaint).  And the parties agree that the cases overlap.  R. 255; R. 244-1.  So the first factor is easily met.

Second, the case for a stay is most persuasive "where the defendant has already been indicted."  *Chao*, 498 F. Supp. 2d at 1037.  The risk of self-incrimination becomes greater, and the Speedy Trial Act ensures that the criminal case will be resolved quickly, thus reducing the delay to the civil case.  *Trustees of Plumbers & Pipefitters Nat'l Pension Fund. v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995).  Here, both defendants have been indicted.  R. 242-2.  So the second factor is also met.

The third factor considers the defendants' interests.  Specifically, courts "consider the extent to which the defendant[s'] Fifth Amendment rights are implicated" by the parallel cases.  *FTC*, 767 F.3d at 627 (quoting *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 344 (8th Cir. 1995)).  Without a stay, Conn says, he and Daugherty must choose between waiving their Fifth Amendment rights, or asserting them and losing the chance to testify in this case.  R. 266-1 at 6.  Thus, Conn asserts that the parallel proceedings undermine his Fifth Amendment rights.

But Conn's dilemma is not unusual.  Federal civil statutes "frequently overlap with the criminal laws."  *Dresser*, 628 F.2d at 1374.  So parallel civil and criminal proceedings are often a possibility.  *See id.*  Parallel proceedings are "unobjectionable" unless the movant can show "substantial prejudice to the rights of the parties involved."  *Id.*  And Conn does not allege any significant prejudice beyond the typical choice whether to invoke his Fifth Amendment rights—a choice defendants must often make, even in the absence of an extra civil proceeding.

15

Furthermore, there are other—less extraordinary—ways to avoid burdening the defendants' Fifth Amendment rights, such as protective orders or stays of certain depositions. Rejecting those suggestions, Conn asks for the nuclear option. R. 272 at 5. Yet he does not explain why those suggestions are inadequate. So the third factor does not weigh in favor of a stay.

Fourth, the plaintiffs have an interest in speedy review of their claims. *Chao*, 498 F. Supp. 2d at 1037. The government argues that the parallel proceedings run against that interest because, if the defendants take the Fifth, the government will be unable to effectively present its civil case. R. 242 at 8. But the government fails to explain how staying the entire civil case would definitively resolve this problem. The stay could—but would not necessarily—stop Conn from still taking the Fifth. He could do so for a variety of reasons unrelated to the parallel proceedings. Indeed, Conn was contemplating his decision long before the government even indicted him. *See* R. 202 (asking the Court to preemptively deny an adverse inference should he take the Fifth). The Court cannot grant an "extraordinary remedy" when the relief it provides is merely hypothetical. *Chao*, 498 F. Supp. 2d at 1037. Furthermore, the burden is ultimately on the government to prove its case using the available evidence. And it may rely on available evidence—other than the defendants' testimony—to do so.

On the other side, the relators have already incurred "significant costs" in litigating this case over the past five years. R. 255 at 10. Just as the government and defendants have interests, the relators have a "right to a determination of [their] rights . . . without . . . delay." *Ohio Envtl. Council*, 565 F.2d at 396. And yet, the end of the criminal proceedings is not in sight: Both Conn and Daugherty have agreed that the criminal case is complex and therefore

removed the case from the Speedy Trial Act's requirements. R. 255-2 at 3–6. Conn has even explained that "it is premature to make any reasonable estimate of the amount of time that will be necessary to prepare for [the criminal] trial." *Id.* at 6. The stay would therefore harm the relators for an immeasurable amount of time. Thus, the fourth factor weighs against a stay.

The fifth factor recognizes the interests of the Court. Courts have a duty to bring cases to a conclusion quickly and efficiently. *See* Fed. R. Civ. P. 1. For that reason, indefinite stays are disfavored. *See Landis*, 299 U.S. at 257 (reasoning that a stay is unlawful unless it is cabined within "reasonable limits"). The government and Conn essentially request an indefinite stay: The criminal case is not limited by the Speedy Trial Act, so the civil case could lie in hibernation with no hope of spring, or of a full and efficient resolution.

In response, Conn suggests that a stay would preserve judicial resources by saving the Court from a piecemeal analysis of his Fifth Amendment rights. R. 244-1 at 8. He also says that the criminal case might resolve important factual issues in this case. *Id.* Though the Court appreciates Conn's concern, the Court is capable of dealing with these common issues as they arise. Plus, the already significant and potentially indefinite delay overshadows Conn's concerns. Thus, the fifth factor weighs against a stay.

The final factor requires evaluating the potential public harm a stay might cause. The government and Conn argue that the criminal trial advances the same interests as this case. *E.g.*, R. 244-1 at 9. They therefore contend that the stay would benefit—not harm—the public interest because litigating in one venue—instead of two—is more efficient. R. 242. That may be true. But that slight benefit is not enough to overcome the prejudice on the other side of the equation. The Court must also consider the FCA's purpose. Congress

enacted the qui tam provisions to ensure civil enforcement of the FCA. *See* § 3730. And it chose to do so even though a criminal statute punishes similar offenses. *See* 18 U.S.C. § 287 ("False, fictitious or fraudulent claims"). Just as Congress has expressed an interest in efficiently enforcing the FCA, the public has a specific interest in vigorously exercising the enforcement rights that the FCA gives them. Staying these proceedings—after five years of toil—would frustrate that interest. Thus, the sixth factor weighs against a stay.

In sum, the first two factors weigh in favor of a stay, but the last four factors do not. The government and Conn have both alleged that the parallel proceedings compromise their interests and undermine their ability to litigate this case. But neither party alleges any harm distinct from or more severe than the typical pains of litigation. Defendants often must decide whether to take the Fifth, and Conn must do so regardless of whether the Court grants a stay. Likewise, the government often must litigate civil cases without the benefit of the defendant's testimony. Although parallel proceedings may further complicate these issues, that complication does not merit an "extraordinary remedy"—it simply requires a revised litigation strategy. By contrast, the potential harm to the other actors affected by this case—the relators, the legal system, and the public—is significant. Any further delay in this case will deny the relators, as well as the public, the opportunity to finally bring this enforcement action to a close. Thus, after balancing all of the interests, the Court will not grant the stay.

IV.

To conclude, even though the inherent stay power survives the FCA, the interests of justice do not require a stay in this case. The case must therefore move forward.

Accordingly, it is **ORDERED** as follows:

(1)     The government's motion to stay this case, R. 265, is **DENIED**.

(2) The defendants' motion to stay this case, R. 266, is **DENIED.**

(3) The defendants' objections, R. 272, to Magistrate Judge Edward Atkins's order denying Conn's motion for a protective order, R. 269, are **OVERRULED** as moot.

This the 9th day of September, 2016.

Signed By:
*Amul R. Thapar* AT
United States District Judge